UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 3:06CR96-W |
| v. | ) | |
| | ) | |
| (1) WILLIAM ROOSEVELT CLOUD | ) | **TRIAL BRIEF** |
| (5) JUDERITA RUSSELL | ) | |
| _____ | ) | |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF ANTICIPATED FACTS ...................................................... 2

        A.      The Fraudulent Flip.................................................................................. 2

                1.      Lie #1:  The Straw Buyer was Providing the Down-Payment....................3

                2.      Lie #2:  All Money Exchanged Between Cloud and the Straw Buyer
                        Was Listed on the HUD-1 Settlement Statement .........................................5

                3.      Lie #3:  The Straw Buyer Would Occupy the Property.............................6

                4.      Lie #4:  The Straw Buyer Was Renting His or Her Actual
                        Residence ....................................................................................................6

                5.      Lie #5:  Cloud owned the House as of the Date of the Appraisal and
                        Sales Contract .............................................................................................7

                6.      Lie #6:  The Straw Buyers Were Getting Gifts and Had Accounts
                        with Bank of America ..................................................................................7

        B.      The Underwriter in Their Pocket ........................................................... 8

III.    COUNT 1:  CONSPIRACY ............................................................................. 10

        A.      Agreement............................................................................................... 11

        B.      Knowing Participation ........................................................................... 12

        C.      Overt Act................................................................................................ 14

IV.     COUNTS 2-4:  MAIL FRAUD ........................................................................ 15

        A.      Knowing Participation in Scheme to Defraud ...................................... 15

        B.      Use of Mails to Execute Scheme .......................................................... 16

V.      COUNTS 5-26:  BANK FRAUD ..................................................................... 17

        A.      Scheme to Defraud Financial Institution .............................................. 18

        B.      Knowingly Execute or Attempt to Execute Scheme.............................. 19

Case 3:06-cr-00096-FDW-DSC   Document 126   Filed 10/02/07   Page 2 of 41

VI.      COUNT 27:  MONEY LAUNDERING CONSPIRACY ................................................ 20

      A.        Conspiracy ................................................................................................ 21

      B.        Knowingly Joined ..................................................................................... 22

      C.        No Overt Act Required ............................................................................. 22

VII.     COUNTS 28-33:  PROMOTIONAL MONEY LAUNDERING ..................................... 23

      A.        Financial Transaction Affecting Interstate Commerce ........................... 23

      B.        Proceeds of Specified Unlawful Activity ................................................ 24

      C.        Knowledge that Criminal Proceeds ........................................................ 25

      D.        Intent to Promote..................................................................................... 26

VIII.    COUNT 34:  MONEY LAUNDERING MORE THAN $10,000 ................................... 27

      A.        Knowingly................................................................................................. 28

      B.        Engaged in Monetary Transaction .......................................................... 28

      C.        Criminally Derived Property Valued at More Than $10,000 .............................. 28

IX.      EVIDENTIARY ISSUES ......................................................................................... 29

      A.        Admissions................................................................................................ 29

      B.        Defendants' Admission of Defendants' Out-of-Court Statements ...................... 29

      C.        Lay Witness Testimony as to Defendants' Mental States .................................. 30

      D.        Cross-Examination of Character Witnesses............................................. 31

      E.        Documentary Evidence ........................................................................... 32

           1.        Certified Copies ......................................................................... 32

           2.        Business Records ....................................................................... 32

           3.        Charts and Summaries ............................................................... 32

           4.        Demonstratives .......................................................................... 33

      F.        Summary Witnesses.................................................................................. 34

G.     Expert Testimony ........................................................................................... 35

H.     Rule on Witnesses ......................................................................................... 36

X.     CONCLUSION ..................................................................................................... 36

## I. INTRODUCTION

On September 27, 2007, the grand jury for the Western District of North Carolina returned a Thirty-Four Count Third Superseding Bill of Indictment against Defendants William Cloud and Juderita Russell.[1]  The Third Superseding Indictment alleges a broad-ranging mortgage fraud conspiracy involving at least sixteen co-conspirators who have accepted responsibility for their part in the mortgage fraud conspiracy by pleading guilty to Bills of Information or to prior versions of the Indictment.  Count One charges Defendants with a conspiracy in violation of 18 U.S.C. § 371.  Counts Two through Twenty-Six charge Defendants Cloud and/or Russell with substantive counts of mail fraud or bank fraud related to fraudulent real estate transactions in violation of 18 U.S.C. §§ 1341, 1344, and 2.  Count Twenty-Seven charges Defendants with a money-laundering conspiracy in violation of 18 U.S.C. § 1956(h) in relation to their receipt and use of the mortgage fraud proceeds.  Counts  Twenty-Eight through Thirty-Four charge Defendant Cloud with substantive money laundering counts in violation of 18 U.S.C. §§ 1956(a)(1), 1957, and 2.

The essence of the case is that Defendants lied to get money from banks in the form of mortgage loan proceeds.  Defendant Cloud was the ringleader, the organizer, and the individual who profited most from the scheme.  Defendant Russell was the insider who underwrote the fraudulent loans in exchange for cash and checks under-the-table.

---

[1]    A December 19, 2006 Second Superseding Indictment contained the same charges against Defendants, as well as against five co-conspirators.  These five co-conspirators, plus Maria Luz Vicera Cloud, Defendant Cloud's wife, were left off the Third Superseding Indictment because they all pled guilty and agreed to cooperate (with the exception of Defendant Hogan, who passed away).

Trial is currently scheduled to begin on October 9, 2007. Counsel for Defendant Cloud has informed the Government that Defendant Cloud is unlikely to stipulate to anything, including the admission of bank records. The Government anticipates at this time that its case-in-chief will take between ten and fifteen days.

## II.    STATEMENT OF ANTICIPATED FACTS

### A.    The Fraudulent Flip

The mortgage fraud scheme was strikingly simplistic. Defendant Cloud would purchase and then flip sell homes, usually the same day, stealing tens of thousands of dollars with each flip. Cloud did not sell these homes on the open real estate market. Rather, to ensure that he made Cloud and his co-conspirators called the "spread", Cloud would recruit a straw buyer to pretend to be a true buyer for the home.

Cloud recruited straw buyers himself, and with the help of Joseph Goines and Consolacion Wright. Both Goines and Wright have pled guilty for serving as recruiters for Cloud. Cloud generally promised such straw buyers that (a) they could buy an investment home with no money down; (b) Cloud would assist the straw buyers in renting out the home and later selling it at a profit; and (c) Cloud would pay the straw buyers at or near the time of closing for participating in the scheme.

Once recruited, Cloud would use the straw buyer's information to apply for a mortgage loan in the straw buyer's name. Once the loan proceeds were distributed, Cloud would collect such proceeds from that loan. To get the loan in the straw buyer's name, Cloud would and did tell any lie necessary. A few of the lies told most often are discussed below.

2

1.    Lie #1:  The Straw Buyer was Providing the Down-Payment

The most common lie Cloud told the lenders was that the straw buyers were providing the down payments themselves, and thus were investing their own money into these properties. Cloud told this lie in two ways and in two places.

First, Cloud lied about the down-payments on the loan applications in the straw buyer's names.  Cloud's practice was to initiate and direct the entire loan application process for the straw buyers.  Cloud would collect from the straw buyers their true financial information.  Then, Cloud would fill out the first draft of the fraudulent loan application himself, changing such true information to lies where necessary.  Then, Cloud would take the fraudulent loan application and accompanying documents (in the straw buyer's name) to a mortgage loan broker selected by Cloud.

Co-conspirators Daniel Greene and Kim Dauria were such brokers, both of whom have pled guilty and accepted responsibility for their role in the scheme.  Greene and Dauria then would type up the loan application Cloud gave them.  In most cases, the straw buyer would sign the loan application at the closing -- often seeing it for the first time at the closing.  However, in some cases, Cloud even forged the straw buyer's name on the applications and in other places. Often, during the closing papers were pushed in front of the straw buyers so rapidly that they did not even realize that they were buying the property from Cloud.  Instead, they thought Cloud was serving a role akin to a real estate agent.

Cloud fraudulently ensured that each of the loan applications stated that the straw buyer would be providing a substantial amount of money as a down-payment for the closing.  This, however, was a lie.  As Cloud then well knew, he himself would be providing the down-payment on behalf of the straw buyer or would repay the straw buyer for the down-payment shortly after

the closing. Indeed, Cloud had promised the straw buyers that they would not have to put money down to buy these houses. Thus, the down-payment was coming from the *seller* of the properties -- not the buyer -- who himself generally had bought the properties the same day. Accordingly, although the lenders believed that the straw buyers were investing their own money in these properties, their reliance on such was based on a lie propounded by Cloud.

<u>Second</u>, Cloud lied about the down-payments on the HUD-1 Settlement Statements. To disguise the true source of the down-payments, Cloud generally would obtain a cashier's check or money order in the straw buyer's name for the expected amount of the down-payment. Cloud would then provide this cashier's check to the closing attorney to be included in the closing file to make it look as though the down-payment had been provided by the straw buyer, rather than Cloud himself. In other circumstances, Cloud would ask the straw buyer to provide the down-payment money, and then would immediately repay the straw buyer following the closing with the proceeds of the fraud.

In all cases, the Settlement Statement fraudulently would list a specific down-payment as having been provided by the straw buyer. Cloud knew this was false, because he himself had provided those funds. Nevertheless, Cloud would sign the Settlement Statement to falsely certify that the funds actually had come from the straw buyer and not him, *i.e.*, that Cloud had "carefully reviewed the HUD-1 Settlement Statement and to the best of [his] knowledge and belief it [was] a true and accurate statement of all the receipts and disbursements made on [Cloud's] account or by [Cloud] in this transaction." The lenders relied on Cloud's certification here as well. However, it, too, was a lie.

2.     <u>Lie #2: All Money Exchanged Between Cloud and the Straw Buyer Was Listed on the HUD-1 Settlement Statement</u>

A second common lie Cloud told the lenders was that no (other) money had passed from Cloud to the straw buyers. As noted, the HUD-1 Settlement Statements required that the parties list all money changing hands in connection with the closing, as well as "all the receipts and disbursements made on [Cloud's] account or by [Cloud]." Cloud falsely certified that all such money that would change hands was listed on the HUD-1.

However, a consistent lie on each of the Settlement Statements was that even though Cloud certified that all funds that changed hands were listed, in truth, Cloud knew that the "incentive payments" Cloud made to the straw buyers was omitted. As part of his pitch to the straw buyers, Cloud generally promised the straw buyers that they would get approximately $5,000 for each loan closed in their name. Although Cloud often cheated the straw buyers by paying them less than promised, he almost always paid them something. But those payments were never listed on the HUD-1 Settlement Statements. Former Attorneys John Lee and Leon Orr have pled guilty for their role in the scheme which involved, among other things, helping to falsify the Settlement Statements. Thus, although the lenders thought that the straw buyers were purchasing these homes of their own volition, the truth was that Cloud was paying them to participate. The straw buyers were not buying these homes to live in, and they were not even buying them of their own accord as investment properties. The straw buyers were getting "paid to play." Cloud lied by omitting those payments to the straw buyers from the Settlement Statements.

### 3. Lie #3: The Straw Buyer Would Occupy the Property

Another frequent lie was that the straw buyer was purchasing the house as a primary residence. If a loan was closed as "primary residence" or "secondary residence" purchase, Cloud generally could put down a lesser fraudulent down-payment (again, which was falsely represented as coming from the straw buyer). This allowed Cloud to perpetrate the fraud with less money out of pocket up front, or fewer "expenses."

Accordingly, Cloud caused the loan applications to state falsely that the straw buyer would be living in the house as a primary or secondary residence. (The deed of trust also would falsely list the purchase as a primary or secondary residence.) The loan applications often were accompanied by fraudulent occupancy affidavits, on which Cloud sometimes would forge the straw buyer's signature. Thus, in many cases,[2] the lenders believed that Cloud's straw buyers would occupy the properties as a primary or secondary home. However, this, too, was a lie.

### 4. Lie #4: The Straw Buyer Was Renting His or Her Actual Residence

To back-up the lie that the straw buyer would be living in the house, Cloud needed another lie -- this time about the status of the straw buyer's actual residence. This was because the loan application could not suggest that the straw buyer would be living in two primary residences at the same time. Cloud's solution was to lie on the loan application, falsely stating that the straw buyer was renting out his or her actual residence. Indeed, in some cases Cloud went so far as to fabricate a bogus rental agreement for the straw buyer's actual house, which

---

[2] In most cases, the straw buyers would purchase multiple houses from Cloud. When a straw buyer was listed as buying multiple houses, the conspirators often agreed that it would be too risky to list every house bought by the straw buyer as a primary or secondary residence. Thus, many later purchases in the name of the straw buyers are listed as investment purchases for this and other reasons.

Cloud would provide to the mortgage broker. In nearly every case, Cloud forged the buyer's name (as "landlord") on these bogus rental agreements. Thus, although the lenders believed in these cases that the straw buyer was renting his or her actual residence and would be deriving income from this rental of his or her own house, this, too, was a lie.

5.      Lie #5: Cloud owned the House as of the Date of the Appraisal and Sales Contract

Another frequent lie was aimed at hiding the flip and at convincing the lender that the house being purchased by the straw buyer had a "seasoned" title. Recall that most of these flips occurred on the same day, often within minutes of each other. Cloud needed to keep this fact a secret. Thus, Cloud generally would execute sales contracts with the straw buyers to sell houses he did not even yet own. Similarly, Cloud generally would ensure that the appraisals falsely listed him as the owner of the house, long before he actually had purchased it. Additionally, the title binder sent to the lender would falsely show Cloud as owning the property long before he actually had purchased it. Cloud utilized this practice to hide from the lender that he was flipping such properties -- usually the same day. Accordingly, although the lenders believed that Cloud was the owner of the houses at the time of the appraisals and sales contracts, this, too, was a lie.

6.      Lie #6: The Straw Buyers Were Getting Gifts and Had Accounts with Bank of America

Cloud also lied to the lenders about the resources of his straw buyers. Two of the more blatant lies involved the available resources of the straw buyers. In some cases, the mortgage brokers informed Cloud that the straw buyers were not listed as having enough resources to cover the fictional down-payment that they were supposed to be providing, or that the straw

buyers otherwise did not have enough resources listed to get the loan. Cloud generally had two fraudulent remedies for this problem.

One fraudulent option Cloud chose was to fabricate a fictional gift letter from some relative of the straw buyer. The gift letter would falsely state that the relative was providing some amount of money to the straw buyer for the closing when, in truth, the straw buyer never had any intention of getting such a gift. Rather, the straw buyer expected Cloud to pay their down-payment and to pay them for engaging in the transaction at all. This expectation was met, and Cloud paid all such money for the straw buyer without the need for any gift.

Another fraudulent option Cloud chose was to falsely claim that the buyer had a large amount of money on deposit with Bank of America. As back-up for this fictitious claim, Cloud utilized a phony verification of deposit purportedly signed by Amy Phillips. Amy Phillips has pled guilty to her involvement in this mortgage fraud scheme. Thus, although the lenders thought these buyers had sufficient resources, this, too, was a lie.

**B.      The Underwriter in Their Pocket**

Cloud utilized an underwriter on the inside to push through his fraudulent loan applications to Chase Manhattan Mortgage Company. If the loan applications had been flagged by the underwriter as fraudulent, the loan proceeds would not have been distributed, and Cloud would not have gotten paid. Juderita Russell, a contract underwriter for Chase Manhattan Mortgage Company, happily obliged and joined the conspiracy.

Defendant Russell was brought into the conspiracy by co-conspirator Daniel Greene, who has pled guilty and accepted responsibility for his involvement in the conspiracy. Early in their relationship, Greene gave Russell money for specific things like medical bills. This was a clear conflict of interest because Russell's job as an underwriter was to scrutinize the loan applications

8

that mortgage broker Greene submitted for, among other things, signs of fraud. Had Russell informed her employer that she was getting money for any reason from a mortgage broker, she instantly would have been fired.

As their relationship progressed, Russell got bolder, and greedier. Indeed, Russell specifically demanded that Greene pay Russell on a transactional basis for each fraudulent loan she approved. Russell affirmed this demand in front of other co-conspirators. The average payment ranged from $500 to $2,000. Russell got paid under the table, and only if the fraudulent loan was approved. If the loan was not approved, she did not get paid. Of course, Russell also did not report to her employer these under-the-table transactional payments.

Russell confessed when she was arrested, after waiving her rights in writing. She admitted that she had been receiving money from Greene. She confessed that she knew that some of the loan applications she underwrote for Greene contained false information. Russell also admitted that normally, she would have gone to her manager and informed that loan applications like those submitted by Greene looked "funny." However, Russell admitted that she did not do so for Greene's loans. Russell specifically admitted that the phony verifications of deposits from Bank of America listing Amy Phillips as verifier looked suspicious to her. Russell confessed that the she knew there was a possibility that verifications of employment submitted by conspirators would fall through if checked on, and so she did not check on them. Russell also confessed that she knew, on one or two loans she underwrote, that the loans were processed as primary residence purchases when she knew that was not true. Co-conspirators also will testify about Greene's arrangement with Russell, and the money paid to ensure that fraudulent loan applications underwritten by Russell would be approved.

Russell's bank records will verify Greene's testimony. They show over $40,000 in under-the-table checks from Greene to Russell personally between April 2001 and July 2003. They likewise show over $40,000 in cash deposits during that period, with Russell sometimes going back to the bank twice in one day to deposit cash. Indeed, some days Russell brought as much as $4,000 in cold, hard cash to the bank to deposit into her account.

Russell's bank records also show that co-conspirator Greene was not her only under-the-table customer. She also received numerous checks, made out to her personally, from mortgage brokers in Georgia who submitted fraudulent loan applications to Chase. None of these payments were permitted by her employer's ethics policy, of course -- no matter the reason. Nor were any reported on her income tax returns.

## III.    COUNT 1:  CONSPIRACY

Defendants are charged in Count One with conspiracy to make false statements to financial institutions, and to commit mail fraud, wire fraud, and bank fraud in furtherance of their scheme to defraud home mortgage lenders, in violation of Title 18, United States Code, Section 371. That statute provides as follows:

> If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a felony].

"As a general proposition, the elements of a conspiracy offense are: an agreement among the defendants to do something which the law prohibits; knowing and willing participation by the defendants in the agreement; and an overt act by the defendants in furtherance of the purpose of the agreement." *United States v. Hedgepeth*, 418 F.3d 411, 420 (4th Cir. 2005).

10

## A.    Agreement

The Government first must prove that an agreement existed to do something which the law prohibits. *Id.* Although the agreement is the heart of the crime of conspiracy, the agreement need not be expressly stated or be in writing or cover all of the details of its execution. "It is not necessary to prove a formal agreement to establish a conspiracy in violation of federal law; a tacit or mutual understanding among or between the parties will suffice." *United States v. Depew*, 932 F.2d 324, 326 (4th Cir. 1991) (quotation omitted); *see Ianelli v. United States*, 420 U.S. 770, 777 & n.10 (1975) ("a tacit understanding is sufficient."). The existence of the agreement may be proved by inference from the actions and statements of the conspirators themselves, and from the circumstances of the particular scheme. *Glasser v. United States*, 315 U.S. 60, 80 (1942). Likewise, proof of the agreement "need not be direct, but may be inferred from circumstantial evidence. Moreover, once a conspiracy is established, even a slight connection between a defendant and the conspiracy is sufficient to include him in the plan." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (quotation omitted).[3] As the Fourth Circuit has summarized:

> The gravamen of the crime of conspiracy is an *agreement* to effectuate a criminal act. By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement. Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced. Indeed, a conspiracy may be proved wholly by circumstantial evidence. Circumstantial evidence tending to prove a conspiracy may consist of a defendant's relationship with other members of the

---

[3]    As discussed in more detail in the Government's response to the motion to dismiss for duplicity (Docket No. 104), "[t]he Supreme Court has expressly rejected the contention that such a count, containing allegations of a single conspiracy to commit two or more separate crimes, is duplicitous." *United States v. Marshall*, 332 F.3d 254, 262 (4th Cir. 2003); *see Braverman v. United States,* 317 U.S. 49, 54 (1942); *Griffin v. United States*, 502 U.S. 46 (1991); *Center v. United States*, 96 F.2d 127, 130 (4th Cir. 1938).

conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy. A conspiracy, therefore, may be inferred from a development and collocation of circumstances. Circumstantial evidence sufficient to support a conspiracy conviction need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt.

*United States v. Burgos*, 94 F.3d 849, 857-58 (4th Cir. 1996) (quotations omitted).

Here, the evidence will be overwhelming that Defendants entered into an agreement with others to defraud lenders. Approximately sixteen co-conspirators already have pled guilty to their involvement in this mortgage fraud scheme, and are available to testify as to the existence of the agreement. Most had a direct agreement or understanding with Cloud himself to defraud lenders. And, although Russell dealt primarily with co-conspirator Greene, co-conspirators Donald Henderson, Kenneth Strong, and William Phillips also are available to testify regarding statements Russell made to them that demonstrate her involvement in the conspiracy. Thus, there should be no dispute at trial regarding the first element, or as to the existence of the conspiracy.

**B.    Knowing Participation**

The Government must also prove "knowing and willing participation by the defendants in the agreement." *Hedgepeth*, 418 F.3d at 420. Whether their participation in the conspiracy was willing and voluntary should be a non-issue in the trial. There can be little argument that Cloud or Russell was an involuntary member of the conspiracy. No mind control or coercion is present in this case. Rather, the crux of this case likely will center on whether Cloud and Russell were *knowing* participants in the conspiracy. Both Defendants likely will argue that they were unwitting participants who were duped, and ignorant of the fraudulent aims of the conspiracy.

12

The Government may prove knowledge by willful blindness, although such hardly will be necessary here. "The government can satisfy the knowledge requirement by showing either that [the defendant] actually knew of the conspiracy, or that he was willfully blind to it by purposely closing his eyes to avoid knowing what was taking place around him." *United States v. McIver*, 470 F.3d 550, 563-64 (4th Cir. 2006) (quotation omitted). Likewise, the Fourth Circuit has recognized that "conspiracy can have an elusive quality and that a defendant may be convicted of conspiracy with little or no knowledge of the entire breadth of the criminal enterprise." *Burgos*, 94 F.3d at 858.

Put simply, "the Government need not prove that the defendant knew the particulars of the conspiracy or all of his coconspirators. Indeed, a defendant properly may be convicted of conspiracy 'without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part.'" *Burgos*, 94 F.3d at 858 *(quoting United States v. Roberts,* 881 F.2d 95, 101 (4th Cir.1989) (quotation omitted); *see also See United States v. Morsley*, 64 F.3d 907, 919 (4th Cir. 1995) ("A conspirator need not have had actual knowledge of the co-conspirators or of the details of the conspiracy.").

There will be more than enough evidence to show that Cloud and Russell were knowing participants in the conspiracy. As discussed above, and among other things, Cloud was the ringleader for the conspiracy. He found the straw buyers, paid them to lend their names and credit to the scheme, collected their financial information, and worked with the mortgage brokers to falsify the straw buyer's information. Cloud provided the down-payment checks to the

13

closing attorneys, deliberately marking them with the straw buyer's names in order to conceal the true source of the down-payments. Indeed, Cloud even signed the Settlement Statements, knowing they did not accurately list all the money he had paid out. Russell received a considerable amount of under-the table cash from Greene for her involvement, in clear violation of her duties as an underwriter. Proof of knowledge should be overwhelming.

### C.    Overt Act

To establish a conspiracy under Section 371, the Government must prove that at least one overt act was committed in furtherance of the conspiracy. The proof of an overt act thus shows that the conspiracy is active, and not just an idle agreement. *United States v. Yates*, 354 U.S. 298, 334 (1957). An overt act is any act done by any member of the conspiracy for the purpose of carrying out or accomplishing the objects of the conspiracy, and need not itself be a criminal act. *United States v. Falcone*, 311 U.S. 205, 207 (1940). The Government is not required to prove all of the overt acts alleged in the indictment; proof of a single overt act is legally sufficient. *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005) ("[E]ach co-conspirator need not take an overt act in order to be convicted of conspiracy so long as one conspirator does so.").

Likewise, the Government may prove at trial overt acts other than and in addition to those charged in the indictment. As the Fourth Circuit has made clear, "[i]t is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) (reversing district court's ruling that Government's proof would be limited). In this case, the Third Superseding

14

Indictment alleges numerous overt acts, including those discussed above, and the Government

intends to introduce documentary and testimonial evidence in support of more than one overt act.

There should be no real issue at trial about whether one of the co-conspirators committed

an overt act in furtherance of the conspiracy. Numerous co-conspirators will testify that they

themselves committed such an overt act. And literally hundreds of documents, in addition to

such testimony, will demonstrate that Cloud and Russell themselves committed overt acts.

## IV.    COUNTS 2-4:  MAIL FRAUD

Counts Two through Four charge Defendants with committing or aiding and abetting

mail fraud in violation of Title 18, United States Code, Sections 1341 and 2. Section 1341

provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud,
> or for obtaining money or property by means of false or fraudulent pretenses . . .
> for the purpose of executing such scheme or artifice or attempting so to do, places
> in any post office or authorized depository for mail matter, any matter or thing
> whatever to be sent or delivered by the Postal Service, or deposits or causes to be
> deposited any matter or thing whatever to be sent or delivered by any private or
> commercial interstate carrier [is guilty of a felony].

18 U.S.C. § 1341. The Fourth Circuit has held that there are "two essential elements" to mail

fraud. *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). "In order to prove mail fraud,

the Government must prove that the defendant (1) knowingly participated in a scheme to defraud

and (2) mailed, or caused to be mailed, anything for the purpose of executing such scheme."

*United States v. Pierce*, 409 F.3d 228, 232 (4th Cir. 2005).

### A.    Knowing Participation in Scheme to Defraud

The Government first must prove that Defendants knowingly participated in a scheme to

defraud. Of course, the scheme to defraud here is the same scheme alleged to have been the

subject of the conspiracy. Likewise, proof of the Defendants' knowing participation in the

scheme to defraud is the same as the proof that Defendants were knowing participants in the conspiracy. Accordingly, the points made above are not repeated here.

**B.** **Use of Mails to Execute Scheme**

The Government also must prove use of the mails or a private carrier to execute the scheme. The Fourth Circuit has explained that "a person 'causes' the mails to be used when he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pierce*, 409 F.3d at 232 (quotation omitted). "[U]se of the mails does not need to be an essential part of the fraudulent scheme." *United States v. Edwards*, 188 F.3d 230, 235 (4th Cir. 1999). It is enough that the mailing be "incident to an essential part of the scheme, or a step in the plot," *Schmuck v. United States,* 489 U.S. 705, 711 (1989) (quotations omitted); *United States v. Pierce*, 409 F.3d 228, 232 (4th Cir. 2005) (quotation omitted) ("Importantly, the use of the mails need not [itself] be an essential element of the scheme."). Here, both Cloud and Russell knew that the final closing documents would be mailed to the defrauded lender following the closing, and after the loan proceeds were distributed. There also were numerous other mailings in furtherance of the scheme to defraud.

Any argument from Cloud or Russell that they did not mail anything personally would be irrelevant. As the Fourth Circuit has explained, "[t]he government need not show that [the defendant] mailed anything himself, nor that he intended the mails be used to carry out the fraud." *United States v. Locklear*, 829 F.2d 1314, 1318 (4th Cir. 1987). Rather, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* Here, both Defendants knew that document would be

16

mailed in the ordinary course of applying for a loan, obtaining the loan, and distributing the HUD-1 Settlement Statements.

## V.     COUNTS 5-26:  BANK FRAUD

Counts Five through Twenty-Six charge Defendants with bank fraud in violation of Title 18, Sections 1344 and 2.  "Section 1344 was intended to fill in serious gaps in Federal jurisdiction in order to ensure the effective prosecution of fraudulent schemes targeted at financial institutions.  It was modeled on the wire [18 U.S.C. § 1343] and mail [18 U.S.C. § 1341] fraud statutes, which, Congress noted, the courts had construed broadly."  *United States v. Colton*, 231 F.3d 890, 897 (4th Cir. 2000) (quotation omitted).  The statute provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution or to obtain any of the moneys, funds . . . or other property . . . of a financial institution . . . by means of false or fraudulent . . . representations [is guilty of a crime].

18 U.S.C. § 1344.  To prove a violation of Section 1344, "the government must demonstrate that the accused (1) executed a scheme to defraud a federally insured or chartered bank and (2) that the accused did so knowingly."  *Id*. (numbering added).[4]

---

[4]     "The two subsections contained in § 1344 proscribe slightly different conduct, but a person may commit bank fraud by violating either subsection."  *United States. v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002).  The Third Superseding Indictment here alleges a violation of both subsections of Section 1344 by stating that Defendants (1) "did knowingly execute and attempt to execute a scheme and artifice to defraud;" and (2) "to obtain by means of false and fraudulent pretenses, representations, and promises," money and funds under the control of the financial institution.  *See id.* at 314 ("Where a statute specifies several alternative ways in which an offense can be committed, the indictment may allege the several ways in the conjunctive, and a conviction thereon will stand if proof of one or more of the means of commission is sufficient.") (quotation omitted).  This Trial Brief lingers on the law of Section 1344(1), which is more ambiguous than Section 1344(2) because Section 1344(2) straightforwardly deals with false statements to banks rather than the more amorphous "scheme to defraud."

## A.    Scheme to Defraud Financial Institution

Little need be said about the law regarding schemes to defraud financial institutions; the law mirrors schemes to defraud using the mails.  The Court should note, however, that although the instant scheme involved numerous affirmatively false statements, active concealment is equivalent to false representations under the statute.  As the Fourth Circuit has explained,

> [C]oncealment is 'equivalent to a false representation' and so appropriately forms the basis for a common law fraud action: the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff.

*United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000) (upholding conviction under 18 U.S.C. § 1344) (quotation omitted).  "[E]ven absent an independent duty to disclose, misleading or deceitful conduct designed to conceal material information from a financial institution violates the [bank fraud] statute."  *United States v. Cotton*, 231 F.3d 890, 894 (4th Cir. 2000) (rejecting as a "cramped construction of the bank fraud statute," defendant's argument that "because the government offered no evidence that he made any affirmative representations or breached any fiduciary, statutory, or other independent legal duty to disclose information, he cannot be held to have violated the federal bank fraud statute.").

Moreover, although there must be a scheme to defraud, "[t]he bank need not be the immediate victim of the fraudulent scheme, and the victim bank need not have suffered an actual loss; it is sufficient for the government to show that a financial

institution was exposed to an actual or potential risk of loss." *United States v. Brandon*, 298 F.3d 307, 312 (4th Cir. 2002).

The single scheme to defraud here properly gives rise to the multiple counts alleged in Counts Five through Twenty-Six. "Section 1344 authorizes prosecution for each *execution* of a scheme to defraud a financial institution, *not* each act in furtherance of such a scheme. A single scheme can, however, be executed a number of times." *United States v. Colton*, 231 F.3d 890, 909 (4th Cir. 2000) (quotation omitted). "[C]ourts have found each in a series of . . . separate loans . . . to be a separate execution of a bank fraud scheme properly chargeable in a separate count of the indictment, even though each was a part of a single scheme to defraud a single financial institution." *Id.*

Each of the financial institutions here were federally insured and the fraudulent loan applications were submitted directly to them or to their wholly owned subsidiaries. *United States v. Walsh*, 75 F.3d 1, 9 (1st Cir. 1996) (noting that "a defendant can violate section 1344 by submitting the dishonest loan application to an entity which is not itself a federally insured institution . . . [such as] a wholly owned subsidiary of" a federally insured institution); *United States v. Pelullo*, 964 F.2d 193, 215 (3rd Cir. 1992) (wholly owned subsidiary of federally insured bank is a "financial institution" for purposes of Section 1343); *see also United States v. Gallop*, 838 F.2d 105, 112 (4th Cir. 1988) (upholding bank robbery conviction with testimony allowing jury to infer that uninsured robbed entity was a subsidiary of federally insured bank).

## B. Knowingly Execute or Attempt to Execute Scheme

As with the mail fraud statute, the Government must prove that Defendants knowingly participated in a scheme to defraud financial institutions. However, "[t]he government does not have to show that the defendant knew which particular bank might be injured or that it was

federally insured." *United States v. Edelkind*, 467 F.3d 791, 797 (1st Cir. 2006). "The statute gives fair warning that bank fraud is unlawful: one who defrauds a bank simply assumes the risk that the victim is federally insured." *Id.*; *see United States v. Linville*, 228 F.3d 1330, 1332 (11th Cir. 2000) ("A bank is a possible victim, of course, but so are other persons, because the fraudulent scheme need only be 'to obtain money, funds, or credits *under the custody or control* of a federally insured financial institution.'").

Of course, the scheme to defraud here is the same scheme alleged to have been the subject of the conspiracy. Likewise, proof of the Defendants' knowing participation in the scheme to defraud is the same as the proof that Defendants were knowing participants in the conspiracy. Accordingly, the points made above are not repeated here.

## VI.     COUNT 27:  MONEY LAUNDERING CONSPIRACY

Count Twenty-Seven charges Defendants with participating in a money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h). That statute provides:

> Any person who conspires to commit any offense defined in this section [Section 1956] or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956(h). The Fourth Circuit has held that "[T]o prove that [the defendants] participated in a conspiracy to launder money, the government must show 'that (1) a conspiracy to commit . . . money laundering was in existence, and (2) that during the conspiracy, the defendant[s] knew that the proceeds . . . had been derived from an illegal activity, and knowingly joined in the conspiracy.'" *United States v. Wemmering*, No. 06-4153, 2007 WL 2022052 (4th Cir. July 12, 2007) (unpublished) (quoting *United States v. Alerre,* 430 F.3d 681, 693-94 (4th Cir. 2005)); *see United States v. Diamond,* 378 F.3d 720, 727 (7th Cir. 2004) ("To convict a defendant of conspiracy to commit money laundering, the government must show the defendant

20

was involved with two or more people to launder money and that the defendant knew the proceeds used to further the scheme were derived from an illegal activity.").

## A. Conspiracy

To prove a violation of Section 1956, the Government first must prove that a conspiracy to commit money laundering was in existence. Here, the indictment properly alleges that the conspiracy had as its objects both a violation of Section 1956(a) and Section 1957. Thus, the conspiracy here alleges multiple objects. *United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003) (quotation omitted) (noting that the indictment was "not required to allege the specific type of money laundering the [defendants] conspired to commit; it was simply alleging a multiple-object conspiracy . . . . [T]he convictions could be sustained if the defendants knowingly and intentionally committed acts furthering any of the three objects of the conspiracy.").

The evidence will show that such a conspiracy was in effect. The co-conspirators will testify about how the proceeds of the mortgage fraud scheme were used both to promote the scheme, and how they often engaged in transactions of amounts greater than $10,000 with the proceeds of the fraud. Defendant Cloud agreed with co-conspirators such as Kenneth Strong, William Philipps, John Lee, Kim Dauria, and Daniel Greene to use the proceeds of the scheme to further the scheme by, among other things, paying the recruiters to recruit straw buyers, paying the straw buyers for participating in the scheme, paying the mortgage brokers for participating in the scheme, reimbursing co-conspirators for money borrowed to make the fraudulent down-payments that were supposedly made by the straw buyers, and making lulling mortgage payments to or on behalf of the straw buyers. Likewise, Defendant Russell demanded, and received, tens of thousands of dollars of illegal proceeds as payment for her role in the scheme,

and as an incentive for her continuing participation in the scheme. Thus, there should be little question that a money-laundering conspiracy was in effect.

### B. Knowingly Joined

The Government also must prove that Defendants knowingly joined the money-laundering conspiracy, knowing that it involved proceeds derived from some illegal activity. This is easily proved here. Defendant Cloud, of course, was the ringleader. He orchestrated the straw buyers, paid them himself after the closings, prepared their fraudulent loan applications, prepared and forged their names to false documents in support of the fraudulent loan applications, and hid the true source of the down-payments.

Russell likewise knew that her pay-offs were derived from illegal money. She received her money on a transactional basis, nearly always after the fraudulent loan proceeds were distributed. She did not get paid if the loan application did not go through. Russell admitted that she knew the loan applications contained false information, and she deposited tens of thousands of dollars in checks and cash into her bank account without declaring such funds on her tax returns. Thus, the evidence will be more than sufficient to show that the Defendants joined the conspiracy knowingly.

### C. No Overt Act Required

The Fourth Circuit is clear that "§ 1956(h) does not require an overt act to be either alleged or proven." *United States v. Bolden*, 325 F.3d 471, 491 (4th Cir. 2003). Nevertheless, the jury will hear evidence of several overt acts in furtherance of the money-laundering conspiracy, including the substantive money-laundering counts discussed below.

22

**VII.    COUNTS 28-33:  PROMOTIONAL MONEY LAUNDERING**

Counts Twenty-Eight through Thirty-Three charge Defendant Cloud only with substantive counts of what is commonly called "promotional" money-laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).  The statute provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity [shall be guilty of a felony].

18 U.S.C. § 1956(a)(1)(A)(i).  The Fourth Circuit has clarified that "[a] money laundering conviction under 18 U.S.C. § 1956 requires:  (1) that the defendant conduct a financial transaction with at least a *de minimis* effect on interstate commerce; (2) that the transaction involved the proceeds of a specified unlawful activity; (3) that the defendant knew that those proceeds were derived from that specific unlawful activity; and (4) that the defendant engaged in the transaction intending to promote that unlawful activity."  *United States v. Bollin*, 264 F.3d 391, 408 (4th Cir. 2001).

**A.    Financial Transaction Affecting Interstate Commerce**

The evidence must establish that the financial transaction have "at least a *de minimis* effect on interstate commerce." *Bollin*, 264 F.3d at 408.  However, the Second Circuit has explained that "the interstate commerce element of the money laundering statute . . . is jurisdictional in nature. . . . [T]he statute's requirement that the questioned activity 'affect commerce' in 'any way or degree' signals Congress's desire to exercise the full extent of its Commerce Clause power.  Hence, the government's burden is not heavy." *United States v. Gotti*, 459 F.3d 296, 336 (2d Cir. 2006).  This *de minimis* affect on interstate commerce will be

established by the fact that the proceeds laundered here were obtained from institutions doing business in interstate commerce.

**B.      Proceeds of Specified Unlawful Activity**

The Government also must prove that that "the transaction involved the proceeds of a specified unlawful activity." *Bollin*, 264 F.3d at 408.  Bank fraud, mail fraud, wire fraud, and making false statements to financial institutions are all specified unlawful activities.  Defendants Cloud and Russell are both charged with substantive bank fraud and mail fraud counts.  However, "details about the nature of the unlawful activity underlying the [money laundering] need not be alleged." *United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003). In addition, it should be "clear that a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful activity." *United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003).

The Government will show here that the money involved in Counts Twenty-Eight through Thirty-Three was derived from the mortgage fraud scheme in violation of the bank fraud, mail fraud, wire fraud, and false statements to financial institutions statutes.  Defendant Cloud paid his recruiters and straw buyers, and repaid co-conspirator Strong, with the proceeds of the fraud after the completion of the relevant transactions.  Indeed, the only source of income for Defendant Cloud in 2001 and 2002 was his mortgage fraud scheme.  Thus, all such funds were derived from this scheme.  The Fourth Circuit has been clear that "[a]lthough Section 1956(a)(1)(A)(i) requires proof that illegal proceeds were spent in furtherance of the specified unlawful activity . . . . it does not require that the government trace the money . . . to a particular illegal . . . transaction." *United States v. Stewart*, 256 F.3d 231, 249 (4th Cir. 2001).

24

The Fourth Circuit also has explained that "the money laundering statute does not require the underlying criminal activity be completed prior to the money laundering transactions. Thus, the key inquiry is not whether the specified unlawful activity was completed prior to the alleged money laundering transaction. Instead, we must determine whether the specified unlawful activity generated proceeds prior to the money laundering, and whether the money laundering actually involved those criminally-derived proceeds." *United States v. Bolden*, 325 F.3d 471, 487-88 (4th Cir. 2003); *see United States v. Butler,* 211 F.3d 826, 829 (4th Cir. 2000) ("Funds are criminally derived if they are derived from an already completed offense, *or* a completed phase of an ongoing offense." (internal quotation omitted) (emphasis added)). In this case, all such funds were immediately derived from funds obtained from financial institutions following the submission of false loan applications, and, regardless, all of Defendant Cloud's funds earned during this period were derived from the mortgage fraud scheme.

### C.      Knowledge that Criminal Proceeds

"A defendant must have subjective knowledge that the funds were the proceeds of unlawful activity." *United States v. Campbell,* 977 F.2d 854, 857 (4th Cir .1992). However, "the government need only prove that [the defendant] knew that the property represented the proceeds of *some form* of unlawful activity . . . though not necessarily which form, of criminal activity." *United States v. Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997) (quotations omitted). This is because "Section 1956 . . . takes dead aim at the attempt to launder dirty money. Why and how that money got dirty is defined in other statutes. . . . The precise nature of the unlawful source . . . is an inconsequential detail that the defendant need not have known." Id. at 1527 (quotations omitted). Indeed, the defendant satisfies the knowledge requirement even if he

Case 3:06-cr-00096-FDW-DSC   Document 126   Filed 10/02/07   Page 29 of 41

believed that the funds derived from *misdemeanor* criminal activity. *United States v. Hill*, 167 F.3d 1055, 1067 (6th Cir. 1999).

Moreover, a defendant may be found guilty of promotional money laundering on a willful blindness theory. *United States v. Collins*, 372 F.3d 629, 634 (4th Cir. 2004) (holding that "the jury could find Defendants guilty if it found that they 'actually knew' the financial transaction involved proceeds from unlawful activity or if they were 'willfully blind' to this fact"); *United States v. Campbell,* 977 F.2d 854, 857-59 (4th Cir.1992) (holding that while "the [money laundering] statute requires actual subjective knowledge . . . this requirement is softened somewhat by the doctrine of willful blindness"). Here, since Defendant Cloud was the ringleader of the mortgage fraud conspiracy, and knew that the money he himself was distributing to promote that conspiracy was derived from the conspiracy, the jury should have little trouble concluding that this element is satisfied.

### D.     Intent to Promote

The Government also must prove "that the defendant engaged in the transaction intending to promote that unlawful activity." *Bollin*, 264 F.3d at 408. Here, it should be clear that the transactions charged as promotional money laundering satisfy this element. Counts Twenty-Eight and Thirty both represent payments to Joseph Goines in exchange for Goines' recruitment of straw buyers for the scheme. Count Thirty represents Defendant Cloud's repayment of a loan that he received from co-conspirator Strong to purchase a down-payment check that was fraudulently listed as having been provided by a straw buyer. Counts Twenty-Nine and Thirty-Two represent payments to the straw buyers in exchange for them lending their name and credit to the scheme. And Count Thirty-Three represents a lulling payment to a straw buyer.

26

These payments to co-conspirators and the straw buyers obviously constitute promotional money laundering. "[W]hen proceeds are used in a transaction to commit the next step in a scheme to defraud, it is clear that the financial transaction advances and furthers the progress of the next step." *United States v. Godwin*, 272 F.3d 659, 669 (4th Cir. 2001) (quotation omitted); *see United States v. Wilson*, 249 F.3d 366, 378 (5th Cir. 2001) (approving of promotional money laundering conviction when "payments . . . were designed to compensate one of his coconspirators so he would continue to assist in carrying out the conspiracy").

Such payments need not be intrinsically unlawful. Rather, where, as here, "the business as a whole is illegitimate, even individual expenditures that are not intrinsically unlawful can support a promotion money laundering charge." *United States v. Peterson*, 244 F.3d 385, 392 (5th Cir. 2001). Likewise, a lulling payment is classic promotional money laundering. *United States v. Godwin*, 272 F.3d 659, 669 (4th Cir. 2001) (approving money laundering conviction based on lulling payments). Thus, the evidence will be sufficient to support these Counts.

## VIII.   COUNT 34:  MONEY LAUNDERING MORE THAN $10,000

Count Thirty-Four charges Defendant Cloud with a violation of Title 18, United States Code, Section 1957. That statute provides:

> Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be [guilty of a felony].

18 U.S.C. § 1957(a). "The elements of the crime under 18 U.S.C.A. § 1957 are: (1) the defendant knowingly, (2) engaged in a monetary transaction, (3) involving criminally derived property valued at more than $10,000." *United States v. Dukes*, No. 95-5904, 1998 WL 188634 (4th Cir. April 21, 1998) (unpublished).

27

### A. Knowingly

The knowledge requirement of 18 U.S.C. § 1957 parallels that of Section 1956(a), and the discussion above is not repeated at length here. Suffice it to say that, as with a prosecution under Section 1956, "the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." In other words, the knowledge element of the offense requires that the defendant know that the property in question is 'criminally derived,' although it does not require knowledge that the property was derived from 'specified unlawful activity.'" *United States v. Weidner*, 437 F.3d 1023, 1041 (10th Cir. 2006).

### B. Engaged in Monetary Transaction

Count Thirty Four alleges that Defendant Cloud engaged in a monetary transaction by providing co-conspirator Strong with a First Charter check for $29,800 as repayment for another loan. Section 1957(f)(1) explicitly defines the exchange of a monetary instruction by, through, or to a financial institution as a monetary transaction. Section 1956(c)(5) defines a "personal check" as a monetary instrument. Thus, Defendant's exchange of a First Charter check to co-conspirator Strong satisfies this element.

### C. Criminally Derived Property Valued at More Than $10,000

Section 1957's requirement that the property be criminally derived from a specified unlawful activity likewise parallels the same requirement in Section 1956(a), and that discussion is not repeated here. The evidence will show that the funds here, as with all of Defendant Cloud's funds during this time period, were derived from the mortgage fraud scheme. In addition, Defendant Cloud's check for $29,800 is obviously valued at more than $10,000.

28

## IX.   EVIDENTIARY ISSUES

### A.   Admissions

During its case-in-chief, the United States will present statements, both oral and written, made by Defendants or their agents.  Such statements are admissions; and as such they are substantive evidence and not hearsay, and are admissible under Federal Rule of Evidence 801(A) and 801(d)(2)(A).  Whereas the oral statements are self-evident admissions by Defendants, the written materials -- which in this case include business records created by them or at their direction -- are also non-hearsay admissions.  *United States v. Williams*, 837 F.2d 1009, 1013 (11th Cir. 1988).  This is also true for statements made by co-conspirators and authorized agents of Defendants pursuant to and within the scope of that agency or in furtherance of that conspiracy, which are therefore admissible under Federal Rule of Evidence 801(d).

### B.   Defendants' Admission of Defendants' Out-of-Court Statements

As this Court made clear in its pre-trial ruling, neither Defendants nor any defense witness may offer Defendants' out-of courts statements or the statements of Defendants' co-conspirators into evidence.  It is well-established that such statements are hearsay pursuant to Rule 801, and are not "admissions by a party opponent" pursuant to Rule 801(d)(2) when offered by the party himself, rather than the party's "opponent."  *United States. v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("Admissions by a party-opponent are not considered hearsay and therefore can be admitted against that party . . . The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party."); *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) ("while the Government was free to introduce the statement as an admission by a party-opponent, *see* Fed.R.Evid. 801(d)(2)(A), [the defendant] had no right to introduce it on his own"); *United*

*States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989) ("testimony was not admissible under Rule 801(d)(2) because the admission sought to be introduced was made by a co-defendant who is not a party opponent. The Government is the party opponent of both defendants.").

### C.      Lay Witness Testimony as to Defendants' Mental States

As this Court has already ruled, it would be inappropriate for any lay witness to give an opinion in the form of testimony about Defendants' mental state, especially that defendant did not intend to commit fraud or relied on another person's advice.  Any such testimony would have to be both based on personal knowledge pursuant to Rule 602 and helpful pursuant to Rule 701. As the Court of Appeals for the Third Circuit has explained,

> While we have never held that lay opinion evidence concerning the knowledge of a third party is *per se* inadmissible, we have certainly made this kind of evidence difficult to admit. If the witness fails to describe the opinion's basis, in the form of descriptions of specific incidents, the opinion testimony will be rejected on the ground that it is not based on the witness's perceptions. To the extent the witness describes the basis of his or her opinion, that testimony will be rejected on the ground that it is not helpful because the fact finder is able to reach his or her own conclusion, making the opinion testimony irrelevant.

*United States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003).  *See United States v. Rea*, 958 F.2d 1206, 1216 (21992) ("When the issue is a party's knowledge, which is perhaps a more easily fathomed state of mind than, for example, intent or motivation, we suspect that in most instances a proffered lay opinion will not meet the requirements of Rule 701.").  Put differently, witnesses who are not mind-readers cannot have personal knowledge of the Defendants' mental state.  And, to the extent that some fact observed by the witness may be relevant to the Defendants' mental state, the witness may testify directly as to that fact and allow "the fact finder . . . to reach his or her own conclusion," 336 F.3d at 242, about the Defendants' mental state.  Any deduced opinion by the witness

30

as to the Defendants' mental state is irrelevant pursuant to Rule 701. Here, the only persons who should be permitted to testify as to whether Defendants intended to commit fraud are Defendants themselves.

**D.     Cross-Examination of Character Witnesses**

The government believes that defendant may attempt to call character witnesses in his/her defense. If defendant does call such witnesses, cross-examination is "allowable into relevant specific instances of conduct." Fed. R. Evid. 405(a). As the Supreme Court has explained:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him . . . . Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives the defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

*Michelson v. United States*, 335 U.S. 469, 479 (1948) (footnote omitted).

It should be noted that the specific acts of conduct which character witnesses are questioned about on cross-examination cannot be proven by extrinsic evidence unless it is an essential element of the charge. Fed. R. Evid. 405(b); *United States v. Benedetto*, 571 F.2d 1246, 1250 (2nd Cir. 1978) ("while a character witness may be asked on cross-examination about 'specific instances of conduct,' such acts may not be proved by extrinsic evidence"). Accordingly, in the instant case, the Government will not attempt to prove the specific instances of conduct discussed during cross-examination by extrinsic evidence, except to the extent that such evidence would also tend to establish one of the elements of the charged offenses.

31

### E. Documentary Evidence

#### 1. Certified Copies

The Government may introduce testimony as to the absence of entries in various Government records, public recording offices, and the like. Such testimony is admissible under Rules 902(4), 803(6), 803(7), and 803(10); *see United States v. Spine*, 945 F.2d 143, 148-49 (6th Cir. 1991). The Government may also offer into evidence certified copies of Internal Revenue Service records including taxpayer returns, certificates of lack of record and transcripts. Such records are self-authenticating under Rules 902(4) and 803(6), Fed. R. Evid.

#### 2. Business Records

A large portion of the Government's evidence consists of business records. Such records, kept in the regular course of business, are admissible as exceptions to the hearsay rule. Fed.R.Evid. 803(6). Such records are also admissible if they were received and kept by the witness and relied upon by him in his regular business, although not made by him. In other words, one may adopt as inherently trustworthy the records created by another and submitted and received in the course of business. *United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977).

Pursuant to the Federal Rules of Evidence, photostatic copies are admissible as duplicate originals. Rule 1001(4) defines "duplicate" to include photocopies, and Rule 1003 provides that such duplicate originals may be used at trial to the same extent as the originals unless a genuine question as to the authenticity of the original is raised. *United States v. Morgan*, 555 F.2d 238, 243 (9th Cir. 1977).

#### 3. Charts and Summaries

The United States may use charts and summaries during the trial, pursuant to Rule 1006, Fed. R. Evid., and may offer such charts and summaries into evidence. *United States v.*

*Stephens*, 779 F.2d 232, 239-240 (5th Cir. 1985); *United States v. Duncan*, 919 F.2d 981, 988

(5th Cir. 1985), *cert. denied*, 500 U.S. 926 (1986).

Such summaries are allowed where the "contents of voluminous writings ... which cannot

conveniently be examined in court may be presented in the form of a chart, summary, or

calculation." Fed. R. Evid. 1006. The defense received notice of these summaries and charts

and will be permitted an opportunity to review them prior to trial. The underlying documents

supporting the charts and summaries have also been made available to the defense for

examination or copying. The underlying documents will be admitted into court, and the

summaries are believed to be helpful to the trier of fact due to the voluminous nature of this

evidence.

For example, summary charts of Defendants' financial activities will be extremely

relevant to this case. As the Seventh Circuit explained in a similar context, "[t]he case was one

involving money laundering . . . . Evidence which showed, for example, that [the defendant's]

unexplained cash deposits into his bank accounts exceeded his reported income has a "tendency

to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." Fed.R.Evid. 401." *United

States v. Turner*, 400 F.3d 491, 498 (7th Cir. 2005) (admitting summary charts of cash deposits

and other bank records).

4.      Demonstratives

The practice of using demonstrative charts in opening statements to give the jury the

"broad outlines" or a preview of the government's case has been approved. *United States v.

DePeri*, 778 F.2d 963, 978 (3d Cir. 1985), *cert. denied sub nom. Murphy v. United States*, 475

U.S. 1110 (1986). As long as the charts employed as demonstrative aids avoid reference to

matters that cannot be proven or would be inadmissible, there can be no error in their use in the opening statement. *Id*. (citing *Maxworthy v. Horn Electric Service, Inc.,* 452 F.2d 1141, 1143-44 (4th Cir. 1972)). The decision to permit the use of charts is within the Court's discretion. *United States v. Possick,* 849 F.2d 332, 339 (8th Cir. 1988).

F.    **Summary Witnesses**

The use of a summary witness has been generally upheld. *See United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995) (finding that the district court acted within its discretion in allowing a summary witness because of the large amount of witnesses and extensive evidence); *United States v. Lussier*, 929 F.2d 25, 30 (1st Cir. 1991) (upholding trial court's decision not to sequester agent when testimony based on evidence presented at trial); *United States v. Sturman*, 951 F.2d 1466, 1468 (6th Cir. 1991) (summary testimony permissible where court charges jury as to all elements necessary for conviction, summary is intended to aid jury in organizing proof and summary is not inflammatory or prejudicially worded); *United States v. Barnette*, 800 F.2d 1558, 1568 (11th Cir. 1986) (upholding government's use of tax auditor and accountant as a summary/expert witness in tax prosecution).

Courts have permitted a Government agent to summarize testimony and exhibits. *United States v. Marchini*, 797 F.2d 739, 765-66 (9th Cir. 1986). In *Marchini*, the court held that it constituted no error to allow summary charts, exhibits, and testimony into evidence to assist the jury where they were based on evidence adduced at trial and after cross examination. *Id*. There is no error admitting a chart summarizing facts and calculations which are admitted into evidence and used as a testimonial aid where the defense has an opportunity to cross-examine with respect to the source of the figures. *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980); *United States v. Wood*, 943 F.2d 1048 (9th Cir. 1991) (noting difference between strictly Fed. R. Evid.

34

1006 summaries and pedagogical charts). Summary witnesses and summary charts are allowed commonly in white collar cases, and the admission of charts and summaries based on testimony is allowed under Fed. R. Evid. 611(a).

### G.    Expert Testimony

The United States will call Debra Sherill and Constance Wilson as the Government's experts in this case. Ms. Sherrill, a Mortgage Banking Instructor at Central Piedmont Community College, will testify generally regarding her specialized knowledge of how a real estate transaction works, including the real estate closing process and the mortgage brokerage process. She will specifically discuss the participants involved in a real estate transaction, their respective roles, and their interaction with one another. She will also discuss the documents that are utilized to execute a real estate closing and the documents that are relied upon to determine whether to approve a mortgage loan.

Ms. Constance Wilson, Vice President of Interthinx, will testify to her specialized knowledge regarding mortgage brokerage and specifically the industry-accepted standards applicable to mortgage loan underwriters. Ms. Wilson will testify to the industry-accepted standards that a mortgage loan underwriter is expected to apply when reviewing loan application documents for the purpose of approving a mortgage loan and the "red-flag" indicators of potential fraud. She will also provide assessments as to whether the loan documents submitted to obtain mortgages and relied upon by defendant Russell in this case met those standards.

There is no dispute as to the admissibility of the testimony of Ms. Sherrill. Nor should there be any dispute about the admissibility of the testimony of Ms. Wilson, as will be shown at the quasi-Daubert hearing prior to her testimony. *See United States v. Winkle,* 477 F.3d 407, 415-17 (6th Cir. 2007) (holding that bank examiner's opinion that a check kite had occurred was

admissible under Rule 702); *United States v. Heath*, 970 F.2d 1397, 1405 (5th Cir. 1992) (district court's limitation of a real estate lawyer's testimony was in error where expert's specialized knowledge and experience in the field of real estate closings were beyond the knowledge and skills of the jurors).

### H. Rule on Witnesses

The United States requests that the case agents be exempted from Rule 615's sequestration as designated representatives of the United States. Fed. R. Evid. 615(2); *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981). The Government requests that all other potential witnesses for both the Government and the defense be excluded from the courtroom and prohibited from discussing the evidence introduced during the trial.

## X. CONCLUSION

The foregoing is a summary of some of the points that the Government anticipates are likely to arise at trial. Should any legal issues arise that are not covered in this trial brief, the Government respectfully requests leave to submit further memoranda as necessary to assist the Court.

RESPECTFULLY SUBMITTED this 2nd day of October, 2007.

GRETCHEN C.F. SHAPPERT.
UNITED STATES ATTORNEY

**s/ Kurt W. Meyers**
DC Bar Number: 490500
**s/ Craig D. Randall**
NC Bar Number 26638
Assistant United States Attorneys
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.344.6222
E-mail: Kurt.Meyers@usdoj.gov

36

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this 2nd day of October 2007, the foregoing document was served electronically through ECF filing upon the defendants at the following addresses:

**Kevin A. Tate**
Assistant Federal Defender
227 W. Fourth Street, Suite 300
Charlotte, NC 28202
704-374-0720
704-374-0722 (fax)
Kevin_Tate@fd.org

**Kimberly Yvette Best**
Best Law Firm, PLLC
PO Box 37154
Charlotte, NC 28237-7154
704-332-9942
704-376-4463 (fax)
thebestlawfirm@bellsouth.net


GRETCHEN C.F. SHAPPERT.
UNITED STATES ATTORNEY

**s/ Kurt W. Meyers**
Assistant United States Attorney
DC Bar Number: 490500
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6609
E-mail: Kurt.Meyers@usdoj.gov