IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )   3:06CR96-1
                                    )   DECEMBER 14, 2009
        vs                          )
                                    )
WILLIAM ROOSEVELT CLOUD,            )
                                    )
                Defendant.          )
_____/

                TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE FRANK D. WHITNEY
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE UNITED STATES:      KURT W. MEYERS, ESQ.
                            CRAIG RANDALL, ESQ.
                            U. S. Attorney's Office
                            227 W. Trade Street
                            Suite 1700
                            Charlotte, NC 28202

FOR THE DEFENDANT:          KEVIN TATE, ESQ.
                            Federal Defenders of WNC
                            129 W. Trade Street
                            Charlotte, NC 28202


        Proceedings reported and transcript prepared by:


                    JOY KELLY, RPR, CRR
                U. S. Official Court Reporter
                    Charlotte, North Carolina
                        704-350-7495

# I N D E X

**WITNESS**                                                    **PAGE**

SPENCER COWAN

  Direct Examination By Mr. Meyers .................132
  Cross Examination By Mr. Tate ...................153
  Redirect Examination By Mr. Meyers ..............163

GUY CECALA

  Direct Examination Q ............................166
  Cross Examination By Mr. Randall ................225
  Redirect Examination By Mr. Tate ................244

DEFENDANT'S EXHIBIT                                        ADMITTED

2, 3      ........................................200

CERTIFICATE OF REPORTER ...........................341

P R O C E E D I N G S

(Court called to order at 9:00 a.m.)

THE COURT:  Good morning.  We're here in the
sentencing of United States v. William Roosevelt Cloud.  The
Court notes Mr. Cloud is not in the courtroom yet, but the
Court is going to proceed on an issue that has not been
ruled on by the Court.  Mr. Cloud doesn't need to be present
during this ruling.

The defense filed on 27 October 2008 a motion to
vacate conviction, or Judgment of Acquittal, on the money
laundering charge, money laundering convictions, I think
it's Counts Twenty-Seven through Thirty-Three, arguing that
the Supreme Court's decision in *United States v. Sanchez*,
128 Supreme Court 2020, 2008, required to prove that the
promotional money laundering transaction in fact involves
profits of a specified unlawful activity rather than
proceeds of a specified unlawful activity.

A threshold issue in this motion is timeliness.
Recognizing that motions for Judgment of Acquittal must
generally be brought within seven days after a guilty
verdict, the defendant argues that Rule 45(b)(1)(B) is
excusable, should be applied here because the Supreme Court
case arose seven months after the jury verdict.

A new rule of construction announced by the
Supreme Court must be given full retroactive effect in all

1  cases not yet final, still open on direct appeal.  Of

2  course, because of that, Mr. Cloud's intentions would be

3  reviewable at the appellate level, even if not first

4  addressed by this court.  Principles of judicial economy

5  would seem to favor scrutiny of these issues by this court

6  who presided over the trial prior to a cold record review at

7  the appellate level.  So under the circumstances, the Court

8  deems it proper to entertain this motion.

9          (Defendant Cloud enters courtroom.)

10         The Court also notes that Mr. Cloud is now in the

11  courtroom.

12         Turning now to the merits of the defendant's

13  motion, and for purposes of the record that motion is

14  Document 185, a nearly identical argument to that advanced

15  by defendant Cloud was recently rejected by the Fourth

16  Circuit nonpublished decision, *United States v. Howard*, No.

17  87 -- excuse me, No. 07-4146, 2009, West Law 205649, Fourth

18  Circuit, January 29th, 2009.

19         In that case the Court recognized the binding

20  Fourth Circuit precedent established that "proceeds," in

21  quotes, as used in 18 U.S.C. Section 1966 generally means

22  receipts, and that court cited United States -- that court

23  cited *United States v. Singh*, *United States v. Caplinger*,

24  *United States v. Stewart*.  These all Fourth Circuit

25  decisions, and I'm not going to read their cites out for the

1    record, but note them as part of this Court's reasoning.

2            Furthermore, the Court held that the *Santos*

3    decision did not upset this settled construction except in

4    cases where an illegal gambling offense forms a predicate

5    specified unlawful activity for the money laundering charge.

6            And this is because *Santos* was a plurality

7    opinion, and so, quote, "the holding of the court may be

8    viewed as that position taken by those members who concurred

9    in the judgment on the narrowest grounds," close quote.

10   That quote is taken from *Marks v. United States*, 430 U. S.

11   188, pinpoint cite page 193, which is a 1977 Supreme Court

12   decision.

13           So in *Santos* it was Justice Stevens who concurred

14   on the narrowest grounds.  His holding was quite limited.

15   Quote, "The revenue generated by a gambling business that is

16   used to pay the essentially expenses of operating that

17   business is not 'proceeds' within the meaning of the money

18   laundering statute."  Close the larger quote there.  Justice

19   Stevens concurrence is found at 128 Supreme Court 2033.

20           Justice Stevens further explained that his

21   "Conclusion rests on conviction that Congress could not have

22   intended the perverse result that the dissents's rule would

23   produce it [the receipts] definition of proceeds were

24   applied to the operation of unlicensed gambling operation.

25   In other applications of the statute not involving such a

1    perverse result I," meaning Justice Stevens, "would presume

2    that legislative history summarized by Justice Alito,

3    [proceeds means receipts] reflects the intent of the

4    enactment of Congress."  That quote is found at page 2034,

5    note 7, of Justice Stevens' concurrence.

6         Thus, as the Fourth Circuit held in *Howard*, that's

7    the unpublished decision I'm relying on, Justice Stevens,

8    "carves out an exception for illegal gambling operations in

9    which proceeds means profits although the rule [in other

10   context] is that proceeds means receipts."  That quote, from

11   the *Howard* decision, found at 2009 West Law 205649, at

12   specifically page 9.

13        Although *Howard* is a unpublished opinion, his

14   reasoning is both persuasive and consistent with a number of

15   other district courts have concluded that *Santos* does not

16   apply outside the realm of illegal gambling operations.  The

17   Court cites *Bull v. United States*, which is a Central

18   District of California decision, December 3, 2008.  *United*

19   *States v. Prince*, which is a Western District of Tennessee

20   decision, November 7th, 2008.  Very few courts have taken

21   the contrary position.  One of those courts is *United States*

22   *v. Hedlund*, Northern District of California, September 9th,

23   2008.

24        However, according to *Santos* plurality, Justice

25   Stevens' position that proceeds could be profits for some

1    predicate and SUA's and receipts for others, is not only

2    original with him, but also potentially foreclosed by the

3    Supreme Court's opinion in *Hart v. Martinez*.

4           However, this Court, this judge, personally

5    believes this argument is unavailable to Defendant Cloud for

6    a number of reasons, given that Justice Stevens explicitly

7    rejected that argument.  He rejected it at page 203497.  And

8    under the *Marks* Supreme Court decision; under the *Marks* rule

9    it is his understanding that controls.

10          Furthermore, it appears to this Court that the

11   *Santos* plurality was wrong in thinking that Justice Stevens'

12   view was so far out of the main.

13          *Santos* was far from the first court to identify

14   and to redress the so-called "Merger" problem.  In a

15   treatise published nearly a decade earlier by the other side

16   and his co-author, Frederick Williams, the undersigned and

17   Mr. Williams explained some courts have attempted to

18   distinguish between true money laundering cases and those

19   which should be treated only a violations of the predicate

20   SUA offense.  Some suggest to be a true money laundering

21   case, the transaction must, in some sense, be distinct

22   logically -- distinct logically and temporarily from the

23   specified unlawful activities.

24          That cite is taken from the Treatise Federal Money

25   Crimes and Forfeitures, Section 9.2, which is published by

1   Lexus Law Publishing, 1999 edition.

2        Furthermore, the office of that treatise expressed

3   their opinion in the legal pitfalls of Justice Stevens'

4   approach to the Merger problem.  This Court, being one of

5   those authors, nonetheless recognizes that a number of

6   Courts of Appeal, including this circuit, have rendered a

7   decision much in the spirit of Justice Stevens' concurrence.

8        For example, in *United States v Heaps*, 39 F.3d

9   479, the Fourth Circuit 1994, seemed to express an opinion

10   that the one-time payment of an essential expense of a

11   inchoate crime, in that case payment for drugs that had been

12   sold on consignment, would merge with the SUA drug

13   distribution and could not be separately punished as money

14   laundering.

15        Thus, Justice Stevens' concurrence understood as a

16   narrow exception necessary to redress the Merger problem,

17   does little to change the state of the law as existed prior

18   to Sanchez.  Thus, the *Howard* opinion, the unpublished

19   Fourth Circuit opinion on which this Court is relying,

20   appears to reach of the correct result by concluding that

21   profits -- that the profits definition for proceeds does not

22   categorically apply to all money laundering crimes, and then

23   defaulting to entrench precedent holding that "proceeds"

24   means "receipts" in context other than those where a

25   separately punishable conviction for money laundering would

1   present a Merger issue and produce a manifestly unjust

2   result.

3          The Court notes that this alleged state of

4   interpretation issue has also been legislatively resolved by

5   Congress.  This past fall Congress, by statute, wrote that

6   proceeds means proceeds and not profits.

7          So the issue on which the Court is ruling today

8   is -- will have little long-term precedent, because Congress

9   has explained to us what Congress meant with the word

10   "proceeds."  However, it does have impact, of course, on

11   Mr. Cloud's sentencing today because he's, under the

12   Sentencing Guidelines, he received a two-point enhancement

13   for money laundering conviction.

14          So in conclusion, the Court holds that the holding

15   of *United States v. Santos* is limited to the reasoning found

16   in Justice Stevens' concurrence.  That consistent with that

17   holding, as well as preexisting Fourth Circuit precedent,

18   the term "proceeds" as used in 18 U.S.C., Section 1956(a)(1)

19   should be construed to mean gross receipts except in

20   circumstances not pertaining to this case.

21          Accordingly, the Court relies upon the reasons

22   previously stated in its original determination of Defendant

23   Cloud's Rule 29 motions, and has renewed Motion to Vacate

24   Conviction and for Judgment of Acquittal, Document 185 is

25   herby denied.

1        All right.  Any questions on that holding?

2        MR. MEYERS:  No, Your Honor.

3        MR. TATE:  No, Your Honor.

4        THE COURT:  All right.  Thank you.

5        We can now proceed with the defendant's

6   sentencing.

7        Mr. Cloud was found guilty of all but one count of

8   the Second Superseding Bill of Indictment on October 22nd

9   2008.  Right?

10        MR. MEYERS:  2007.

11        THE COURT:  It's been over two years since the

12   conviction?

13        MR. MEYERS:  Yes, sir.

14        THE COURT:  Mr. Cloud, as I told you on the day of

15   your conviction, your case was referred to the United States

16   Probation Department for a Presentence Investigation Report.

17        The Court has received that report; your counsel

18   has.  Both sides have extensively briefed that report, as

19   well as sentencing memos.  I want to ask you:  Have you

20   received this presentence report?

21        DEFENDANT CLOUD:  Have I received the sentencing

22   report?

23        THE COURT:  Yes, sir.  The one prepared by the

24   Probation Office, have you received a copy of it?

25        DEFENDANT CLOUD:  Yes, sir, I have.

1        THE COURT:  And have you read it?

2        DEFENDANT CLOUD:  Yes, I have.

3        THE COURT:  Have you had an opportunity to go over

4   the report with Mr. Tate?

5        DEFENDANT CLOUD:  Yes, sir, we did.

6        THE COURT:  All right.  Thank you.

7        All right.  Now there are numerous objections to

8   the report on both sides.  The government has filed an

9   objection with regard to which Sentencing Guidelines should

10  apply, arguing that the current Sentencing Guidelines should

11  apply rather than the ones in effect at the time of the

12  conspiracy.

13       The government claims that since the Sentencing

14  Guidelines have become advisory, that the ex post facto

15  clause of the Constitution of the Bill of Rights does not

16  apply.  That's a legal issue.

17       The Court has extensively researched this issue.

18  The Court understands that several circuits have addressed

19  the issue but the Fourth Circuit has not addressed the

20  issue.

21       From the Court's research, the Court found the

22  decision by the Honorable Henry Hudson, who is a

23  distinguished jurist from the Eastern District of Virginia,

24  former United States Attorney in the Eastern District of

25  Virginia, as well as the former Director of the United

1  States Marshal Service.

2          Judge Hudson concludes that the ex post facto

3  clause does apply to advisory Guidelines.  He relies on the

4  Supreme Court, *Miller v. Florida*, 482 U. S. 423, 1987, that

5  holds that basically anything that makes more onerous the

6  punishment for crimes committed before its enactment,

7  violates the ex post facto clause.  And based on the *Miller*

8  decision, he says the Fourth Circuit has defined an ex post

9  facto law as one that "changes the legal consequences of

10  acts completed before its effective dated."  Close quote.

11  Citing *United States v. Heater*.  *Heater* cite is at 63 F.3d

12  311, pinpoint cite page 332, Fourth Circuit 1995.  I should

13  add Judge Hudson is at 603 F.Supp. 2d 874, and that citation

14  to *Heater* is found at pages 876 to 877.

15          The rationale that -- rather I should say based on

16  that understanding of the meaning of ex post facto, Judge

17  Hudson concluded that although the Guidelines are advisory,

18  it is mandatory under *Booker*, *Gall*, and *Kimbrough*, or under

19  I should say the *Booker* progeny of cases, that the

20  Guidelines be consulted and be used as the starting point

21  for the analysis of a defendant's sentencing.

22          And because it is the starting point for the

23  analysis, it means the sentencing range that's determined

24  after the Guidelines application will probably have some

25  impact on the defendant's sentence, because a court will

1   have to explain in more detail a variance upward or a

2   variance downward.  It would have to be more detailed in

3   explaining a downward variance, Judge Hudson concludes.  It

4   does impact the legal consequences of acts completed before

5   the effective date of the more recent Guidelines.

6           So the Court denies the government's objection

7   based on the reasoning of Judge Hudson.  In the case -- I

8   never said the name of the case:  *United States v. Lewis*,

9   603 F.Supp. Second, 874.  I know you want to disagree with

10  me.

11          MR. MEYERS:  No, Your Honor.  I want to ask the

12  Court, I don't know if the Court has gotten to this part

13  yet, to address the government's argument in the alternative

14  as to the base offense level, and that's contained at page

15  30 --

16          THE COURT:  Yeah, the continued conspiracy, and

17  then it runs over.

18          MR. MEYERS:  Yes, sir.  *United States v. Bennett*,

19  which is a Fourth Circuit case from 1993, the question is:

20  Was there evidence that the conspiracy continued after the

21  effective date of the Guidelines?  Which for the purposes of

22  here would be November 1st, 2003.

23          I point the Court to Exhibits 125B-8, 125B-9 --

24  again, this is addressed at page 30 of the Government's

25  Sentencing Memo.  Those are checks from Leon Orr to the

1    defendant.  Those were introduced in furtherance of the

2    conspiracy.

3            The Court also then, Exhibits 125E-1 through

4    125E-15, checks dated from March 2004, well after November

5    1st, 2003, to September 2005.

6            In addition, I will pull up as one example

7    Government's Exhibit 83C, which is the loan application for

8    a straw buyer, Gabriel Brown.  And if the Court looks --

9    this is a 2005 transaction, the Court looks at page 3 of

10   this, it says a HUD involving Defendant Cloud and his

11   co-conspirators, Defendant Daniel Greene.

12           If the Court looks at the HUDs for this

13   transaction, 83A -- 83A to 83B, the documents on their face

14   show same-day flip by the Defendant Cloud involving

15   defendant, Daniel Greene, on April 7th, 2005, in which the

16   Defendant Cloud as Prestigious Home bought the house for

17   84,000 -- perhaps that's 94 -- excuse me, and resold it to

18   Ms. Brown the same day for $164,000.

19           So the Court has -- and the Court additionally has

20   the same documents for another purchase by Ms. Brown, both

21   of which were primary residence purchases.  To show the

22   Court that I can show --

23           THE COURT:  Let me ask you when -- all right, the

24   2002 Guidelines are the ones used in the report.

25           MR. MEYERS:  Yes, sir.

1          THE COURT:  What year Guidelines do you want to

2     use, 2005?  When did the change go --

3          MR. MEYERS:  November 1st, 2003, Your Honor.

4          THE COURT:  Let me ask, before I go to Mr. Tate,

5     let me ask Ms. Easley.  Ms. Easley didn't address this issue

6     because she thought the ex post facto clause would control.

7     What is the Probation Office's position on this issue?

8          PROBATION OFFICER:  The only issue that I would

9     have with the under 1B1.11 commentary of the current

10     Guidelines, which I will believe were amended in the 2002

11     Guidelines as well, which refers to the last date of the

12     offense of conviction is the controlling date, and in the

13     indictment is says through -- in or about 2002, that's why I

14     used 2002 Guidelines.  The commentary goes on to say you can

15     use relevant conduct under 1B1.3 that occurs after that

16     date.  But that the controlling -- for the use of the

17     Guidelines then is what's charged in the indictment.

18          THE COURT:  That's commentary -- which commentary?

19          PROBATION OFFICER:  Commentary Application No. 2.

20          THE COURT:  2 to 1B1.11.

21          PROBATION OFFICER:  Yes, sir.  I've just looked.

22     It's the same in the 2002 Manual.  However, I was just going

23     to say the technical wording in the indictment says from as

24     early as 1999 through at least on or about 2002.

25          MR. MEYERS:  Judge, I would point out that what

1    the Fourth Circuit says in *United States v. Bennett* is that

2    it's not the allegations in the indictment, it's the count

3    of conviction in the indictment.  The count of conviction

4    here being Count One, a conspiracy count, the government

5    clearly introduced evidence going through 2005 at trial,

6    conspiracy itself lasted through 2005.

7              There's additional evidence in the PSR, I don't

8    think the Court should consider that.  Like, for example,

9    the Memorandum of Interview of Ms. Brown who said, "That the

10   way it happened with me is exactly the way it happened with

11   the other buyers."

12             The Court should not consider that, but the Court

13   can look at the documents, which on their face, show two

14   same-day flips to Ms. Brown in 2005, which have the same

15   elements of the conspiracy; and one of which was done by

16   co-conspirator Daniel Greene.  I believe that that evidence

17   introduced at trial meets the standard of *United States v.*

18   *Bennett*.

19             I've also cited -- I believe that's the only case

20   I have in the Sentencing Memorandum on that issue.

21             But I think the courts are fairly consistent on

22   that.  The question was there evidence at trial showing that

23   the conspiracy, or if that's the allegation, extended past

24   the effective changeover for the Sentencing Guidelines.

25             I just want to ask the Court to consider that

1    argument, although I understand the Court's position with

2    regard to argument.

3              THE COURT:  Mr. Tate, what's your position?  I'm

4    sure you're opposed to that.

5              MR. TATE:  Thank you, Your Honor.

6              We concur with Probation.  We believe the

7    commentaries in the Guidelines support a proposition that

8    you go with the Guidelines.  And I think looking at the

9    indictment, the plain language of the indictment says "on or

10   about 2002," it doesn't mean "on or about 2005."

11             As the Court recalls, we objected to the evidence,

12   Gabriel Brown evidence, introduced at trial for that very

13   specific reason:  That it was not evidence.

14             What the Court has just looked at is the closing

15   statement.  The fact that there was a flip, same-day

16   transaction, is not an issue of a crime at all.  There's

17   nothing illegal about that.  People buy homes and sell them

18   at a profit every single day.  In other words, that would

19   make every one of those transactions illegal.

20             There's no evidence at all introduced at trial

21   that those transactions involving Gabriel Brown in 2005 were

22   in any way fraudulent or illegal.  The government certainly

23   could put on evidence and chose not to.  I think that speaks

24   volumes to perhaps the proof on that issue.

25             For those we believe that the 2000, earlier

1   version of the 2002 Guidelines should be used.

2          MR. MEYERS:  This will the last time I stand up,

3   Your Honor.

4          If I may turn on the Court's screen now, because I

5   think Mr. Tate made a fair point.  I just do want to show

6   the Court the kickback check which are contained in

7   Government's Exhibit 117A, which was introduced at trial,

8   along with Government's Exhibit 82B, I believe, which also

9   was introduced at trial, clearly shows checks from Defendant

10  Cloud, controls Prestigious Homes, to Gabriel Brown.

11         The Court can see the date is the same day as the

12  settlement transaction.  This is as kickback.  If the Court

13  looks, I'll scroll down under HUD, for the transaction 2317

14  Jordi Way, knowing that 2317 Jordi Way is also listed in the

15  memo line of the check, the HUD shows only money coming from

16  the borrower.  It does not show money going to the borrower.

17         The check the defendant filed the same day to

18  Ms. Brown with 2317 Jordi Way in the memo line shows money

19  going to the borrower, Gabriel Brown, from the seller, when

20  HUD shows only money going to the seller, in line 603,

21  clearly says "to the seller" and it shows money coming from

22  the borrower, Ms. Brown.  Signed by the Defendant Cloud,

23  signed by the borrower, and that kickback check of $18,000

24  clearly shows fraud in 2005 related to this.

25         MR. TATE:  Just briefly, Your Honor, on that issue

1    again, it doesn't show fraud other than the government

2    saying the fact that this check is written is not evidence

3    of anything.  If it occurred after the closing, it couldn't

4    possibly be the Settlement Statement.

5         And there are circumstances where sellers of homes

6    pay closing costs and things like that; what's on the

7    Settlement Statement is what's on the table at the time he

8    closed.

9         Ms. Brown is not here to be questioned about that,

10   and I just don't believe other than calling it kickback,

11   which is labeling, that there's -- that that in any way

12   shows there's any type of fraud at all.  The transaction

13   could have been perfectly legal and the same could have

14   occurred.  That in and of itself doesn't make it illegal.

15        THE COURT:  Scroll back up to the top of the HUD.

16        MR. MEYERS:  Yes, sir.

17        THE COURT:  You used the term "kickback."  Is this

18   supposed to be covering the down payment of 12,000, or

19   whatever the borrower was to bring, plus money that

20   Ms. Brown as the "investor" would have received, a payment.

21        MR. MEYERS:  To be -- I think to be consistent

22   with the case law, Your Honor, that evidence was not

23   produced at trial why the money was paid.  What the Court

24   did see is two weeks of evidence about the pattern or

25   conduct --

1          THE COURT:  No, I understand that.  I understand

2    that.

3          MR. MEYERS:  The government's reasoning is what

4    these documents show on their face is the same pattern that

5    all the straw buyers testified to.

6          THE COURT:  Right.  But I'm saying, your argument,

7    though, is the 18,000 is both the down payment coming from

8    the defendant to Ms. Brown, right, but Ms. Brown is supposed

9    to -- as the borrower is supposed to come up with the down

10   payment and she never did.

11         MR. MEYERS:  I think what the Presentence Report

12   shows, because the Presentence Report contains the

13   Memorandum of Interview from Ms. Brown, is that, in fact,

14   this was the kickback which was higher than what some of the

15   other folks were getting.

16         THE COURT:  It was exclusively kickback.

17         MR. MEYERS:  That's right.  And that someone else,

18   Defendant Cloud paid the down payment besides this.

19         THE COURT:  In addition to this.

20         MR. MEYERS:  That's right.

21         And just to be clear, what the government's

22   argument is, it's the fraud that we have, a Settlement

23   Statement, just like we had at the trial, of April 20th,

24   2005, and we have a check from the seller on April 20th,

25   2005, to the buyer.  As the Court heard over two weeks of

1  evidence, if there's going to be a check, let's be clear,

2  this is for the very same property as the HUD-1 Settlement

3  Statement and noted by the Defendant Cloud's own handwriting

4  on this check.

5        You heard at the trial in order for the HUD to be

6  truthful and not fraudulent, it needs to disclose any money

7  going to the buyer.  The Court can see, looking at lines

8  200, there's no monies going to the buyer other than the

9  loan amount.

10        And in terms of the cash to the borrower, which is

11  what this check obviously is, it's cash to the borrower from

12  the seller, that needs to be disclosed on line 303 of the

13  HUD-1 Settlement.  There was a lot of testimony about that

14  at the trial as the Court recalls.

15        Line 303 shows only cash from the borrower in the

16  amount of $12,000.  It is not disclosed that the borrower

17  will receive from the seller cash in the amount of $18,000

18  for this transaction.

19        THE COURT:  No, I understand all of that.

20        So this was -- Ms. Brown was an investor, using

21  the term "investor" as used throughout the trial, that got

22  paid a lot more money than the normal investor.  Right?  The

23  normal investor received just a few thousand dollars.

24        MR. MEYERS:  That's correct, Your Honor.  This is

25  a conspiracy evolved, I think the evidence shows, through

1    2005, and Defendant Cloud, not only did he have to go to

2    Georgia because people were complaining they had to pay more

3    money.

4              THE COURT:  All right.  Go ahead, Mr. Tate.

5              MR. TATE:  I think that's exactly the conclusion.

6              THE COURT:  It's argument.  It's argument.

7              MR. TATE:  But I think equally, every witness that

8    testified about these Settlement Statements -- remember the

9    charge is bank fraud, so it's the material omission that

10   basically --

11             THE COURT:  I think the charge is also conspiracy

12   to commit mail fraud, wasn't it?

13             MR. TATE:  Mail fraud and wire fraud.  But there's

14   no evidence whether it was mailed, whether it was in

15   furtherance of the conspiracy, what the buyer -- we don't

16   know who the lender is here.

17             THE COURT:  We do actually know, don't we, up on

18   top of the HUD.

19             MR. TATE:  What I'm saying is what is consistent

20   is what has to be to the Settlement Statement is what has

21   occurred thus far.  This statement in any way doesn't say

22   what's going to happen tomorrow, what's going to happen

23   later today or next year.  And I think the people who

24   discussed the Settlement Statement were very clear about

25   that.

1          This concerns the transaction for the property.

2   This has nothing to do with the somebody is going to do for

3   the buyer after the fact.  And that's why it doesn't have to

4   be on there.  The only thing that's on there is what's

5   happened.  What is happening.  Whose bringing what.  The

6   yield spreads are not on here either, I'll just point that

7   out.  The yield spreads are not on the Settlement Statement

8   to the --

9          THE COURT:  But that's all part of the fraud,

10  right?  The spread was never disclosed between the first

11  transaction and the second transaction.

12         MR. TATE:  The yield spread is paid from the

13  lender to the broker.  It has nothing to do with Mr. Cloud.

14  It's paid from the lender to the broker.  And that

15  consistently wasn't on the Settlement Statements either.

16  And they said, "Well --"

17         THE COURT:  Wait.  Wait.  Wait.  From the lender

18  to the broker, the yield spread -- are you talking about --

19  what are you talking about?  Are you talking about a float

20  to the interest rate between the original contract?

21         I don't understand when you say "yield spreads."

22  When the term "spread" was used during the trial -- because

23  I went back and read a lot of the transcript this past

24  weekend of the trial -- "spread" referred to the difference

25  between the first purchase transaction where there was

1  legitimate seller selling it to -- usually to Mr. Cloud, and

2  then Mr. Cloud selling it to the investor in the second

3  transaction, and the spread was the difference, really,

4  between those two transactions.  What do you mean by "yield

5  spread"?

6          MR. TATE:  Yield spread is a premium paid to the

7  lender to a broker, like Dan Greene, for charging a super

8  high interest rate.  See, that's supposed to be disclosed on

9  that too.

10         THE COURT:  Where do you know there's a yield

11 spread on here?

12         MR. TATE:  Well, because Daniel Greene talked

13 about yield spreads.  I mean the same reason we don't know

14 what the yield spread is is the same reason we don't know

15 what the $18,000 is to Gabriel Brown.  You would have to

16 reach a conclusion that it was supposed to be on the

17 Settlement Statement and it wasn't.

18         THE COURT:  But why is that unreasonable to

19 conclude based on all the evidence of all the transactions

20 that were fraudulent.

21         MR. TATE:  Because it just wasn't proven.  It

22 could -- very well be a legitimate transaction.

23         THE COURT:  It could be.  You're right.

24         So your point, though, is you're both arguing

25 these different positions.  That's what it is.  You're not

1    saying there's insufficient evidence here; you're just

2    arguing that the evidence is not by a preponderance.

3            MR. TATE:  There's no evidence that -- number one,

4    there's no evidence that the Jordi Way home was in any way

5    fraudulent at all.  That there's no evidence that --

6            THE COURT:  Except there were 20-some-odd -- I

7    forgot how many number of actual transactions presented to

8    the jury, and the jury found beyond a reasonable doubt that

9    all those transactions were fraudulent.  That -- you

10   don't -- you're not -- are you taking the position the Court

11   can't consider all the other evidence, the two weeks of

12   trial?

13           MR. TATE:  I'm not saying that.  If this was part

14   of the evidence, then, yes.  But it wasn't.  They

15   introduced, over objection, a copy of the Settlement

16   Statement.  I said, "Nobody is here that was part of this

17   transaction to talk about it, what happened.  Was there

18   fraud in this case?  Was there a material lie or omission on

19   the loan application to the bank?  Was there a fraudulent

20   asset statement?  Any of that kind of stuff.

21           THE COURT:  All right.

22           MR. TATE:  The fact he wrote a check to Gabriel

23   Brown the second day doesn't mean that there was a fraud,

24   and doesn't mean it had to be on the Settlement Statement.

25           THE COURT:  No, I understand.  I agree.  You're

1    making an argument that doesn't -- standing alone, this

2    check for $18,000 might not have to be on the HUD statement

3    because it didn't relate to the closing.

4          But the Court is of the view that it can consider

5    all the evidence in this case, including all the trial

6    evidence, in reaching it's conclusion on this one

7    transaction, whether this transaction was fraudulent or not.

8          Anything else, Mr. Meyers?

9          MR. MEYERS:  Just very quickly to correct the

10   record, I believe defense counsel misrepresents the

11   testimony; not intentionally, but I think he has got it

12   wrong.

13         Argument was continually advanced during the trial

14   that checks don't have -- checks from Cloud to the straw

15   buyer don't have to be on the HUD because they came out,

16   they were in the parking lot, whatever, all the evidence

17   consistently established that if it relates to the

18   transaction before, during, after, it's got to be on the

19   HUD.

20         THE COURT:  Right.  I think that's not only a

21   factual issue that was presented to the jury, it's also a

22   legal issue.

23         The Court is aware that a HUD-1 is supposed to

24   reflect all the money that passes between the parties with

25   regard to the closing.  And if it doesn't reflect it, then

one or more parties knows that something is not being
reflected on the HUD-1 is involved in fraudulent conduct.
And sometimes I think the evidence shows it can be reflected
without dollar amount so long as it's on the HUD-1 with some
reference to paid outside of closing or something, but
everything has to be reflected to the HUD-1 so someone could
pick up the HUD-1 and understand the complete nature of the
closing, because it's the one document that brings
everything together.

      The Court does find by a preponderance of the
evidence, based on the all the trial record in this case and
extensive amount of fraudulent transactions, that this check
from Prestigious Homes, which is, of course, the corporation
under which the defendant operated for many of his illegal,
fraudulent transactions, was a form of -- some form of
illegal payment to Ms. Brown for this 2317 Jordi Way
property.

      It is -- it was part of fraud because it was not
reflected to the HUD-1 statement, therefore making the HUD-1
statement fraudulent.  There's just ample evidence HUD-1
statements are put into the mail or put into the wires.
There could not be a closing without a HUD-1 being sent from
the closing attorney to a financial institution, to any real
estate agent or mortgage broker.

      So clearly this was a continuing act of a

1   conspiracy, as well as it could stand alone as a separate

2   mail/wire fraud count or bank fraud count because a

3   financial institution was involved.

4        So there is evidence that the conspiracy continued

5   well into 2005, and that the defendant was the actual person

6   committing these further overt acts of the conspiracy.

7        Now, with that finding of fact, I go back to the

8   Probation Office and ask the Probation Office what is the

9   legal effect of that finding of fact?

10        PROBATION OFFICER: Your Honor, then, I believe we

11   would be using, in effect, today's Guideline Manual, because

12   it would be the same one used in 2005. So it would increase

13   the base offense level from 6 to a 7, and that will have a

14   one-level impact on the total.

15        THE COURT: So that's Probation Office's

16   interpretation. I'll let the defendant argue -- I presume

17   the defense opposes that, and that I'll let you make

18   argument.

19        MR. TATE: We would ask that this exhibit, the

20   Settlement Statement, be marked and made part of the

21   sentencing record introduced in evidence.

22        I'd just note for the record that the lender

23   appears to be First Consolidated Mortgage Company, not a

24   bank that would not qualify, would not be able to -- they

25   would not able to charge the 13 with corporate bank fraud

1   because they don't meet the definition of a bank.

2          THE COURT:  I concur with you on that.  I'm not

3   sure that First Consolidated Mortgage Company does meet the

4   definition of a financial institution.  So the Court will

5   say it's still part of the continuing conspiracy without a

6   doubt, and it's overwhelming circumstantial evidence

7   throughout the whole trial that HUD-1's are wired and

8   mailed.  But as to bank fraud, the Court doesn't know

9   specifically if First Consolidated Mortgage does meet the

10  specific definition of a financial institution.  So the

11  Court concurs with that analysis by the defendant.

12         MR. TATE:  Was it 117A?

13         MR. MEYERS:  What the screen in front of the court

14  is showing is Government Exhibit 82B on the top, and

15  Government's Exhibit 117A at the bottom.  Both of those were

16  exhibits that were introduced and admitted at trial.

17         MR. TATE:  For purposes of sentencing, retain the

18  exhibit.  I'll move for admission.

19         THE COURT:  But they are admitted.  They are in

20  the record.  We don't have to reintroduce things that are

21  already in the trial record.

22         All right.  Let me get my legal notepad.  Can you

23  give me, Ms. Easley, of those changes again to the offense

24  level.

25         PROBATION OFFICER:  At this point, on paragraph 24

1  the base offense level, according to 2B1.1(a) would be

2  increased to 7.  It would make the total paragraph 24

3  increase to a 35, and the total offense of level paragraph

4  32 increase to a 43.

5            THE COURT:  All right.  Mr. Tate, I know you

6  disagree with the legal conclusion of the Probation Office

7  and the Court's finding of facts, but do you agree based on

8  those two, the legal ruling of Probation and this Court's

9  finding of fact, that that's is the correct change on this

10 one narrow issue?

11           MR. TATE:  Yes.  Withstanding our objection, yes.

12           THE COURT:  Okay.  That covers the government's

13 objections, or is there another?

14           MR. MEYERS:  Yes, Your Honor.  We objected to the

15 failure to include an increase of two levels for abuse of

16 trust.

17           THE COURT:  Oh, okay.  Your contention in your

18 sentencing memo is it's a private trust, right?

19           MR. MEYERS:  That's correct, Your Honor.  By

20 virtue of the defendant's relationship with the straw

21 buyers, the government used -- addressed this --

22           THE COURT:  Church membership.  Saying to some of

23 them he was a real estate agent, things like that.

24           MR. MEIER:  That's right.  The government's

25 argument is contained as page 36 of the government's

1    Sentencing Memorandum.  And the government pointed to straw

2    buyer Robert Moore as a good sample, and quoted some of his

3    testimony.

4         That testimony is contained at page 5 of the

5    Government's Sentencing Memorandum.  So if the Court looks

6    as page 5 of the Government's Sentencing Memorandum and

7    cites page 1395 of the trial transcript, Mr. Moore was asked

8    whether Cloud prepared his 1999 tax turn.  Mr. Moore said,

9    "Yes, he did."

10         The government asked, "How did that work?"

11         Mr. Moore responded, "Well, Defendant Cloud was

12    also a tax preparer.  He was a financial advisor."

13         Joseph Goines described the pitch Cloud instructed

14    him to give as to buyers who were going to invest in real

15    estate, so he set himself up as an investment advisor.  Told

16    folks he was looking for investors.

17         The co-defendant Lee testified that Cloud telling

18    him he was in the business of investing in properties.  And

19    perhaps as importantly, there was substantial trial

20    testimony, referenced on page 6 of the Government's

21    Sentencing Memorandum, that these straw buyers provided the

22    defendant with their Social Security numbers, their bank

23    account numbers, their tax returns, information about their

24    income and assets, the most personal information that you

25    could give anyone.

1           And what the Fourth Circuit has said in United

2   *States v. Godwin* -- or *Goodwin*, and that is cited a page 36

3   of the Government's Sentencing Memorandum, quote, "It is

4   well settled that whether the defendant held a position of

5   trust must be examined from the perspective of the victim."

6   The defendant certainly held that position of trust when he

7   told them he was a tax return preparer, he was an investment

8   advisor.  He told them he was a real estate agent.

9           THE COURT:  Let me ask you, though, all of those

10  are fraudulent statements.  If you used the term "real

11  estate agent" in the context of an agent that's a fraudulent

12  statement.

13          Other than the power of attorney, was there

14  anything where there was an actual, kind of fiduciary

15  relationship, a truly legal one?  Foundation of fraud?

16          MR. MEYERS:  I don't think in terms of Defendant

17  Cloud.  He didn't have a licensure for it or anything like

18  that.

19          THE COURT:  He did receive from several of the

20  investors powers of attorney.  Correct?  Or not?  Page 37,

21  38 -- oh, I'm sorry.  Cross-examination is that some of the

22  straw buyers received a power of attorney.

23          MR. MEYERS:  That's right.  I'm not aware of any

24  evidence that he exercised a power attorney for a straw

25  buyer that was introduced at trial or in the Presentence

1    Report.  He made that contention during the trial.  It may

2    be, and it probably is, there are transactions out there we

3    still don't know about in which he did that.  He did

4    exercise power of attorney for his wife.  I wouldn't call

5    her a victim.

6            THE COURT:  So other then that -- and that's

7    cross-examination, which is not supported by any

8    documentation, that doesn't mean it doesn't exist -- there's

9    no abuse -- there's no trust position that legally arose.

10   Right?  I mean, it was all a fraudulent positioning to

11   assert that he had a special trust.

12           MR. MEYERS:  I think that's right, Your Honor.

13   Instead of "legal" I would use the word "formal".  There was

14   no formal position of trust that he held.  The only

15   exception might be the 1999 tax return for Robert Moore.

16           Mr. Moore testified he have gave the information,

17   that Defendant Cloud prepared his tax return, and he thought

18   that Defendant Cloud did it.  In reality what the tax return

19   shows is that it was Tamika Monroe, Mr. Cloud's niece, who

20   prepared that tax return.

21           The Court will recall there was also testimony

22   that we showed that legitimate return for Mr. Moore, then we

23   showed the fraudulent tax return of the defendant --

24           THE COURT:  Still, that's not a formal

25   relationship because you can prepare someone's return

1    without being an approved tax return preparer for the IRS.

2              MR. MEYERS:  Agreed, Your Honor.

3              So to be clear, the government's argument is that

4    the recent trust does not result from any formal

5    relationship that he had.  Rather it results purely from the

6    perspective of these straw buyers who were victims in that

7    sense.

8              THE COURT:  Let me ask Ms. Easley why you weren't

9    convinced that there was an abuse of position of trust?

10             PROBATION OFFICER:  Your Honor, when I read the

11   Sentencing Memorandum, I did not realize that was a formal

12   objection to the Presentence Report.

13             THE COURT:  It kind -- it wasn't in the original

14   objections, right?  Because your original objection was a

15   letter to Probation Office describing ex post facto in

16   referencing the continuing conspiracy, but it wasn't in that

17   original letter, right?  It was only in your memorandum.

18             MR. MEYERS:  It was late, Your Honor, but it

19   preceded the memorandum.  And so in fairness to the

20   Probation Office, there are hundreds of documents in this

21   case --

22             THE COURT:  This is the most briefed sentencing

23   this Court's ever handled.

24             MR. MEYERS:  My initial reaction was to apologize,

25   Your Honor.  I think it's appropriate --

1            THE COURT:  79-page memo.  The Court read it all;

2     read everything Mr. Tate prepared, too.  It was extensively

3     well prepared and briefed by both parties.

4            MR. MEYERS:  Thank you, Your Honor.  We believe

5     ever word was necessary for the sentencing hearing.

6            I would refer the court to Document 189 which was

7     filed on December 9, 2008.  That is a letter to the

8     Probation Office setting forth this objection for abuse of

9     trust.

10           I never did formally go to the probation officer

11    and ask that this be included because it was late.  I did

12    not file it within the required time period after the draft

13    Presentence Report was put in, and so I guess I had assumed

14    the probation officer did not consider it, as is their

15    right, because it was not filed on time.

16           THE COURT:  All right.  And based on your honesty

17    in admitting that, then the Court's going to deny it, and

18    you can reraise it had if you think it's appropriate in the

19    context of a variance.  But for purposes of a Sentencing

20    Guidelines, I think it's more appropriate to stick to our

21    requirements that objections be timely made with the

22    Probation Office so Probation has an opportunity to respond

23    to it.

24           MR. MEYERS:  Thank you, Your Honor.

25           THE COURT:  Okay.  That is the government's

1    objections.  Correct?

2            MR. MEYERS:  Yes, Your Honor.

3            THE COURT:  All right.  Mr. Tate, you have several

4    objections.  Is there a particular order you would like to

5    go through these objections?

6            MR. TATE:  Well, no, Your Honor.

7            Obviously, our position, too, is that for most of

8    our objections we set out that it's the government's burden

9    of prove, so we have lodged our objections.  We do intend to

10    put on some evidence, but we would like the government to

11    meet their burden first.  Once the PSR is challenged, which

12    it has been, the burden is on the government to sustain

13    their position on here.

14            And, of course, our first objection is to the loss

15    amount.  And we also objected to the enhancement of the

16    supervised release, organizer.  We objected to obstruction

17    of justice enhancement.  I think I can speak to the

18    obstruction enhancement.

19            THE COURT:  I read, of course, your argument that

20    it was a tactical decision made by you.  Of course, I read

21    the Government's Sentencing Memorandum, which summarize the

22    sidebar where you said that you were told by your client

23    that the zoning permit had been filed and had been denied.

24    Why is that not enough?  You were misled by your client.

25            MR. TATE:  I don't know that I was misled by my

1  client for one.  I believe the sidebar was what was the

2  basis for the question.  I said my client gave me -- and my

3  client told me this, and he wasn't clear what he told me.  I

4  know he had some documents on his own.

5          There was some discussion about whether or not

6  he -- or whether or not his house was supposed to be

7  permitted for a group home.  He handed me a document I had

8  not looked at before.  Witness is on the stand; asked her

9  had she ever seen the document.  She said no.  That was the

10  end of it.  I didn't say, "Isn't it the document you filed,"

11  or anything like that.  I asked her to identify the document

12  and then was going to based on whether she could identify

13  it, was going to question her about any discussion she had

14  with Mr. Cloud about getting the place zoned for a group

15  home.

16          Once she could not identify the document, it was

17  of no use to me, and I returned it to Mr. Cloud.  The

18  government then asked for it later and then pointed out it

19  still had the carbon in it, but I don't recall any

20  discussion it had been filed, or that she filed it.

21  Basically I asked her a foundational question.  She could

22  not identify the exhibit and that was the end of it.  It was

23  never marked.  It was never admitted into evidence, and as

24  far as I can recall, there was no further question other

25  than by the government.

1          THE COURT:  I didn't mean to immediately go into

2     that one first, but --

3          MR. TATE:  Well, it seems like one of the easier

4     ones to discuss.  I don't know what evidence could be put on

5     it, so that's why --

6          THE COURT:  Other than the sidebar transcript.

7     Mr. Tate -- excuse me.  Mr. Meyers.

8          MR. MEYERS:  Just to be clear, Your Honor.  It was

9     marked.  It was marked as Defendant's Exhibit 7.

10         The Guideline in the Application Note 4 was two

11    examples of obstructive conduct.  First one, C, is

12    attempting to produce a false or counterfeit document during

13    a judicial proceeding.

14         If the Court will recall, during the

15    cross-examination of Veronica Williams, and during the

16    testimony regarding her, part of the fraud was the defendant

17    promised to put her into a group home; promised he would

18    file a zoning application.  She testified to the jury that

19    was one of the things he lied to me about.

20         Defendant Cloud avers that testimony, gives to his

21    lawyer a counterfeit document, a zoning petition for 2800

22    Georgia Avenue.  That was a false, counterfeit document.  He

23    gave it to his lawyer clearly with the intent that his

24    lawyer show it to the witness in order to make the jury

25    think that he had actually filed that zoning petition.  He

hadn't.  No zoning petition was ever filed.  That's a false

and counterfeit document.  Defendant Cloud clearly attempted

to produce a false and counterfeit document during a

judicial proceeding.

If the Court looks at page 40 regarding the

Sentencing Memorandum, I lay out the testimony to address

this materiality question.  The Court was the one who is sua

sponte asked for the sidebar.  The Court was deeply

concerned about the suggestion through his lawyer that this

zoning petition was actually filed or not.  The Court said,

"Can we have a sidebar?"

"Question:  What's your good faith basis that

there was a zoning petition actually filed and that a zoning

change was actually denied?"

"Answer:  My client has told me that."

The clear import, whether or not his client

specified said it or implied it to his lawyer is that a

zoning petition was actually filed and actually denied.  He

gave his lawyer a counterfeit document to use --

THE COURT:  I want to get something straight,

though.  It wasn't a counterfeit document, it was just not a

processed document, right?  It was an unfiled zoning

petition, wasn't it?

MR. TATE:  Yes.  I mean, that's the problem, is

the use of the label "counterfeit."

1          THE COURT:  The document itself wasn't

2     counterfeit, it just --

3          MR. TATE:  If it was counterfeit if it had a stamp

4     on it indicating it had been filed.  I hadn't looked at it.

5     It was an application.  You know, I believe what it was, I

6     think there was questioning about whether or not that was

7     one of the goals, and she said it was.  And I asked her:

8     "Had you ever seen this application?"  And she said no.  And

9     I said okay.  And that's the end of it.  It was a proper

10    avenue of cross-examination.

11         And the other issue that I think the Court --

12         THE COURT:  I don't think there's anything wrong

13    with your cross-examination or anything, I don't think

14    there's anything wrong with the witness's answer.  What I'm

15    trying to do is clarify the document per se was not

16    counterfeit, it was what happened to that document that

17    was -- was a purported fraud on the Court.  Because the --

18    the Court was very concerned to make sure that that actual

19    zoning petition had been filed, because all that was

20    available was an unfiled copy.  And that -- the Court didn't

21    want there to be any misunderstanding with the jury that

22    something had occurred that had not occurred, right, that

23    had been filed and the local zoning authority had denied it.

24         MR. MEYERS:  I think that's not exactly correct,

25    Your Honor.

1              THE COURT:  Correct me.

2              MR. MEYERS:  Two things.  First I want to get the

3    order of the testimony clear.

4              The Court asked for that sidebar prior to the

5    government establishing that it was a false document,

6    because the carbon copies were attached.  So the Court asked

7    for that sidebar before the government had established those

8    carbon copies were there.  So the clear import of the

9    questioning was that the zoning petition had been actually

10   filed.

11             And second, I want to address whether or not it's

12   a false or counterfeit document.

13             THE COURT:  Yeah, explain that.

14             MR. MEYERS:  I think that it is, and this is the

15   reason.  The application was for 2800 Georgia Avenue and was

16   for a straw buyer, Veronica Williams, for the time period in

17   which this house had been done, which would have been 2002.

18             They're producing a document in 2007 which

19   purports to be for 2002.  And I'll show the Court by

20   Government's Exhibit S-95, which is an affidavit from the

21   zoning office in Mecklenburg County what the zoning office

22   says in that affidavit, if I may present it to the Court.

23             THE COURT:  Please.

24             MR. MEYERS:  What the zoning office says is

25   there's no --

1          THE COURT:  The Court wants to note for the record
2     that Mr. Meyers handed it to Mr. Tate and he glanced at it.
3     All right.  Thank you.
4          MR. MEYERS:  One, the zoning officer says is, in
5     essence, there is no such thing as a -- there should never
6     be in existence a denied zoning permit or application.
7     Their practice and procedure there at the zoning office is
8     to rip them up if they are denied.
9          That makes a purported zoning application for a
10    2002 house with Veronica Williams, for 2800 Georgia Avenue,
11    a false and counterfeit document.  There never was any
12    zoning petition ever made.  That document suggested that
13    there was.
14         THE COURT:  I guess I'm caught up with the phrase
15    "counterfeit," because I think of "counterfeit" as being
16    where there's legitimate currency; there's improperly
17    counterfeited currency where someone is making an artificial
18    copy of something that is not what it purports to be.
19         In this case, really you're saying this is a fraud
20    document.  It shouldn't exist.  If it really had been
21    denied, the document shouldn't itself exist because it
22    should be torn up.
23         MR. MEYERS:  Yes, sir.  And in fact, I think
24    "counterfeit" is purporting to be something it's not.
25         THE COURT:  Right.

1    MR. MEYERS:  And this document purported to be a

2  zoning application that had been filed and denied.

3    MR. TATE:  That's exactly what's false.  We never

4  even got to that step.  There was never any evidence that he

5  filed a zoning permit.  The question to her was:  "Ma'am,

6  have you ever seen this?"  That could have been did you

7  participant, did you go down yourself and pick up this

8  application?  Was there even a intent to have a group home?

9  And I think that's what we're getting at.  Not that it had

10  been submitted and denied.  That's the factual leap.

11    THE COURT:  No, I don't think the government's

12  argument is that there was a fraud on the jury.  The

13  government's argument is there was a fraud on me, the judge,

14  at the sidebar.

15    MR. TATE:  Well, the Court rightfully asked what

16  is the good-faith question for that, and I told him.  My

17  client could very well -- the intent was -- well, he could

18  say, "Well, listen, we intended to file it.  Here's the

19  application."

20    THE COURT:  But that's the point.  That's not the

21  answer -- the Court asked the question.  The Court asked the

22  question has -- has this been filed and has it been denied?

23    MR. TATE:  The Court asked me had it been filed.

24    THE COURT:  It's in the transcript.

25    MR. TATE:  The Court called me to a sidebar, which

```
 1    was to ask about -- I really shouldn't have been getting
 2    into what my client told me at all.  I shouldn't have really
 3    been -- but -- but the --
 4              THE COURT:  When you have a good-faith basis for a
 5    question, you have to say my client or someone else told me
 6    this, and then you were protected.  You were protected.  You
 7    can then say I have a good faith basis for the question.
 8    You're protected because you said, "My client has said it
 9    was filed and it was denied."
10              MR. MEYERS:  Judge, I can help.  I have the
11    transcript up on the screen.
12              THE COURT:  The whole transcript.  Yeah, I know in
13    your summary you only have portions of it, but let's go
14    through the whole sidebar.
15              MR. MEYERS:  Well, this is before the sidebar,
16    Your Honor, this is page 1598 of the trial transcript.  It's
17    cross-examination of witness Veronica Williams:
18              "Answer:  Yes, I was calling Cloud and I was not
19    getting a response.
20              "Question:  That's after he was denied zoning for
21    group home?
22              "Answer:  This is the whole -- do you agree that
23    there would be no reason to steer you to someone to train
24    you if the location can't be zoned for that.  Correct?"
25              "Calls for speculation.
```

1           "The Court:  Can we have a sidebar?"

2           So it was clearly right after a question, "that's

3 after he was denied zoning for group home."  There was no

4 ambiguity about that.

5           MR. TATE:  It doesn't say anything about him --

6 the location can't be zoned.  That means you can't have a --

7 a person could learn that without even filing a permit.  You

8 can't possibly have a group home in this area at all.  There

9 would be no reason to file.  You could have talked about it

10 but then it's not a reality.  I think there's nothing -- you

11 would have to make a factual jump to say --

12           THE COURT:  Well, no, the issue was whether I was

13 deceived, and I was deceived, quite honestly.  If you scroll

14 a little further, I specifically asked, "Was this filed and

15 was it applied for?"

16           "Yes.

17           "And who told you?"  Go on.

18           And you say, "My client has told me that."

19           And I said, "Your client told you that.  You don't

20 have anything other than that?"  The "what" I think is

21 supposed to be "that."

22           I'm asking the witness, and she says that there's

23 a zoning -- that's not what she said.  She said Mr. Cloud

24 told her it had been denied.

25           Okay.  "So that's what I'm curious about.  I don't

1  want the jury to think the process was denied when, in fact,

2  it might not never have occurred.  You can ask those

3  questions.  That's my concern."

4          That was the whole essence of it.  I don't want

5  the jury to believe it had been denied when it might never

6  have occurred.  And you told me that your client told you

7  that it had been denied.

8          MR. TATE:  Right.  Well, my client didn't tell me

9  that specifically, but he did tell me that he could not get

10  it zoned and that's what I knew.  And I asked her did she

11  know anything about the application process, whether he told

12  her that he could not get it zoned because they won't allow

13  it in that area, that's where I was going, and I was cut off

14  with it.  But once she said, "I can't recognize the

15  document," that was the end of it.  But there was never any

16  indications, for instance --

17          THE COURT:  I mean, this is very important, I

18  don't want to put you on the spot, but you would swear that

19  all your client told you was, "I could not get it zoned."

20  He didn't say, "It was denied."

21          MR. TATE:  That's exactly what he told me.  He

22  told me that during the testimony.  Then he was ruffling

23  through his own files to hand me this application.  I looked

24  at it in the middle of cross and stood up and started asking

25  her questions.

1          THE COURT:  I'm not going to make you swear

2     because I don't want to require that, but a proffer from you

3     is, "All my client told me was I couldn't get it."  Not

4     specifically that "I filed the petition and it was denied."

5     But rather, "I could not get the zoning for group home."

6          MR. TATE:  That's what I recall him telling me at

7     the table.

8          THE COURT:  That's it.  It's only you and he are

9     the witnesses to this.

10         MR. TATE:  He told me, he said, "I couldn't get it

11    zoned."  The next thing is he handed me this.  I looked at

12    it and I asked her had she ever seen it.  Those are

13    foundational questions.  Now, did you have discussions --

14    because their argument was that this was a complete fraud.

15    That these people were duped.  That there was no

16    intentions --

17         THE COURT:  Okay.  This is a very sensitive issue

18    because it does get into communication between an attorney

19    and his client.  But I accept Mr. Tate's assertion that all

20    his client told him was that he couldn't get it zoned and

21    that Mr. Tate then presumed that to mean he had applied and

22    it was denied -- and it was denied.  And I'm -- I think

23    that's the proper holding of this case.

24         MR. MEYERS:  And I think that may be, Your Honor,

25    for the statement to the court at sidebar "my client told me

1   that." It was a false statement. Mr. Tate didn't know

2   that.

3         The question for the Court now, I believe, is did

4   Mr. Cloud attempt to produce a false or fraudulent document

5   in a judicial proceeding? Did the Defendant Cloud attempt

6   to produce a false or fraudulent document in a judicial

7   proceeding by handing his lawyer that document?

8         THE COURT: Mr. Tate just said he was the one

9   thumbing through the document.

10         MR. MEYERS: He said his client gave it to him,

11   Your Honor.

12         THE COURT: Yeah. But of course his client gave

13   him everything.

14         MR. MEYERS: Yes.

15         MR. TATE: Mr. Cloud, for instance, he could hand

16   me a document to look at, and because I stand up and do

17   something with it, he doesn't know what I'm trying --

18         THE COURT: Sit down, Mr. Tate. You've won this

19   one.

20         The Court is going to find as a matter of fact,

21   that there was a miscommunication, misunderstanding between

22   attorney and client, and that there's insufficient evidence

23   to support obstruction of justice enhancement and that's

24   based on Mr. Tate's proffer. All right. So those two

25   points will be removed. That's paragraph 28.

1          PROBATION OFFICER:  28.

2          THE COURT:  All right.  Now let's start with the

3   one that's going to take the longest amount of time of the

4   objections that remain, that's the loss amount.

5          So it is the government's burden of proof.  I know

6   the government takes the position that it can, if it wants,

7   rest on the Presentence Report, but I presume that's not

8   what the government intends to do.

9          MR. MEYERS:  Well, to be clear, Your Honor, the

10  Presentence Report and the trial testimony establishes, I

11  think, by a preponderance of the evidence the loss amount

12  with regard to the actual properties here for the

13  conspiracy, $10 million.

14         THE COURT:  Okay.  But let me get into specifics

15  there.

16         The defense's argument is you can't count

17  Mr. Strong, Mr. Phillips, and a few others because they were

18  separate conspiracies.

19         MR. MEYERS:  Yes, sir.

20         THE COURT:  All right.  I've re-read a lot -- like

21  I said, I went through the whole transcript.  I didn't read

22  it word for word, the whole transcript, this weekend, but I

23  went through the whole transcript, and I did review the

24  testimony of all the alleged co-conspirators.  And I note

25  that those co-conspirators are named as co-conspirators in

1    the indictment, either as fellow charged co-conspirators or

2    named in other paragraphs as co-conspirators where they have

3    been -- where they have pled guilty or have been charged in

4    other indictments.

5        But let's get to the 10 million specifically

6    through looking at each of the other co-conspirators, and

7    making it perfectly clear how they are directly related to

8    Mr. Cloud and how Mr. Cloud reasonably foresaw all the

9    losses generated by those co-conspirators.

10        MR. MEYERS:  Yes, Your Honor.

11        THE COURT:  And don't spend a lot of time.

12        MR. MEYERS:  I'm make it quite clear.

13        What I will submit to the Court, provide a copy to

14   defense counsel as Government's Exhibit S100 and S100-A.

15   S100-A is a spreadsheet I provided to Mr. Tate last week.  I

16   presented this to the Court.

17        The Presentence Report is quite specific and

18   establishes with plaintiff's specificity the properties that

19   Defendant Cloud himself was personally involved with.

20        In terms of holding the Defendant Cloud for the

21   for the other properties, S100 and S100-A put into the

22   record for the Court, which I think is already a matter of

23   public record for this court since this Court conducted the

24   sentencing hearings.

25        THE COURT:  Right.

1           MR. MEYERS:  Is the stipulated loss amounts.

2           THE COURT:  And I should note for the record the

3   Court is considering all the other defendants it has

4   sentenced, both for purposes of those defendants being

5   similarly situated or not being similarly situated when I

6   get the sentencing factors, and also for purposes of

7   understanding the full scope of the conspiracy.  I just want

8   that on the record.

9           MR. MEYERS:  To make clear for the Court, the

10  argument for the government about what the evidence showed

11  during the trial that the way this conspiracy worked is it

12  had several cells or units, if the Court will, each unit

13  being headed by a particular promotor.  The promotor shared

14  the lawyers, the underwriters, the mortgage brokers, the

15  recruiters in some cases.  And each promotor was the

16  responsible for their own unit of operations knowing what

17  the other promotors were doing, and using the same modus

18  operandi et cetera, as laid out in more detail in the

19  Government's Sentencing Memorandum.

20          What -- S100 is an affidavit of

21  Special Agent Michael McNeely.  He was the F.B.I. agent who

22  was responsible for all the other promotors.

23          It just puts into this sentencing record what the

24  stipulated loss amounts were by the defendant, Michael

25  Brian, the defendant Henderson, the defendants Kenneth

1    Strong and William Phillips who operated together sort of as
2    co-promotors.
3           I know the Court already has all this information
4    because the Court handled the sentencings for all these
5    individuals.  The Court saw those individuals in open court
6    stand up and stipulate to these loss amounts.  And that
7    affidavit also establishes why it was that those defendants
8    were not asked -- we did not ask the Court to hold them
9    responsible for their foreseeable losses from their
10   co-promotors in the conspiracy.  That's only because they
11   pled guilty so early we didn't have a full understanding of
12   the conspiracy at that point.  As the government notes in
13   it's Sentencing Memorandum, for example, Kenneth Strong, one
14   of the fellows that pled guilty in 2003, years before the
15   Defendant Cloud went to trial.
16          What the affidavit and what the spreadsheet
17   establishes is that all of the loss amounts for those
18   promotors were within the time period of conspiracy that the
19   defendant was in the conspiracy, namely that the earliest
20   transaction was August 4, 1999, by Michael Bryant, and the
21   latest transaction was later then that in 2003.  I believe
22   there is a typo, I should say, in the affidavit.
23          We put this together yesterday.  I want to make
24   clear for the Court that it appears because of cutting and
25   pasting that A through C all have the same second sentence,

which is incorrect.  So I'd ask the Court instead to look at the spreadsheet, which is S100-A for those time periods.

S100-A indicates on it's face what the dates were and indicates, I believe, all those dates were within the scope of the conspiracy.

That's set forth more particularly in the Government's Sentencing Memorandum.  I can find that if the Court doesn't have that information immediately available. We were working on this yesterday after receiving the spreadsheet.

THE COURT:  We all were working on Sunday in this case.

All right.  According to Ms. Easley's calculations -- well, I guess the government's calculations when you add in Mr. Cloud, Mr. Strong, Mr. Bryant, and Mr. Henderson, that the total intended loss was $10,052,875. Is that correct?

MR. MEYERS:  Yes, sir.  And we ask the Court to hold that that was reasonably foreseeable to the defendant, Cloud, because of the trial testimony which established that all the factors of a common scheme or plan, according to 1B1.3, are established here.

THE COURT:  Let me clarify:  In the PSR of June 29th, 2009, the number 9,161,509.  Right?  Then the government said that was an addition error and the proper

1  amount is 10,052,875?

2         MR. MEYERS:  That's correct, Your Honor.

3         THE COURT:  I just want to make sure:  Mr. Tate,

4  were you aware of that alleged addition error?

5         MR. TATE:  Yes, sir.

6         MR. MEYERS:  And just to be clear for the record,

7  if the Court looks at paragraph 12 of the Presentence

8  Report, the four numbers that are there, 3.3 million,

9  2.9 million, 2.6 million, 1.1 million all do add up to that

10 $10 million.  It's -- all those numbers are correct, it's

11 just the arithmetic is --

12        THE COURT:  I just wanted that explained on the

13 record.

14        All right.  This Exhibit S100-A is the 10 million

15 loss -- supports the $10 million loss amount?

16        MR. MEYERS:  Yes, sir.

17        To be clear, that identifies the properties that

18 were involved for the co-conspirators, defendants --

19        THE COURT:  Right.

20        MR. MEYERS:  -- Strong, and the loss amounts stem

21 from those.  What that especially also does is it

22 establishes those losses were incurred during the time

23 period that the defendant was involved in the conspiracy.

24 That's one of the factors the Court would need to find.

25        THE COURT:  Which was '99 to 2005.

1          MR. MEYERS:  Correct, Your Honor.

2          THE COURT:  According to paragraph 12.  This is

3     the 94 fraudulent loans that Ms. Easley refers to.  S100-A.

4          MR. MEYERS:  It does include those 94 fraudulent

5     loans which are the ones Defendant Cloud himself personally

6     had a hand in.

7          THE COURT:  So how many total on this then?  I'm

8     sorry.  230.  I see now.

9          MR. MEYERS:  Yes, sir.

10         THE COURT:  All right.  Very briefly for the

11    record, explain to me how -- I know all these -- most of

12    them of these co-conspirators testified, but go through

13    Mr. Strong, Mr. Bryant, Mr. Henderson and explain how

14    they -- how Mr. Cloud reasonably foresaw their loss amount.

15         MR. MEYERS:  Thank you, Your Honor.

16         I think there's two questions defense would

17    challenge:  One was whether they were involved in the

18    conspiracy with Mr. Cloud; and the second one being whether

19    their losses were reasonably foreseeable, so I'm going to

20    address each in turn.

21         First, with regard to Michael Bryant, the facts

22    supporting that -- at least some of the facts supporting

23    that are set forth in the Government's Sentencing Memorandum

24    starting at page 12, in which the defendant, Lee, testified

25    quite extensively that he prepared transactions for both

1    Michael Bryant and for the defendant, William Cloud.

2              The Court will recall there was testimony, the

3    fact that they shared the same spot in Mr. Lee's trust

4    account, each borrowing the other's money, coming into

5    Cloud's together.

6              The evidence also established that Cloud and

7    Bryant together were co-promotors on a number of

8    transactions which are listed there, namely Steve Mirman

9    transaction.  The defendant, Lee, testified there was no

10   difference between the way Mr. Cloud and Mr. Bryant operated

11   in the conspiracy.

12             Straw buyer Robert Moore testified that Cloud had

13   told him that Bryant was the man helping Cloud by houses at

14   1302 of the transcript.

15             This was testimony from Kim Dauria that they

16   worked with Cloud and Brian together.  In other words, there

17   was a great deal of testimony about how those two worked

18   together.

19             With regard to Defendant Strong, the facts tying

20   them together from the trial begin at page 15 of the

21   government's Sentencing Memorandum.

22             Mr. Strong testified they were in business

23   together.  He testified they had the same role.  He

24   testified their direct interaction was limited to Strong

25   owing Cloud money for his closings, but he testified they

were in the same business of the transcript.  He testified
he worked with the same mortgage brokers, they worked with
the same lawyers, they worked with the same underwriters.
They used the same verification of deposits with Amy
Phillips.  They talked explicitly about loaning each
other -- about Strong loaning money for his closing; they
knew what the other one was doing in the conspiracy.  They
did it in the same geography, meaning Mecklenburg County.
And Cloud, in fact, solicited them to go out to Atlanta in
response to their getting heat from irate buyers.

        Henderson said that his connection, that his link
in the conspiracy to the Defendant Cloud was primarily
through Dan Greene.  He testified he had a standing
agreement with Dan Greene that anyone who wanted to get one
of his houses could.  Cloud did that for the Kenneth Wanke
transaction.

        The defendant, Henderson, also testified that he
had the same modus operandi as Defendant Cloud, namely the
false lease agreements, the fake cashier's checks, the
verifications of deposit from Amy Phillips.  Together they
used same conspirators:  Leon Orr, Amy Phillips, Juderita
Russell, Dan Greene.  And the government's argument with
regard to those is set forth in the Sentencing Memorandum in
quite some detail.  It starts --

        THE COURT:  You don't have to restate that part of

1    the Sentencing Memorandum.

2              MR. MEYERS:  Thank you, Your Honor.

3              I just point out there's really two ways that the

4    Court ought to do it.  I think the two work together in the

5    if Fourth Circuit.

6              First there's 1B1.3 which says if you're trying to

7    figure out whether it's a common scheme or plan, if there's

8    common victims; there are here in this case as set forth in

9    the memorandum.  Whether there's common accomplices.  There

10   are numerous.  They used the same professionals, in the some

11   cases the same straw buyers.  Whether there was a common

12   purpose.  There was here:  Defrauding mortgage lenders in

13   the same way.  Whether there was a similar modus operandi;

14   there was here.

15             The Guidelines say there needs to be at least one

16   of those factors.  Here all four of those factors are met.

17             In addition, the Fourth Circuit adopts *Pinkerton*

18   for purposes of sentencing liability.  That's discussed in a

19   number of Fourth Circuit cases, *United States v. Newsome,*

20   *United States v. McHan*, which is another Fourth Circuit

21   case; *United States v. Moore*, also at 56, 57 in the

22   Government's Sentencing Memorandum.

23             And the question was was it reasonably

24   foreseeable.  I think the trial testimony established that

25   it was.  What Defendant Cloud, and what Defendant Strong,

Phillips, Henderson, and Bryant all knew is that they each
were heading their own operation.  Each had their role,
which was to go find the straw buyers, organize the
transactions, make the transactions work.

          Sometimes they worked together; more often, they
worked on their own, in their own little units, in their own
little cells.  Each knew what the other one was doing.
That's why they went to each other.  They knew they were in
the same business, as their testimony showed, and their
transactions happened with the same people, in the way same
way, under same location, under the same type --

          THE COURT:  When you say "same people," you're
talking about the same accomplices, right?  The real estate
appraisers.

          But the common victims, though, I have a little
concern with because Mr. Cloud, I thought, targeted the
Filipino American community.  And did the other
co-conspirators target that specific group of investors?

          MR. MEYERS:  I think that would be a difference.
I think that that's something Mr. Cloud brought uniquely to
the table in his role.  But in terms of the same bank
victims, yes.  They all worked through Juderita Russell.
Therefore Chase Manhattan was hit a number of times.  Mr.
Cloud and Mr. Bryant in particular went after Countrywide
through Kim Dauria.

1          THE COURT:  So it depends on which victim you're

2    talking about.

3          MR. MEYERS:  That's right.

4          THE COURT:  All right.  I did not understand that

5    aspect of your common scheme or plan.

6          MR. MEYERS:  And so for this reason, this is very

7    much like, as I pointed out, the case of the *United States*

8    *v. Osborne*, which is at the Government's Sentencing

9    Memorandum, page 59.  That's a Tenth Circuit case from 2003.

10          In that case what the Tenth Circuit found was that

11    the folks operated independent cells, and although the

12    aggravate losses of the entire scheme there, the $125,000,

13    were foreseeable, because he knew the other members of the

14    scheme with his roles, he knew the general outlines of what

15    was done, and he knew it was done by all the cells.

16          Because of that, the Tenth Circuit found that the

17    losses from all other folks in those independent cells were

18    foreseeable.  Fourth Circuit, reached the came conclusion in

19    *United States v. Codarcea*, page 60 of the Government's

20    Sentencing Memorandum, there it said he was responsible,

21    even though he was only entitled to one part of the bank

22    fraud scheme, because all the losses occurred during the

23    same time period, in the same area, in the same manner.

24          He was involved in the conspiracy at the beginning

25    and at the end, with no indication he withdraw, and he was

1    linked to the other individuals who were engaged in

2    identical fraudulent transaction.

3           It's also like the Fourth Circuit case of *United*

4    *States v. Newsome*.  That was the tree stealing conspiracy.

5    The defendant was only involved, as the jury found, with a

6    couple trees.  He was responsible for losses of $1,000.  If

7    he was responsible for all the losses in the entire

8    conspiracy of about $32,000 during the time period that he

9    was in it.  The Fourth Circuit did not hold him for losses

10   for the time period he was not in the conspiracy, only when

11   he was in it, even though he was only involved with a couple

12   trees, he was responsible for all the losses.  And the

13   reasons were it be reasonably foreseeable to him.  Those

14   other folks were doing the same thing he was doing.  The

15   same co-conspirators.  They were doing the same victims,

16   whether it was the trees or the folks who owned the trees, I

17   suspect in that case, and he did it in the exactly the same

18   way; there was similar modis operandi.

19          Following the strictures set forth in 1B1.3,

20   following *Pinkerton*, following these cases, we believe the

21   Court should hold the defendant, Cloud, responsible for the

22   losses incurred by the other promotors in this conspiracy.

23          THE COURT:  All right.  Thank you.

24          Mr. Tate, I'll let you respond to that issue, the

25   direct actual or intended loss.  And I think you take the

 1    legal position that actual loss is the only correct loss.

 2          MR. TATE:  Yes, Your Honor.

 3          And our position is really that there was no

 4    intended loss in this case.  Intended loss is what the

 5    defendants intended.  I think every witness in here

 6    testified they intended to make money.  Nobody intended for

 7    the lenders to lose money.  Nobody intended for the straw

 8    buyers to lose money.  Everything was about making money.

 9    Indeed, they made a lot of it, all of them, and there was no

10    intended loss.

11          The reason they want to shift to intended loss is

12    because they understand the problem with the actual loss.

13    So they want to get into this murky world of reasonably

14    foreseeable where you can't really go to that unless there's

15    some intention of intended loss.

16          Let me start off by saying first of all, the first

17    procedural error would be crediting any stipulations by

18    co-defendants; that they have stipulated to loss amounts and

19    said those are specific and apply to loss amounts.

20          I believe the testimony would be they never really

21    undertook the analysis on loss that we've done, and just

22    like the Court would instruct a jury, the fact that a

23    co-defendant has pled guilty is no way evidence against

24    Mr. Cloud.  Mr. Cloud was not a party to that stipulation.

25    He didn't know what it was.  I suspect those defendants

1     really didn't care because they knew at the end of the day

2     that their sentence was based on the 5K, so they weren't

3     mitigating loss as we are here.

4           THE COURT: Well, I have agree to the extent that

5     they are concerned about a 5K, but are you saying they lied?

6           MR. TATE: No. They just didn't know.

7           THE COURT: They lied when they said this is the

8     loss amount which I was responsible for.

9           MR. TATE: I can't say whether they lied or not, I

10    haven't spoken to them. I can't get into their heads. But

11    what I do know from my practice and experience is that they

12    didn't litigate loss. They stipulated to a loss amount.

13    One reason Mr. Cloud didn't plea is that they offered the

14    same deal for Mr. Cloud, the loss amount. We said let's

15    see. And they didn't produce it, and Mr. Cloud wouldn't

16    agree to the loss amount.

17          THE COURT: But now, though, in this case, the

18    government has a record of interviews of all those

19    co-conspirators, and the FBI has put together a database

20    based on those debriefings and has come up with this number

21    of probation officers who have reviewed the number.

22          MR. TATE: That's not true.

23          THE COURT: It's not true?

24          MR. TATE: I've looked at all the 302s. I haven't

25    seen anything talking about loss. Just looking at this

1  chart he just turned in this morning, it's 230 pages, it

2  probably doesn't even list a loss amount on there at all.

3          THE COURT:  No, no.  This chart to is identify

4  properties, it's not to identify loss amount.

5          MR. TATE:  No.  They haven't established a loss

6  amount.  There still isn't any evidence before the Court --

7  all of them people were just saying it, but you can say

8  anything --

9          THE COURT:  Wait, wait, wait.  That's evidence.

10  It's evidence.

11          MR. TATE:  No.  I can come in here and say there's

12  zero loss.  Is that evidence?

13          THE COURT:  No.  But if a co-conspirator says to

14  FBI agent these are the properties that I was involved in

15  and this is the spread, these are the two different

16  transactions, the first and the second, that's evidence.

17          MR. TATE:  That's exactly what's not before the

18  Court, though.  I haven't seen that at all.  Let me go

19  through where I think we are.

20          THE COURT:  If you didn't -- I mean that was --

21  that's in the Presentence Report.

22          MR. TATE:  Presentence Report is not evidence.

23  It's just conclusions.  It's not evidence.

24          They have -- a Presentence Report, Probation did

25  not interview a single one of those people.  And I haven't

1    seen a 302 where Don Strong, Bryant, Mr. Henderson or

2    anybody else said, "Here's the loss amount."

3              THE COURT:  Let me ask Ms. Easley where she got

4    her specific numbers then.  So -- because I have seen some

5    charts.  I saw them last week.  And I want Ms. Easley to

6    explain those charts.  She was showing them to me.

7              PROBATION OFFICER:  One of the charts that

8    determine Mr. Cloud's actual loss was part of the attachment

9    to the objections and to the Presentence Report.

10             And what we did in all of these cases is we went

11   and worked with the FBI agents, went through the file, took

12   the difference between an original amount of the loan and

13   then the foreclosure price, the actual loss.  If we could

14   not come up with actual loss because foreclosure procedures

15   had not been processed, and we could not obtain those files

16   because the banks were out of business or whatever, we took

17   an average of what the ones we could determine was, getting

18   rid of the high and the low, came up with a average, and

19   multiplied that to get intended loss for the other loans

20   that we could not come up with.  We did that in the Strong

21   case.  Henderson.  We followed that procedure in all the

22   cases.

23             THE COURT:  Mr. Tate, you're saying you didn't ask

24   Ms. Easley --

25             MR. TATE:  What the Court had just suggested had

1  happened.  What she just admitted is that they did it in

2  Cloud, Strong, Henderson, so it's not their statements.

3  It's not co-conspirator statements --

4          THE COURT:  But this is sentencing.  The Probation

5  Office never, to the best of my knowledge in preparing a

6  Presentence Report, in no case ever actually goes and tracks

7  down a co-conspirator, but it works through the agents and

8  the counsel on both sides on coming -- on putting this

9  together.

10          MR. TATE:  Correct, Your Honor.  And I understand,

11 except they didn't work with me in this case.

12          THE COURT:  But you met -- didn't you meet with

13 Ms. Easley some time --

14          MR. TATE:  No.  No.

15          THE COURT:  But you certainly had the opportunity

16 to.

17          MR. TATE:  Well, we exchanged documents.  We

18 disagreed.

19          We're saying their procedure of determining loss,

20 which she's just said is that herself and FBI agent

21 determined the loss amount, and then they used estimates for

22 houses they couldn't find records of.

23          They didn't go and talk to the lender see what the

24 actual loss amount was.  That's all speculative.  It has to

25 be specific and reliable.  You just can't come up with a

1    number to fit where you want it to be, and that's what we're

2    saying has happened here.

3            THE COURT:  Well, and that's the nature of the

4    intended loss, is you estimate -- because it's intended, you

5    estimate what the loss was supposed to be, even if there was

6    no loss.  If the actual loss was zero -- my understanding of

7    the law is that the actual loss is zero, but there was an

8    intended loss, you still go with the intended loss.

9            And, of course, intended loss is not going to be

10   supported by addition and subtraction of different

11   transactions, because the actual loss between two

12   transactions -- well, between the second closing and the

13   foreclosure, the actual loss might be zero, but it's still

14   intended loss that counts.

15           MR. TATE:  But whose intent is it?

16           THE COURT:  To defendant's and the

17   co-conspirators.

18           MR. TATE:  So how does an FBI agent or Probation

19   determine what Mr. Cloud's intent was based on something

20   that somebody else did that they didn't talk to?

21           THE COURT:  Well, the jury found he intended to

22   commit this fraud beyond a reasonable doubt, so the FBI

23   doesn't have to go back and rethink the jury verdict.  They

24   just have to present the evidence showing the loss amount

25   supporting the jurors verdict that the defendant intended to

1    defraud.  They have already made that finding beyond a

2    reasonable doubt that he intended to defraud.  That's not

3    for me to relook at.

4         MR. TATE:  Intending defraud and intending a loss

5    for the lender is two different things.  The jury did not

6    entertain that question.

7         We're not here questioning whether Mr. Cloud was

8    guilty.  The jury spoke.  The issue is:  Do you use actual

9    loss or intended loss?  If it's intended loss, it's

10   Mr. Cloud's intent, not Mr. Bryant's, not Mr. Henderson's.

11        THE COURT:  No, in that case, it's -- it's

12   Mr. Cloud's reasonably foreseen view of the other

13   co-conspirator's intent.

14        MR. TATE:  But the testimony of the people that

15   testified, both Mr. Henderson and Mr. Strong, is very clear:

16   They had very limited dealings with Mr. Cloud.  They did one

17   house apiece with them.  They brought in over 100 houses

18   that these folks did that had absolutely nothing to do with

19   Bill Cloud.

20        THE COURT:  Well, that's a factual issue.

21        MR. TATE:  But that's exactly what Probation just

22   admitted they did.

23        THE COURT:  Right.  I know.  That's a factual

24   issue.  That goes back to Mr. Meyers' argument of common

25   scheme or plan.

1        Let me just get back to -- your position is
2   there's never ever an intended loss of your client ever.
3        MR. TATE:  That's not my position at all, in all
4   due respect.
5        THE COURT:  I thought you said that there was no
6   intended loss.
7        MR. TATE:  As I understand the concept of intended
8   loss, I said it's not present here.  The intent -- the
9   intended loss, you have to intend for the lender to take a
10  loss, or whoever the victim was in the case, which the
11  government has charged there are lenders --
12       THE COURT:  Or investors.
13       MR. TATE:  The investors can't be victims because
14  the government identified them as co-conspirators at trial
15  when they put them on the stand and had them introduce
16  801(d)(2)(e) statements.
17       THE COURT:  No.  See, that's where I disagree with
18  you as a matter of law.
19       A co-conspirator can also be a victim.  When they
20  are lulled into something and they commit fraud, and then
21  they find out their commission of fraud leads to them
22  being -- losing their own home from the fact they are having
23  to cover a default or deficiency in a foreclosure, they lose
24  their own home.  They lose their credit worthiness.  They
25  were victims.  They are co-conspirators and they're victims.

1    MR. TATE:  I would respect the Court's ruling if

2    that's the ruling --

3    THE COURT:  I'm saying legally a victim can be a

4    co-conspirator.

5    MR. TATE:  Well, the Guidelines say they can't.

6    They said if they are a culpable participant, they can't be

7    considered a victim.

8    And when they put them in on the stand they said

9    they -- because at that time I asked them -- I said the

10   judge is going to -- it's going to -- the Court is going to

11   have to consider it foundationally for evidentiary rules

12   like 801(d)(2)(e) statements.  The government said they were

13   unindicted co-conspirators.

14   THE COURT:  Okay.  And I went too far adrift on

15   that.  We need to -- I think I've got your argument:  That

16   Mr. Cloud personally never intended for anyone to lose any

17   money.  He intended for everyone to be whole.  That's your

18   --

19   MR. TATE:  To make more than whole.  That everyone

20   would make money in this thing.

21   And what we're saying is we relying on Fourth

22   Circuit decision in *United States v. Bolden*.  And in *Bolden*

23   they said the fact that the defendant is aware the scope of

24   overall operations having been held accountable for

25   activities the whole operation -- determine the role the

1     defendant agreed to play.

2         And the role the defendant agreed to play here

3     with Mr. Henderson was his invitation -- it was a standing

4     invitation. I asked him at the trial, "Sir, if I would have

5     brought you a buyer, would you have given me 50 percent?"

6     He said, "Yes."

7         This was not a part of any criminal conspiracy.

8     He's basically a booster. If he brings somebody in, there's

9     a reward. His agreement was with Dan Greene.

10         THE COURT: He's a recruiter.

11         MR. TATE: Mr. Cloud knew somebody, took him to

12     Mr. Henderson and he got at commission out of it. That was

13     the end of their dealings, the only dealings he ever had.

14     It wasn't a part of any other aspect of Mr. Henderson.

15         Mr. Strong, he had a limited role, was that Mr.

16     Strong borrowed him some money after Daniel Greene referred

17     Strong for a loan. He said that was the extent of our

18     dealings. I didn't know why he was loaning the money. He

19     paid me back with interest, and I was happy to get it back.

20         Mr. Bryant, we never heard from Mr. Bryant. We

21     know that Mr. Bryant had some dealings with Mr. Mirman. The

22     did two deals, Mr. Cloud's name was not on those

23     transactions. Just because Mr. Cloud knew Mr. Mirman and

24     Mr. Bryant, and that Mr. Cloud sold houses to Mr. Mirman at

25     some other time doesn't make him vicariously liable for any

1    and everything Michael Bryant did.

2              Now, common scheme and plan.

3              All the literature on these cases, they are like

4    blueprints, and they say at all times -- this is how they

5    operate:  If that were the case, Mr. Cloud would be liable

6    not just for losses of any and every mortgage fraud here,

7    but anywhere in the United States, because they all have a

8    common scheme and plan.  They all use straw buyers.  They

9    did not even use the same people.

10             If you look at the lenders here, most of the loans

11   done by Mr. Bryant, done by Mr. Henderson, a lot of them

12   were subprime loans.

13             Mr. Cloud, when he dealt with Mr. Greene, those

14   were performing or confirming loans that went through Fannie

15   Mae, that means they were not subprime.  People had to use

16   certain underwriting standards by Freddie Mac.  There was

17   evidence of that.

18             When you get into some of these subprime loans,

19   they were outside the time frame of the indictment Mr. Cloud

20   was charged.  There's no evidence he was ever involved or

21   knew anything about it.

22             They were subprime.  And during that time, Your

23   Honor, you heard evidence it didn't -- in many instances it

24   didn't require them to state it, they just came in and said

25   what their income was, and it was encouraged by the lenders.

1        The other distinction is both Ken Bill and Mr.

2   Henderson are not similarly situated with Mr. Cloud.  They

3   were builders.  They had licensed people that had a license.

4   Real estate people connected to them.  Mr. Cloud was not

5   even in their class of people.  They were builders.

6   Mr. Henderson builder.  Just like Beazer Homes, he was

7   building properties.  He had special privileges with the

8   banks and underwriters that Mr. Cloud knew nothing about.

9   And so he's not even similarity situated to these people.

10       And trying to tax him with hundreds of loans that

11  they did outside of the scope of this time frame, when they

12  did one limited transaction with him, we think would be

13  error.

14       Additionally, they haven't even proven that even

15  if those transactions involving other people were fraudulent

16  they were losses.  There's no evidence there are any losses

17  in connection with those other properties or those other

18  defendants who were charged in different indictments to even

19  come up with a ten million.  It's just a number that

20  seemingly is picked out of the sky; that we've seen nothing

21  that would support that there were any losses in connection

22  with those properties.

23            THE COURT:  But you had the opportunity to see all

24  of these records that Ms. Easley prepared.

25            MR. TATE:  No.  Her records are --

1          THE COURT:  Did you call?

2          MR. TATE:  Your Honor, we've looked at those.

3     We're saying they are not evidence.  We haven't seen

4     anything from the lenders in these other 230 cases that

5     suggest there were any losses.  We went out and got the

6     records ourselves for the 94 that were identified.

7          THE COURT:  See, now, yes, I know what you pulled.

8     You pulled some very narrow actual losses.  And you also

9     said when there was no losses, there was no loss whatsoever.

10    And yet that's not the law.  The law is the higher of actual

11    or intended loss.

12         MR. TATE:  Right.  Of course, our position is

13    there was no intended loss.

14         THE COURT:  I understand your position that there

15    is know intended loss, but that -- the Court has to legally

16    and factually reject that, and I want to explain why.

17         Under your theory, there was no intended loss.

18    Bernie Madoff would not be in prison right now.  You're

19    basically arguing that if you're running any form of fraud

20    scheme, you're always hoping to catch up.  That's the goal.

21    You're claim here was hoping to catch up, meaning hopefully

22    the properties would be resold quickly -- or not going into

23    foreclosure, and -- or some tenant would get in there and

24    actually be a good, honest tenant that would stay there and

25    pay, but -- and hopefully that would cover the debt

1    servicing.

2          The bottom line, the loans were made based on

3    fraud, extensive amounts of fraud.  And hoping that the

4    fraud would never be detected, because you could stay ahead

5    of the cash flow by either having the property eventually

6    sold again, or having a good tenant in there that would

7    cover the cash flow, is kind of a fanciful view of no

8    intended loss.

9          Bernie Madoff, and all Ponzi operators hope they

10   are going to be able to cover everybody, but eventually the

11   house of the cards collapses.  And so that argument of

12   intended loss, that "I never really intended anyone to be

13   victimized but I got in over my head and I got ahead of

14   myself," is just really a fanciful view of intended loss

15   because it would mean it would never be intended loss ever.

16         MR. TATE:  The way -- even the cases the

17   government cited where it was only two courts that I saw

18   filed intended loss in this kind of a case, they found

19   because there's inflated appraisals.  The people -- they

20   duped people.  The said come and buy this house --

21         THE COURT:  But we haven't inflated appraisals on

22   this, but we have also outright lies on loan applications,

23   we have lies with the underwriter.  We have bribes paid to

24   the underwriter.  We have real estate closing attorneys, who

25   have fiduciary duty, who are watching money being churned

1  through their accounts that wrong people were bringing in

2  down payments.  There's just a vast multitude of fraud in

3  each of these transactions.

4         MR. TATE:  No -- no -- no qualms with that at all.

5  We agree.

6         THE COURT:  I appreciate with you agreeing with me

7  there.

8         Now, so there's -- the intended loss comes from

9  the fact that when you create the fraud and you get money

10 you're not supposed to get from an lender, that hoping that

11 that lender will get paid back in whole down the line is not

12 a defense to intended loss.

13        Intended loss, as you know, I've got a flip that's

14 occurring on the same day, or within a couple days, and I

15 have -- you know, it's 100,000 purchase for the first day,

16 first transaction; it's flipped to $130,000 the same day or

17 the next day, there's no way your property appreciates

18 30 percent in this one day.

19        MR. TATE:  What the evidence was in this case, and

20 if the Court would listen to me mechanically how this works.

21        There's no dispute:  Mr. Cloud owned these

22 properties.  And the evidence was even Brian (ph) said they

23 were in foreclosure.  When the house is already in

24 foreclosure, it's already in a reduced rate because the

25 lender -- we're going to put on evidence of this effect --

1    the lender is only interested in recouping what's

2    outstanding on the house.

3            THE COURT:  No, that's the first lender.

4            MR. TATE:  They are not trying to get full market

5    value.

6            THE COURT:  Are you saying that -- you're saying

7    purchasing a property out of foreclosure before he was

8    flipping it.  That's what you're saying.

9            MR. TATE:  Right.  He had rights to the house.

10           What the government would have to show you that

11   you intended to defraud the lender because they issued a

12   loan on a house that wasn't worth what they put into it.

13           THE COURT:  Well, then why -- why did he have to

14   bring down payments or bring in investors?

15           MR. TATE:  Because he was selling them the house.

16           THE COURT:  No, he wasn't selling them the house.

17   The investor thought we were buying the house, but knew

18   that -- well, excuse me.  The banks knew the investors were

19   buying the house for a residence, when the investors never

20   intended to do that.  And they were just really nominee

21   owners of the property.  He was kind of de facto owner of

22   the property in the sense that he was responsible for

23   putting a tenant and doing other things to keep it from

24   going into foreclosure.

25           MR. TATE:  This deal was all about him getting a

1  house at a lower price and selling it at a higher.

2         THE COURT:  Right.

3         MR. TATE:  The issue price he sold it to a party,

4  was it inflated?  Was it the fair market value of the house?

5  We're saying it was, despite the lies about -- of what was

6  needed to qualify the straw buyers, there was no intent that

7  the lenders loosing any money; there was no intent that the

8  straw buyers loose any money.  The idea was that the house

9  would keep appreciating and they would sell it and make

10  money.

11         But it was a business.  Once you try to put

12  renters in there, you try to get it Section VIII

13  qualified -- if you have well intentions, if you don't know

14  how to do that, it doesn't happen.  Now you're over your

15  head.

16         There was ample evidence that Mr. Cloud had keys

17  to properties.  He was going down and trying to do

18  evictions.  And most of these mortgages did not go into

19  foreclosure right away.  It was several years don't the

20  line.  People had paid money.  Mortgage payments had been

21  paid on these houses.  There was no intent to defraud the

22  lender.

23         He was a bad businessman, is what happened.  You

24  get tenants in there.  They don't pay the rent.  Now it's

25  going to cost money to get them evicted.  Who's going to pay

1    for that?  See, people don't think through all of that.

2            THE COURT:  But you're right, people don't think

3    through all of it.  But the thing is, is that they know what

4    they are -- they are intending to do something that is not

5    legally and factually possible.

6            MR. TATE:  That's right.

7            THE COURT:  And, therefore, that is what ends up

8    being the intended loss.  All -- they don't know the exact

9    dollar amount of the intended loss per se, but what they are

10   hoping -- they are hoping to benefit in a spread, for

11   example, and they are hoping that they will catch up in a

12   few months or years by keeping the cash flow positive on the

13   property.

14           MR. TATE:  Well, see, what are they trying to

15   catch up?

16           THE COURT:  They trying to catch up on the fact

17   that there's the quick flip, and the flip is under

18   fraudulent pretenses.

19           MR. TATE:  No.  That's not the evidence in this

20   case.

21           THE COURT:  Oh, yes, it is.  Every single flip was

22   under fraudulent pretenses.

23           MR. TATE:  The flip itself was legal.  What was

24   under fraudulent pretenses was the loan application.

25           THE COURT:  Right.  I agree.  I agree.  They

1    couldn't have gotten -- Mr. Cloud couldn't have gotten this

2    money.  Two things couldn't have happened:  Mr. Cloud

3    wouldn't have gotten the spread and Mr. Cloud could have

4    never gotten the loan in the first place because he wouldn't

5    qualify for those loans if he was buying --

6          MR. TATE:  Mr. Cloud didn't get a single loan.  It

7    was the straw buyers that got the loans.

8          THE COURT:  But that's the point, isn't it?

9          MR. TATE:  Yes.  But the issue is outside of the

10   fraudulent loan application, just because you intend -- a

11   person could intend to do a fraudulent loan application to

12   live in their own primary residence.  Their own house.  We

13   just want a house.  They pay the house off or sell it and go

14   somewhere, they didn't intend for the lender to lose any

15   money.  I mean people go buy houses everyday.  If that's the

16   case, anybody who buys a house or loses their job and goes

17   into foreclosure, they should have foresaw they might lose

18   their job.

19         THE COURT:  If they lied on the loan application,

20   yes, that's --

21         MR. TATE:  They committed the crime which is bank

22   fraud or whatever it is.  That's the crime.  But the issue

23   of loss is separate and a different analysis than underlying

24   offense.  That's what I'm saying.  In order to get into the

25   intended lose, it's Mr. Cloud's intent, not what Probation

1  thinks it is, not what the FBI thinks it is.

2         THE COURT:  But I'm saying you're view of intended

3  loss is the same as Bernie Madoff's theory, or any Ponzi, is

4  that we will stay ahead of the cash flow issue, and

5  hopefully -- you know, in Bernie Madoff case or any Ponzi

6  scheme case you hope the equities market just skyrockets,

7  and because it skyrockets, you can catch up.

8         Likewise, your client's hoping that the real

9  estate values of property will skyrocket, and that property

10 can be sold down the line at such an appreciation that it

11 covers his -- the flip that he was involved in, and that the

12 property is rented in the interim that keeps the property

13 from the going into foreclosure.

14        MR. TATE:  With all due respect, Your Honor, I

15 disagree.  First of all, he didn't need to cover the flip

16 because the amount that the house was sold at was the fair

17 market value.

18        THE COURT:  Well, see that -- except for where you

19 had fraudulent appraisals.

20        MR. TATE:  There wasn't no fraudulent appraisals.

21        THE COURT:  See, that's a factual issue.  So you

22 are arguing that every single one of his sales was at fair

23 market value.

24        MR. TATE:  Yes, the evidence --

25        THE COURT:  No, that's not the evidence.  What's

1    your evidence to show that every single one of these

2    properties was sold as fair market value?

3            MR. TATE:  The fact that Fannie Mae bought them

4    and didn't send them back to the lender when they have

5    provisions to do that if there was responsible appraisal.

6    The fact that not a single fraudulent appraisal was not

7    introduced into evidence into this case.  The fact there

8    wasn't single testimony about any fraudulent appraisal that

9    would have suggested the house --

10           THE COURT:  In this case there weren't a lot of

11   fraudulent appraisals, but there are fraudulent

12   appraisals -- but there were fraudulent appraisals in this

13   grand scheme.

14           MR. MEYERS:  Your Honor, there are so many factual

15   misrepresentations presented that I'd like to correct the

16   record.

17           First of all, we did not put on an appraiser to

18   testify that they were fraudulent.  However, we introduced

19   numerous fraudulent appraisals.  And the way they were

20   fraudulent is -- and it's alleged in the indictment and the

21   jury found it, the appraisals are in evidence --

22           THE COURT:  Right.  And it says in the indictment

23   there were fraudulent appraisals.

24           MR. MEYERS:  Absolutely.  Mr. Cloud would be

25   falsely represented on the appraisals as the owner of the

1  property before he owned the property.  Those appraisals

2  were false.  I want to show the Court an example.

3         MR. TATE:  Let me say, that that has nothing to do

4  with inflating the market value.

5         MR. MEYERS:  Mr. Tate, I let you talk for a long

6  time.  I'd like to correct a few of the misrepresentations

7  you've made.

8         One of the things Mr. Tate said was that there was

9  no fraudulent appraisals because they were all bought out of

10  foreclosure.

11         THE COURT:  That's not true, though.  There was a

12  couple bought out of foreclosure.  I don't know how many

13  specifically, by my review of the evidence is not many were

14  bought out of foreclosure.

15         MR. MEYERS:  It's not true and it's not relevant.

16         If the Court looks at, for example, at

17  Government's 57A and 57E which were introduced in evidence.

18  This is a property Eda -- Edna Griffin Fish and her husband,

19  Robert Fish.  That's not a foreclosure company.

20         Mr. Cloud bought it on November 28th, 2000.  It's

21  closed at John Lee's office, and he sold it same day,

22  November 28th, 2000, for 120 percent increase.

23         The way he did that, as the evidence established,

24  was by paying the straw buyers to sign the documents without

25  reading them.

1        I wanted to correct the statement that there was

2   no fraud outside the loan applications.  It's simply not

3   true.

4        There was fraud on the HUD-1 Settlement Statements

5   as well.  There was fraud on the appraisals.  Those

6   appraisals are in evidence.

7        It's true that it wasn't a focus of the

8   government's case because there was so much other fraud in

9   the case we didn't focus on the appraisals, but there was

10  evidence false appraisals.  And one thing, the increase in

11  price, we had experts testifying about it.

12       The suggestion that Mr. Cloud had nothing to do

13  with the appraisals is also false.  We have numerous

14  documents in which Mr. Cloud is ordering the appraisals that

15  are in evidence, in the Presentence Report.

16       The suggestion that all of this talk about

17  Mr. Cloud's intent, there's no evidence of Mr. Cloud's

18  intent in this case.  Mr. Cloud didn't testify.  That's his

19  right.  Mr. Tate's saying he hoped for it to work.  That's

20  not evidence.

21       THE COURT:  It goes back to what I'm saying, in

22  every tiered fraud scheme, the goal of the perpetrator of

23  the fraud is hopefully to catch up.

24       MR. MEYERS:  Agreed, Your Honor.

25       THE COURT:  In every one; whether it's mortgage

1  fraud or Ponzi or whatever .

2      MR. MEYERS:  And I'm sure, you know, that in some

3  part of his brain that rationalized his conduct, if there

4  was such a part, he hoped these properties would have

5  appreciate in value, despite in the increasing them one day

6  by 120 percent, as in this case.  There's no way he would

7  have legitimately thought that.

8      The First Circuit addresses this claim in this

9  case in *United States v. Innarelli*, which is cited in the

10 Government's Sentencing Memorandum on page 46.

11     There the Court of Appeals rejected the

12 defendant's argument and, quote, "never intended the buyers

13 to default."  The court said, "We focus our loss inquiry on

14 the objective reasonable expectation of a person in his

15 position at the time he perpetrated the fraud, not on his

16 subjective intentions or hopes."

17     The only way this objective intent came into

18 Mr. Cloud's sentencing memorandum was by false citations.

19 The cited to the Fourth Circuit case.

20     THE COURT:  Well, the Court knows it's an

21 objectively reasonable standard, not a subjective standard

22 with regard to loss.  Because otherwise, it would be a

23 meaningless standard because no defendant would ever have

24 the intent to have a loss.

25     MR. MEYERS:  Intent of loss in the Presentence

1    Report has been repeatedly approved by the Court of Appeals,

2    by the First Circuit, *Innarelli*, on page 46; on the Seventh

3    Circuit in *Bryson*; by the Eleventh Circuit in *Greene*, and it

4    fits the intent of the co-conspirators. They talked about

5    getting the spread. They talked about the spread. The

6    spread is the difference between the loan amount and what

7    they had to pay for the property.

8            And to be precise here, the intended lose is the

9    entire loan amount. That's the intended money that they

10   intended to get out of it. It's fair to subtract from that

11   a proxy for the value of the house. Because Mr. Cloud knew

12   once there was a foreclosure on the loan, the lender could

13   get the house back.

14           So I think it's fair, although the intent of loss

15   amount is the entire loan money that was gotten by fraud,

16   that's what they did. They get loan money by fraud. It's

17   fair to substract, even in intended loss calculations, I

18   think, a proxy for the value of the house.

19           THE COURT: But that's what the Probation Office

20   did.

21           MR. MEYERS: That's what the Probation Office did.

22           THE COURT: In every one of these calculations.

23           MR. MEYERS: And the Courts of Appeals have

24   repeatedly approved that methodology.

25           Take the loan amount, which is the money they got

1    by lying.  Subtract from that a reasonable proxy for the

2    value of the house.  A reasonable proxy is what Cloud paid

3    for it because that's the only free market transaction that

4    existed in this case, what Mr. Cloud went out and bought it

5    for.  Not all of our -- well, if even they are, it's not

6    like he was the only one there.  Lots of people bid on these

7    houses.  That is a reasonable approximate fair market.

8              I want to address the question of what this Court

9    has to do to include the losses from the other

10   co-conspirators.

11             THE COURT:  The Court has to make findings of fact

12   whether these individuals are co-conspirators or they ran

13   separate conspiracies, or were not part of the same common

14   scheme or plan.  The Court does understand that's something

15   it has to do.

16             MR. MEYERS:  Yes.  The Court has to find what a

17   reasonable approximation of the loss from those

18   co-conspirators if it's attributable to this defendant.

19             This Court does not have to do that on a

20   house-by-house basis.  It simply doesn't have to do that.

21   The courts are the quite clear.  The Guidelines say that the

22   Court needs to make reasonable approximation of the loss.

23   Fraud cases are complicated, this Courts of Appeal have

24   repeated held.  This Court needs to make a reasonable

25   approximation of this loss.

1          This Court could do that by taking, as set forth

2     in Comment (3)(c) of Section 2B1.1 of the Guidelines, by

3     simply taking the approximate number of victims, multiple by

4     the average lost to each victim.  This Court could do that

5     here if it wanted to.  It could simply say this was the

6     approximate loss, and multiplying that by the number of

7     houses.  The Court could do that if it wanted to.

8          What the Presentence Report suggests instead -- in

9     fact, it enures to the defendant's benefit -- I think the

10    Court could reasonably say what we're talking about was what

11    was reasonably foreseeable to this defendant.  He knew they

12    was doing the same thing, in the same area as him, with the

13    same co-conspirators.  I say the reasonably -- an

14    approximate estimation of the loss attributable to him is

15    the same as him.  He knew that he caused around $3 million

16    in loss.  He could have reasonably assumed that his

17    promotors would have caused $3 million of loss.  So for the

18    intent of loss, that would be a reasonable process for this

19    Court to do, and that would be much worse for the Defendant

20    Cloud.

21          THE COURT:  Much closer to 12 million.

22          MR. MEYERS:  Yes, sir.

23          Instead, what the Presentence Report says it's

24    used as the reasonable approximation, a stipulated loss.

25    It's backed up by all the documents in the government's open

1    file, that this defendant has access to more than three

2    years.  Now, so the Court is well within its rights to do

3    that.

4              I want to correct a couple other things.  Ken Bill

5    was not a builder.  That was part of the problem.  They had

6    a company, just like Prestigious Homes.  Cloud wasn't a

7    builder.  He had a company that sounded like a builder,

8    Prestigious Homes, but he didn't build any houses.  Don

9    Henderson did build houses at one point, but not any of the

10   fraud houses.  The fraud houses, he acted just like Cloud

11   did; just like Ken Bill did.  Michael Bryant wasn't a

12   builder.  It's just not true.

13             There's no evidence that these were subprime loans

14   or stated income loans or NINA loans.  There's no evidence

15   of that.  All the evidence is to the contrary.

16             So all of the attachments to the defendant's

17   Sentencing Memorandum about Countrywide, state income loans

18   and NINA loans, it's just a red herring.  There's no

19   evidence of that being the case in these cases.

20             I also want to address -- I don't know if the

21   court will address it -- we've looked, even though it came

22   in Sunday morning, yesterday morning, at Mr. Tate's actual

23   loss calculation.  It is riddled with errors.

24             He repeatedly picks the wrong deed to determine

25   the foreclosure sale amount.  He picks the trustee deed,

1   which is the deed filed by the bank, which is the tax value

2   in most cases, or reasonably close proximity to the tax

3   value.  The deed that matters is the warrant deed, the

4   resale from the foreclosure company to the new buyer.  And

5   that one, way lower.  So the actual loss calculations by

6   Mr. Tate are just wrong.

7           THE COURT:  The substitute trustee value is

8   actual -- substitute trustee or the trustee, but you

9   normally say substitute trustee -- that is bidding the

10  bank's actual loan principal plus cost.  That's normally

11  what -- the foreclosure bid in the financial institution is

12  not -- as I said, they are bidding their remaining principle

13  and cost.  They are not actually bidding fair market value.

14          MR. MEYERS:  I'd be happy to show the court a few

15  examples of that, just so the Court understands.  Again, we

16  don't think the Court needs to get into actual loss.

17          Just so the Court understand, I'm putting on the

18  document cam a modified version of Mr. Tate's spreadsheet.

19  Again, we got this yesterday morning, which was a Sunday.

20  We did do our best to work on that.

21          We have a few examples here that show the error

22  that was made by the defendant, Cloud.

23          For example, No. 12, on this spreadsheet is 2301

24  Sanders Avenue in Charlotte, North Carolina.  This document

25  claims that the loan amount was 135,000, and by and large

1    once we check, the loans amounts seemed to be correct.  He

2    claims there's no loss.  Zero loss for this property.  This

3    is an example of different kind of error.

4            In fact, the actual resale amount is $88,000, and

5    I can show the Court that by showing the government -- by

6    showing the Court Government's Exhibit 101A.

7            This is a real estate lookup for this.  In fact,

8    when a loan is sold, resold, to a true buyer, Mr. Morris,

9    the price is $88,000.  You can see the trustee deed which is

10   loan 135, much higher in this example.  So the true resale

11   price is 188,000, which makes for an actual loss of $47,000.

12           The Court will note that for 2301 Sanders, which

13   is this property, the PSR loss is less, $36,000.  So this is

14   one example in which Mr. Tate's spreadsheet says that there

15   was zero loss; in reality there was an actual loss of

16   $47,000, and it is more than the presentence loss.

17           I'll take the Court to the next example.

18           THE COURT:  The presence loss, column X, is taken

19   from the Cloud properties chart, Cloud only, which is

20   incorporated as part of paragraph 12 to the Presentence

21   Report.

22           MR. MEYERS:  That's correct.

23           THE COURT:  That's where column X is coming from,

24   from paragraph 12 and the chart attached to that.

25           MR. MEYERS:  That is correct, Your Honor.  And

1    that's the loss from -- I will mark the document I'm using

2    as Government's Exhibit 101.

3              So in this case the actual loss actually exceeds

4    the intended loss.

5              The next example is 9255 Hutchinson Lane.  It's a

6    Rodney Thompson transaction.

7              The Court heard Mr. Thompson testify at the trial.

8    The claim said the loan amount was 199.  There was a

9    foreclosure amount of $135,000.  That column K comes from

10   the defendant's spreadsheet.  In reality, as the Court can

11   see looking at 101B, that $135,000 number is the trustee

12   deed.  In reality it resold for less than that, $128,000.

13             I can show the Court the trustee deed came from

14   the defendant, and it clearly says "trustee deed," and it

15   shows it's Chase Manhattan mortgage, $135,000.  That's the

16   trustee deed.

17             And this, by the way, illustrates a number of

18   factual inaccuracies proffered to the Court earlier, which

19   is that Fannie Mae never forced the banks to buy them back.

20             Just to the contrary.  The standing agreement that

21   Chase and just about ever other lender had with Fannie Mae

22   was that if there's fraud, you have to buy the loan back.

23   And this is an example, obviously, in which Chase did.

24             MR. TATE:  Excuse me.  I'm sorry.  It is not.

25   Chase was a servicer, so their name goes on the trustee.  The

1    loan was sold to the bank and we have the records from that.

2         MR. MEYERS:  Okay.  We're going to see some of

3    those records pertaining to Fannie Mae actually which show

4    the true actual loss.

5         Let's get to the point here.  The point here is

6    that the numbers are wrong from what the defendant

7    submitted.  They said 128; the actual loss is the loan

8    amount, which is 199 minus 128; which is, in fact, 71-five.

9    The PSR loss is a little bit higher than that, the intended

10   loss, $75,500.

11        Look at the next example, which is 1609 Forest

12   Street.  Douglas Edwards.  Mr. Tate's spreadsheet says if

13   the loan amount is 111.  We believe that to be correct based

14   on our limited research we were able to do yesterday, in

15   reality -- and he says their foreclosure amount was $90,000,

16   and, therefore, there would be a loss of zero.  Well, that

17   on its face is just poor arithmetic.  Now, again, that's

18   just a typo, I see.

19        MR. TATE:  No.  We said there was an intervening

20   sale.  That being somebody else got the property and sold

21   it.  I mean, theoretically if that were the case --

22        THE COURT:  How did you have an intervening sale,

23   because on a Deed of Trust you have a due-on-sale clause.

24   So the property should have still been in the name of the

25   original party that acquired it under the mortgage, unless

1    it's an assumable mortgage, but there haven't been many

2    assumable mortgages for a decade.

3           MR. TATE:  We have an intervening sale.  My

4    understanding is that whoever --

5           THE COURT:  But that's fraudulent, though.  If

6    there's a due-on-sale clause and there was an intervening

7    sale, then that was a fraudulent sale.

8           MR. MEYERS:  I have the documents right here.  I'd

9    be happy to illustrate for the court.

10           THE COURT:  Maybe I should -- so I'm not

11    misleading anyone, the Court has a pretty substantial

12    background in real estate closings and real estate finance.

13    The Court was a real estate paralegal.  I did 400 title

14    investigations for purposes of closings before I went to law

15    school.  When I was in law school, I was also a joint MBA,

16    and I concentrated in real estate finance and took a

17    substantial amount of secondary mortgage market courses,

18    real estate finance courses, tax and financial accounting.

19    I have probably about 40 to 50 hours of intermediate and

20    advanced accounting.

21           So I just wanted everyone to know that I do

22    understand this terminology.  And so if I respond quickly

23    like say there's a due-on-sale clause, it's because I have a

24    background in real estate finance and real estate closing.

25           MR. MEYERS:  Thank you, Your Honor.

1    I want to show the Court 101C, which is the real

2  estate look-up for Forest Stream Court in Charlotte, and

3  there they have the trustee deed being 91,000, and the

4  actually resale -- actually 93,000 to Zito Latino (ph).

5    Again, it shows the error in them picking the

6  wrong deed.  Here's the substitute trustee's deed, which is

7  the next page of this exhibit, and it shows it's the

8  Deutsche Bank National Trust Company.  So again the are

9  looking at the wrong deed when they're trying to do the

10  resale.  In this case it's actually to the defendant,

11  Cloud's, benefit because it actually resold for a higher

12  amount.

13    But, again, just to show the Court for reliability

14  of what they have submitted is not reliable.  Here, in fact,

15  are the stamps.  The way the Court can find the sales prices

16  is divide the stamp by two, and times them by a thousand.

17  I'm not so brave as to do that on the spot.

18    Here, what we've got, though, then is a actual

19  loss of this one, of $18,000; the PSR intended loss is

20  $16,000.  This shows again an actual loss that's higher.

21    Look at the next one, which is 4203 Brian Furr

22  Drive, no 52 on Mr. Tate's spreadsheet.  What's listed here

23  is a loan amount of $87,300.  There's no foreclosure amount

24  listed on the spread sheet and therefore it didn't go into

25  losses.  In fact, the resale amount, after foreclosure, was

1    $60,000.

2              MR. TATE:  Again, so we're clear, that's why I

3    want the government to put on their evidence instead of

4    going back to Furr.  Furr Lane is the property from Alice

5    Ben (ph), and we could not find any evidence of a

6    foreclosure.

7              THE COURT:  What I wanted to do was to first have

8    a presentation on the actual intended loss that was related

9    to all the co-conspirators.  And after we had, the Court had

10   ruled on that, then deal with the issue of the unintended

11   victims, such as the communities and neighborhoods.  Because

12   I think, one, it is dependent on the other, and I think it

13   would have allowed the parties to better argued the

14   unintended victims after we made a determination of the

15   actual intended lose, the direct victims.

16             MR. MEYERS:  To be clear, Your Honor, the

17   government supports and suggests that the Court adopt the

18   intended loss calculation of the Presentence Report which

19   has been affirmed over and over by courts of appeals.

20             THE COURT:  And that's basically the Cloud

21   properties, Cloud-only chart, that is incorporated by

22   reference in paragraph 12.  Obviously, Mr. Tate, you have

23   reviewed that whole chart because you referenced it in your

24   column X on your chart.  You had that chart, right?

25             MR. TATE:  Yes, we do have it.

1          MR. MEYERS:  Just to be clear, Your Honor, column

2     R through F on this chart were added by the government in

3     order to show the error --

4          THE COURT:  Oh, I see.

5          MR. MEYERS:  -- Mr. Tate's reasonableness.

6          THE COURT:  This is your variation of Mr. Tate's

7     chart .

8          MR. MEYERS:  I'll put a yellow line down here.  We

9     couldn't adjust it to put columns in the middle.  But

10    columns L from the left are from Mr. Tate's chart, and

11    columns R through Y are the government's, and this is

12    intended to show the Court the errors.

13         THE COURT:  No, I understand.  You've clarified

14    for the Court, but Mr. Tate, you've always had access and

15    reviewed that Cloud properties, Cloud-only chart?

16         MR. TATE:  Yes, we've had a copy of the chart, and

17    that's what we use to prepare our chart.

18         And just so it's clear, that's why I wanted the

19    government to go forward and deal with it in that way is

20    that on this chart there are a number of properties that say

21    "no data," and just picked a price of $32,000.

22         THE COURT:  Well, but Ms. Easley explained that

23    that's an averaging process that the Probation Office used

24    that's based on, as Mr. Meyers said, case law and the

25    Sentencing Guidelines.  It's a reasonable calculation when

1     you don't have complete data.

2             MR. TATE:  Yeah.  I think for some of those homes

3     we did find data that suggest no loss at all.  And then I

4     think it was Ms. Easley that said the 32,000 was based on

5     some figure divided by the number of defendants that came

6     from precisely what we're objecting to, Henderson, Strong,

7     and those folks.

8             THE COURT:  Right.  Right, I understand that, but

9     that was the same process that was used -- no, actually you

10    used the stipulated amount.

11            PROBATION OFFICER:  Right.  Other ones I used that

12    and that was based on the same amount.  32,000 number came

13    up just from the Cloud -- and in fact, it should be higher

14    than that now because when I did it, I based it on the first

15    number that we had, which was most mostly intended loss,

16    which was $2 million.  Now with the actual loss in some of

17    those properties, it was increased to 3 million, which would

18    increase our average so we should have used the new data.

19            MR. MEYERS:  What I'm doing for the Court right

20    now is I don't want the Court to be under the

21    misapprehension that there was no actual loss.

22            THE COURT:  Oh, no, no, no.  The Court knows in

23    many properties, or to define an actual loss in many

24    properties, or the intended loss, the Sentencing

25    Guidelines -- the Court's understanding of the Sentencing

1    Guidelines is you can use the higher of those two.

2          MR. MEYERS:  Absolutely.  And so the Court doesn't

3    need to address this, but I do think it's relevant for the

4    record that the charts submitted by the defense in this case

5    arises at its conclusions by simply looking at in the most

6    cases the wrong deed or just getting the numbers wrong.  We

7    were able to put together about ten samples.  I can run

8    through them pretty quickly here.

9          THE COURT:  No.  No, my -- you can just introduce

10   your variation of Mr. Tate's chart.  What I want to do is

11   proceed.

12         Like I said earlier, I wanted to do this in two

13   phases:  The actual intended loss directly from this

14   conspiracy, and then the unintended loss from the

15   neighborhoods.

16         And Mr. Tate is taking the position there's no

17   intended loss of his client, and, therefore, should only

18   rely on actual loss in the handful of cases there are.  And

19   I think Mr. Tate, you aren't presenting any additional

20   evidence other than what you've handed up to the Court in

21   relying on the Presentence Report which has these already

22   prepared charts in it?

23         MR. MEYERS:  And two weeks of trial testimony.

24         THE COURT:  And two weeks -- and all the trial

25   testimony.  All the records there.  You're not putting

1    Special Agent McNeely back up to add to the record.

2              MR. MEYERS:  Oh, there's nothing -- I think that's

3    right, Your Honor.  The evidence of his intent was the way

4    he acted and what he told the --

5              THE COURT:  Right.  So what we need to be doing

6    right now is allowing Mr. Tate to present his factual case

7    against the actual and intended loss, and then get to the

8    unintended victims in the second phase after the Court's

9    made a ruling on that.

10             MR. MEYERS:  Thank you, Your Honor.

11             I would introduce at this point Government's

12   Exhibit 101.

13             Again, it shows again in nearly every case the

14   actual loss, when you look at the correct deed, exceeds the

15   intended loss that is in the Presentence Report.

16             THE COURT:  All right.  Thank you.

17             All right, Mr. Tate.

18             MR. TATE:  Your Honor, at this time we haven't had

19   it marked.  We will have marked as Defendant's Exhibit 1 our

20   chart, and ask it be moved into evidence.

21             We stand on our chart and the figures therein.  I

22   think the record is just as reliable, more reliable than

23   those produced by the government.

24             In addition, we reassert our objection to many of

25   those properties as not being relevant conduct and not being

1    tied to Cloud.

2          We do intend to during -- put on a witness during

3    the collateral damages stage that will address some of the

4    lending practices, a review of the statements, and where

5    these houses were purchased.  And our position is to -- in

6    order to determine -- when you look at a loss, the

7    Guidelines are specific.  It has to be a victim, and they

8    define a victim as a person -- or a person, including the

9    corporation, has suffered actual pecuniary harm.  That's the

10    leap they -- that any lender that lent a loan here was a

11    victim for the purposes of the Sentencing Guidelines and

12    also, they sustained a loss.

13          Even when there's a foreclosure doesn't mean there

14    was a loss, even if the loss was less than the loan amount,

15    because as our witness will testify the originator of these

16    loans services the loan.  That's where they make their

17    money.  They don't make their money transacting with Fannie

18    Mae or Freddie Mac, they're going to get money to servicing

19    the loan, and that's where the huge profits come in as well.

20          We believe that we can demonstrate that a number

21    of these loans are actually sold.

22          Now, just so the Court is clear, we don't believe

23    that we necessarily have a burden of proof at all, but we

24    endeavored to go out and as best we could to assign these

25    deeds.  It was a daunting task to come up with the loss

1    amounts to the extent we could.

2          A number of these, in the 94 properties -- I don't

3    know the exact number -- but a number of them are classified

4    as attempts.  That means there was never any loan issued at

5    all, and then they have been assigned a loss value 32,000

6    apiece, and that's what we specifically object to.

7          One, that it's not an attempt to do anything

8    illegal.  Two, that it had anything to do with Cloud; and

9    three, that that's suggested as an intended loss.

10          I did ample research, too, and we did look at the

11    case where the government cited where the Court's found --

12    and I would say that most of the authorities say that you

13    use actual loss in this case.  That dealt with bank-fraud

14    type cases.

15          Now, when I look at the cases that went to

16    specific -- they talked about intended loss, it always

17    talked about the intended defendant.  And where they found

18    intended loss in most cases was the defendant's scheme was

19    to sell the house at an inflated appraisal.  And there was

20    evidence introduced that there was an inflated appraisal

21    that showed the value of house being higher than what they

22    were selling it for.  And then the purchaser of the home was

23    still --

24          THE COURT:  I understand all your argument.  But

25    what evidence do you have to present -- not argument -- what

1   evidence do you have at this time.

2          MR. TATE:  Other than our chart of intended loss,

3   we would present our chart that shows there was no intended

4   loss, and the lack of evidence that there was an intended

5   loss on Mr. Cloud's part.

6          We would suggest that the record as a whole

7   suggests that the intent of all the parties involved,

8   including anyone that testified in his trial, Mr. Greene,

9   Ms. Dauria, the straw buyers, the intent was that they make

10  money, not that they intended to defraud the lender and get

11  more money for a house that really wasn't worth that.

12         This was a real estate investment.  It was a real

13  estate investment scheme, is what it was, and the

14  proposition was that, you know, I can find a house that's in

15  a depressed condition, thereby that -- the prices, he can

16  buy the house that's artificially low because the lender --

17  and the Court said he was involved in real estate -- the

18  lender is only interested --

19         THE COURT:  I was -- I want to make clear I never

20  practiced real estate law but I was a real estate paralegal,

21  and -- but I do have, on the accounting and finance side, I

22  do have an extensive background in real state finance.

23         MR. TATE:  We intend to get this on with our

24  witness.  I just wanted to put it on a good amount ahead of

25  time.

1          What we're basically saying is that Mr. Cloud

2     bought these homes, oftentimes -- not always -- they're in

3     foreclosure.  Whoever is the lender is only interested in

4     getting back that's owed on the home.  So what's what they

5     sell it for.  The house may as well be worth more than that

6     because, as the Court may know, if the lender takes in more

7     than that, more than what the house is worth, then they have

8     to give the residual --

9          THE COURT:  Back to the person who signed the

10    promissory note.

11         MR. TATE:  So, Mr. Cloud, I think the evidence

12    was, would go in and put down $200 on it and said, "I want

13    the right to buy the house."  He didn't own it yet.

14    Mr. Greene who is the mortgage broker, lenders will not

15    allow Mr. Cloud to do an appraisal --

16         THE COURT:  You still have to outbid the financial

17    institution, so $200, plus whatever the financial

18    institution is bidding.

19         MR. TATE:  Well, the financial institution may not

20    be linked.  If he goes directly to the person that's holding

21    the foreclosure and say, "I'm going to find a buyer.  I want

22    to rights to by this house," and the banks allow it and

23    authorize simultaneous closings and then find somebody else;

24    sells it to the --

25         THE COURT:  Okay.  Show me the evidence of that.

1    MR. TATE:  The evidence of what?

2    THE COURT:  Of a simultaneous closing, where he

3  had an authorization from an financial institution to do

4  that.

5    MR. TATE:  No.  The evidence was at the trial was

6  that they were simultaneous closings.

7    THE COURT:  No.  No.  No.  What he just said was

8  that a financial institution was going to go and put

9  property in foreclosure, and he went to the financial

10  institution and got permission to do this simultaneous

11  transaction where he would buy it and flip it.

12    I don't recall any evidence of that at trial.  So

13  if you have evidence of that, present it.

14    MR. TATE:  Let me take a look.

15    THE COURT:  I do not recall any of that.  I would

16  have definitely remembered -- if he had a written

17  authorization from an financial institution to do that, I

18  would have remembered that.  I reviewed the transcript

19  yesterday, and I don't remember any testimony to that.  If

20  that's true, let's hear it.  Let's hear the evidence.  If

21  you have don't have evidence, then I have to deal with the

22  way the evidence is.

23    MR. TATE:  Let's for the sake of argument here,

24  what I'm saying the value of the house that Mr. Cloud sold

25  it at versus what the buyer of that is not a fair -- is not

1    a loss -- it's not an intended loss.  It's an attempt to

2    make a profit.  But it hasn't been established that it's

3    fraudulent.  Because if the house was not worth what it was

4    appraised for, the lender would reject it.  And I think the

5    Court can take judicial notice of that.  They would reject

6    it.

7              THE COURT:  I agree.  But there are ample records

8    of fraudulent real estate appraisals, and the government

9    didn't have to get into it in this particularly case because

10   the focus for the jury, in front of the jury -- they're

11   focus before the jury was the transaction itself was just

12   fraudulent because it was purported to be a residential

13   purchaser when they were an investment purchaser.  But they

14   were fraudulent real estate appraisals in this case --

15             MR. TATE:  Fraudulent in what context?  How were

16   they fraudulent?

17             THE COURT:  They were inflated.  The real estate

18   appraiser would have known of the flip and would have known

19   that the property sold at one value in the morning and one

20   value in the afternoon, and in preparing its flip, would

21   have known the actual nature of the double transaction.

22             MR. TATE:  Okay.  But I'm not aware of any

23   appraisal that was faulty, other than the government's

24   position it was fraudulent merely because Bill Cloud was

25   listed as the owner.

1       I haven't seen any evidence or any testimony that

2   a particular property appraisal or a property in this case

3   was appraised as a value higher than what it actually was

4   worth.  And that's what I'm talking about.  And in the cases

5   is I've looked at that about talked about intended loss.

6       THE COURT:  But then why would the property have

7   had a hard time selling in a foreclosure, when down the

8   line, when there's no rent to cover the debt servicing, then

9   why couldn't the property have sold close to what the

10  investor had acquired it for?

11      MR. TATE:  Well, they did; and oftentimes they

12  sold it for more.  They showed an example of ten, but if

13  there's 94 houses that we got --

14      THE COURT:  So we're back to intended loss, not

15  actual loss.

16      MR. TATE:  Right.  And our position is that they

17  have to show something that he intended a loss and the

18  burden doesn't shift to us to prove he didn't.

19      THE COURT:  No, no, no.  Now, but you made a

20  factual assertion a moment ago of something that there's

21  nothing in the record; that he had authorization from

22  financial institutions to pull a property out of

23  foreclosure, so to end the foreclosure start -- it was in a

24  foreclosure start.  He went to a financial institution and

25  got authorization to do a direct purchase from the person

1  selling it, and the financial institution would stop the

2  foreclosure and then he could resell it.

3          You're right.  That would be a probably pretty

4  honest transaction so long as the resale was to a true

5  residential purchaser, not an investor.  But where is the

6  evidence of that?

7          MR. TATE:  I'm saying we're relying on the lack of

8  evidence.

9          THE COURT:  No.  No.  No.  You just asserted a

10 legitimate transaction all the way through, and I'm trying

11 to find the evidence of that in the record.

12         MR. TATE:  What I'm saying, Your Honor, just so

13 it's clear, is that there is no evidence of a fraudulent

14 appraisal.

15         THE COURT:  Okay.  I agree in this -- that not

16 every one of these properties had a fraudulent appraisal on

17 it.  The government didn't present fraudulent appraisals to

18 the jury in this case because that wasn't important for

19 meeting the elements of conspiracy in the fraud charges.

20 But there were -- there is in the record, as Mr. Meyers said

21 in the open file, there are fraudulent appraisals.  But that

22 still begs the question of the fact there was an intended

23 loss versus as actual loss.

24         MR. TATE:  Our position is this:  One, that the

25 open file is not evidence.  Because it's an open file it's

1    not evidence.

2         THE COURT:  I agree.  Open file is not evidence.

3    But they presented a methodology that was used by the

4    Probation Office for the intended loss calculation.  Your

5    response is:  There was never an intended loss.  And there's

6    no evidence to show there was never an intended loss.

7         MR. TATE:  There is no evidence of an intended

8    loss.

9         THE COURT:  No.  No.  No.  I said the other thing.

10   I said there's no evidence -- when you started your whole

11   argument at the very beginning, and Mr. Meyers pointed this

12   out, there's no evidence that there's no intended loss other

13   than your assertion.

14        MR. TATE:  Right.

15        THE COURT:  And there's no evidence of these

16   legitimate transactions where you had authorization from a

17   property that was supposedly going into foreclosure and

18   Mr. Cloud bought it so there -- and so there was a

19   foreclosure start, but it never completed, and then he

20   bought it and then flipped it.  There's no evidence of any

21   of this in the record.

22        MR. TATE:  Okay.  Let me say what there is

23   evidence of.  There's evidence Mr. Cloud flipped it.

24        THE COURT:  Evidence Mr. Cloud flipped it.

25   Absolutely.

          MR. TATE:  We rely on that.  And rely on the fact
that the loans went through and were not rejected.  That the
appraisals were legitimate as well.

          THE COURT:  And I think a large portion of these
appraisals the appraiser were legitimate and a large portion
they were illegitimate.  The bottom line is:  All the loans
are fraudulent.

          MR. TATE:  Not all of them.  We would concede 18
of them produced were fraudulent.  The other 76 or 66 -- 76
we don't know anything about.

          THE COURT:  So are you saying that the Court has
to have the government make in this hearing today, where
hearsay evidence is permissible, the Court is required to
have the government present every one of those closings?

          MR. TATE:  No.  The Court can do whatever it feels
necessary to make its findings, but the Court has to make
those findings and it has to be on specific and reliable
evidence.  We'll deal with the Court's findings.  Well
accept the Court's findings.

          But our position is that as the matter currently
stands, they have not substantiated anything outside what
they prove is actually fraud.  Two, they haven't proved
there was a loss associated with it.  Three, they haven't
demonstrated that Mr. Cloud intended any loss because the
evidence is to the contrary; the evidence at trial was that

1  this was a profit-making scheme for everybody down the line.

2          THE COURT:  It was a profit-making scheme for

3  everyone but the financial institutions.

4          MR. TATE:  Financial institutions, too.  That's

5  why they were --

6          THE COURT:  Well, why was the financial

7  institution lied to?  I mean, comes down to:  Why lie to a

8  financial institution?

9          MR. TATE:  Because people -- you're asking -- if

10  you ask me my opinion of it, I think at the trial the

11  evidence was because many of these people already owned a

12  home.  And the reason they took the straw buyers is because

13  they had strong credit source.  And because they already

14  owned a home it's going to be a red flag.  They say, well,

15  you're buying another house, how are you going to pay for

16  both of them?  So then they come up with fraudulent lease

17  agreement and say it's actually rented, and because you can

18  get a better interest rate --

19          THE COURT:  Most of these -- there were a few

20  where they had fraudulent rental agreements, but most of

21  these, the investor was purported to be the residential

22  purchaser.  There were some where there were fraudulent

23  leases created also, so you could have the appearance it

24  would be a positive cash flow, at least a wash between rent

25  coming in and debt service going out.

1        MR. TATE:  And I think Mr. Green's testimony was

2   that if the house is designated or underwritten as primary

3   residence, it gets a more attractive interest rate.

4        THE COURT:  That's very true, yes.

5        MR. TATE:  That wasn't the fraud.  But that --

6   that is an intent to get a loan fraudulent.  It's not an

7   intent that the lender suffer a loss because it wasn't.

8        THE COURT:  Well, that's an actual loss there just

9   in the differential between the proper loan rate and the

10   higher loan rate.  I mean, if a investor is acquiring the

11   higher, they pay a higher interest rate.  So that's a loss

12   based on fraud there.

13        MR. TATE:  Except for the fact that we know that

14   Mr. Greene testified about it, that the fact that at Chase,

15   that's why we're using Fannie Mae's underwriting desktop

16   system was because if it was approved in through their

17   underwriting system, Fannie Mae would purchase the loan;

18   Chase would service it, making money but it would never be

19   at risk on the loan.  If it defaulted, then it's Fannie Mae.

20   That's going to go into the other part of our presentation:

21   What happens when Fannie Mae if there was fraud and what

22   happens to the loans even when they go into to foreclosure.

23        THE COURT:  What happens is the taxpayers' pays

24   for it.  So when Fannie Mae or Freddie Mac or Ginnie Mae end

25   up having to cover it all, there's still ultimate

1  victimization, it's just the taxpayer becomes the victim.

2          MR. MEYERS:  Your Honor, just a few things I want

3  to make clear.  First --

4          THE COURT:  Let me finish up with Mr. Tate.

5          Are you presenting any evidence today about your

6  client's lack of intent to have a loss amount?

7          MR. TATE:  No.  We're relying on our position

8  there has been no sufficient evidence that he intended a

9  loss.  That's our position.

10          THE COURT:  All right.

11          MR. MEYERS:  Thank you, Your Honor.

12          I just want to make clear that there's a

13  suggestion that belies here about primary residence.

14          To be clear, for the record, they lied about

15  nearly everything.  They lied about income.  They lied --

16  presented fake tax returns, there was fake verifications of

17  deposits.  They presented cashier's checks to receive other

18  sources of down payments.  So that wasn't an important part

19  of the lie but it was everything.

20          Second, I heard the Court say when it was -- the

21  conversation with Mr. Tate that it would take it that some

22  appraisals were not false.  I'm assume the Court was just

23  saying that for purposes of argument, saying assuming

24  arguendo some appraisals were not false.

25          THE COURT:  And you didn't present to the jury any

1    appraisals in this case.  You introduced them, but they were

2    never shown to them.  Right?

3            MR. MEYERS:  I think we did.  We certainly did

4    introduce for the appraisals.  They were there for the jury

5    to inspect during its deliberations.

6            THE COURT:  You never referred to them in

7    argument, I don't recall.

8            MR. MEYERS:  It certainly wasn't a focus of our

9    case.  I'm not saying that -- that, you know, that was an

10   important part of our case.  I just wanted the record to be

11   clear that the Court wasn't making a factual finding --

12           THE COURT:  No.  The Court is not making a factual

13   finding, but there were -- there were a handful, I don't

14   know the number, but there were transactions where it wasn't

15   necessarily a fraudulent real estate appraisal.

16           MR. MEYERS:  I wouldn't agree with that, Your

17   Honor, but it certainly wasn't the focus of our case.  As

18   long as the Court is clear that that was for purposes of

19   argument, I just wanted to make the record clear on that.

20           THE COURT:  Are -- you're saying in every single

21   one of these closings there had to be a fraudulent real

22   estate appraisal?

23           MR. MEYERS:  I'm just saying that that's an issue

24   we really didn't get into.

25           THE COURT:  Right.

1          MR. MEYERS:  When you increase the price of a
2    house by 30, 40 percent in one day, and the way to do it is
3    by eliminating all the market factors; by paying the
4    borrower, by lying about their income and by lying about
5    everything else, I think that is evidence of a false
6    appraisal.
7          THE COURT:  Oh.  You're creating a false fair
8    market value.
9          MR. MEYERS:  Absolutely.
10          THE COURT:  That's different than a licensed real
11    estate appraiser actually preparing a fraudulent document
12    knowing that his or her document is going to be relied on by
13    a financial instruction.
14          MR. MEYERS:  Fair enough.
15          And we did have one appraiser plead guilty in this
16    case, Buddy Nabs (ph) that was only one transaction, but
17    listen, if a appraiser needs for the appraisal to be wholly
18    and completely accurate, he need to list whether there's a
19    kickback.  Because that effects whether or not this is a
20    free market transaction.
21          There are kickback in ever single instance in this
22    case.  So I think that is evidence that in fact every one of
23    the appraisals if false.
24          Again, I don't mean to take the Court on this
25    tangent, but to the extent the Court did travel down that

1  road a little bit, I want to make the record clear on that.

2  That the Court is simply not finding --

3  　　　　THE COURT:  The Court's is not addressing the real

4  estate appraisal issue because it is -- it's not necessary,

5  in the Court's opinion, based on the methodology used by the

6  Probation Office to show an intended loss.

7  　　　　MR. MEYERS:  Yes, Your Honor.  I just wanted to

8  make the record clear with that respect.

9  　　　　With respect to whether or not there is evidence

10  of intended loss, I think the Court has already addressed

11  that issue, I just would like to reference the Court to page

12  21 of the government's Sentencing Memorandum.

13  　　　　This addresses that there are intended losses, not

14  just because they lied like crazy to get these loans, but

15  also because the defendant knew that these loans were going

16  into foreclosure and continued on with this scheme.  The

17  defendant --

18  　　　　THE COURT:  You're talking about the fact that he

19  would start getting phone calls -- and this was clearly

20  presented to the jury -- he start getting phone calls from

21  investors who said they are receiving foreclosure notices,

22  and they thought that he was covering the debt service.

23  　　　　MR. MEYERS:  Absolutely.  He told -- he told the

24  straw buyers that he'd put renters on the properties.

25  Testimony from the staw buyers was he lied, never put a

1    renter in there at all.  In some cases when there was a

2    renter in there, he wouldn't follow through on it.  The

3    testimony was the Defendant Cloud promised that if anything

4    went wrong, that he would make the mortgage payments.  The

5    evidence was that he did not make the mortgage payments.

6         THE COURT:  That was consistent from the every

7    investor that has testified.  No investor has ever

8    contemplated that they were going to have to cover the

9    shortfall from debt servicing.

10        MR. MEYERS:  And if the Court -- page 23 of the

11   Government's Sentencing Memorandum references page 1403 of

12   the transcript where straw buyer Moore said consistently the

13   rent wouldn't pay the mortgage.  And the reason for that is

14   because the price of these houses was increased in some

15   cases by 120 percent in one day.  Of course, the rent won't

16   cover the mortgage, wouldn't cover the mortgage in that

17   case.

18        Some of the straw buyers said they flatly told the

19   defendant that the properties were in foreclosure and they

20   were getting foreclosure notice, and Cloud simply ignored

21   them.

22        Cloud paid them.  Cloud arranged for them to buy

23   multiple houses with enormous loan amounts in a short period

24   of time.  He knew what their income was because he plugged

25   in their true financial information that misrepresented that

1    financial information to the banks.

2           That on it's own, again, when he knows he's going

3    to walk away from these, he knows these properties are going

4    into foreclosure and no one is going to be around to make

5    the mortgage payments.  He told the straw buyers they

6    wouldn't have to make the mortgage payments, and he lied to

7    them over and over again.

8           So there is plenty of evidence of intended loss,

9    even besides him creating multiple lies on multiple fronts

10   simply in order to get the loan amounts.

11          Again, to be clear, the intended loss is the money

12   that was received because of the lies, subtracted by a fair

13   proxy for the value of the house.

14          THE COURT:  All right.  On the first issue of the

15   actual intended loss, before we consider the unintended

16   victims and collateral damage, the Court makes the following

17   findings of fact by preponderance of the evidence:

18          The defendant did become a member of a broad-based

19   conspiracy to defraud home lenders and others sometime in

20   1999.  He continued well into 2005.  The Court's already

21   found that earlier today.

22          The conspiracy involved multiple aspects of fraud

23   in mortgage applications and mortgage transactions.  It was

24   pervasive fraud from virtually ever area of the closing.

25          Real estate attorneys were brought in; real estate

1   appraisers in many cases were brought in and aware of the

2   fraudulent nature of the flip.  Real estate mortgage brokers

3   were brought in in virtually all the cases.  In some cases,

4   real estate agents and real estate brokers were brought in.

5          In every case, an investor was brought in who

6   never intended to occupy the property and was brought in

7   because they had a credit worthiness that allowed them to

8   apply for a mortgage.

9          These were very sophisticated transactions, which

10  I'll be getting into later in more detail, because so many

11  people with fiduciary duties were brought in by the promotor

12  and the defendant, Mr. Cloud -- in this case promotor.

13  "Promotor" is not a legal term per se, such as real estate

14  appraiser.  A promotor is just a term that's been adopted by

15  this Court and other courts in referring to the person who

16  puts all these pieces of this fraudulent transaction

17  together.  But the promotor is the key figure in ever

18  transaction, but they usually receive the largest amount of

19  illegal profits, illegal gain.  And they are facilitating

20  the whole transaction, getting all the parties together, and

21  finding the property.

22         And the geographic scope of this conspiracy was

23  throughout Mecklenburg County surrounding counties, and even

24  reached down to Atlanta, Georgia, where the defendant was

25  intending to go into the business of mortgage fraud because

1    he believed the spread would be greater in Atlanta, Georgia.

2    And the "spread" refers to the additional amount of money

3    that he received between the two transactions, the flip.

4    And the spread came primarily from the loan proceeds.

5        Now, this was a broad conspiracy, and included

6    other promotors than just Mr. Cloud.  It included Michael

7    Bryant, Don Henderson, Kenneth Strong and William Phillips.

8    It included attorneys such as John Lee and Leon Orr.  It

9    included mortgage brokers, such as Kim Dauria and Daniel

10   Greene.  It included recruiters, such as Mr. Goines and

11   Ms. Wright.  It included underwriters -- and I want to add

12   back that an underwriter has an fiduciary duty, such as

13   Ms. Russell, who was also convicted at trial with this

14   defendant, Mr. Cloud.  It included bank officials like false

15   account verifier, Amy Phillips, who falsified account

16   records, I believe, from Bank of America.  That's correct.

17   It was Bank of America, right?

18        MR. MEYERS:  Yes, Your Honor.

19        THE COURT:  The nature of this scheme was common.

20   It was a common plan, although each of the individual

21   promotors did not necessarily consult with each other when

22   they were doing a real estate flip.  Although, they did talk

23   to each other about how to do the flips, in fact it was the

24   intent of Mr. Strong to get training from Mr. Cloud.  But

25   that never actually came to fruition because Mr. Strong

1    figured it out and started going into the flips.  But he did

2    talk to Mr. Cloud about it.  He talked to Mr. Cloud about

3    going down to Atlanta -- I should rephrase that.  Mr. Cloud

4    talked to Mr. Strong about going to Atlanta.  But they not

5    only shared the common plan, but they also shared money.

6    Mr. Strong, in particular, loaned Mr. Cloud, fronted

7    Mr. Cloud some money so Mr. Cloud could do something with

8    these transactions.

9           But when you look at the factors as to what

10   creates a common scheme or plan, you have to look, of

11   course, at common victims, common accomplices, common

12   purpose and similar modus operandi.

13          As Mr. Meyers argued earlier, that happened in

14   this case.  It was one large conspiracy because the primary

15   victims in this case, the immediate victims in this case

16   were the banking institutions and the mortgage bankers.  The

17   institutions provided the money.  Some of them -- some of

18   those institutions met with the actual definition of

19   financial institution; some of those institutions did not

20   necessarily meet the legal definition of financial

21   institutions but they still were the lenders.  Those were

22   the common victims.

23          But also common victims in this case were the

24   collateral victims who were in neighborhoods where several

25   of these flips were going on, but where the multiple

1    co-conspirators would have been targeting a similar area of

2    Charlotte, the impact that a neighborhood would have from

3    multiple flips in a neighborhood from the various promotors

4    would have caused those individuals to be common victims.

5              To a certain extent some of the investors who,

6    admittedly, kind of came in as conspirators ended up being

7    victims, but the Court is not looking at the investors as

8    common victims, but it's looking at the lending institutions

9    and it's looking at neighborhood and communities which were

10   affected by these promotors going into certain geographic

11   areas of Charlotte and Mecklenburg County and some of the

12   surrounding counties.

13             The common accomplices is very straight forward

14   here.  The attorneys were involved with all the promotors,

15   the mortgage brokers, the recruiters, the underwriters,

16   false account verifiers such as Ms. Phillips.  The promotors

17   shared these individuals, and they shared these individuals

18   because they had to find people that had fiduciary duties

19   that were willing to cheat.  Therefore, it made sense for a

20   promotor to go to another promotor's, for example, closing

21   attorney like John Lee and Leon Orr, because they knew that

22   John Lee or Leon Orr would not look behind the transaction,

23   which the closing attorney has a fiduciary duty to do.

24             So the common accomplices are central here.  There

25   are only a handful of attorneys who are going to risk their

1  license to practice, much less imprisonment, to facilitate

2  these mortgage fraud schemes, or mortgage fraud transaction.

3  And there clearly was a common purpose. Despite

4  the defenses argument that there was no intended loss here,

5  there was really an intent to defraud lending institutions

6  and to run away with that spread. To take that spread money

7  and to it away. If there truly was no intent to cause a

8  loss to a financial institution or to an investor, then the

9  defendant would have done what he did not do, and that was

10  stay tied close to these investors when they were calling

11  him up and complaining to him that they were getting

12  foreclosure notices. This defendant and the other

13  defendants would have done their best to keep the investors

14  from being responsible for deficiencies in foreclosure, or

15  for even allowing the foreclosures to occur because when the

16  foreclosure occurred, even if there was no deficiency in the

17  foreclosure, the investor would have a significant impact on

18  their credit record.

19  So there was of very much of a common purpose here

20  from all these promotors to get a short-term quick gain from

21  the property and then walk away from the property, either

22  that day or within a few months, and not do any property

23  management or anything like that.

24  Now, admittedly the defendant did do some property

25  management. It's in the record. He did some of that. But

1  that property manager was very minor, according to the

2  Court's recollection of the trial transcript; and a lot of

3  it was to make the property look more appropriate for

4  closing.  But the small amount of property management he did

5  does not offset the fact that virtually the vast majority of

6  the properties went into foreclosure.  I believe it was that

7  80 percent.

8          MR. MEYERS:  That's correct.

9          THE COURT:  80 percent of the transactions he was

10  directly involved in went into foreclosure.  So there was a

11  common purpose of all these promotors.

12          And then there was also common modus operandi.

13  And the Court's already kind of highlighted that by talking

14  about the common accomplices.  The fact that so many people

15  with licenses and fiduciary duties had to be brought in to

16  this.

17          The modis operandi would be very straight forward:

18  You do a quick flip.  You have a promotors bringing in down

19  payments instead of having the actual purchaser bringing in

20  a down payment.  You have the supposed purchaser, the

21  investor, frequently claiming they were to be a resident.

22  You had a fraudulent documents created for those

23  individuals.  And ultimately, to make it all happen, you

24  also frequently would bribe an underwriter, such as

25  Ms. Juderita Russell.

 1          But the method of doing this, the modis operandi

 2     was extremely similar.  It had to be similar because there

 3     were so many individuals of fiduciary duty that had to be

 4     brought into the scam.  And since you needed so many people

 5     with fiduciary duty, you could only go to a handful of

 6     accomplices to do it; I think there was only handful of

 7     attorneys, handful of mortgage brokers, handful of

 8     underwriters and bank employees that are going to facilitate

 9     fraud, and so the fact you use the same people for all these

10     transactions means that the method of operation of each

11     transaction, of each illegal flip, was very, very similar,

12     if not identical.

13          So with all those findings of fact, based on

14     preponderance of the evidence, and after the Court's review

15     of the methodology used by the Probation Office to reach the

16     actual and intended losses in this case, and basing those on

17     an objectively reasonable process, not a subjective process,

18     the Court believes that the Presentence Report of

19     approximately $10 million, specifically $10,052,875, is the

20     intended loss to lenders.  That is comprised of the

21     3.33910 -- $3,339,106 that the Probation Office estimated

22     from Mr. Cloud's properties alone.  The 2,943,433 intended

23     losses for Mr. Bryant -- excuse me, from Mr. Strong;

24     2,695,586 from Mr. Bryant; and 1,160,750 from Mr. Henderson.

25          All of these other co-conspirators' loss amounts

1    were reasonably foreseeable to the defendant because he was

2    so -- he was interacting and sharing the scheme, the

3    accomplices, the methodology with his fellow promotors.

4         The Court does find that the money intended to be

5    received, minus a fair proxy for the value of the house, is

6    a reasonable and objective method of doing the calculations

7    in this case.

8         Now, that's the Court's finding of fact.

9         I still can't determine the loss amount for

10   purposes of the Sentencing Guidelines until we go through

11   the unintended victims in this case; that's the external

12   loss to the communities.

13        MR. MEYERS:  One piece of clarification, Your

14   Honor.  I did not hear the Court say, and I may have missed

15   it, I want to make sure I understand the Court's finding

16   properly, that the Court finds that the Defendant Cloud

17   intended that approximate $10 million in losses.  I think

18   the Court sort of put it in the passive voice --

19        THE COURT:  Yes.  The Court does find the

20   defendant -- as a matter of fact, by preponderance of the

21   evidence, the Court finds the defendant, William Cloud,

22   reasonably foresaw and intended a loss of $10,052,875.

23        All right.  Any other clarification?

24        MR. MEYERS:  No, Your Honor.  Thank you.

25        THE COURT:  Mr. Tate, any questions or

1   clarifications?

2           MR. TATE:  No.  Just note our objections.

3           THE COURT:  All right.  Let's go to -- all right.

4   Let's take a 15-minute recess.  And is it possible we would

5   be able to finish by 1:00.  I don't know.

6           MR. MEYERS:  I believe so, Your Honor.  I met

7   with -- we have, I should say, about 30 minutes of Victim

8   Impact Statements to present to the Court.  I met with

9   Dr. Cowan last night.  I think he'll be fairly quick and I

10  can speed it up if the Court's familiar with his report.

11          THE COURT:  Yes.  I've read it entirely.

12          MR. MEYERS:  I think we can certainly present what

13  we have left in that amount of time.

14          THE COURT:  The defense has evidence also.

15          All right.  I had a 1:30 appointment with visitors

16  from an Russian delegation that were coming here to

17  Charlotte to talk to lawyers and judges, and I believe it's

18  1:00 or 1:30.  I certainly want to the maintain that,

19  because that's hard to reschedule since the Russian

20  delegation will be returning home.  If we push up to 1:30,

21  then we'll have to continue the sentencing.  Let me rephrase

22  that:  We have to finish the sentencing at a later date,

23  which would probably be Friday.

24          MR. MEYERS:  We could meet after the Court's --

25          THE COURT:  Well, you're probably not aware,

1    Magistrate Judge Toliver Davis passed away this past

2    weekend, or I think on Friday, and his funeral is late this

3    evening in Forest City.  So after I meet with the Russian

4    delegation, I'll be heading to his funeral.  Judge Davis

5    retired a decade ago, but he was a distinguished member of

6    this court.

7              MR. TATE:  Your Honor, just two things by way of

8    scheduling.  We do have out-of-town witnesses we would like

9    be able to put on, get him back to his home today.

10             THE COURT:  We understand.

11             MR. TATE:  For scheduling purposes, I have

12   scheduled a long overdue vacation beginning tomorrow and

13   will be out of court next week or so.

14             THE COURT:  We could maybe do it late tomorrow

15   afternoon.  Tomorrow was -- I'd have to do it by 4:00.  We

16   might be able to do it late tomorrow.  Let's see where we

17   end between 1:00 and 1:30.  We'll recess to just 12:15.  Ten

18   minutes.

19             (Recess taken.)

20             MR. TATE:  Judge, are we on the record?

21             THE COURT:  Yes, we are.

22             MR. TATE:  Let them just say a couple things about

23   scheduling, if I can.

24             I understand you weren't aware of the what was

25   going on occur this afternoon with the Court's schedule --

1          THE COURT:  And none of us anticipated Magistrate

2     Judge Davis's death.

3          MR. TATE:  Yeah.  What I was going to suggest, and

4     I spoke to Mr. Meyers, he has an out-of-state witness and I

5     do, too, that has plane reservations this evening.  If he

6     could put on his expert and we could put ours on, even out

7     of turn, so that he could be free not have to come back at a

8     later time.  That's what I would propose and hopefully get

9     that done by 1:30.  In terms of my personal schedule, I have

10    what they use-or-loss time.

11         THE COURT:  Right.  I understand that.

12         MR. TATE:  I'm going to be actually taking off the

13    balance of the year trying to resolve some of that time.

14         THE COURT:  Mrs. Blackmon told me that this starts

15    tomorrow morning for you.  Well, and we can have your

16    experts testify, and then we could continue this to January.

17         MR. TATE:  I hate to do that, you know, I have

18    been trying to take this for sometime, for a year; haven't

19    been able to because something always comes up.

20         THE COURT:  We all knew this was to be a lengthy

21    sentencing.  I originally anticipated blocking a whole day,

22    but I talked to both counsel and both you have you all said

23    it's a half day, and so I then planned a half day.

24         MR. TATE:  I think we both said a whole day.  I

25    kind of remember the e-mail exchange.  Am I right, Mr.

1    Meyers?

2            MR. MEYERS:  I thought we asked for whole day.  We

3    had an intervening conference in which Mr. Cloud had written

4    a letter, and it may be that that's what the Court's

5    referring to.

6            THE COURT:  See, I think that's what happened.

7    When we the status conference.  I thought counsel said it

8    was a half day, because originally I'd planned on whole day,

9    and you said a half day and so we did that planning.  And

10   it's too late now.  I could have moved the Russian

11   delegation until late in the day, but they're schedule is

12   set.

13           MR. TATE:  Well, what happens is, and the reason I

14   kind of wanted to focus and get the experts out so we could

15   get out by 1:30 because otherwise me and Mr. Meyers, arguing

16   back and forth, it's the majority of the time.

17           THE COURT:  I agree.  And both of the experts are

18   about the issue at hand?

19           MR. MEYERS:  Yes, they are.

20           THE COURT:  And I also want to clarify.  I

21   referred to this as unintended victims, and I should

22   rephrase that:  It's collateral victims is a better phrase

23   because victimization doesn't have to be specifically

24   intended by a defendant, but the defendant has to have some

25   recognition that the collateral damage will be broad.  So

1    when I use the term "unintended victim," that was a bad use

2    of the word "unintended."  It should be "extended victims"

3    is the better term.  Extended victims.  And it's referred to

4    in the Presentence Report as external loss to the

5    communities.  So with that said, let's go forward with the

6    experts.

7              MR. MEYERS:  Thank you, Your Honor.

8              I'm going to talk to Mr. Tate.  I had 30 minutes,

9    as I said. I'm to only going to play the first 15 minutes

10   which is directly relevant to what the expert will testify

11   to, and he may reference it during his testimony.

12             This is from folks who lived near houses that were

13   foreclosed as a result of the counts of conviction.  These

14   are interviews of relevant statements from these folks.

15             THE COURT:  These are only from foreclosed

16   houses that were actual counts --

17             MR. MEYERS:  That's right, Your Honor.  And in the

18   video we're going to indicate where they were a neighbor of

19   which house it was, so I'll play for the government, now --

20   I'll refer to this as Government's Exhibit 102.

21             THE COURT:  Just for the record, all the exhibits

22   both parties referred to are admitted in a sentencing.  You

23   don't really have to say it but I am saying it; they are all

24   admitted.

25             (Videotape played.)

COWAN - DIRECT

1      MR. MEYERS:  The United States would call Spencer

2  Cowan.

### SPENCER COWAN

4  being duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

**BY MR. MEYERS**

7  Q    Good afternoon, Dr. Cowan.

8  A    Good afternoon.

9  Q    For the sake of time, instead of asking you all the

10  specific questions we talked about yesterday, would you just

11  summarize for the Court your position, where you are, and

12  some of your education experience?

13  A    Yes.  My name is Spencer Cowan.  I'm senior research

14  associate at the Center for Urban and Regional Studies at

15  the University of North Carolina, Chapel Hill.  I received

16  my Ph.D from the University of North Carolina at Chapel Hill

17  in city and regional planning, and JD from the Boston

18  University School of Law.

19  Q    Dr. Cowan, have you been retained by Department of

20  Justice in this case?

21  A    Yes, I have.

22  Q    Are you compensated or your work?

23  A    Yes, I am.

24  Q    How much are you compensated?

25  A    $150 an hour.

COWAN - DIRECT

1  Q    Does your compensation depend in any way on your

2  findings?

3  A    No, it doesn't.

4  Q    I want to get clear, first, in a very summary fashion,

5  with the Court's permission, about what you're not here to

6  testify about.  You're not here to testify about the fraud.

7  Right?

8  A    No, I'm not.

9  Q    In fact, you didn't pick the list of properties you

10  analyzed, did you?

11  A    No, I didn't.  They were furnished to me by the United

12  States Attorney's Office.

13  Q    So you are here simply to take the data you were given

14  and to estimate the external losses to the communities using

15  that data as your assumptions?

16  A    Yes.

17  Q    Please summarize for the Court, as a broad overview,

18  what research is out there that's relevant to quantify the

19  collateral damage from foreclosure?

20  A    At the time I prepared the report, there were five

21  principal sources I used.  There was a study by Dan

22  Immergluck and Geoff Smith on the impact of foreclosure to

23  starts on nearby property values.  There was a study by Lin,

24  Rosenblatt & Yao on the impact of foreclosures in the

25  Chicago PMSA, the largest statistical area.

COWAN - DIRECT

1       There were reports by Apgar and Duda, and by Moreno on

2  the impact on communities; how much tax revenue they lost

3  and how much it cost them in additional services to secure

4  properties and keep them secured.  And one study by Shlay

5  and Whitman of abandoned properties, the Impact of Abandon

6  Properties in the City of Philadelphia.

7  Q    Is this research all peer review, Dr. Cowan?

8  A    Yes, it is, which is the standard or this type of

9  effort.

10 Q    Now, Dr. Cowan, does the research indicate whether

11 there is, in fact, collateral damage from foreclosure?

12 A    Yes, it does.  It consistently finds that there's

13 statistically significant collateral damage in terms of

14 negative impact on the property values of nearby properties

15 and costs to the community.

16 Q    Is there any serious dispute among researchers about

17 whether this is true?

18 A    No, there isn't.

19 Q    Is there any serious dispute among researchers about

20 whether this negative collateral impact is a quantifiable?

21 A    No.  Different researchers use different methods or

22 different data resources, but there's no dispute about the

23 ability to quantify it.

24 Q    Dr. Cowan, your report describes three kinds of damage

25 that result from foreclosure.  Would you list those three

1  kinds of damage for the Court, please?

2  A    The first is the damage to nearby property owners from

3  reduction in value of their properties.

4      The second, as I said, is the cost to the community in

5  the terms of securing properties, maintaining them,

6  additional policing.  And finally there's lost tax revenue.

7  Q    Would you summarize for the Court, please, Dr. Cowan,

8  why it is the research posits there's a negative pecuniary

9  impact on the nearby homes from foreclosures?

10 A    Different researchers have different theories.  Lin,

11 Rosenblatt and Yao, for example, posit that these properties

12 in foreclosure can get into the appraisal chain and be used

13 as comparable sales.  Immergluck & Smith in an another study

14 found that they contribute to foreclosures in the

15 neighborhood; contribute to an increase in crime.

16     These are properties that are traditionally

17 undermaintained.  They begin to be evidence of blight that's

18 obvious from the streets -- as you heard the neighbor saying

19 you can tell which properties are deteriorating, and a

20 deteriorated property along a street will tend to be a

21 negative amenity and reduce values.

22 Q    What, if any, effect does increased crime from abandon

23 properties have according to researchers?

24 A    If increased crime in neighborhood is associated with

25 decrease in values, it makes it harder to sell properties,

1  and it can lead to further increases in crime.

2  Q    Dr. Cowan, why would there be a tax loss that results

3  according to the peer studies?

4  A    People who are in a foreclosure process generally don't

5  have enough money to pay their taxes.  They can file tax

6  liens but they're not always collectible.  The owners may

7  end up in bankruptcy, and frequently it's just not worth the

8  effort or doesn't yield enough money.  So Apgard and Duda

9  estimate that the loss of about a little over $500 per

10  foreclosure.

11  Q    And why does it cost the local government, Dr. Cowan?

12  A    Well, the government's -- sometimes properties, when

13  they are foreclosed, they are left vacant.  The new owner

14  doesn't always secure them properly.  Even if they are

15  secured, they may not be maintained properly.

16       You heard about the grass growing, the rodent

17  infestation.  Properties, even if they are secured, vandals

18  can break in.  They can have parties.  Properties can become

19  the victim of arson, or sites for drug activities or

20  drug-related activities.

21  Q    And Dr. Cowan, I think you mentioned in your report you

22  had relied on one study which wasn't foreclosure-specific,

23  but looked at the effect of abandon properties in nearby

24  neighborhoods.  Why did you rely on that study as well?

25  A    The Shlay and Whitman study was the only one I found at

COWAN - DIRECT

1    the time that evaluated the impact of multiple negative

2    properties within a single neighborhood.

3        All of the foreclosure studies, particularly Lin and

4    Immergluck, both spoke of the impact of a single foreclosure

5    or foreclosure start.  Shlay and Whitman quantify the impact

6    from multiple abandoned properties, and then they found a

7    nonlinear relationship, so that a second abandoned property

8    didn't have the exactly the same impact as the first, and

9    they found it decreased with the number of abandoned

10   properties.

11       I used that to adjust for the situation where there

12   were multiple foreclosures within a single neighborhood.

13   Q    Well, Dr. Cowan, what community does Shlay and Whitman

14   study?

15   A    They studied Philadelphia.

16   Q    Dr. Cowan, if you would, now please summarize for the

17   Court some of the variables that you took into account in

18   your analysis, namely, what variables affect the amount of

19   collateral damage that can result from foreclosure?

20   A    One consistent finding is that the distance matters.

21   Both Immergluck and Lin found that the impact decreased with

22   distance.  They find -- because their findings were as a

23   percent of the property's value, you'd need to know the

24   values of properties nearby, and the number of properties

25   affected.  They found it affected an area, specific area, I

COWAN - DIRECT

1  defined radius, so I had to determine the number of

2  properties within that area.

3  Q    And what are some of the other factors beside distance?

4  A    Distance and time within which the foreclosure

5  occurred.  Lin, specifically, found greater impact if

6  foreclosure occurred within two years than in a period from

7  three to five years.  But they did find statistically

8  significant impact as long as five years after the

9  foreclosure.

10 Q    Address, if you would, how density an/or value might

11 affect the impact?

12 A    The impact occurs over a certain area, and so the

13 density affects it because it affects the number of units in

14 the impacted area.

15    If the area, for example, a 100-meter circle, is about

16 seven acres, depending on the density of development, there

17 may be seven houses at one unit per acre; it would be 28 if

18 it's four units per acre.

19    Value affects it again because the impact is a

20 percentage of the value.  So a decrease of 1 percent or

21 5 percent or 8 percent is based on the value of the

22 properties.  And so I needed to find the -- a way to assign

23 value to the properties within the area.

24 Q    Dr. Cowan, I want to step into your methodology now.

25 I'm not getting -- I know the Court wants to move quickly,

COWAN - DIRECT

1   so I'm just going to --

2           THE COURT:  And let me add, I have great respect

3   and reverence for Magistrate Judge Davis, but I think he

4   would agree that justice should be done, so I'm not going to

5   go to his funeral after all.

6           But I still have this commitment with the Russian

7   delegation, so we'll recess when we recess and we'll come

8   back at 4 p.m.  And I hope my support staff can help me as

9   much as you can; and we'll stay until we finish.  So if I

10  need to get back up clerks or anyone, you need to start

11  making arrangements for that.  Is that already with the

12  parties, we reconvene at 4:00 and go until we finish?

13          MR. MEYERS:  Yes, Your Honor.

14          THE COURT:  All right.

15  **BY MR. MEYERS**

16  Q    Dr. Cowan, I'm still going to move quickly because I'm

17  assuming the Court's familiarity with the report --

18          THE COURT:  The Court read the whole report

19  yesterday, and its very familiar with it, but the Court

20  really appreciates Dr. Cowan going through this summary of

21  his report.

22  **BY MR. MEYERS**

23  Q    Thank you.

24      Dr. Cowan, I want to show you now what's referenced as

25  Table 3 in your report, which is on page 16 of your report.

COWAN - DIRECT

1    Your report being Docket No. 24-1 in the record here.

2         And showing you Table 2, I would ask that you please

3    explain for the Court how you created Table 3 and its

4    relevance, please?

5    A    Table 3 -- and it's not on this screen, I'm looking

6    over the clerk's shoulder -- is basically a way of

7    converting the distances given in the peer-reviewed analysis

8    converting them to acres.  Because this is from the Lin,

9    Rosenblatt and Yao study.

10         They differentiated the distance in hundred-meter

11   increments, finding statistically significant impact out to

12   a range of 900 meters, but converting that to square meters

13   isn't really helpful because we think of area in this

14   country in terms of acreage.

15         So the first column is defined circle or ring.  The

16   next is the area within that ring in acres converted from

17   square meters.  The next is based on the overall average

18   density for all of the properties in question; 61

19   foreclosures.  How many units were in those various -- the

20   circle or the various rings out to that distance.

21         So, for example, in the circle within a 100 meters of

22   the 61 properties, it's 7.8-acre area, had 401 units,

23   averaging about eight units in that closest in circle.  As

24   you can see it progresses out.  Because the rings get

25   progressively larger, more and more units get included.

COWAN - DIRECT

1  Q    I want to take you now to table -- excuse me, let me

2  ask you, then, Dr. Cowan, how you determined the value of

3  the units that would be affected in those rings as you

4  described it?

5  A    For each of the 61 foreclosures, I checked the address

6  against the Census block group for the 2000 Census.  The

7  Census block group is the smallest area at which I could get

8  census data on the value of houses within that area.  I --

9  Q    Please describe what a block group is?

10 A    A block group is the smallest aggregation the Census

11 has for financial data, and it consists some -- usually

12 between 500 and 1200 houses would be in a block group.  The

13 next level up would be the Census Track, and then to the

14 county level.  So the block group is the smallest and what I

15 feel is the most comparable to an individual neighborhood.

16 Q    So what did you take from the block groups?

17 A    Identified, as I said, each block group, and I used the

18 median house value.  Median is the 50th percentile, which

19 means that half the houses in the block would be worth more;

20 half the houses in the block would be worth less.

21 Q    Why do you use the 2002 Census data instead of

22 different estimated data, for example?

23 A    The Census data set is the one that is consistent

24 across jurisdictions.  And so where I was dealing with

25 different jurisdictions, different states, it provided me a

COWAN - DIRECT

1   consistent, constant, reliable source of data that I could

2   use.  It will tend to understate the values later because

3   the 2000 data I believe are actually 1999 values.

4        So for foreclosures in, say, 2003, 2004, the actual

5   value would probably be higher, but those kind of data at

6   that small an aggregation are not available.

7   Q    So would that have the effect of underestimating or

8   overestimating the collateral damage?

9   A    It would underestimate it because one of factors is

10  it's a reduction in a percent of the value, and if the value

11  is lower, then the amount of the reduction would be lower.

12  Q    So you took that conservative approach here?

13  A    Yes.

14  Q    Did you make any adjustment for multiple foreclosures

15  in a single block group?

16  A    Yes.  There were instances, there were as many as four

17  foreclosures in a single block group among the 61

18  properties.

19       Using the Shlay and Whitman study, I estimated the

20  decreasing impact to try to come up with a formula as

21  closely as I could would approximate their results, which

22  simply was that the second foreclosure within a block group

23  would have half as much an of an impact, a third would have

24  as third as much of an impact; so there would be a

25  decreasing impact of more foreclosures within a single block

COWAN - DIRECT

1  group.

2  Q    You did that on the basis of the Shlay and Whitman

3  study?

4  A    Yes.

5           THE COURT:  Can I -- I have several questions.

6           Are these four foreclosures that would be in this

7  one block group you might have found, were they all in

8  Mr. Cloud's properties directly or one of the other

9  co-conspirator promotors?

10          THE WITNESS:  Your Honor, I --

11          THE COURT:  Well, do you know how he broke that

12  up?

13          THE WITNESS:  These were all Cloud-only

14  properties.  There were 61 that I ended up including,

15  because of other limitations in the studies that I wanted to

16  be precise.

17          For example, the Lin, Rosenblatt and Yao used

18  conventional mortgages; that would be single-family and

19  one-to-four family.  So if there were five or more family

20  units, those would not have been included; not that there's

21  no impact, but because they weren't included in the study, I

22  didn't include them in my calculations.

23          THE COURT:  All right.  Thank you.

24          MR. MEYERS:  Just to be clear for the Court and

25  for the record, Dr. Cowan's report references property by

COWAN - DIRECT

1   number 1 through 94, and those numbers correspond exactly to

2   the Presentence Report.

3           So he did not actually estimate the losses for

4   properties that were reasonably foreseeable to Cloud and

5   part of the conspiracy are handled by -- Henderson, he,

6   again in order to be conservative, although 89 million

7   doesn't sound like a conservative number, we really only

8   looked at the collateral damage just from Cloud himself; the

9   properties that he had a direct hand in.

10          THE COURT:  All right.  Thank you.

11  **BY MR. MEYERS**

12  Q    So Dr. Cowan, I stole a little bit of your thunder

13  there.  Let me ask you to skip to the conclusion, please,

14  which is what was the total estimated loss to the

15  neighborhood from foreclosures four years back.

16  A    Based on the 61 foreclosures that were full

17  foreclosures, and using the method I described, I found

18  total losses to the properties to total 89,600,000, I

19  believe.

20  Q    Dr. Cowan, I would to take you now to Appendix C, which

21  I believe sets forth your conclusion to support that

22  89 million with the methodology described in your report.

23          Does the first page of Appendix C, which is listed as

24  page 28 of 41 in Docket No. 224-1, does that represent the

25  properties that you looked at that were actually foreclosed?

COWAN - DIRECT

1  A    Yes.  Those are the properties in the data set I was

2  given, with an identifiable street address and a foreclosure

3  date.  So these I know were actually foreclosed.  These

4  aren't just foreclose starts, for example.

5  Q    I want to take you now to page 31 of your report in

6  Docket No. 224-1, and ask you to please describe what's

7  listed here.

8  A    The first column is the property number.  The next is

9  the data that was used.

10       There were five properties where, when I went to the

11  block group or tried to find the property address, the

12  Census for 2000 did not have that address listed.  In that

13  case, it indicated to me that it was a new development that

14  was not in existence as of the 2000 Census, and to avoid the

15  bias that would come from using a block group that didn't

16  have the development in it, I used the Census track, which

17  is the next largest.

18       But then the third column is the land area.  In the

19  Census it's calculated in square meters, but I did a

20  conversion.  Also, the number of single-family housing

21  units, that's single-family detached/attached, or

22  one-to-four family that would be eligible for a conventional

23  mortgage for each block group for a Census track is

24  appropriate, and then the average density in units per acre.

25  So, for example, in the first one, the average was .93 units

COWAN - DIRECT

1   per acre throughout the block group.

2   Q    Dr. Cowan, I now want to take you to page 32 of

3   Document 224-1 in the record, and ask you to please describe

4   for the Court what is listed here?

5   A    First column again is the property identification.  The

6   second is the median value for single-family houses in the

7   area in the block group.  The next is simply multiply the

8   density -- average density per acre by the number of acres

9   in the area.

10      So the first three columns are for the circle around

11  the foreclosed property, zero to hundred meters.

12      For the first property, 7.3 units were impacted.

13  That's about 7.8 acres and about 9.3 units per acre.

14      Based on the Lin study, the level of the impact was a

15  decrease of 8.7 percent, for a period of up to two years.

16  Based on that median value and the number of units impacted,

17  multiply -- came out to a total loss of property value in

18  that first hundred meter circle of just over 52,000.

19      The next column going to the next ring out; from 100

20  meters to 200 meters.  Again, taking area times the density;

21  number of units impacted; the impact level from the

22  Rosenblatt and Yao study, and then multiply that by the

23  median value to get -- and this progresses out through the

24  remaining rings out to the largest ring they found

25  statistically significant impact, was out to a radius of

COWAN - DIRECT

1    900 meters.

2    Q    In other words, Dr. Cowan, as you get close in, there's

3    a greater impact, .087 percent, but there's fewer units.

4    A    Yes.

5    Q    And as you get further out, there is a lesser impact

6    of, for example, .047 for 100 and 200 meters and --

7              THE COURT:  Let me just make sure I understand

8    this.

9              So when you look at the number, negative 52,115,

10   go back to the prior page, which is the impact within a

11   hundred meters to property one, that means roughly each of

12   those seven properties devalued about what $4,800, $5,000?

13             THE WITNESS:  Yes.

14             THE COURT:  All right.  I just wanted to

15   understand.  52,000 refers to all seven properties.

16             THE WITNESS:  Yes.  That's the sum total of impact

17   within that radius.  But if you look down --

18             THE COURT:  Almost 9 percent devaluation of the

19   median properties.

20             THE WITNESS:  Yes.  If you look down to

21   properties 8, 10 and 11 -- I mean, 8 and 10 and 15, you can

22   see where these were properties that were in the same block,

23   group which you can tell by the fact they have the same

24   median value -- and I've decreased the impact from

25   8.7 percent to 4.35 to 2.9 -- in other words, to estimate

1   the declining impact that Shlay and Whitman found.

2          THE COURT:  All right.

3   **BY MR. MEYERS**

4   Q    Using this methodology, you found the total of

5   approximately $89 million in collateral damage to the

6   victims?

7   A    Yes.  From those 61 foreclosures.

8   Q    Dr. Cowan, I don't know if you noted yet, but Mr. Guy

9   Cecala is here.  Have you read his report that critiques

10  your work?

11  A    Yes, I have.

12  Q    One of the things he claims that your research is

13  flawed because it relies on a study of depressed

14  crime-ridden areas of Chicago during the late 1990's.  Did

15  you read that critique?

16  A    Yes.

17  Q    What is your response, please?

18  A    I consider it not to be an accurate reflection of

19  the -- or characterization of the works on which I relied.

20         The Immergluck & Smith study was of foreclosure starts

21  in the city of Chicago, not foreclosures; and based on

22  research I've done in another project, about half of

23  foreclosure starts actually ends up in foreclosures, which

24  means that half of the properties that Immergluck & Smith

25  studied, the borrower was still in possession of the

COWAN - DIRECT

1    property, so they would not have been vacant or abandoned.

2    They are spread through the city.  There were over 3,200

3    foreclosures starts and 9,000 transactions for comparison

4    purposes.

5    Q    So Dr. Cowan, 32,000, that's not just in one

6    neighborhood?

7    A    No, that's -- that's certainly not just one

8    neighborhood.  Even more the --

9              THE COURT:  Wait a minute.  You said 32,000.

10             THE WITNESS:  3200.

11             MR. MEYERS:  3200.  Excuse me.

12   A    The Lin study is actually based on foreclosures but

13   it's foreclosures throughout the Chicago PMSA, Primary

14   Metropolitan Statistical Area, which consists of Cook

15   County, which is Chicago, and eight additional counties in

16   Illinois.

17        I just checked this morning, and according to the 2000

18   Census, Lake County, which is immediately to the north of

19   Cook County, the median family income as a little over

20   $76,000 a year, compared to the national average of 50,000,

21   just over 50,000.  So I would not consider Lake County by

22   any stretch of the imagination a disadvantaged area of the

23   City of Chicago.

24   Q    So the Lin studies was how many counties?

25   A    Eight -- excuse me, nine counties.

COWAN - DIRECT

1  Q    Nine total counties, only one of which was Cook County,

2  and only a part of Cook County is obviously the City of

3  Chicago, and only part of the City of Chicago is one

4  crime-ridden neighborhood?

5  A    Yes.  Well, there may be one than one crime-ridden

6  neighborhood in the City of Chicago.

7  Q    Fair enough.  So why is that not then an adequate

8  critique of your work?

9  A    To suggest that the studies of one or a few select

10  disadvantaged, crime-ridden neighborhoods in Chicago simply

11  is not an accurate reflection of the dataset upon which

12  those two studies were based.

13  Q    And are you aware, Dr. Cowan, because you are a

14  researcher in the housing studies field, are you aware of

15  any economist, anyone in the housing field that thinks the

16  studies upon which you relied may not be used outside of

17  Chicago?

18  A    No.  There are critiques that suggest that Chicago may

19  be different in some respects, but there are no studies I

20  know of, and I try to keep track of them, that suggest that

21  the negative impact wouldn't be comparable; that there would

22  not be some measurable impact.  It may vary depending on

23  density.  It may vary depending on the housing market, but

24  that's not a question pf whether there's a negative impact.

25  It's more the details.

1  Q    Dr. Cowan, you used Lin for your findings of $89

2  million primarily.  Is that correct?

3  A    Yes.

4  Q    And Lin studied those nine counties in PMSA in the

5  Chicago.  What is the density the Chicago's PMSA compared to

6  Mecklenburg County?

7  A    The unit density is slightly higher in Mecklenburg

8  County, very slightly, but it is slightly higher.  So over

9  all, Chicago, of course, the City of Chicago is much denser

10 than Mecklenburg County, or the surrounding PMSA, but the

11 surrounding a counties are predominantly suburban.

12 Q    So in other words, the geographic studies by Lin is a

13 actually less dense than Mecklenburg County?

14 A    Yes, it is.

15 Q    Dr. -- or excuse me, Mr. Cecala actually also claims

16 that your study is flawed because it's largely theoretical.

17 It's not based on actual neighborhoods.  What's your

18 response to that?

19 A    I did not go and examine the properties.  I did not

20 have them appraised.  According to my calculations, based on

21 the 61 foreclosures, they were approximately 32,000 units

22 affected.  And it simply was not within the scope of what I

23 could accomplish to do a full appraisal or examine those.

24 This is a fairly standard methodology used by nationally

25 recognized organizations, such as the Center for Responsible

COWAN - DIRECT

1   Lending to use, median value, and average unit densities.

2   Q    In other words, you can do economics in housing studies

3   without taking a ruler to every single house?

4   A    Yes.

5   Q    Dr. Cowan, you have also been here today and have you

6   seen that, in fact, there was quite a good deal of actual

7   losses for many of these houses?

8   A    Yes.  I think the statements that were shown are fairly

9   typical of exactly what the research has indicated, which is

10  deterioration of the properties, criminal activity, cost to

11  the community in the terms of having to come in and rectify

12  some of the situations, visual blight inhibiting other

13  properties owners from being able to sell.

14  Q    Mr. Cecala also claims, Dr. Cowan, you're study is

15  flawed because he looked at zip codes that were relevant in

16  this area, and the zip codes overall rose in value by

17  34 percent, whereas your block groups -- he's claiming that

18  a better method than your block groups.  Could you respond

19  to that.

20  A    The zip codes are useful because they are a way that

21  economic data are aggregated, but they are very much larger

22  areas.  I would say a zip code of 10,000 units would be

23  fairly common because they determine postal delivery routes.

24  On the other hand, I don't think a neighborhood that would

25  be affected by foreclosure as encompassing ten thousand

COWAN - DIRECT

1  units.  The block group, again generally from 500 to 1,000

2  units, maybe 1,200; some are larger, depending on how the

3  Census is operating and whether they get broken up.  But the

4  Census tries to keep them fairly small, and I think at a

5  scale that I would consider as a housing policy person, more

6  indicative of neighborhood characteristics than a zip code

7  would be.

8  Q    Multiple neighborhoods; dozens, if not more,

9  neighborhoods in a zip code?

10 A    Yes.  My zip code, in fact, I am in Chapel Hill,

11 something in excess of four miles from my post office.  It's

12 on the other side of town.

13 Q    Dr. Cowan, you also have conclusions regarding tax

14 loses regarding your report.  I'm going to let those speak

15 for themselves.  I'll turn you over to cross-examination

16 now.

17            THE COURT:  Mr. Tate.

18                    **CROSS EXAMINATION**

19 **BY MR. TATE**

20 Q    Dr. Cowan, your report, is it largely theoretically?

21 A    Yes.

22 Q    Did you study any actual properties and what happened

23 during those foreclosures?

24 A    No, I did not.

25 Q    Now, with respect for the underlying data you used, was

1 it based largely on communities in the Chicago and

2 Philadelphia?

3 A    The data on impact, the two studies, the Immergluck and

4 Lin studies were based in Chicago, but the data I applied in

5 using the findings from those studies to determine the

6 collateral damage were based on the block groups for each of

7 the 64 foreclosed properties.

8 Q    Okay.  Now, with respect to the Philadelphia

9 communities, did Philadelphia factor into your analysis?

10 A    No, they didn't.  I used the Shlay and Whitman study

11 only as the way of estimating the declining impact of

12 multiple foreclosures within one neighborhood.

13 Q    And you certainly are aware that Chicago and

14 Philadelphia, the home values, the depreciation rates, the

15 foreclosure rates are substantially different than that for

16 Charlotte and Mecklenburg County?

17 A    I really didn't look into what the median home values

18 would be in different neighborhoods in Chicago, so I really

19 couldn't tell you whether they were all that different.

20 Q    And you didn't look at that when you made the

21 comparison between that and the PMSAs in Chicago, did you?

22 A    I did not.

23 Q    Because you didn't do that, you can't tell to any

24 degree of educational certainty that those figures are

25 accurate, can you?

1  A    Yes, I can, because I'm using the finding from peer

2  review studies that indicate the amount of the impact.  That

3  impact is across a variety of properties, with a variety of

4  housing types, densities and values.

5       So when I say, for example, using the Lin study, that

6  within 100 meters of a foreclosed property there's a

7  negative impact of minus 8.7 percent, that's across all of

8  the properties they studied which vary in value and housing

9  type.  And so I would say it was fairly applicable to the

10  kind of mixed housing stock that would be almost anywhere.

11  Q    But that study wasn't of Mecklenburg County, was it?

12  A    No.

13  Q    It wasn't of Gaston County, was it?

14  A    No.

15  Q    And it's in the north.  Is that right?  They have

16  different tax rates in the north, in Chicago?

17  A     Yes, they do.

18  Q    And they are substantially higher, aren't they?

19  A    I don't know what the tax rates are in Chicago, but I

20  would imagine they would be higher.

21  Q    But you didn't go study, when you made your analysis,

22  you didn't factor in any of the differences in the tax

23  rates, did you?

24  A    The tax rates were -- I believe would be a factor in

25  the study in terms of their padomic (ph) analysis of the

1  impact on housing prices, because the tax rates would vary

2  between -- among, for example, counties in the Chicago PMSA,

3  so that would become a control variable that would be taken

4  into account in assessing the overall impact.

5  Q    I'm asking what you did, Doctor.  You didn't adjust the

6  findings of your study based on any differences in the tax

7  rates between Mecklenburg County and Cook County, Chicago?

8  A    No, I didn't.  I didn't think it would be appropriate.

9  Q    And, in fact, isn't it true, if you know, that Cook

10 County, Chicago, has about three times the crime rate than

11 Mecklenburg County?

12 A    I don't know that.  I didn't research it.

13 Q    You didn't factor that in as part of your analysis?

14 A    I didn't research it.  No, I did not --

15 Q    But you did --

16 A    -- put the crime rate --

17 Q    -- what you consider the crime rates?

18 A    No.

19 Q    You did not?

20 A    No, I did not.

21 Q    You didn't say crime rates affected the value of

22 property?

23 A    Crime rates effect the value of property.  That much I

24 know from my community development and housing research.

25 But I did not factor it in in terms of the impact of the --

1    impact on value that a foreclosure would have.  If it was

2    considered, it would be considered as part of determining

3    what the impact was based on the Lin or Immergluck studies.

4    Q    Which dealt with Chicago?

5    A    Yes.

6    Q    Not Mecklenburg County?

7    A    Not Mecklenburg County.

8    Q    So you don't know what those factors are for

9    Mecklenburg County, do you?

10   A    No, I don't.

11   Q    Now, with respect to the foreclosures that you studied,

12   sir, did it differentiate between foreclosures caused by

13   fraud or by foreclosures by somebody just losing their job?

14   A    No.

15   Q    So the study of foreclosures had absolutely nothing to

16   do with fraudulent foreclosures, did it?

17   A    I don't know whether any of the foreclosures in the

18   study was as a result of fraud, so I can't differentiate.

19   Q    And the foreclosures, the 61 properties that you

20   discussed as being related to Cloud, how do you know they

21   are related to Cloud?

22   A    That was in the dataset that was provided to me by the

23   United States Attorney's Office.

24   Q    So you're simply relying on something somebody else

25   told you?

COWAN - CROSS

1  A    I'm relying on the dataset that I was provided.

2  Q    You didn't review any -- of those 61 properties, any

3  foreclosures to see whether they were actually connected to

4  William Cloud or not, did you?

5  A    That was not what I was engaged to do.

6  Q    So your answer is no?

7  A    No, I did not.

8  Q    Now, with respect to the Cloud properties, do you know

9  whether or not prior to going into foreclosure, two or three

10 other people may have actually lived in or owned the house?

11 A    Again, I was operating with the dataset that I was

12 provided that the indicated that these were properties

13 associated with Mr. Cloud, and given there was a foreclosure

14 date, that they went into foreclosure.

15 Q    Well, did you know whether or not Mr. Cloud was a party

16 to the foreclosure or whether it was some other third party?

17 A    I don't know who foreclosed.

18 Q    And you don't know why they foreclosed either, do you?

19 A    No, I did not.

20 Q    Did you review any neighborhood track in connection

21 with those 61 properties were you found multiple

22 foreclosures in one neighborhood?

23 A    Yes.

24 Q    What neighborhood was that?

25 A    I don't remember the neighborhood.  I was looking at

1    block group data, and I remember that, in fact, I believe

2    there were 61 foreclosures.  There were 51 affected block

3    groups or tracks, which would indicate there was some

4    overlap, and I think the largest single number of

5    foreclosures within one block group was four.

6    Q    Now, you don't have any specific information that those

7    properties are connected to William Cloud?

8    A    From the dataset that I was provided, yes, all 61 were

9    indicated as associated with Mr. Cloud and exclusively with

10   Mr. Cloud.

11   Q    Did you do any study of abandoned properties of those

12   61 of which percentage of those properties had been

13   abandoned?

14   A    No.

15   Q    Did you do any specific studies of the actual

16   neighborhoods involved in those properties?

17   A    Other than comparing -- other than the Census data in

18   terms of property value and unit density, no.

19   Q    And of course, the Census data was outdated.  It was

20   from 2000, wasn't it, or 1999?

21   A    2000.  It's published in 2000.  I believe it's

22   actually -- they indicate that the housing value data is

23   1999, or in 1999 dollars.

24   Q    And did you factor in the fact that housing price

25   values are rising at 34 percent between 1999 and 2004?

1   A    As I mentioned, using the 2000 data would tend to

2   understate them because of the appreciation.  But, no, I did

3   not adjust the values upwards to reflect what statistically

4   might be over a large area a price appreciation, but I don't

5   know the situation for specific neighbors in Charlotte or in

6   Mecklenburg County, or in any of the other affected

7   counties.

8   Q    And did you review the specific sales or foreclosures

9   of those properties to determine whether they actually

10  foreclosed for more money than they are actually valued at

11  at the time?

12  A    No.

13  Q    So, in essence, your study could include figures that

14  don't take into account the fact that the homes are actually

15  foreclosed on or higher rates than the actual loan amounts?

16  A    The studies don't suggest that the sale price of a

17  specific foreclosed property affects the impact.  They say

18  their studies of a foreclosure within this radius, during

19  this period of time has on average a certain statistically

20  significant impact on the value of nearby properties.

21  Q    But, of course, that wasn't specific to any of the

22  properties in this case, was it?

23  A    No.  It was based on the study of several thousand

24  transactions in Chicago and in Chicago PMSA.

25  Q    In a totally different state?

1    A    Yes.

2    Q    That study, of course, for the properties back in the

3    late 1990s, weren't they?

4    A    The Immergluck and Smith was.  The Lin, Rosenblatt and

5    Yao I believe was 2003 and 2006.

6    Q    Okay.  Didn't that study 19 foreclosures and abandoned

7    properties from 1997?

8    A    That would be the Immergluck and Smith study, not the

9    Lin, Rosenblatt and Yao.  The Lin, Rosenbaltt & Yao study, I

10   believe -- and I'm recalling, it could be 2002, but it

11   was -- I think it was 2003 and 2006.

12   Q    Okay.  And what neighborhoods did that study?

13   A    That studied all neighborhoods throughout the Chicago

14   Primary Metropolitan Statistical Area, which as I said is

15   Cook County and eight additional counties to the northwest,

16   and east -- south of Chicago, because there aren't to many

17   neighborhoods to the east of Chicago.

18   Q    Because it's in the lake?

19   A    Right.

20   Q    Now, with respect to that study in 2006, did it factor

21   in foreclosures?

22   A    Yes.  It was of the impact of foreclosures, not just

23   foreclosure starts.

24   Q    But not through 2006.  Right?

25   A    Yes.  Including 2006.  I believe their dataset was

COWAN - CROSS

1    foreclosures and real estate transactions in 2003 and 2006.

2    Q    Now, did your study take into account any specific

3    distances between homes and 61 properties that you were told

4    are attached to Bill Cloud.  Did it take into -- let me

5    strike that.

6         Did your study, the methodology you used take into

7    account the distances between the actual 61 properties that

8    you were asked to look at?

9    A    It did to the extent that, as I showed and explained in

10   the appendices, Appendix C, each ring, at a distance,

11   intervals of a hundred meters, which is the interval that

12   Lin, Rosenblatt and Yao used has a different and declining

13   impact with distance.

14        So, for example, within the hundred meter radius circle

15   there was one level of impact.  From one hundred to two

16   hundred meters, there's a lower level of impact, and so on

17   out, 200 to 300 meters.

18   Q    I understand.

19   A    So it does take into account the distance.

20   Q    But they are measuring the density of homes in Chicago

21   that are closer together than they are in Mecklenburg

22   County, aren't they?

23   A    I used the density in Mecklenburg County.  And the

24   density in Mecklenburg County is actually slightly higher

25   than the density in the area studied by Lin, Rosenblatt and

COWAN - CROSS

1    Yao.

2    Q    Now what -- from what year density in Mecklenburg

3    County did you use?

4    A    2000.

5    Q    You compared that to the density in Chicago which was

6    taken when?

7    A    Also from this 2000 Census.  I used the 2000 Census

8    data to get the area and number of housing -- single-family

9    housing units, actually conventional housing units, and it's

10   a simple arithmetic calculation.

11           MR. TATE:  Thank you.  No further questions.

12           THE COURT:  Redirect?

13                    **REDIRECT EXAMINATION**

14   **BY MR. MEYERS**

15   Q    One question, Dr. Cowan.  You were asked a lot about

16   Chicago versus Mecklenburg County.  You presented an

17   economical analysis, one based on economics.  Are you aware

18   of any differences in human nature or economic behavior

19   between Mid-westerners and Carolinians?

20   A    No, I'm not.

21           MR. MEYERS:  I have no further questions, unless

22   the Court has questions of Dr. Cowan.

23           THE COURT:  No, Dr. Cowan, I've read your report

24   very thoroughly, and I appreciate your testimony.

25           THE WITNESS:  Thank you, Your Honor.

COWAN - CROSS

1          THE COURT:  We'll recess until 4 p.m, and I
2    presume we'll allow your expert to testify so he can make an
3    evening flight.

4          Anything before we recess?

5          MR. MEYERS:  No, Your Honor.

6          THE COURT:  All right.  Then I'll see everyone at
7    4:00.

8          (Recess taken.)

9          (Court reconvened at 4 p.m.)

10         THE COURT:  It's now 4:01, and we're reconvening
11   after recess.

12         Dr. Cowan finished testifying.  For convenience of
13   the defense, would you like to call your expert, Mr. Cecala.

14         MR. TATE:  Cecala.

15         THE COURT:  Thank you.  I apologize for
16   mispronouncing your name -- or do we continue with the
17   government's presentation?  I'll leave it up to you,
18   Mr. Tate.

19         MR. TATE:  If the government has more -- since
20   we're now on such a tight time frame --

21         THE COURT:  Then the government can continue.

22         All right, Mr. Meyers.

23         MR. MEYERS:  Thank you.  That's what the
24   government would present in terms of the evidence.

25         In the Government's Sentencing Memorandum it

1    addresses why it believes this damage to the community is

2    both properly cognizable under the Guidelines and was

3    reasonably foreseeable to the defendant, Cloud.

4           To be clear, the government contends that the

5    Court could address the losses to the community in one of

6    two ways or perhaps both of two ways.

7           The first is by including it as part of the 2B1.1

8    loss calculation, which is recommended in the PSR, which the

9    government endorses.

10          Second -- there's really three ways -- the Court

11   could depart upward pursuant to United States Guideline

12   5K2.5, and that's addressed on page 66 of the Government's

13   Sentencing Memorandum.  That is an encouraged basis for

14   departure, according to the Fourth Circuit, for losses that

15   are not adequately taken into account within the Guidelines.

16          And third, the corporate upwardly vary in order to

17   address the impact to the neighborhoods.

18          We believe Dr. Cowan's testimony, the study was

19   important to give the Court a realistic assessment of what,

20   exactly how much damage to the communities did result from

21   the defendant Cloud's conduct.

22          So the, first, I would like to address whether or

23   not the Court may take into account that kind of loss to the

24   communities in --

25          THE COURT:  These are legal argument, right?

COWAN - CROSS

1          MR. MEYERS:  Yes, they are.

2          THE COURT:  I feel like I should first go through

3     evidence and argument first.

4          MR. MEYERS:  I think that makes sense.

5          THE COURT:  So the government has no other

6     evidence to present on the issue of collateral damages.

7          MR. MEYERS:  No additional besides the trial

8     testimony, testimony of the Dr. Cowan, and the PSR.

9          THE COURT:  All right.  Mr. Tate, what evidence

10    would you like to present?

11         MR. TATE:  At this time we call Guy Cecala.

12    **Judge, I don't know if you could hear it, but there's like a**

13    **hum.**

14         THE COURT:  I do hear the hum.  It hasn't bothered

15    me but I hear it.  Do we know the source of the hum?

16    Florescent light probably needs to be replaced.

17                           **GUY CECALA**

18    being duly sworn, was examined and testified as follows:

19                      **DIRECT EXAMINATION**

20    Q    Good afternoon.  Can you state your name and for the

21    record can you spell it.

22    A    Sure.  Guy Cecala.  C-E-C-A-L-A.

23    Q    And what do you do, sir?

24    A    I'm CEO and publisher of a market research firm and

25    publication company based in Bethesda, Maryland.

CECALA -DIRECT

1    For 25 years we've tracked the mortgage market.  Our

2  clients are mostly large lenders, people like Fannie Mae,

3  Freddie Mac, but also government agencies.  We track all

4  aspects of the mortgage market, from mortgage underwriting,

5  mortgage servicing, mortgage securitization, mortgage fraud.

6  You name it, we cover it.

7  Q    And what is the name of that company?

8  A    Inside Mortgage Finance Publications, Inc.

9  Q    And did you provide this market research analysis to

10  lenders?

11  A    They are our primary customers because we charge a lot

12  for it.

13  Q    Now, have you reviewed certain documents in connection

14  with this case?

15  A    Yes.  Yeah.  Specifically you asked me to review the

16  reports you got from Fannie Mae and Freddie Mac regarding

17  losses related to certain properties.

18  Q    And have you been able to discern who the lenders were

19  in at least the 94 properties that were identified to you?

20  A    In most cases, yes, lenders identified and in a number

21  of cases the service is also identified.

22  Q    And are any of those lenders your clients?

23  A    All the big ones are:  Countrywide, which is now part

24  of Bank of America.  Chase.  Wells Fargo.  Most of those

25  lenders at one time or another were customers.

CECALA -DIRECT

1    Unfortunately, a number of them are out of business now.

2    Q    Well, specifically J. P. Morgan Chase, is that one of

3    your clients?

4    A    Yes.

5    Q    How about Bank of America?

6    A    Yes.

7    Q    Wells Fargo?

8    A    Yes.

9    Q    City Financial?

10   A    Yes.  Those are also top four mortgage lenders in the

11   country, both in terms of originations and servicing.

12   Q    Fannie Mae?

13   A    Yes.

14   Q    Freddie Mac?

15   A    Yes.

16   Q    How about the Treasury Department?

17   A    Yes.

18   Q    The Federal Deposit Insurance Corporation?

19   A    Yes.  Most of the banking agencies, as well as the

20   Federal Reserve Board.

21   Q    Have you ever been certified or asked to serve as an

22   expert on financing and lending practices?

23   A    Yes.  Well, first of all, I do it all the time in terms

24   of the media.  I do two, three interviews a day with

25   newspapers, radio stations, or television stations.  I've

CECALA -DIRECT

1    also consulted with congressional committees, but mostly

2    behind the scenes.  I don't testify at the hearings.  I give

3    them information for their analysis.

4    Q    What type of issues have you been previously asked to

5    serve as an expert on?

6    A    Mostly due to the mortgage crisis and what caused it

7    and the meltdown; role of securitization, role of subprime

8    lending, that type of thing.

9    Q    How about fraud.  Fraud?

10   A    More recently, yes.  We've done -- we do a series of

11   training audio conferences.  We did one this year on

12   mortgage fraud, you know, specifically what lenders can do

13   to prevent it from happening and in analyzing at least the

14   current crop for mortgage fraud we're seeing in this

15   country.

16   Q    Is part of the information you provided trends and

17   statistics on mortgage fraud and foreclosures?

18   A    Yes.  Very much that because it's very much part of the

19   mortgage market these days.

20   Q    Have you over the years tracked the foreclosure rates

21   in various parts of the country?

22   A    Yes, although there are other services that do it, we

23   provide analysis on top of what they do.  Most of the best

24   foreclosure analysis is published by the Mortgage Bankers

25   Association.

CECALA -DIRECT

1 Q    Now, have you ever testified in federal court as a

2 expert?

3 A    I did one of these last month in Federal District Court

4 in Asheville.  I can't remember what district it is.

5 Q    Aside from that, how have you rendered expert services

6 in these areas?

7 A    I also served as an expert witness in a civil suit

8 brought against Chase.

9 Q    And who retained you in that case?

10 A    A private attorney, but basically Chase.

11 Q    That was representing Chase?

12 A    Yes.  It never went to trial.  It settled.

13           MR. TATE:  Your Honor, we'd ask that Mr. Cecala be

14 designated as an expert witness based on the Rule 16.

15           THE COURT:  Well, I think we -- don't we have to

16 show some academic training?

17           MR. TATE:  No.  It can be based on experience and

18 expertise.

19           THE COURT:  Well, we haven't had any discussion

20 about methodology or peer review process or anything.

21           MR. TATE:  The Rule 16 notice sets forth what he

22 will testify to.  It was not objected to by the government,

23 and that's what we contend to have him testify to now.  I

24 don't know what more I can ask him.

25           THE COURT:  Ask him about his -- whether he has

CECALA -DIRECT

1  any degrees in finance, accounting, taxation.  What his

2  degrees are to.

3  **BY MR. TATE**

4  Q    What is your level of education, Mr. Cecala?

5  A    I have a bachelor of arts degree from Boston College,

6  with major in English and political science.  I've got a

7  master's degree from the University of Maryland.  That was

8  for journalism.

9  Q    Now, this Inside Mortgage Finance magazine, explain to

10 the Court, if you will, the level of expertise; what is it

11 that lenders rely on that you tell them?

12 A    Most of it is market analysis.  We're probably the

13 largest source in the United States of rankings of lenders

14 in term of that origination, mortgage servicing.  We break

15 it down by product type.  We do it nationwide.  We don't do

16 it on a state or regional level, but we do it so a national

17 level.  That's primarily what people do.

18      We also analyze mortgage legislation or

19 mortgage-related legislation coming from Congress, as well

20 as any regulation that's coming from the Treasury, Federal

21 Reserve Board or any of the banking agencies.

22 Q    For 25 years, have you tracked lending practices and

23 lending trends?

24 A    Yes.  That's our core business.

25 Q    As part of your core business, do you have an intimate

CECALA -DIRECT

1  understanding of underwriting policies and practices of the

2  various lenders that are your clients?

3  A    We have to closely follow -- we have publications that

4  deal just with underwriting.

5  Q    Okay.  Do you unless deal with retail mortgage lending.

6  Do you report on that?

7  A    Yes.  That's part and parcel of the whole market,

8  basically wholesale and then retail.

9  Q    What's the difference between retail and wholesale?

10  A    Retail is basically when you get a mortgage from the

11  bank office, when you go to a Bank of America office and you

12  have applied for a mortgage there.

13       Wholesale is primary going through a mortgage broker,

14  who, in turn, sells that loan to Bank of America or a Wells

15  Fargo or a Chase.  Generally the mortgage broker doesn't

16  have any ability to fund the loan.  He's just acting

17  effectively as remote loan officer.

18  Q    Now, with respect to underwriting policies between the

19  time period of 1999 and 2000 --

20            THE COURT:  Well, wait a second.  What are asking

21  him to be an expert in?

22            MR. TATE:  What I notice on -- I don't have it

23  right in front of me -- but in our Rule 16 notice we notice

24  what his -- what he would be testifying to.

25            THE COURT:  All right.  And mortgage financing

CECALA -DIRECT

1    practices, risk to lenders, and concept of the

2    securitization of bundling of loans. All right. But not in

3    collateral damage from an bundle of foreclosures?

4            MR. TATE: We also submitted a report on him

5    regarding collateral damage where he did a market trend

6    analysis --

7            THE COURT: He did a page and a half, and there's

8    no support whatsoever of data support. I think you've shown

9    he is an expert in mortgage financial practices, risks to

10   lenders and securitization. I don't think you've shown he

11   is an expert in collateral damage from the results of the

12   series of foreclosures in a given geographic area.

13           MR. TATE: Let me ask him, before we move for the

14   introduce of that report, let me ask him -- I was first

15   going to have him qualified then go into it. I can start

16   off with that and lay a foundation for both the admission of

17   that report and his opinions.

18           THE COURT: Mr. Meyers?

19           MR. RANDALL: I can address that, Your Honor.

20           The government would object to the foundation

21   that's been laid on the issue before the Court at this time

22   which is the collateral damages in this case.

23           We don't believe there's been a sufficient

24   foundation laid for Mr. Cecala to testify to the collateral

25   damage, to take that kind of issue with Dr. Cowan findings.

CECALA -DIRECT

1   There's been no foundation that Mr. Cecala has economic

2   background; real estate, accounting, statistics, anything

3   that would be qualify him to be able for provide an

4   assessment, a quantitative assessment of collateral damage

5   to a neighborhood or to question Dr. Cowan's report at this

6   time.  I wouldn't take issue with the general items that

7   Your Honor's previously stated, but I don't think those are

8   relevant to the issue before the Court at this time.

9           THE COURT:  Do you need to do some more voir dire?

10          MR. TATE:  Yes.

11  **BY MR. TATE**

12  Q    Mr. Cecala, at my request, did you undertake a study

13  and prepare a two-page report with respect to collateral

14  damages?

15  A    Not actually collateral; looking at the actual damages

16  in geographic areas caused by the alleged foreclosures or

17  whatever, yes.

18  Q    And as part of that review, did you review the report

19  of Dr. Cowan?

20  A    Yes, I did.

21  Q    And did you review other records in relation to the 94

22  properties that are identified in that report?

23  A    Yes, I did.

24  Q    What specifically did you do?

25  A    Well, I worked with your office in doing it, but

CECALA -DIRECT

1    basically went through ever property that was identified in

2    Dr. Cowan's report, and tracked the home values during that

3    period from 1999 to 2004, and also from 2004 to 2009, to see

4    if we could see if there were any market losses on those

5    individual properties, as well as the surrounding zip code.

6    Q    And what was the methodology that you used?

7    A    It was very straight forward.  In using the analysis,

8    broke the time period up into two five-year chunks, taking

9    the available data that was available on that specific

10   property, and just looking at exactly what they said

11   happened to that property value during that period.

12            THE COURT:  Okay.  You just said your analysis was

13   specifically of the property value, not collateral damage.

14   So you didn't even analyze --

15            THE WITNESS:  No, the --

16            THE COURT:  -- the consequences.

17            THE WITNESS:  Well, I looked at the individual

18   property and then also looked at the zip code that property

19   was in.  So I guess by that extension you could say it was

20   collateral damage because that's basically what Dr. Cowan's

21   report is, except he was using Census blocks instead of --

22            THE COURT:  Right, he was.

23            MR. RANDALL:  Your Honor, you may have done that

24   analysis.  I don't think a foundation has been laid to

25   suggest he's qualified at this point for the analysis --

CECALA -DIRECT

1          THE COURT:  Where is the -- do you have the report
2   supporting that?  You have a page and a half report here,
3   but do you have the data analysis, all the individual
4   properties, anything like that?
5          THE WITNESS:  Yes.
6          THE COURT:  Where is that?
7          THE WITNESS:  I've got a copy of it in my
8   briefcase if you'd like to see it.
9          THE COURT:  Yes, I would, if possible.  Has the
10  government received a copy of this?
11         MR. RANDALL:  We have the same thing Your Honor
12  made reference to, the two-page report.
13         THE COURT:  It's an expert report and it has not
14  been turned over to the government?
15         MR. TATE:  There is no report, Your Honor.   You
16  asked him about the underlying data.
17         THE COURT:  Right.  Well, so you're saying this is
18  the whole report.
19         MR. TATE:  That's his report.  The data he used
20  was the property addresses and the values -- and the values
21  of -- tracked values of those properties over those period
22  of years individually.  And his report indicates he used
23  public report -- public data records, and then if the Court
24  would allowed me, I'll be very clear how to get it.
25         THE COURT:  All right.  Thank you, sir.

CECALA -DIRECT

1   Appreciate it.

2           THE WITNESS:  I don't believe anybody asked to see

3   that other than you.

4           (Hands document to judge.)

5           THE COURT:  All right.  The Court's been handed

6   Change in Value for Collateral-Related Properties.  I think

7   this needs to be added to the record.

8           MR. TATE:  That's fine.

9           THE COURT:  All right.  The government needs to be

10  given a copy of this.

11          Ms. Blackmon, if you could go make copies.

12          I think we need to take a ten-minute recess while

13  the parties look at this, so let's recess until 4:30.

14          (Recess taken.)

15          THE COURT:  All right.  The Court believes this

16  Change of Value for Collateral-Related Properties, the

17  spreadsheet should be part of the expert's report.

18          The Court will ask the government if it needs more

19  time, because this should have been turned over a long time

20  ago.  If the government does need more time, we'll

21  continuing this sentencing hearing.  If the government

22  doesn't believe it needs more time, we'll continue today.

23          MR. RANDALL:  I think we're prepared to go forward

24  right now, Your Honor.  Obviously, I think I'll need

25  additional time for cross-examination with respect to this

CECALA -DIRECT

1    since we didn't have it before.  We agree with the Court

2    that it's a final report that we should have had to prepare

3    for cross examination today.  Given the fact, the last hour,

4    we're certainly prepared to go forward, Your Honor.  We're

5    prepared to cross-examine.  We'd just ask for some leeway to

6    cross-examine; that it might take longer than anticipated.

7            THE COURT:  The Court does believe Mr. Cecala is

8    an expert in mortgage financing practices, risk to lenders

9    and securitization and the bundling of loans.  The Court is

10   just not convinced by the evidentiary presentation right now

11   that he is an expert in the analysis of collateral damage

12   from bundles of foreclosures in an area.  You might be able

13   to convince the Court of that with further voir dire, but at

14   this point you haven't.

15           He clearly is an expert in what I just read, and

16   there's no dispute about that.  But that's very, very

17   different than what Dr. Cowan is an expert in as a Ph.D. in

18   urban and regional planning, and the specific peer review

19   analysis he used.  There's just clearly a dramatic

20   difference in the types of expertise of these two the

21   witnesses.  Not saying that this expert is not an expert.

22   He is.  But not in the issue before the Court, collateral

23   damage.  Dr. Cowan is an expert in the issue of collateral

24   damage, and so the Court wants that to be clear on the

25   record.

CECALA -DIRECT

1    MR. TATE:  Let me, just for the sake of the record
2  as well, the government in this case, unlike me, did not
3  file a Rule 16 notice of Dr. Cowan at all and we asked for
4  one.  Dr. Cowan as far as I know has not ever been
5  designated as expert in collateral damages.  I don't even
6  know what the term means.  What's at issue is here is
7  exactly what Mr. Cecala is an expert in, which is housing
8  prices and the valuation of housing prices and it's impact
9  by foreclosures.
10    THE COURT:  But on a grand scheme nationwide,
11  where he's following market trends, not on the specific
12  issue of collateral damage to designated bundles of
13  properties that, you know, based on literally
14  meter-differences from the foreclosed property.
15    I mean, specificity with which Dr. Cowan prepared
16  this report and the peer review methodology he used is
17  dramatically different than what has been presented to the
18  Court.
19    I want you to explain to me scientifically, using
20  the social science and peer review process that Dr. Cowan
21  has used, how this extremely talented expert, Mr. Cecala, in
22  market trends, market analysis, which is very important to
23  his clients, is the same as doing the specific collateral
24  damage analysis that's been done by Dr. Cowan.
25    MR. TATE:  Certainly.  Your Honor, I'll go to

CECALA -DIRECT

1  that.

2          What Dr. Cowan did not do was do it with any

3  specificity, even if you just look at the cross.

4          What he did was he used statistics based on a

5  study 12 years ago in Chicago; did not study a

6  specifically -- Cloud property specifically, and track what

7  happened to that specific neighborhood, to that specific

8  house.  That's exactly what Mr. Cecala did.  And Mr. Cecala

9  is --

10          THE COURT:  But you're mixing apples and oranges.

11          No one disputes he did a specific analysis of each

12  house.  That's the direct damage.  It's the next step that's

13  critical, and that's what's abundantly clear to this Court.

14  The next step is collateral damage.

15          And the collateral analysis, from this expert's

16  report, is by zip code; not by the specific analysis of

17  meter distance, up to a hundred meters up to 900 meters

18  away; just short of a kilometer away.  And using zip code is

19  really quite unscientific.  I mean it's ten thousand units,

20  as Dr. Cowan said, you can have four foreclosures in ten

21  thousand units and it has absolutely no scientific or

22  statistical impact.  And that's why this report is highly

23  suspicion.

24          And I'm very uncomfortable with even accepting

25  that this is useful to the Court under just a basic

CECALA -DIRECT

1    relevancy analysis because it's based on a zip code

2    comparison.

3            Ten thousand units.  I mean, of course, you've got

4    foreclosures and ten thousand units it's going to show no

5    collateral damage whatsoever versus if it's 20 units in

6    neighborhood, or 40 units in neighborhood, and you have four

7    foreclosure, or even one foreclosure, it's going to have a

8    dramatically different impact.

9            MR. TATE:  They didn't look at that single

10   foreclosure in that Census track analysis.  I think the

11   Court --

12           THE COURT:  Can you look me in the eye and tell me

13   that the next-door neighbor to a house that was foreclosed

14   did not have actual direct collateral impact.  That's what

15   your expert concludes.  You can't consciously look me in the

16   eye and say that.  Right?  The next door neighborhood that

17   was within 50 to 100 meters of the foreclosed house did not

18   have direct impact.  We had video presentations of that,

19   both --

20           MR. TATE:  But we don't know when those videos

21   were taken.

22           THE COURT:  Oh, Mr. Tate.

23           MR. TATE:  We just don't.  I mean, what that

24   proved was nothing.

25           THE COURT:  No.  Mr. Tate, it proved an awful lot.

CECALA -DIRECT

1   People said the impact on their ability to resell their

2   house.

3           MR. TATE:  Did they even try to resell their

4   house?

5           THE COURT:  Okay.

6           MR. TATE:  Did they even try to resell the house?

7           THE COURT:  My solution here is we continue this

8   case, this sentencing, and we do -- let there be a more

9   thorough review of this report.  Because I just don't see

10  how -- I'm giving you a second opportunity Mr. Tate.  I

11  don't see how you can credibly use a zip code analysis

12  because it's such a massive number of units.

13          MR. TATE:  I was going to do that from

14  Mr. Cecala's testimony.  We'd be happy to provide a

15  supplemental pleading.

16          Now let them just say this in my defense.

17  Mr. Cecala noted to the Court we gave it to you and nobody

18  had requested this.  We hadn't.  This is the first time I've

19  seen it.

20          Mr. Cecala is so highly regarded in mortgage

21  finance --

22          THE COURT:  Absolutely.

23          MR. TATE:  -- I didn't ask him.  I took his

24  conclusions.  I accepted his conclusions.  I didn't ask him

25  the underlying data.  This is really the same kind of chart

CECALA -DIRECT

1  that was contained in Dr. Cowan's reports, just numbers just

2  like his.

3          THE COURT:  No, I mean I agree.  I mean, there's

4  no doubt Mr. Cecala is an expert in certain areas, and

5  possibly he's an expert in this area.  But I don't see how a

6  zip code analysis of comparison -- it's just too huge an

7  analysis.  I mean, of course, a handful of foreclosures in a

8  whole zip code is not going to cause there to be a

9  noticeable decrease of value every house in the zip code.

10  They are going to go up in a growing economy, but the street

11  the foreclosure is on, the couple of blocks that that

12  foreclosure is on, the immediate community, it's going to be

13  felt very painfully and that's what the Court needs to

14  understand.

15          MR. TATE:  Your Honor, if the Court would just

16  hear me out on this issue.  I'm not quarreling with the

17  Court.

18          But with Dr. Cowan's report it's less specificity

19  because they are not dealing with real numbers.  It's

20  theoretical.  He admitted based on theory.  It's based on

21  theory.  Guy Cecala used publicly available data that

22  measures --

23          THE COURT:  No.  No.  No.  You were right for each

24  one of the actual properties, he used public available data,

25  all right, to say this was the devaluation of this property

CECALA -DIRECT

1    or it might have been -- might have not been an actual loss

2    on a particular property after it went into foreclosure, but

3    that's not the point.

4            It is -- he still had to then make a comparison of

5    that foreclosed property for certain group of properties.

6    And when you're using -- if you use a zip code, yes there's

7    data out there as to this zip code between this period and

8    this period, from 1999 to 2004, appreciated this much.

9            Now, no one is disputing that.  That's -- I'm sure

10   there's ample data out that there supports all of that.  But

11   that doesn't measure the impact of the foreclosures because

12   you're going beyond where the damage is.  The damage is in

13   the neighborhood.  It's not in the whole zip code.

14           MR. TATE:  How would the Court parse foreclosures.

15   Let's say for instance that sake or argument Cloud-related

16   foreclosures in the same neighborhood where people lost

17   their job, how would you parse that out from those

18   foreclosures he had nothing to do with; a foreclosure around

19   the corner that's foreclosed because of a divorce.  This is

20   a more specific way of doing it.  If Mr. Cecala were allowed

21   to testify, he would say this is what the lenders rely on to

22   note.

23           THE COURT:  I can't give you a specific answer to

24   that, but I would think -- I would think you would say,

25   "Okay.  We're looking at this bundle of properties within

CECALA -DIRECT

1   500 meters, and there were two foreclosures within that five

2   hundred meter radius, and one was a result of Mr. Cloud's

3   activities, and the other was the result of someone who lost

4   their job.

5           When you know that, you can do an understanding,

6   you can account for that two variables.  But you're still

7   doing -- defined radius where the collateral damage is going

8   to have measurable impact -- do we zip codes?  Do we use the

9   whole county?  Do we use the whole state?  The collateral

10  damage is never going to be measured in the whole state or

11  the whole county.  That's virtually impossible.  And zip

12  codes is still too broad.

13          MR. TATE:  What I'm saying, Your Honor, is that

14  Dr. Cowan's report doesn't do that.  Exactly what the Court

15  said it should do --

16          THE COURT:  I think Dr. Cowan report does.  It

17  starts with one hundred meters.  That's the first level.

18          MR. TATE:  But it doesn't talk about what houses

19  were foreclosed in that 100 meters.

20          THE COURT:  Well, within a hundred-meter range I

21  seriously doubt you're going to have two houses in

22  foreclosure in a hundred meter radius.  It's possible, but

23  that impeaches his bottom line of 89 million, and brings it

24  back to 84 million or whatever -- but it doesn't -- it

25  doesn't mean the peer reviewed methodology is wrong.

CECALA -DIRECT

1          MR. TATE:  There was no peer review of his report.

2          THE COURT:  No.  No.  No.  The methodology is peer

3    reviewed.

4          MR. RANDALL:  Judge, I think that's the key point,

5    if I may interrupt.

6          I think the first issue here is that the

7    government laid a foundation through Dr. Cowan that his

8    methodology has been approve through peer review, and the

9    articles that he's relying upon has been affirmed through

10   peer review process.  And he's laid that foundation and

11   testified that he implemented that peer review approved well

12   regarded methodology to come up with his conclusion.  The

13   government's problem here with Mr. Cecala is the defense

14   hasn't laid a foundation that he's applying a generally

15   accepted, scientifically proven peer review methodology for

16   his results.

17         THE COURT:  Right.  Because he's using too large

18   of a comparison in a zip code.

19         MR. RANDALL:  Yes, sir.

20         Having said that, Your Honor, the government is

21   fine with going along and letting Mr. Cecala testify to this

22   methodology.  We'll handle it on cross-examination why we

23   think this isn't sufficient.

24         MR. TATE:  Well, at this point, Your Honor, we

25   feel disadvantaged because we filed a Rule 16 motion of more

CECALA -DIRECT

1   than a year ago, and filed a supplement a couple days ago.

2   The government never filed an objection.  They never filed a

3   counter to our Rule 16.  We didn't challenge their expert.

4   Now all of a sudden, you know, they're saying that we

5   haven't laid a sufficient foundation.  We'd like an

6   opportunity to go and have Mr. Cecala, work with Mr. Cecala

7   to get that and to get whatever the Court feels is

8   sufficient to make a proper ruling that it needs to be.

9           MR. RANDALL:  Judge, Mr. Tate was provided with

10  all the necessary reports, underlying documentation

11  associated with Dr. Cowan's report well in advance of trial,

12  as opposed to sandbagging him on the day of the hearing with

13  a witness on stand.  We didn't have access to any of his

14  information, as opposed to Mr. Tate, who has had a full

15  report from Dr. Cowan, and ample opportunity to prepare

16  cross examination of --

17          MR. TATE:  All we have is his report.  We don't

18  have his underlying data.

19          THE COURT:  That is it.  He went through -- took

20  each property, and then he applied the radius across the

21  board, so his underlying data is right there.  How is it not

22  there?  I mean, I look at this three pages as equivalent to

23  about his 15 for 20 pages of spread sheets.

24          MR. TATE:  But they are not dealing with any of

25  the properties.  They are dealing with something --

CECALA -DIRECT

1          THE COURT:  Well, except they would dispute that

2     enormously.  I mean, he said he went through 61 foreclosed

3     properties, and then he did analysis away from each

4     property.  And he wasn't looking at actual loss to that

5     property.  He's looking at the collateral damage of

6     devaluation of the property around there, and he's looking

7     at the increased cost of public services, such as increased

8     law enforcement, and ending in the loss of revenues in

9     taxes.

10          MR. TATE:  I believe, and I would stand on this,

11     that the people who best value and look at devaluation of

12     properties are people in the home finance business, the

13     people in the lending business that rely on Mr. Cecala; not

14     academics talking -- and the question would be do any --

15          THE COURT:  Wait.  You're saying a Ph.D. in urban

16     and regional planning is -- who my understanding of Ph.D.

17     programs, has actual training in methodologies and

18     statistical analysis and all these other things that go with

19     a Ph.D. program, isn't qualified to give an expert's opinion

20     on neighborhood devaluation?  I mean, that's what he's spent

21     --

22          MR. TATE:  The question is do the people -- if

23     this is about losses, do people that rely -- who relies on

24     that type of methodology in determining collateral losses?

25     I haven't heard of anyone that's relied on his opinions for

CECALA -DIRECT

1  that.

2       THE COURT:  Well, you haven't yet showed anyone

3  that has relied upon this witnesses opinions on the area of

4  collateral damage.

5       MR. TATE:  I was trying to but --

6       THE COURT:  Are you saying in Nashville he

7  testified to collateral damage?

8       MR. TATE:  Certainly, from what all he testified

9  to, in Nashville, I was just getting out of the fact he was

10  qualified as an expert there.  He's routinely relied on to

11  talk about -- very, very --

12       (Simultaneous conversation.)

13       THE COURT:  He's an expert.  He's an expert on

14  those market trends analysis of mortgages.  I totally

15  understand that.  But he said he's doing nationwide analysis

16  so he could provide it to his clients.  Because I understand

17  the Bank of America's and the Wells Fargo's of the world

18  want to know market trends and analysis in mortgages because

19  that's one of the businesses they are in.  But that's not

20  the measurement of collateral damage from a foreclosure on a

21  particular street or in the neighborhood.

22       MR. MEYERS:  May I make clear the government's

23  position with regard to the procedure here?

24       THE COURT:  You all wanted to go forward.

25       MR. MEYERS:  We want to go forward.

CECALA -DIRECT

1          We believe that the Court's analysis of
2   Mr. Cecala's a methodology and his analysis is the correct
3   one.  That's why we preempted it with Dr. Cowan.  We believe
4   the Court will reach all those conclusions.

5          For purposes of the record, however, the defendant
6   we believe should present Dr. -- or excuse me, Mr. Cecala's
7   testimony so it's out there.  We think the Court will
8   properly analyze it having heard from Dr. Cowan.  We believe
9   that Mr. Cecala should say what he's going to say.  We think
10  the Court will reject it --

11         THE COURT:  Might current concern, though, I have
12  been asked to qualify him as an expert, and he is an expert
13  within certain fields without a doubt, but I have been asked
14  to qualify for as an expert on an issue before the Court,
15  and I don't know that he's an expert for the issue of
16  collateral damages.

17         MR. MEYERS:  And I don't want to tag team the
18  Court, because Mr. Randall has this witness, but I think the
19  Court could refuse to certify him as expert and still hear
20  from him on that subject matter.  That way the record will
21  be quite clear, and the Court could evaluate his testimony
22  accordingly.

23         THE COURT:  The Court's going to reserve on the
24  certification of him as an expert.  Mr. Tate, I'll let you
25  continue.  All right.

CECALA -DIRECT

1      But you understand the Court's concern is the

2    breadth of the radius here, and that has -- because it gets

3    back to my core question of you:  Can you honestly tell me

4    the next door neighborhood to a house that was foreclosed

5    did not have collateral damage from that foreclosure?

6    Because that's what the conclusion is here: there's zero

7    collateral damage.  And that, quite honestly, has to be a

8    preposterous conclusion.  All right.  So continue.

9    **BY MR. TATE**

10   Q    Mr. Cecala, as part of your duties as publisher of

11   inside these financial magazines, do you track housing

12   prices?

13   A    Yes, we do.

14   Q    Do you track the evaluation of housing prices due to

15   foreclosures?

16   A    Yes, we do.

17   Q    Do you do that as a measurement to an individual

18   property or communities?

19   A    Individual properties.

20   Q    Okay.

21   A    I might add that the concept of damage to communities

22   is not widely accepted.  It's not accepted in the mortgage

23   industry, and I'm not aware of any real lawsuits or a legal

24   basis for recognizing collateral damage either.

25   Q    Do the lenders, the lenders that are your clients, do

CECALA -DIRECT

1  they rely on those type of damages in a making risk

2  assessments or in doing home financing?   For instance, did

3  you observe if any people saying they might have a hard time

4  selling their house because of the foreclosure next door?

5  A    No.   But again, we only track actual damages that a

6  lender reports.   When a lender foreclosures on a property,

7  it's a mathematical calculation on exactly what their loss

8  is and whether they want to lend in that area again.

9  Q    My question to you, Mr. Cecala, is with respect to --

10  were you in the courtroom when they played the video of the

11  people talking about difficulties with the house next door

12  having rats?

13  A    Yes.

14  Q    And one in particular mentioned that they didn't put

15  their home up for sale because they thought it might effect

16  the values.

17       Is one of the things you do is rely and track what

18  foreclosures in a neighborhood would have on the impact of

19  financing another home to purchase or selling a home?

20  A    Not specifically, no.

21  Q    Now, how would you -- how do foreclosures impact a

22  particular neighborhood in general?

23  A    In much the way that, you know, people describe it.

24  You know, the property is abandoned and the place goes into

25  disrepair.   Other people see it in the neighborhood.   Then

CECALA -DIRECT

1    it has, you know, very negative consequences, particularly

2    if you're trying to sell another property in the area.

3    Q    Now, the study by Dr. Cowan, did you review that study?

4    A    I did.

5    Q    Did it concern abandoned properties?

6    A    I think on several occasions the research he referred

7    to, that his analysis was based on, reported that it was

8    very much reliant on abandoned properties.

9    Q    Now, with respect to the 94 properties that you studied

10   involving Mr. Cloud, do you know if any of those properties

11   were abandoned?

12   A    I don't have any information specifically on whether

13   they were abandoned, no.

14   Q    Now, is there a relationship as to what happens to a

15   home before foreclosure and what happens before foreclosure?

16   A    Before and after?

17   Q    Yes.  In terms of value of a house.

18   A    Well, it depends.  You know, one of my analysis was

19   basically looking at foreclosures in the time period this

20   took place, which was 1999-2004, versus foreclosures in the

21   last five years.  It's dramatically different.

22        Housing market, mortgage market conditions, it has an

23   impact on what happens.  In the 1999-2004 period was one of

24   the most prosperous periods in the history of this country

25   in terms of home price appreciate and availability of

CECALA -DIRECT

1    mortgage finance.

2        As a result, you know, home prices nationwide increased

3    about ten percent, and North Carolina increased about five

4    percent a year in those areas.  And, also, simultaneously

5    foreclosures were like half a percent; very, very low.

6    Again, dramatically different from what we're seeing today.

7    Q    And would the period of 1999 to 2004 be different from

8    like 1997?

9    A    Well, yes.

10   Q    And in terms of the housing markets in Chicago and

11   Charlotte, what can you tell the Court the differences

12   between those markets?

13   A    Well, you know, obviously Chicago tends to be a more

14   urban area, but certainly, even in the terms of densities,

15   significantly different from North Carolina and the areas

16   around here.  The type of dwellings is different.  The type

17   of people who live here, they employment base is completely

18   different.  There are a lot of differences.  Housing tends

19   to be very localized and very regional, and it's hard to

20   make generalities about one trend in one area versus

21   another.

22   Q    When you're making a market analysis like for one of

23   the lenders in this case, do you rely on that specific

24   market or somewhere else?

25   A    Well, we practice mostly the national market because we

CECALA -DIRECT

1   don't have the expertise all the time to do specific market

2   conditions.  But we wouldn't try to say that we knew what

3   the mortgage lending market was Chicago versus New York or

4   some other area.

5   Q    Now, you've heard the Court's concerns about your

6   testimony as opposed to Dr. Cowan's.  What's the primary

7   different between you and Dr. Cowan?

8   A    I do market analysis.  I describe what he does as more

9   of an academic analysis.

10  Q    Now, with respect to tracking a damages based on a

11  Census block, do you have an opinion as to whether zip codes

12  would be more reliable or less reliable?

13  A    First of all, the first question in terms of damages,

14  any analysis I provided did not attempt to analyze actual

15  damages since I don't know what collateral damages are in

16  the area.  All I tried to do was provide a very basic

17  analysis of what happened to home prices in those areas,

18  specifically of the properties that were identified as Cloud

19  properties, and also in the surrounding area.

20  Q    And did you use zip codes or census tracks for that?

21  A    I used zip code because that was the only thing

22  available.

23  Q    And do you have -- do you know if zip codes -- are you

24  saying Census tracks would not have been used?

25  A    Census blocks is a much smaller scale and would be the

CECALA -DIRECT

1   best to use, but if you have to balance whether you have the

2   most detailed information in the time period involved with

3   the level of scale you use, it's a tradeoff.  My feelings

4   was it would be better to use zip codes rather than no

5   analysis at all for the surrounding area.

6   Q    Why would zip codes be better in your opinion?

7   A    Well, because zip codes are available.  You have

8   housing data exists very much on a monthly basis now for zip

9   codes, because that's what everybody has access to.  Census

10  blocks tend to be tied to the Census data which doesn't come

11  out very frequently.

12  Q    Now, between the period 1999 and 2004, what

13  specifically can you tell the Court about the values and the

14  zip codes where these properties are located in connection

15  with Mr. Cloud?

16  A    Well, there wasn't -- during that period, there wasn't

17  one zip code where the properties were located that went

18  down in terms of value during that five-year period.

19  Q    Of the properties that you studied, was there a

20  particular number that actually ended up in foreclosure?

21  A    Once again, I didn't have any specific information on

22  what was a foreclosure sale and what happened to be a

23  property that wasn't in foreclosure.

24  Q    With respect to -- were there 11 properties that you

25  found that were in foreclosure?

CECALA -DIRECT

1  A    There were 11 properties that actually saw a decrease

2  in value during that period; I guess roughly 11 out of 80 or

3  something the properties I was able to identify.  I think

4  they were like 98 or whatever properties.  We didn't have

5  data on all those.  Roughly 80 or something of them, 11 went

6  down in actual value during that period from 1999 to 2004.

7  Q    And what happened to the other properties, the other 66

8  properties?

9  A    They were up in value, and as group, the average was up

10  60 percent during that five-year period, even factoring in

11  the ones that went down.

12  Q    I ask you to take a look at your report, page 2.  I

13  want to ask you some questions about that, where you

14  discussed the foreclosed property, revealed that not even

15  one area experienced a drop in average home values in

16  1999-2004.  Explain how you came to that conclusion?

17  A    You're referring to the last paragraph?

18  Q    Yes.  Your last paragraph where you speak of a drop in

19  average home value between '99 and 2004.

20  A    Well, again, looking at the zip codes where all the

21  Cloud properties were located, not one of the zip codes

22  recorded a drop in home value between 1999 and 2004.

23  Q    Now, let me ask you about your -- do you report or hold

24  seminars as well with lenders on mortgage fraud that affects

25  value of foreclosures?

CECALA -DIRECT

1    A    Yes.  It's a big mortgage industry issue and we held

2    one -- the last one we did was in July.

3    Q    And now in terms of payments made to lenders after a

4    fraudulent mortgage, what do you normally see in terms of

5    when there's fraud, do you see a period of time that the

6    foreclosure occurred between?

7    A    What's very common in mortgage fraud, and what tends to

8    expose mortgage fraud is that the mortgage goes in default

9    very, very quickly.  In some cases -- in many cases, none of

10   the mortgage payments are even made.

11   Q    And typically what is the time frame that you receive

12   foreclosure after the time that the transaction takes place?

13   A    Generally the mortgage industry standard is six months;

14   that if you can make it past six months, a lender or

15   investor like Fannie Mae and Freddie Mac, is less to require

16   you to buy back a mortgage if it's defaulted in that period.

17   One year certainly; two years, very much so.

18   Q    When -- have you studied or been involved with matters

19   where there are inflated appraisals?

20   A    Yes, I'm familiar with it.

21   Q    And what do you typically see in a case where there are

22   inflated appraisals in terms of foreclosures?

23   A    Larger than normal losses.  Losses that basically that

24   appear instantly because the property is worth so much less

25   than the appraised value.

CECALA -DIRECT

1  Q    Now, with respect to -- did you read as part of your

2  review, did you review records submitted by Fannie Mae and

3  Freddie Mac?

4  A    Yes.  I believe you asked Fannie Mae and Freddie Mac to

5  produce their loss statements, which is generally what most

6  people in the mortgage industry do, whether you're a lender

7  or whether or not you are Fannie Mae or Freddie Mac, they

8  happen to have some of the best records, but every property

9  they take ownership of, they have detailed statements on how

10  much they incurred in expenses and what they ended up with

11  by the time the foreclosed property was sold.

12      In the Freddie Mac and Fannie Mae cases, and some

13  banks, too, we're not talking about a foreclosure sale --

14  once the property is foreclosed, they take ownership of it.

15  It's called real-estate owned, or REO.  And that's what you

16  tend to see advertised in newspapers these days.  When

17  somebody says, "I'm bidding on a foreclosed property" or

18  "I'm buying a foreclose property," most of the time that

19  isn't a property that's being sold at a foreclosure auction,

20  it's one the lender has actually acquired and is selling

21  after the fact, or an investor like Fannie Mae and Freddie

22  Mac.

23  Q    Let me stop you so I show you what been marked as --

24  let me show you what's be marked as Defendant's 2 and 3.

25          MR. TATE:  May have I approach, Your Honor?

CECALA -DIRECT

1    THE COURT:  Oh, of course.

2  Q    Ask you to take a look at these.  Ask you if you

3  recognize these documents.

4       (Hand document to witness.)

5  A    Yeah.  These are the two reports that -- Fannie Mae

6  produced one, and Freddie Mac produced one, too.  I think

7  you subpoenaed them or asked them to produce documents

8  showing basically what their losses were and the source of

9  the losses, if any, in on each of the properties that they

10 had an interest in.

11 Q    And did you review those records as part of your

12 preparation in testifying today?

13 A    Yes.  I looked at them before, sure.

14 Q    In addition to those records, did you review a disk

15 provided by Fannie Mae?

16 A    Yes.

17 Q    Do those charts accurately summarize the records that

18 you used?

19 A    Yes.  These printouts -- the disks are basically

20 spreadsheets that are stored on a CD and whatever, and these

21 are printouts from them.

22      MR. TATE:  I move for admission of Defendant's

23 Exhibit 2 and 3.

24      THE COURT:  Any opposition?

25      MR. RANDALL:  No, Your Honor.

CECALA -DIRECT

1        THE COURT:  They will be admitted.

2        (Defendant's Exhibit No. 2, 3 received.)

3  **BY MR. TATE**

4  Q    Sir, first of all, I want to ask you to look at the

5  spreadsheet submitted by Freddie Mac.  Of the 94 properties

6  associated with Cloud, does it indicate how many properties

7  they purchased -- number of properties they purchased?

8  A    Well, they show one foreclosure on a SunTrust mortgage

9  one, and I'm not sure what the designation of "C" means

10 other than perhaps closed.  The majority of the properties

11 are listed as before me in terms of the loan status, which

12 means the mortgage is not delinquent or in default, and

13 foreclosure was not initiated on the properties.

14 Q    And how many properties are in that status?

15 A    Six of the nine.

16 Q    And are you able to discern from -- first of all, do

17 you have a copy of what I just gave you already up there at

18 the desk with you, those charts and summary?

19 A    Yes.  I've got it right here.

20 Q    Let me ask you about Fannie Mae, do you see how many

21 properties Fannie Mae reported a loss statement or profit

22 statement on?

23 A    Yeah.  Well, they have a loss category column on all

24 the properties, and that's one of the columns that they have

25 is the loss column.

CECALA -DIRECT

1  Q    And did you review the profit and loss statements from

2  Fannie Mae?

3  A    Yes.  And Fannie Mae's case it shows the majority of

4  the property they did not take a loss on.

5  Q    Now, let me ask you to explain for the Court how it is

6  Fannie Mae or Freddie Mac would end up with a particular

7  home that was involved in a Cloud transaction; how would

8  they ever take ownership of that home?

9  A    Well, first of all, a loan that Fannie Mae and Freddie

10  Mac would purchase is considered a conforming mortgage.

11  Generally in the mortgage industry considered a prime

12  mortgage since that's virtually the type of loans they buy.

13      They buy them and bundle them into mortgage securities,

14  which they sell with basically a government guarantee all

15  over the world.

16      As part of the agreement Fannie Mae or Freddie Mac have

17  with the lender, they basically have to certify that the

18  loan meets their underwriting standards, meets all

19  appropriate state and federal law requirements, that the

20  appraisal was done in a correct fashion.  Basically

21  verifying the quality of the mortgage.

22  Q    Now, with respect to the homes that are assumed by

23  Fannie Mae and Freddie Mac to Chase Bank, did you hear

24  testimony that Chase Bank's underwriting system was used to

25  approve those loans?

1  A    Yes.  And a number of the loans, yes.

2  Q    And what is Fannie Mae or Freddie Mac's underwriting

3  system?

4  A    Both Fannie Mae and Freddie Mac, since the middle of

5  the 1990s, have used an automated underwriting system.

6  Fannie Mae's is called Desktop Underwriter, and it's pretty

7  much what's known in the mortgage industry as an automated

8  underwriting system, but basically a black box.  Nobody

9  knows exactly what the variables are.  It takes a bunch of

10  different factors in, such as a credit store, debt-to-income

11  ratio, loan-to-value ratio, how much reserves the borrower

12  may have, and factors it all in and comes out with approved,

13  not approved, caution, but basically results in that a

14  mortgage broker or lender can type in the information and

15  get results right away.

16  Q    And if Fannie Mae approves a particular loan, let's say

17  based on information provided by the broker, what happens to

18  the home?  Is it sold then to Fannie Mae or is there an

19  agreement to buy that, or how does it works?

20  A    Well, when they make a loan and it goes through one of

21  these automated underwriting systems, it's basically given

22  preferential treatment, because Fannie Mae and Freddie Mac

23  are confident it meets their underwriting standards.

24       So generally once those loans go through, they go into

25  Fannie Mae security.  Fannie Mae guarantees the credit

CECALA -DIRECT

1   quality.  Charges the lender an annual guarantee fee for

2   that.  If the loan-to-value ratio is above 80 percent, it

3   has to carry private mortgage insurance.  And that all goes

4   into the equation of when there's a loss or when something

5   goes wrong.

6   Q    For instance, like Fannie Mae or Freddie Mac, the loss

7   profits statements that you've viewed, if they report no

8   loss, would you be able to discern whether or not they

9   forced a lender to -- like for instance in this case, Chase,

10  to buy back any of their loans?

11  A    I didn't see that in the first time looking at it that

12  there was any column for whether there was a loan required

13  to be bought back.

14      As a practical matter, it wouldn't show up on any one

15  of these sheets unless Freddie Mac or Fannie Mae took

16  ownership of it.  If they required the lender to buy the

17  loan back, it would be the lender's responsibility to

18  foreclose on the property, and it wouldn't show up here at

19  all.  Because the lender would be forced to buy it back

20  based on the unpaid principal balance at the time.  So if it

21  was $150,000 loan, Chase would have to pay back a $150,000

22  loan to Fannie Mae and then they get the title to the

23  property.

24  Q    So the fact that Fannie Mae or Freddie Mac handled a

25  particular foreclosure, would that conclude that perhaps

CECALA -DIRECT

1  they did not send the loan back to the bank alleging a fraud

2  was involved with that particular loan?

3  A    Yeah, almost assuredly.  Again, if they find any

4  evidence of fraud, that's grounds for repurchasing the loan.

5  Q    Is that something that Fannie Mae or Freddie Mac

6  routinely does?

7  A    They do very aggressively, yes, particularly in the

8  current market environment.

9  Q    Is that a contractual relationship between them and the

10  lender?

11  A    Yes.  Under their seller agreements, it's caused -- or,

12  you know, they are responsible for preventing fraud.

13  Q    Let me ask you briefly about the role of a broker in

14  terms of obtaining the home loan.  What is the broker's

15  relationship to the lender and the broker's responsibility?

16  A    The mortgage broker is effectively an independent

17  contractor in terms of their status.  Their affiliation with

18  lenders basically was known as sponsorship, so Chase would

19  sponsor a number of brokers, basically authorizing them to

20  originate loans on their behalf.  But the broker doesn't

21  have any money to actually make the loan, so dependent on

22  Chase, or a larger lender actually funding the loan, they

23  effectively act as a loan officer.

24       However, during this time period, 1999 to 2004, the

25  rules governing what a broker could do and can't do were

1   much more liberal than they are today.

2       For example, during this time period a broker routinely

3   ordered appraisals for the lender on the lender's behalf and

4   the lender authorized brokers to do that.  In the current

5   environment, basically since last summer, no one would allow

6   a broker to do that.

7   Q    But during the period of these loan's origination, a

8   broker was allowed to contract it's own appraisals?

9   A    The brokers basically had a lot of leeway during that

10  period to do a lot of things.

11  Q    Could an ordinary consumer, like say in this case,

12  Mr. Cloud, who was purported seller of a house, would the

13  lender rely on them for an appraisal?

14  A    I don't see any way that's possible.  As you might

15  imagine, lenders require that they basically choose the

16  appraiser, and they have a list of approved appraisers that

17  they authorize.  They sometimes delegate that responsibility

18  to a broker, but in no case would you allow a party to the

19  transaction, either the buyer or the seller of the property,

20  to select an appraiser because they obviously have a

21  conflict of interest.

22  Q    And if a lender were aware of that, based on your

23  training and experience, would they approve the loan?

24  A    I don't think so, because if there was a problem with

25  it, they would be required to buy it back based on a

CECALA -DIRECT

1  fraudulent appraisal or a bad appraisal.

2  Q    Now, one of the things I brought up in this hearing is

3  the concept of yield spread premiums.  Can you explain to

4  the Court what yield spread premiums are and what they were

5  during the period of 1999 to 2004?

6  A    Yes.  To clarify, we're talking about yield spreads

7  here.  We're not talking about the yield spreads involved in

8  flipping the property, which is kind of what's been involved

9  in these cases.

10      Yield spread premiums are a fee that mortgage brokers

11  collect by basically charging higher interest rates than

12  market conditions allow.   For example, in the current

13  market environment, if you have -- the prevailing rate is

14  5 percent, then a mortgage broker sells Chase or somebody

15  else a loan with a 5 and a half percent, he gets paid extra

16  for originating that high rate interest loan.

17      It's a controversial practice that the Department

18  of Housing and Urban Development is currently in the process

19  of trying to eliminate, and it's very rarely even disclosed

20  on documents, like a HUD-1 Settlement sheet.

21  Q    Since you've referenced the HUD-1, and there's been

22  some discussions about the HUD-1 Settlement sheet and what's

23  required, who is the HUD-1 Settlement sheet designed to

24  protect?

25  A    The HUD-1 Settlement sheet, just like the good-faith

CECALA -DIRECT

1  estimate, are part of disclosures given to borrowers

2  required under the Real Estate Settlement Procedures Act.

3      They are basically aimed at protecting borrowers from

4  being hit with fees or charges that they didn't know about.

5  It's trying to make them very aware of the mortgage process,

6  what they need to know when they go to closing, how much

7  they are going to pay in closing costs, and basically what

8  they have to pay.

9  Q    Is the Settlement Statement in any way designed to

10  protect the interest of the lender?

11  A    No.  Only that it's a disclosure requirement that if

12  they screw it up, they're held liable for it, and someone

13  like HUD or a civil plaintiff could sue them.

14  Q    But the Settlement Statement is designed to advise the

15  buyer, is that right?

16  A    Yes.  That's the sole purpose of it.

17  Q    Is it a consumer document?

18  A    Yes, to protect the borrower in a mortgage transaction.

19  Q    Do lenders rely on the Settlement Statement in any way

20  in making a decision to fund the loan?

21  A    No.  Because the underwriting decision has to be made

22  probably at least a month or two before a HUD-1 is produced.

23  In most cases, a HUD-1 is only produced at closing; some

24  cases, a day or two before.

25  Q    As far as you know, is there any requirement that --

1   for instance, some money that's going to be given to the

2   buyer, be on the HUD-1?

3           MR. RANDALL:  Your Honor, I would object to this

4   on relevance.  We're pretty far afield from the issue before

5   the Court now as being collateral neighborhood damages.  I

6   don't know if this is relevant to the Court's inquiry at

7   this point.

8           MR. TATE:  Your Honor, as the Court is aware,

9   we're putting on evidence at sentencing, and part of the

10  evidence we've put on is the financing, and we believe it's

11  relevant to Mr. Cloud's culpability, which the Court would

12  have to decide in terms of whether he's a leader or

13  organizer.  There's been some references that Mr. Cloud did

14  some things.

15          I think he's asking for some water.

16          (The witness is given water.)

17          THE COURT:  I'm allowing the question because it

18  could be useful in some other issues before the Court.  It

19  doesn't seem directly relevant to collateral damage, but it

20  is useful in understanding the ultimate purposes of HUD-1.

21          But even though, as you said, they are not relied

22  on by the lender, aren't they relied on by Fannie Mae,

23  Freddie Mac and Ginnie Mae in doing a securitization?

24          THE WITNESS:  It becomes the only, final record of

25  the mortgage transaction and that's why it's important too.

CECALA -DIRECT

1      THE COURT:  It's ultimately relied on by the

2   ultimate lender, which is the secondary mortgage market.

3      THE WITNESS:  That's the only paper trail they

4   essentially have of what transpired with the mortgage.

5      THE COURT:  All right.  Thank you.

6   **BY MR. TATE**

7   Q    Now, with respect to appraisers, who is responsible for

8   obtaining appraisers?  Is the appraiser an fiduciary of the

9   buyer or seller or someone else?

10  A    Generally that responsibility relies solely with the

11  lender who's originating the loan and taking responsibility

12  for funding the loan.

13      As I mentioned, during this time period, they routinely

14  delegated it to someone like a mortgage broker, but

15  that's -- if you did a retail origination through Bank of

16  America office, it would be the loan officer who would

17  actually order the appraisal.

18  Q    And is that on an approved list, approved by the lender

19  or someone else?

20  A    Generally each lender will either keep an approve

21  appraiser list, or they'll require certain certifications

22  for appraisers.  They have to have certain -- basically

23  certifications, whatever, I think there are two or three for

24  different appraisal groups and you have to be certified and

25  tested on that.

CECALA -DIRECT

1  Q    Now, in the instance, whether it would be Fannie Mae,

2  Freddie Mac or Chase, or any other lender, in the event that

3  a home is sold at a value higher than what it's actually

4  worth, based on your training and experience, what would

5  they do with that loan?

6  A    I'm not sure I understand what you're asking.

7  Q    Well, if there was a fraudulent appraisal, would Fannie

8  Mae or Freddie Mac take the loss on that?  Would they keep

9  the house?

10  A    No.  They would kick it back to the lender.  To answer

11  your question, nobody knowingly wants to make a mortgage for

12  a value that's worth more than the house.  And that's the

13  purpose of appraisals, is to make sure you don't run into

14  that situation.

15  Q    Now, with respect to -- do you know -- did you hear the

16  term used in this hearing, the term "flipping"?

17  A    Yes.

18  Q    And what do you understand that to mean?

19  A    Well, it's a common term, particularly in real estate

20  over the last ten years, where somebody tries to buy a house

21  and then turn around as quickly as possible and make a

22  profit on it, basically capitalizing on the rapid home price

23  appreciation we've seen in the country over the last ten

24  years.  It was a lot earlier to do five years ago than it is

25  to do now, for example.

CECALA -DIRECT

1  Q   As far as you know, does the lending industry consider

2  flipping illegal or is it an approved type transaction?

3  A   I wouldn't use the word "approved."  It's not illegal,

4  and it's fairly common.

5      During 2005, 2006, roughly a third of the property

6  sales in the United States involved some kind of investor or

7  second home, so it's always been a huge hunk of the housing

8  market in this country.  It's a lot less now, but

9  historically it's been a big number.

10 Q   Explain, if you will, the value of a home that's in the

11 foreclosure, and is held by a bank.  How is it that a person

12 like Mr. Cloud can buy that home at one price, for instance

13 $100,000, and then sell it as $164,000.  How is that --

14         MR. RANDALL:  Your Honor, I'm going to object at

15 this point.  There's no evidence, no record these kind of

16 transactions took place in the underlying trial testimony.

17         When Mr. Tate tried to do this earlier today, I

18 think the Court addressed that with Mr. Tate.  There's no

19 indication these particular transactions took place in this

20 case.

21         THE COURT:  What are you referencing, Mr. Tate?

22         MR. TATE:  What I'm trying to reference is the

23 suggestion earlier that if you buy a house in foreclosure,

24 that it's necessarily -- that because a house is in

25 foreclosure --

CECALA -DIRECT

1    THE COURT:  Right.  Do you have -- but point to

2  one of the properties that was actually presented to the

3  jury, point to any of the 93 properties; point to any one of

4  them that was -- Mr. Cloud acquired during a foreclosure

5  start.

6    MR. TATE:  Well, I'm going to ask you to make a

7  list.  There's a spreadsheet I have passed you that had --

8  that has foreclosure dates on there.

9    THE COURT:  No, not foreclosures at the end.

10  We're talking forecloses at the beginning when Mr. Cloud

11  acquired the property.

12  **BY MR. TATE**

13  Q    Take a look at Maribel Lane.  1601 Maribel Lane.

14  A    That's No. 6 on the list.

15    THE COURT:  Do you have it?

16    MR. TATE:  It's this one.

17  Q    I believe that's what it says.  Are you looking at the

18  loan spreadsheet?

19  A    Yes.  I was trying to share with -- No. 6.

20    THE COURT:  I'm looking at the wrong spreadsheet.

21  Which exhibit number is it?

22    MR. TATE:  It's Defendant's Exhibit 3.  1605 --

23  it's the same one I e-mail to the Court.

24    THE COURT:  I thought that's what I'm looking at.

25  And I have 314 East 4th Street.

CECALA -DIRECT

1    MR. TATE:  That's the short one.  It looks like
2  it's the government's.
3    THE COURT:  No.  This one end in Q.  The
4  government's end in X.  Can I see that?
5    (Hand document to judge.)
6    Maybe I'm mistaken.  I see now.  All right.
7    It is the same one.  This one, the copy I have,
8  which I printed this out this weekend, has two series of
9  numbers on it based on the spreadsheet nomenclature.  And
10  this one that the witness is using only has -- does not have
11  the X and Y axis of the spreadsheet.
12    Now I see it is -- it's the same data, but it's
13  just I have the columns as X and Y on it, and that's what
14  was confusing me.  So I see it.  It's on row 9 of my
15  spreadsheet, but it is property No. 6.  All right.  So you
16  may continue.
17  **BY MR. TATE**
18  Q    For instance, 1609 Maribel, do you see that, sir?
19  A    I do.
20  Q    Now, do you see where that property, the purchase of
21  that property appeared for February 7th, 2000?
22  A    Correct.  And the foreclosure date's March 23rd, 2004.
23  Q    First of all, is it significant that the foreclosure
24  date is four years later?
25  A    Well, it would be very unusual to have a fraud case

CECALA -DIRECT

1  where the mortgage didn't default within the first six

2  months, if not year, so to have it go four years without it

3  defaulting is very unusual.

4  Q    Does that mean someone is making payments on it?

5  A    Yeah, that's exactly what it means.  Somebody was

6  making the mortgage payments.

7  Q    If you purchase a property that is in foreclosure by a

8  bank, based on what you know about lenders, are they trying

9  to get the full market value of a property?

10  A    No.  All they are looking to recovery is the loan

11  amount.

12            THE COURT:  Plus cost.

13            THE WITNESS:  Yeah.  Foreclosure cost or whatever,

14  too.  And they are specific legal requirements.  They have

15  to post in the newspaper things that this house is being

16  sold at foreclosure, and they put down the amount that it's

17  being sold for.

18            In many cases, the amount is so low that the bank

19  actually acquires the property, and then proceeds to sell

20  it.  But I think we talked about this earlier, if they sell

21  it for more than the amount owed, they have to share the

22  proceeds with whoever owned the property to begin with.

23  Q    In the foreclosures that you reviewed provided by

24  Fannie Mae, did you show where they sold the house for more

25  and had to share in the profits with anyone?

CECALA -DIRECT

1   A     No.  It -- well, no, because I guess Fannie Mae took

2   ownership of the property, so anything that Fannie Mae did,

3   took place on a post foreclosure basis.  We don't know

4   exactly what happened during the foreclosure sale, but

5   Fannie Mae acquired the property, became part of Fannie

6   Mae's holdings of real estate.

7   Q     Now, with respect to abandoned properties, once a house

8   goes into foreclosure, who is responsible for -- you heard

9   testimony about grass being long, the pool not having a tarp

10  over it -- who is responsible, based on your training and

11  experience, for the upkeep of a property once it's in

12  foreclosure?

13  A     Basically the mortgage servicer takes responsible for

14  it on the behalf the investor.  I'm very familiar with

15  Fannie Mae and Freddie Mac do, and I can tell you not one of

16  these properties was ever abandoned because Fannie Mae

17  actually fixes up the properties.

18        Fannie Mae is the largest purchaser of United States of

19  carpet, of appliances -- everything, because they have a

20  huge business, unfortunately, they have to fix up the

21  properties and resell them.  They maintain it.  Hire people

22  to cut the grass and everything else.

23        THE COURT:  So Fannie Mae is the victim.  Fannie

24  Mae ends up having a lot of damages.

25        THE WITNESS:  Except for if they acquire the

CECALA -DIRECT

1  property, the first thing they do is a try to maintain it.

2          THE COURT:  Right.  But that's what I'm saying.

3  Fannie Mae then has to shoulder a cost it never intended to

4  shoulder.

5          THE WITNESS:  Exactly.  And that should be

6  reflected in this sheet that was provided.

7  **BY MR. TATE**

8  Q    Of all the profit and loss statements that you

9  reviewed, was it your testimony in the majority of the cases

10  that the homes you reviewed purchased by Fannie Mae there

11  was no loss?

12  A    On the Fannie Mae cases, yes.

13  Q    And with Freddie Mac?

14  A    Freddie Mac only had looks like one case.  The rest are

15  considered performing, which means they are still

16  guaranteeing the mortgage and nothing has gone wrong with it

17  as far as they are concerned.

18  Q    Let me ask you about certain lenders.  There was

19  discussion about a different -- whether they are subprime.

20  Do you have a chart provided by the government says "Cloud

21  Properties" that shows the various lenders in this case?

22  A    Yes.

23  Q    I ask you to take a look at that.

24          MR. TATE:  Mr. Meyers, what was the government's

25  exhibit that you use?

CECALA -DIRECT

1    MR. MEYERS:  This is the attachment to the

2  Presentence Report.

3    MR. TATE:  So this wasn't admitted in here as

4  attachment to the Presentence Report?

5  **BY MR. TATE**

6  Q    Is this the 94 properties that you studied, list of the

7  compilation of the 94 properties you studied, Mr. Cecala?

8  A    Yes.  This list of 94 properties, clearly the Fannie

9  Mae ones are supposed to be a subset of the -- and the

10  Freddie Mac too.

11  Q    Let me ask you about some of these other lenders on

12  here, and ask you what you can tell the Court about their

13  lending practice.

14    MR. TATE:  And the reason I'm going into this,

15  Judge, is to -- as far as irrelevant conduct and the common

16  scheme and plan as opposed to the evidence adduced at trial.

17  **BY MR. TATE**

18  Q    I'm going to ask you to look at property No. 4, Fleet

19  Mortgage Company.  What can you tell the Court about Fleet

20  Mortgage Company's underwriting standards?

21  A    Fleet Mortgage doesn't exist now.  I believe it was

22  acquired by J. P. Morgan Chase.  But it's basically a prime

23  lender who had made mostly Fannie Mae, Freddie Mac type

24  loans.

25  Q    And would they use the Desktop Underwriting system?

CECALA -DIRECT

1    A    Anybody who wants to sell a loan to Fannie Mae and

2    Freddie Mac is pretty much required to use that.

3    Q    What about Countrywide Home loans?

4    A    Countrywide Home loans also falls into that category.

5    During the time period here it was Fannie Mae's largest

6    customer, but they do make a variety of different loans, and

7    I can't tell from this whether it went through one of their

8    subprime units or a different type of unit.

9    Q    How about City Financial Mortgage?

10   A    City Financial is the subprime lending unit of City,

11   City Bank, and it only does subprime loans.

12   Q    Now, with subprime mortgages, were there different

13   underwriting requirements of subprime mortgages in regards

14   to the type of the documentation that you need?

15   A    Generally, they have less documentation, and you pay a

16   higher interest rate for that, and generally made available

17   to people with less than perfect credit.

18   Q    Was is a NINA loans?

19   A    Well, that's kind of a slang expression for no income

20   no asset verification.  And I guess that's probably the most

21   liberally underwritten mortgage out there.  When you

22   basically take a borrowers word for their income and/or

23   their assets and you don't verify anything.  It's generally

24   reserved for somebody with a high credit score and/or a

25   substantial down payment.  But we've seen that it was also

CECALA -DIRECT

1    used with people who didn't have particularly high credit

2    scores and didn't put any money down.  Those loans defaulted

3    very quickly.

4    Q    Crossland Mortgage?

5    A    They are primarily a jumbo mortgage lender but

6    basically a prime lender too.  They sell loans both Fannie

7    Mae and Freddie Mac.

8    Q    And Nations Credit Financial, looking at specifically

9    1601 Maribel property, No. 11, where Nations Credit

10   Financial is listed as the lender.  Can you tell the Court

11   about Nations Credit?

12   A    Primarily a subprime lender.  Generally anybody with

13   Financial is a finance company, and most of the subprime

14   originations were originated through finance companies, even

15   if they were subsidiaries of banks.

16   Q    And did they require any documentation at all?

17   A    I don't know in this specific case what the

18   documentation was.  But they, you know, ran the whole

19   spectra.  They did have loans that had minimal or no

20   verification of income or assets.

21   Q    And is there any way to tell with this particular

22   property what type of -- whether they required any

23   verification that they --

24   A    Not based on what's on this sheet, no.

25   Q    How about First National Bank of America?

CECALA -DIRECT

1  A    A prime lender, as far as I know.  Associates is on

2  there, Associates Home Equity.  They are a subprime lender.

3  Q    Associates is a subprime, and they were involved with

4  2949 Morgan Street?

5  A    Yes.

6  Q    Postal Mortgage Services, specifically property 37,

7  Eastwood Drive, the address that was discussed?

8  A    Can't make any specific judgment on that.

9  Q    Do you know, have you ever heard of Postal Mortgage

10  Services?

11  A    Yes.  They are a small lender, though, and they don't

12  fall on our radar screen.  Generally, we track the largest

13  hundred in the United States, and they clearly fell outside

14  of that.

15  Q    How about National City Mortgage?

16  A    Yes.  They were subsidiary of National City Bank in

17  Cleveland.  They have since sold, but they were a

18  combination lender.  They did prime loans as well as

19  subprime, and reduced documentation loans.  Again we can't

20  tell from this specifically what the loan was.

21  Q    Option One Mortgage?

22  A    Virtually all subprime.

23  Q    Now, directing your attention to these property --

24  beginning property 59 at Forsyth County, North Carolina, I

25  see the appearance of a lender by the name of the First

CECALA -DIRECT

1   National Bank of Arizona.  Is there anything significant

2   about First National Bank?

3   A    Yes.  They are what we call an Alternative A lender.

4   Basically reduced documentation is most of their business.

5   Q    The type of documentation we talked about in terms of

6   asset verification, income verification, a lender like First

7   National Bank of the Arizona require that type of

8   documentation?

9   A    It would certainly be reduced if not the kind of loan

10  Fannie Mae or Freddie Mac would buy.  It's generally what

11  you'd have to package it into private securities.  But,

12  again, without seeing the specific loans documents, I don't

13  know how much income they verified or what.

14  Q    What about Aurora Loan Services?

15  A    Almost the exact same type of operation.  It was bought

16  by the Lehman Brothers and still exists today.

17  Q    Credit Home Lenders?

18  A    Another exclusively subprime lender.

19  Q    Lehman Brothers you just mentioned, what is Lehman

20  Brothers?

21  A    Lehman Brothers is a defunct investment banking firm,

22  but like many Wall Street firms probably between 2005 and

23  2007 bought up a lot of subprime and reduced documentation

24  lending operations which were having financial trouble.

25  They obviously thought the credit crisis would blow over and

CECALA -DIRECT

1   that would be a good investment.  A bad move.

2   Q    How about Argent Mortgage Company?

3   A    Again, a subprime lender.

4   Q    Directing your attention to property 86 down in Atlanta

5   that has the name Alan Thompson associated with reference to

6   a number Long Beach Mortgage, what can you say about Long

7   Beach Mortgage?

8   A    It's the subprime lending arm that used to be part of

9   Washington Mutual, and I think it's got Wells Fargo --

10  somehow Wells Fargo ended up with the mortgage.  I'm

11  guessing that given the date when it was originated, it was

12  part of Long Beach and Long Beach since went out of

13  business.

14  Q    First Horizon, Nova Star, property 190.

15  A    First Horizon is a prime mortgage.  They were bought by

16  Nova Star, but again I can't tell you anything specifically

17  about that loan.

18  Q    Now, with respect to lenders like Chase who cut these

19  loans and then sold them to Fannie Mae, how did lenders --

20  how did they make their money?  Did they make their money by

21  selling the loan portfolios or how did they make money?

22  A    It depends on type of the loan and it also depends on

23  the time period, and the time period we're talking about

24  here 1999 to 2004 was really the period when subprime

25  lending took off.

1        And one of the reasons subprime lending took off is

2   because it was more profitable for lenders to originate

3   loans, that you couldn't make much money or any money on a

4   Fannie Mae/Freddie Mac.  You made your money in the

5   servicing of the loan, meaning the payments collected each

6   month from borrowers passed through investors.  With

7   subprime loans, you had a lot of opportunity to make money

8   at the front end, securitizing it and servicing it down the

9   road provided nothing went wrong.

10  Q    How that does a lender make money servicing a loan

11  after they sell it?

12  A    They collect the monthly payments, say 100,000 loans,

13  they'll collect roughly $20 a month.  That will be their fee

14  for passing on their monthly payments to investors.

15  Q    But how do you make money on $20 a month?

16  A    Well, you pretty much have a factory-type of operation.

17  You send out bills on an automated fashion.  You have got

18  machines in the back room that slice open envelopes and take

19  checks out.  It's pretty much just how you can process

20  payments that you receiving from borrowers basically in an

21  envelope.  It's designed to collect the payments.  It's not

22  designed to actually pursue foreclosures or call up

23  borrowers and do any modifications, which is one of the big

24  problems we're running into now.  No one was set up to

25  handle the proceeding.

CECALA -DIRECT

1  Q     Do you have to deal in significant volume of those --

2  A     It's an economy-of-scale business.  As I mentioned

3  before, J. P. Morgan Chase is the third largest mortgage

4  server in the country, and to make money they have got to do

5  literally trillions of dollars worth of loans.

6          MR. TATE:  No, Your Honor.

7          THE COURT:  Mr. Randall.

8          MR. RANDALL:  Thank you, Judge.

9                  **CROSS EXAMINATION**

10 **BY MR. RANDALL**

11 Q     Good afternoon, Mr. Cecala.

12 A     Good afternoon.

13 Q     It's been a long day and we'll try and stay focused on

14 a couple of issues here, sir.

15      What I'd like to address with you first is the

16 collateral impacts.

17      As far as your educational background, sir, I discussed

18 this a little bit before, but you have a BA in English and

19 political science.  Correct?

20 A     Correct.

21 Q     Master's degree is in journalism?

22 A     Yes.

23 Q     You're not a trained economist.  Is that right?

24 A     That's right.

25 Q     That you are not a trained statistician?

CECALA - CROSS

1  A    Although I took graduated level statistics, no, I'm

2  not.

3  Q    You don't have a degree in real estate accounting?

4  A    No, I do not.

5  Q    You don't have any formal degree in a quantitative

6  discipline?

7  A    No.

8  Q    And your current position right now is it's CEO and

9  publisher of Inside Mortgage Finance publication.

10  A    Correct.

11  Q    As part of your professional responsibilities with that

12  organization, do you ever personally perform quantitative

13  assessments to determine collateral losses associated with

14  property foreclosures?

15  A    Not specifically, no.  I do analysis but not as -- in

16  terms of collateral damage, no.  As I mentioned before,

17  that's not really a recognized concept in the mortgage

18  industry.

19  Q    It might be at issue for the Court, sir.  If you could

20  just answer my questions, sir, I'd appreciate it.

21  A    Sure.

22  Q    Are you familiar with the peer review journal articles

23  that were referred to by Dr. Cowan earlier in his testimony

24  today?

25  A    I am.  I've actually read some of them.

1  Q    Have you read the Immergluck and Smith External Cost of

2  Foreclosure, the Effect of Single-family Mortgage

3  Foreclosures on Property Values?

4  A    No.

5  Q    Have you had read the Immergluck and Smith Impact to

6  Single-family Mortgage Foreclosures on Neighborhood Crime?

7  A    No.

8  Q    Have you read the Lin, Rosenblatt and Yao article on

9  Spillover Effects of Foreclosures on Neighborhood Property?

10  A    Yes.

11  Q    And have you read Apgard and Duda, an article on

12  collateral damage, Municipal Impact on Today's Mortgage

13  Foreclosure?

14  A    Yes.

15  Q    Are you familiar with any of the peer review articles

16  related to those journal articles I just asked you about,

17  peer review data?

18  A    I'm very familiar with the peer review process and what

19  it involves in terms of producing the research.

20  Q    Are you familiar at all with any of the peer review

21  that went out with respect to these particular studies or

22  articles?

23  A    Not beyond the fact that I know peer review went on.

24  That's all.

25  Q    Can you cite to the Court any academic literature that

1    would support criticism of the methodology that Dr. Cowan

2    employed in making his findings in this case?

3    A    No.  I don't have any criticism of the methodology, by

4    the way.

5    Q    That's good to know.  Thank you.

6         And I think you testified earlier -- I think you

7    testified earlier, sir, the report that we received today,

8    this spreadsheet, for lack of a better term, that we were

9    provided during the break, this was not an effort on your

10   part to ask you to determine any neighborhood collateral

11   damage.  Is that right?

12   A    It was an attempt to show what happened to zip codes

13   where Cloud properties were located.  So to the extent you

14   could track a decline in property values, potentially you

15   could attribute it to a Cloud property foreclosure.  But I

16   think you've pointed out that it's very hard to have one

17   foreclosure impact a thousand houses or whatever maybe in

18   the zip code.

19   Q    Well, let me ask you, sir, essentially what you did

20   here was these are results that you found of appreciation of

21   the housing market.  Is that essentially what I've

22   characterized here?

23   A    I think it tries to capture appreciation, but it's

24   actually change in property values.  It uses repeat

25   transactions.  For example, if you have a five-year period

1    and you've got a property located in there, if it sold two

2    or three times, or refinanced once and there was a record of

3    a new mortgage being put out with an appraisal on it, it

4    captured that.  So to some extent it's as close as you're

5    going to get to actually tracking property value over a time

6    period over a designated area.

7    Q    You're not aware of any literature that would support

8    this methodology in terms of apply it to a loss assessment

9    for collateral damage in foreclosures?

10   A    No, I'm not.

11   Q    Are you aware of any peer review of this methodology to

12   take these numbers and apply them to an assessment of

13   collateral damages in neighborhoods as a result of the

14   foreclosures?

15   A    No.

16   Q    Let me just ask you, sir, so I understand what we're

17   portraying here at this table, you have a category, I just

18   direct your attention to a category where it says "property

19   for five years" as the one of the first quantitative data

20   points.

21   A    Okay.

22   Q    How did you derive that number, sir?  Please explain

23   for the Court and for my own benefit how that calculation

24   was made?

25   A    On the property, you're talking about?

CECALA - CROSS

1  Q    Yeah.  It says "property five years."  I'm guessing

2  that's a five-year period of time that's analyzed in some

3  way?

4  A    Yeah.  The available data out there generally tracks

5  properties in five-year blocks, so a property value five

6  years means 2004 to 2009, because that's the last five

7  years.  What happened on that property's value in the last

8  five years, you skip over and you get --

9  Q    Let me ask you one more question on that point.

10 A    Sure.

11 Q    So you would take into consideration all the property

12 transaction of the sales of that property within that

13 five-year block?

14 A    Keep in mind, I don't take it -- this is again what's

15 available there.  You plug in your home address and you pick

16 a time period, it will tell you what it thinks happened to

17 your property value during that time period.  I don't make

18 any judgment on whether that's accurate or anything else.

19 Q    But that would reflect certainly the transactions that

20 Mr. Cloud had been involved in with respect to the

21 properties listed here?

22 A    Correct.  The actual specific property address, yes.

23 We plug in the property address, it tells you whether you

24 have enough information to come with changes in home price

25 value.

CECALA - CROSS

1   Q    So if we're dealing with a property that Mr. Cloud has

2   dealt with and purchased it and sold it on the same day,

3   there was some appreciation associated with that sale, that

4   number would impact your calculation or this particular

5   number you've put in your table?

6   A    Correct.  And, again, it's over a five-year period.

7   Q    Yes, sir, I understand.

8   A    You know, foreclosure or whatever happened there is

9   basically a snapshot of one day or a much shorter period of

10  time.

11  Q    As a hypothetical, if a individual, say Mr. Cloud in

12  this case, purchased a property on one day in that five-year

13  time frame and sold it at 125 percent appreciation in the

14  same day, that 125 percent appreciation would go into this

15  calculation?

16  A    Correct, as would a foreclosure after the fact where it

17  sold for half that price.

18  Q    If it foreclosed within that time frame?

19  A    Within that five-year time period, yes.  It would have

20  for 1999 to 2004 to be captured by this.

21  Q    Let's turn to the zip code analysis for the five-year

22  period of time.  What types of properties does that account

23  for?  Next column date.

24  A    Beg your pardon?

25  Q    Next column of data I'm referring to.

1  A    Yeah.  This is all single-family housing.  It would

2  cover condos, but wouldn't cover any multifamily housing.

3  And it's the same thing, you know, you put the property in,

4  the information, you ask for the changes in that for five

5  years, you have the option of selecting that zip code.

6  Again, it's all done through a computer program.

7  Q    And would that then -- that number would include the

8  entire zip code for the particular property line it's on?

9  A    Correct.

10  Q    That would certainly be a wider universe of properties

11  than what Dr. Cowan and folks had done, his study with

12  respect to the neighborhood?

13  A    No question.

14  Q    And then the "property ten year" would be the same type

15  of calculation as you described the property in five years,

16  sir?

17  A    Right.  Property five years, the last five years;

18  property ten years is the last ten years.

19  Q    So every transaction with respect to that property

20  would be accounted for in that calculation?

21  A    Correct.  And as you can see, normally there's not many

22  properties in the United States that go down in value over

23  ten years.  Here you see some that did mostly because the

24  last five years has been so bad.

25  Q    What is the next column, sir?

CECALA - CROSS

1    A    That's a calculation of the property during the first

2    five years.  As I said before, the information that you

3    capture is done in five-year segments.  You theoretically

4    can't go back and say give me 1999 to 2004.  What you can do

5    is get 1999 through 2009 and subtract out the last five

6    years, so that's what programmed in there.  It's just a

7    subtraction of the ten-year value from the five-year value.

8    Q    Okay.

9    A    And the same goes with the zip.

10   Q    Okay.  I understand.

11        So again, for our focus here today, sir, the particular

12   property for the five years and the particular property for

13   the ten years, that would include all the transactions that

14   Mr. Cloud would have engaged in with his respect to that

15   property within that respective period of time?

16   A    Correct.  Not just his involvement, anybody else who

17   bought the property or whatever during the period.  It is

18   property-specific, not borrower-specific.

19   Q    Did you examine any appreciation rates in any other zip

20   codes for comparison purposes outside of the ones provided

21   that Mr. Cloud was involved in?

22   A    No, I did not.

23   Q    Did you examine any substantive code beyond this?  Did

24   you have any data that allowed you to go into a more finite

25   level than a zip code level?

CECALA - CROSS

1   A    Nope.  Not available.

2   Q    Sir, I want to address with you just for a few minutes

3   the appreciation that you talked about.

4        Again, is it fair to say that those numbers are not

5   adjusted for fraudulent transactions at all?  In other

6   words, you didn't back out -- identify fraudulent

7   transactions and back those out of the sample survey.

8   Correct?

9   A    No.

10  Q    So if transactions were closed with overappraisals

11  performed, then those numbers would be included in the

12  statistics that you provided?

13  A    It doesn't actually use the appraisal.  It uses the

14  purchase value.  So if your home sold for $150,000 one year

15  and then two years later sold for 170, it would calculate

16  the appreciation based on those two transactions.  If there

17  was a foreclosure, that would have to show up eventually as

18  a purchase or some other transaction that would take that

19  value and drop it down.  Most likely would drop it down.

20  Q    Okay.  But the sale had resulted from a reliance of

21  time over appraisal, that sale would be reflected in the

22  numbers?

23  A    Correct.

24  Q    Now, you did mention with respect to we were talking

25  about the appraisals, I think you mention -- did you say on

1   direct-examination it would not be proper for the seller to

2   be providing the appraisals?

3   A    Yes.  It would be very unusual and legally

4   inappropriate.

5   Q    So if there's evidence in this case where that, in

6   fact, occurred with respect to the defendant, that would be

7   legally inappropriate?

8   A    And certainly it would be grounds for having to

9   repurchase the loan and the lender not exercising their

10  authority or jurisdiction over the appraisal process, yes.

11  Q    Let me move, sir, to talk a little bit about

12  foreclosure numbers.  I think you testified to just some

13  general foreclosure statistics, sir.  Reading from your

14  report, and correct me if you said something different

15  today, but from the report I think you said only about two,

16  2.7 percent of prime mortgages, the type at issue in the

17  Cloud case, in the country were delinquent at all, and just

18  .56 percent were actually in foreclosure.  Are those

19  accurate numbers?

20  A    Yes, except for I will tell you that the analysis I was

21  doing was based on looking at Fannie Mae and Freddie Mac

22  sheets, as well as Dr. Cowan's analysis of essentially prime

23  mortgages.  Obviously, when we went through the list of who

24  the lenders were on other properties, it does show there was

25  subprime reduced documentation loans, clearly nonprime

1  mortgages in there.  And I didn't put those numbers in

2  there.  Those would be higher.

3  Q    I understand.  Those numbers would be somewhat higher.

4       But you're aware in this case, testimony earlier in Dr.

5  Cowan's report showed 61 foreclosures with respect to the

6  Cloud properties out of 74 that had closed, reflecting

7  somewhere in an 80 percent foreclosure rate.  That would be

8  considerably higher than the number that you reported

9  nationally.  Is that right?

10 A    That would be a phenomenally high foreclosure rate.

11 Q    Sir, staying on the collateral damage, we talked about

12 the statistics and the numbers a little bit, but with

13 respect to the neighborhood collateral damage, assuming a

14 property purchased by an individual foreclosures as a result

15 of a fraud related to the case, you're not suggesting that

16 foreclosure would not have a negative impact on the

17 surrounding neighborhood, are you?

18 A    No.  Generally foreclosures have a negative impact on

19 them.  All I attempted to do was try to look at the

20 neighborhood, even if it was too large an area or whatever,

21 but the zip code to see exactly what happened during the

22 time period in question to the overall property values.

23 Q    And that certainly wouldn't address whether -- even if

24 you had an appreciation for the zip code, that wouldn't

25 address a slow appreciation resulting from negative impacts,

1    would it?

2    A    No, it would not.

3    Q    And also if individuals who are living in an affected

4    neighborhood, I think you said on direct examination with

5    the foreclosure happening in a neighborhood, you might

6    expect some kind of adverse repercussions?

7    A    Oh, sure.  If the property is abandoned and everything

8    else, it has a negative impact selling the property.

9    Q    In some cases wouldn't you agree, sir, it may be

10   difficult for individuals effected in that neighborhood to

11   even sell the property?

12   A    Yeah.  In the situation we saw in the television,

13   particularly in the current market environment where

14   everything is bad enough as it is, yes, it would be enough

15   to keep somebody out there.

16   Q    Those numbers would not be reflected in the statistics

17   you provided?

18   A    No, they would not.

19   Q    And even if in the neighborhood -- even if a

20   neighborhood continued to appreciate to some degree, a

21   foreclosure in the neighborhood may cause a slower

22   appreciation in that neighborhood.  Isn't that possible?

23   A    Yes.  It really depends on the time of the foreclosure.

24   If you have a foreclosure and the property is abandoned, and

25   that type of thing, that's where you see the huge impact.

1    There's some neighborhoods in good times when you have

2  a foreclosure and nobody even knows it was a foreclosure

3  because it was done so quickly and the property values were

4  strong enough to support it.

5  Q    Sir, I want to address with you just briefly also the

6  Fannie Mae/Freddie Mac numbers you were provided.  And let

7  me just make sure I understand where those came from.

8         MR. RANDALL:  If I could, may I recover Defendants

9  2 and 3 from Mr. Cecala?

10        THE COURT:  You may.

11  Q    I'll put this on the screen.  Have they been marked?

12  A    That's the one I'm trying to find.  No.  This is the

13  same one.

14  Q    That's different?

15  A    Freddie Mac.  It says "Freddie Mac" at the top.  The

16  other two I guess are both Fannie Mae.

17        MR. RANDALL:  Your Honor, may I ask Mr. Tate mark

18  these.  I think I was referring to them as 2 and 3 and I'm

19  not certain which is which because they're not marked.  I

20  just don't want to be inaccurate in the record.

21  Q    Anything else he provided to you?

22  A    No.

23  Q    That's everything?

24  A    Other than I think this was from yours, the top

25  properties, and this was the original exhibit that we were

1    talking about.

2    Q    That's from the PSR.  We'll take that at this point.

3    A    That's all I've got.

4    Q    All right.  Thank you, sir.

5         I'm showing you what's been marked as Defendant's

6    Exhibit 2.  Put that up on the -- now, Mr. Cecala, did you

7    actually create this spreadsheet or was that provided to

8    you?

9    A    No, I did not create it.  It was printed out off of the

10   CD that I saw.

11   Q    So this was provided to you by the defense team in the

12   case already prepared in this way?

13   A    Yes.

14   Q    I just want to clear up one aspect.  I don't want to

15   spend a whole lot of time because I think it's somewhat

16   collateral to our collateral discussion, but I want to clear

17   up one point to you, because I don't want to let it stand

18   there.

19        If you could just scroll to the right.  I think what we

20   see in the first column, unpaid balance.  Is that right,

21   sir?  UPB.  And the second category is current unpaid

22   balance?

23   A    Right.  Normally the first one is at another period of

24   time, either at origination or perhaps when the property was

25   acquired, that's why sometimes there's a difference,

1  sometimes there's no difference.

2  Q    Okay.  And if we scroll a little bit more to the right,

3  you see there are categories of other costs that appear to

4  Fannie Mae?

5  A    Sure.

6  Q    And those include accrued interest, legal fees, taxes?

7  A    Basically, they are paying for everything a homeowner

8  would do, plus fixing it up.  You can see repairs in there.

9  Everything else.

10 Q    Let's get to a couple key categories here that show "MI

11 proceeds," is that mortgage insurance proceeds?

12 A    Correct.  That means there was some sort of claim,

13 insurance claim, that Fannie Mae put in to the mortgage

14 insurance company, and the mortgage insurance company paid

15 it out, just like you would a homeowner's insurance claim or

16 an auto claim.

17 Q    That would certainly be a loss to the mortgage

18 insurance company in that case, is that right?

19 A    Yes.

20 Q    Could that be resulting from the detection of

21 fraudulent activity, sir?

22 A    It could be in this case, but mortgage insurance

23 companies are like Fannie Mae, Freddie Mac, the insurance

24 policy that you get is generally voided in cases of fraud,

25 and they require the lender -- they won't pay, basically.

1   Q    Now, the net sale of proceeds is the next category.

2   That would be the sale after the foreclosure?

3   A    Yes.  It's net, so it generally means after they took

4   all those costs and everything else out of it.  It wouldn't

5   include the MI proceeds.  Well, I'm not positive.  I

6   generally don't think it includes MI proceeds, but I don't

7   know for sure.

8   Q    Okay.  And "other receipts," sir.  What is that

9   addressing, the "other receipts" category?

10  A    It's basically a miscellaneous category.  If they

11  collect any money from any other source that shows in there,

12  it's hard to imagine why you would see like 133,000, 188,000

13  in there --

14  Q    It is for me.  That's why I was hoping you could

15  explain that for me, sir.

16  A    I'd have to ask them why you would have something like

17  that.  Sometimes it's based on lenders paying something in

18  because Fannie Mae went after them and said, "We can't

19  require you to repurchase it, but you know this was a bad

20  call."

21  Q    So it's a recoupment of funds from the lender.

22  A    Yes.

23  Q    Let's scroll to the right just a little bit.  Total

24  receipts are calculated there and I believe we have to go to

25  the next page for the calculation.

CECALA - CROSS

1    Mr. Cecala, did you calculate that economic gain/loss

2 column there?

3 A    No.  I'm looking at the same spreadsheet that was

4 provided to me.

5 Q    Yeah.  I just saw it on Friday, so I have only been

6 working with it a couple days so you can probably help me

7 through it.  We're going to have to flip back between these

8 last two pages, unfortunately.  Does it appear to you, as it

9 appears to me, that that number is calculated by subtracting

10 out --

11 A    You'd have to ask, you know, Kevin who actually put the

12 numbers together.

13 Q    I'd like to but, unfortunately, I'm required to ask

14 you.

15 A    That's true.  I'm sorry.

16    MR. TATE:  We didn't prepare this chart.  That was

17 something prepared by Fannie Mae.  It has their name at the

18 bottom of it.  Those are Fannie Mae records.

19 A    Normally that's the way it's done.  Whatever they give

20 him, I'm assuming Kevin, or his office, did not insert other

21 columns or do calculations.  Normally, any spreadsheet like

22 this that Fannie Mae, a lender, would produce would have a

23 credit loss number at the end that showed you, you know, for

24 their accounting purposes what they ended up losing or

25 making on this property.

CECALA - CROSS

1   Q    Let me just ask you this and maybe simplify things.

2        If you were actually to look at the -- this would only

3   reflect the loss to Fannie Mae after taking into account the

4   judgments for the other receipts and the mortgage insurance

5   proceeds.  Correct?

6   A    Correct.  This is Fannie Mae's private accounting of

7   it, basically.

8   Q    So if the losses shows particular number for Fannie

9   Mae, those have already been adjusted because they have been

10  compensated to some degree by these other means shown in

11  detail?

12  A    Presumably, yes.

13  Q    So that loss lies elsewhere?

14  A    Correct.

15       MR. RANDALL:  Thank you, sir.  That's fortunately

16  the only point I wanted to make with you with respect to the

17  Fannie Mae documentation.

18       THE COURT:  Mr. Tate, redirect?

19       MR. TATE:  Yes.  Your Honor, at this time we would

20  move to introduce as well in connection with those charts,

21  which are Defendant Exhibit 2 and 3, the business record

22  affidavits of Fannie Mae and Freddie Mac certifying their

23  records and their spreadsheets.

24       THE COURT:  All those for formalities of trial are

25  not required here, so you don't need to have all the

CECALA - CROSS

1    certifications.  They are admitted.  They are admitted, the

2    certifications on this.

3              MR. TATE:  Thank you, Your Honor.

4              (Defendant's Exhibit No. 2, 3 received.)

5                    **REDIRECT EXAMINATION**

6    **BY MR. TATE**

7    Q    Mr. Cecala, in addition to the spreadsheets produced by

8    Freddie Mac and Fannie Mae, did you also review a disk?

9    A    Yes, at least in Fannie Mae's case.  Fannie Mae's

10   spreadsheet information was provided on the CD.

11   Q    And the CD, did it contain individual loss statements?

12   A    Yes.  It had, I think, a sheet for each one of the

13   properties.  I didn't print it out.  I don't know if you

14   printed it out, but yes.  Generally the sheet we just saw on

15   the screen is a summary, and they have individual ones.  You

16   know, Fannie Mae and Freddie Mac have great paper work on

17   all of this stuff.

18   Q    Now, with respect to the information submitted by

19   Fannie Mae and Freddie Mac on the properties that Cloud --

20   I'll use this term the Cloud properties that he purchased,

21   Mr. Randall pointed out a number of instances where it shows

22   "report payments from mortgage insurance."  Did you see

23   that?

24   A    Yes.

25   Q    And in the field of mortgage finance, would a mortgage

1  insurer pay a claim that they deemed to be based on fraud?

2  A    No.

3  Q    And why not?

4  A    As I said before, generally the mortgage insurance

5  contract basically says they don't have to pay in cases of

6  fraud, just like more insurance doesn't have to pay in the

7  case of fraud.  If they knew it was fraud, they -- or there

8  was evidence of fraud, they tried to find a way and wouldn't

9  pay the claim.  Neither would Fannie Mae in fact acquire the

10  loan, either.

11  Q    In addition to the mortgage insurer, are you aware of

12  whether or not Fannie Mae and Freddie Mac have provisions

13  within their contracts for various things like Chase and

14  others, that if there was fraud involved, they, in fact,

15  would force that bank to buy the loan back?

16  A    I don't know.  I don't know what the statute of the

17  limitations is.  I think there's a time period that if you

18  don't discover fraud for two years, for example, or

19  whatever, you're not going to be able to bring that up.

20  It's called seasoning the loan.  Basically, if the loan

21  performs for I think at least two years, you would be

22  hard-pressed to say, hey, there was mortgage fraud and it

23  somehow compromised the ability of loan to perform.

24  Q    Now, of the documents that you reviewed for Fannie Mae

25  and Freddie Mac, did it suggest to you in any way they had

1  recouped money from the lenders by selling the loan back to

2  them, or making the lender buy the loan back?

3  A    No.  In fact, it was just the opposite.  As I said

4  before, they wouldn't even show up on that sheet if Fannie

5  Mae had required them to buy the loan back, because it

6  basically takes the whole transaction out of Fannie Mae's

7  hands and becomes the lender's problem.

8  Q    Now, that box that Mr. Randall showed you where it said

9  "other income," was it your testimony that there's money to

10  be made in terms of making fees on servicing of loans as

11  well?

12  A    Yes.  But I'm pretty sure that wasn't reflected in that

13  column there.  This is just basically related to disposing

14  the property or whatever else.

15  Q    Did Fannie Mae and Freddie Mac, as far as you know,

16  bundle these type of loans and sell them as mortgage-backed

17  securities?

18  A    Basically 95 percent of all loans are Fannie Mae and

19  Freddie Mac purchased -- in fact, they don't even purchase

20  the loans.  In these cases, Chase comes to them with a

21  bundle of loans.  Fannie Mae says we'll put a guarantee on

22  that security, and you can go ahead, Chase, and sell that

23  security.  We call it a purchase transaction, but

24  effectively it's Chase issuing the security, and Fannie Mae

25  putting it's Good Housekeeping Seal of Approval on it.

1   Q    And would they make income from the sale of that

2   bundle?

3   A    Yes.  That's one of the ways they profit from it.  And

4   they also pay a guarantee fee to Fannie Mae for the life of

5   the security.

6   Q    Who pays that fee to Fannie Mae?

7   A    Chase.  We're using Chase's an example.  It would vary

8   anywhere from in this time period ten to 15 basis points of

9   the total mortgage amounts, and amounts to almost another

10  mortgage insurance policy.

11            MR. TATE:  Thank you.  No further questions.

12            MR. RANDALL:  Nothing.

13            THE COURT:  All right.  Mr. Cecala, you may step

14  down.  Thank you very much.  I appreciate it.

15            THE WITNESS:  Am I free to leave?  Because I have

16  a 8:00 flight.

17            THE COURT:  Can we release the witness?

18            MR. TATE:  Yes.

19            THE WITNESS:  Thank you.

20            THE COURT:  You're very welcome.

21            Anymore presentation on collateral damage by

22  either side?

23            MR. MEYERS:  No, Your Honor.

24            MR. TATE:  No, Your Honor.  I do have two

25  witnesses.

CECALA - CROSS

1          THE COURT:  But not on collateral damages.

2          MR. TATE:  No.

3          THE COURT:  All right.  Good.  Let me make my

4     conclusions on the false amount issue, and then we'll take a

5     15-minute recess.

6          First, I want to thank Mr. Cecala as he leaves.  I

7     thought he was extraordinarily honest, and his integrity

8     shows because he acknowledged certain very critical points

9     in his testimony.

10          He did not dispute Dr. Cowan's methodology.  He

11     admitted right up front that foreclosures have a negative

12     impact on neighborhoods, admitted just a few moments ago.

13     He actually said that a Census block radiation analysis is

14     probably better than a zip code, but he had zip code access,

15     and so he used zip codes.  And he acknowledged specifically

16     zip code analysis that one foreclosure in a thousand units

17     would have little measurable impact.

18          Those are all extremely honest statements of the

19     defense's experts, and I do want to say that he is truly an

20     expert in the analysis of collateral damage.

21          After hearing all his testimony, I apologize for

22     cutting Mr. Tate off.  He's both an expert in mortgage

23     backed securities and mortgage trends, but also in

24     collateral damage analysis.  And I thank you, sir, as you

25     depart.  And I want to make sure you catch your plane.  If

1   it's at 8:00, you better head to the airport.

2            THE WITNESS:  Thank you.

3            THE COURT:  Now, Dr. Cowan on the other hand is

4   just as extraordinarily qualified expert.  Clearly his

5   resume shows he has the training and academic study to do

6   the analysis of the impact on foreclosures in communities.

7   Both his master's in Urban and Regional Planning from the

8   University of Florida, and his Ph.D. in City Regional

9   Planning from the University of North Carolina, Chapel Hill,

10  support that, but in particular, his actual experience

11  focusing on housing and community development issues.

12           His analysis appears to the Court, and the Court

13  finds as a matter of fact, seems to be extremely thorough in

14  detail, and it is based on methodology, which the defense's

15  own expert acknowledged was not in dispute.

16           What really is the issue in determining collateral

17  damage is radius.  And I think it's just common sense that a

18  next-door neighbor to a house that's foreclosed has

19  collateral damage.  It comes from all the factors that Dr.

20  Cowan spoke about.

21           The impact of disrepair on the house.  The impact

22  on the immediate fair market value of the immediately

23  adjacent homes.  Because when a house goes into foreclosure,

24  that comparable that's created for purposes of real estate

25  appraisal is down and it brings down all the houses in the

CECALA - CROSS

1    comparable appraisal zone.

2          So no one can credibly dispute that the next-door

3    neighbor to a foreclosed house doesn't have a direct and

4    some level of measurable damage in a short-term period.  And

5    that's what we're talking about.

6          If we talk about a five-year term, everything is

7    going to appreciate; in an appreciating economy, everything

8    is going to appreciate.  So if a neighboring property from

9    foreclosure five years later is going to be up, the

10   foreclosed house five years later is going to be up, and

11   we've loosely been talking about five years, not realizing

12   that some of these houses we're talking not about a

13   five-year period on these houses, both the foreclosed houses

14   then and neighboring houses, we're talking about maybe a

15   one- or two-year period of each of those houses.

16         Certainly collateral damage analysis, we're

17   talking about what happens in the next year or two, not over

18   five years or ten years.  Because it's clear they are going

19   to appreciate, particularly as Mr. Cecala said, of a

20   five-year period where we had extraordinary appreciation in

21   the national markets and in North Carolina of five to ten

22   percent.  Five percent for the most part in this region,

23   annual appreciation.

24         So you can't say over a five-year period that

25   there's no damage, because over a five-year period the

CECALA - CROSS

1   damage didn't occurred; the damage occurred three or four

2   years before, and the measurable damage is what's over that

3   short-term period of a couple of years.

4           And then the lagging of that; what would have

5   really been the property value five years later?  It

6   probably would be much higher than it was if it hadn't had a

7   sudden drop from the foreclosure.

8           So we're talking about -- so that's my factual

9   finding about the five-year analysis, the ten-year analysis.

10  We need to be looking in a short time frame when we're

11  talking about collateral damage, but more importantly is the

12  radius analysis.

13          The Court finds Dr. Cowan's expert report highly

14  credible and acceptable an analysis of collateral damage.

15  But that's only the first step.  The second step is not the

16  expert's report but what's reasonably foreseeable to this

17  defendant.

18          Dr. Cowan's report uses a methodology that is

19  well-recognized through peer review in the community of --

20  in the academic community, and we find out from Mr. Cecala,

21  even in the nonacademic community with regard to collateral

22  damage -- let me say that community is the basically the

23  neighborhood impact community, so to speak, that arena.

24          So as I said, the report is credible, but all the

25  information in the report is probably, in this Court's eyes,

1  not reasonably foreseeable to the defendant, Mr. Cloud.

2       The report includes impact 800 to 900 meters from

3  the foreclosed home.  That's almost a kilometer.  It's --

4  900 meters is over a half mile away.  And it seems that's

5  it's not reasonably foreseeable that a defendant -- this

6  defendant, Mr. Cloud, or any defendant involved in mortgage

7  fraud, would perceive of collateral damage a half mile away.

8       But it's just common sense, and triers of fact can

9  use their common sense, that an analysis of what's on the

10  street -- understanding what's on the street where the

11  foreclosure is, is the area where there's going to be

12  collateral damage.

13       And we have an analysis of zero to 100 meters, and

14  an analysis of 100 to 200 meters.  200 meters is a little

15  less than two football fields.  Two football fields seems to

16  be a street.  There are streets a lot longer than that, but

17  there are very, very few streets that are shorter than

18  100 meters.

19       So the Court finds as a finding of fact, using the

20  methodology of Dr. Cowan, that properties within 200 meters

21  were collaterally damaged by these foreclosures.  The Court

22  doesn't know that number, but it's in front of the Court

23  because it's on pages 32 and 33 of Document 224-1, and the

24  Court asked the government to add up those two columns.

25       And, therefore, it's clear the Court is not trying

CECALA - CROSS

1    to reach a result of a certain number, because the Court

2    doesn't know what the number is and because we're talking

3    about two columns of 93 numbers, what that number is seems

4    to be objectively reasonable as a reasonably foreseeable

5    amount of collateral damages a person involved in mortgage

6    fraud would see occur; that is, the block or street where

7    the foreclosure is is going to have collateral damage.

8            All right.  That's the Court's finding of fact, so

9    the government needs to add up those two columns.  Once

10   those two columns are added up, we add it back to the

11   $10,050,000 figure that the Court found earlier as the

12   intended loss from the co-conspiracy; $10,052,875, plus

13   those two columns.  That's the Court's finding of fact is

14   the loss amount in this case.

15           All right.  We'll take a 15-minute recess.

16           (Recess taken.)

17           THE COURT:  Has the United States added up those

18   two columns?

19           MR. MEYERS:  We have, Your Honor.  Luckily, we had

20   an IRS special agent in the spectator area, and the price

21   for his attendance was adding the numbers up.

22           We got to $9,157,815, which would bring the total

23   loss to $19,210,690.

24           THE COURT:  All right.  That's the Court's finding

25   of fact, that dollar amount.  That's the threshold for what

CECALA - CROSS

1  7 million and 20 million?

2          MR. MEYERS:  That's right, Your Honor.

3          THE COURT:  All right.  The Probation Office has

4  concluded a 22 level enhancement for more than 20 million.

5  Does that reduce it to a 20-level enhancement?

6          MR. MEYERS:  That's correct, Your Honor.

7          THE COURT:  So that changes 35 for paragraph 24

8  down to 33.  Is that correct?

9          MR. MEYERS:  I believe so, Your Honor.  I focused

10  on the file.  I think it would be a 39.

11          THE COURT:  I'm saying paragraph 24.  39 or 41?

12  Are you talking about paragraph 32?

13          MR. MEYERS:  The Court sustained the defendant's

14  objection for obstruction of justice, and the Court allowed

15  the government's objection for base offense level.  So I

16  think the Court starts at a 43, goes down minus 2 for

17  instruction and then minus 2 on the loss.

18          THE COURT:  So total offense level -- so 32,

19  paragraph 32 now is a 39; and as we said before, paragraph

20  28 is now a zero.  Paragraph 24 is a 33.  So we still have

21  to do a role in the offense and that's it.

22          MR. TATE:  Sophisticated means and more than one

23  million in gross receipts.

24          THE COURT:  Oh, all right.  Let's do those before

25  we do role and offense, because they are still part of the

1    loss amount calculation.

2              What's your argument this was not sophisticated?

3              MR. TATE:  We would rest on your pleadings, but

4    other than under the crime that they proved at trial

5    essentially involved a mortgage broker, who would be -- gone

6    to a straw buyer, basically as Mr. Cecala said was used, a

7    desktop underwriting system, reject it or deny it; reject it

8    not enough assets, income, whatever it was.

9              And I think Mr. Greene's testimony was that in

10   instances where Mr. Cloud would talk to straw buyers,

11   Mr. Cloud would come back and by whatever document was

12   needed to justify the loan on behalf of the buyer.  Not be

13   particularly sophisticated about that.

14             There was -- Mr. Cloud, of course, one of the

15   considerations was whether one was in a fiduciary

16   relationship or if we believe he was not.  It was the

17   lenders who controlled the broker, an extension of the

18   lender who drove the appraisal process, the ability to

19   underwrite, ability to undermine the credit bureau -- to do

20   all the things necessary to effectuate the loan.

21             I described Mr. Cloud in regard to the sentencing

22   and despite the fact that he was trying to engage in sale of

23   real estate, he was unlicensed, wasn't particularly educated

24   in the field, there wasn't much he could do without the

25   licensed professionals in this case, whether it be the real

CECALA - CROSS

1    estate agent, the brokers, the appraisers.

2           THE COURT:  Is this your argument for

3    sophistication or for a role of the offense?

4           MR. TATE:  Both.  Kind of goes hand and hand.

5    It's sophisticated means.

6           What the courts have looked for was whether there

7    was extensive undertendency to avoid detection of the

8    offense.  And the cases I cited, they all involve use of

9    shell corporations; otherwise disguise who was involved.

10          Here it's very clear, it's a tracing, that's why I

11   investigated the case.  Mr. Cloud made no attempt to hide

12   the ability with no shell corporations.  On the surface they

13   appeared to be legitimate dealings, and I think to a large

14   extent he believed they were.  There -- even though there

15   was sufficient evidence he engaged in the fudging of

16   documents, there's nothing particularly sophisticated about

17   that.

18          So for those reasons, including his culpability

19   and overall scheme, there really wasn't much he could do to

20   make go without on broker.  We believe the sophisticated

21   means enhancement would not be appropriate.

22          THE COURT:  Thank you.  Mr. Meyers.

23          MR. MEYERS:  Thank you, Your Honor.

24          First, the sophisticated means enhancement hinges

25   on the offense, not the defendant's conduct.  That's made

1   clear in 2B1.1(b)(9)(C), which says the offense otherwise

2   involved sophisticated means.  But that's just a legal

3   point.  In reality the defendant employed all the

4   sophisticated means and his conduct was the most

5   sophisticated.

6           On page 32 of the Government's Sentencing

7   Memorandum it notes nine instances of sophisticated means

8   that have been recognized by courts as sophisticated, and

9   they were employed by the Defendant Cloud in this case.

10          So on page 32 the government notes the defendant

11  Cloud purchased cashier's checks for down payments in the

12  names of the straw buyers to mislead others about the true

13  source of the funds, putting the straw buyer's names in the

14  remitter line to make it appear as though the straw buyers

15  had bought the check.

16          Defendant Cloud created phoney lease agreements, a

17  quite sophisticated document that he used creating

18  fictitious names of people who didn't even exist, find this

19  person's true address per the lease agreements to make it

20  look as though they were renting their own residence.

21          Phoney verification of deposits.  They hired Amy

22  Phillips who actually worked at Bank of America to answer

23  the phone and say, "Yes, this person had a deposit here in

24  this amount."  You saw that in the case of Rodney Thompson

25  in particular.

CECALA - CROSS

1    Phoney verifications of employment.  The

2  conspiracy involved false verifications of where people

3  worked.  Falsified tax return of straw buyers Robert Moore

4  the Defendant Cloud created.  The testimony is quite clear

5  that Defendant Cloud was in possession of the true tax

6  return.  The Defendant Cloud returned the false tax return

7  to Kim Dauria.  Gift letters.  The Defendant Cloud suggested

8  that to Kim Dauria.  The Defendant Cloud supplied one of

9  these in this case.  Use of a bank insider to verify phoney

10  verifications I discussed already.

11    False appraisals that misrepresented the true

12  owner of the property.  And the numerous incidents that

13  straw buyer's names being forged on the real estate

14  documents.  The Court will recall there was testimony the

15  Defendant Cloud was forging the straw buyer's name on

16  documents.  Co-conspirator Greene testified about that.

17    This is very close to numerous cases that the

18  government cited in its sentencing memorandum.  For example,

19  the *Septon* case, Eighth Circuit, 2009, affirming it when

20  there were loan applications with forged signatures, forged

21  Notary stamps, altered tax returns, pay stubs, fake gift

22  letters, bank statements and bank notes very similar to this

23  case.  The case of *Wright* involves purchasing a cashier's

24  check in someone else's name.

25    THE COURT:  I've read your brief.  You don't need

CECALA - CROSS

1    to go through all those cases.

2              MR. MEYERS:  Thank you, Your Honor.

3              THE COURT:  The Court finds after hearing all the

4    trial evidence that there was sophisticated means employed

5    by the defendant in this conspiracy.

6              As Mr. Meyers has pointed out, there were numerous

7    acts specifically by the defendant that showed his level of

8    knowledge of real estate transactions, real estate closings,

9    and that he facilitated a whole series of fraudulent acts

10   for each of these flips.  It wasn't -- didn't happen just

11   once, it happened for all these flips, that he personally

12   facilitated things that required a high degree of

13   sophistication and knowledge of real estate closing.

14             The government has outlined nine in its Sentencing

15   Memorandum at page 32.  The Court adopts those, but the

16   Court beyond that also looks at the fact that the defendant

17   was the promotor who brought all the licensed individuals to

18   the table, and it took a high degree of sophistication to

19   convince people with licenses and fiduciary duties to commit

20   fraud to bring -- I think the most sophisticated person at

21   the table is the promotor who can take people who have

22   licenses and get them to put those licenses on the line for

23   just a modest amount of money, basically the regular fee

24   those individuals would have received at an honest closing,

25   when he's walking away from chunk of change that comes from

1  the spread between the two transactions.  So there's ample

2  record evidence supporting sophisticated means.

3          The next disputed issue is 1 million gross

4  receipts from financial institutions.

5          The Court has already made a finding of fact

6  earlier about the intended loss amount of 10,500,000.  I

7  need Mr. Tate to explain to me why that isn't sufficient to

8  supported $1 million in fraud to financial institutions.

9          MR. TATE:  Gross receipts first, and then, again,

10  we had adopted and ask the Court to rely on our pleading

11  where we outlined our position on that.

12          First of all, the majority of the lenders on this

13  list do not meet the statutory definition of a financial

14  institution.

15          THE COURT:  Well, there are multiple definitions

16  of financial institution, and clearly there's one for bank

17  fraud; there's also one for money laundering.  But isn't

18  there a separate one for purposes of Sentencing Guidelines

19  and what's specifically is the definition of financial

20  institution for the purposes of the Sentencing Guidelines,

21  because I thought that was a broader definition than say for

22  bank fraud.

23          MR. TATE:  I think in term of "gross receipts," I

24  think the gross receipts necessarily include gross receipts

25  from the lending institution themselves, and that doesn't

CECALA - CROSS

1    take it to the fact that Mr. Cloud did not receive the gross

2    receipts.  It went to the buyer for the purchase of the

3    house which was collateralized as well.  And, of course,

4    notwithstanding our objection to the inclusion of several of

5    these properties roll into conduct, we don't believe there

6    was one million in gross receipts.

7                THE COURT:  Thank you.

8                PROBATION OFFICER:  The definition for financial

9    institution is under Application Note 1, third one down, and

10   it does broaden the --

11               THE COURT:  Right.  I'm reading that also.  I had

12   the 2009 version of the Guidelines, brand-new, but -- so I

13   think I'm reading from the wrong Guidelines.  Actually, no.

14   I'm reading from the right Guidelines based on my ruling

15   this morning.  Well, let's see, the conspiracy continued up

16   to 2000 -- into well into 2005; continues to January 2006.

17   Is there anything improper about using the 2009 Guidelines?

18   Was there is a change in the definition of financial

19   institution?

20               PROBATION OFFICER:  I have the 2002 Guideline and

21   it's exactly the same definitions.

22               THE COURT:  All right.  The definition of

23   financial institution not only includes the definitions

24   found in the various statutes the Court's referred to, but

25   it is a broad definition, including investment companies,

CECALA - CROSS

1   brokers and dealers registered or under the SEC, which

2   doesn't apply here.  It uses the very important phrase "any

3   similar entity whether or not insured by the federal

4   government."  That's the big distinction.  And I think in

5   bank fraud in particular, the institution has to be insured

6   by the federal government.  But under the Sentencing

7   Guidelines, the definition of "financial institutions" does

8   not require the entity to be insured by the government.

9          MR. MEYERS:  That's correct, Your Honor.

10         That's now changed under the new statute, Section

11  21, which was passed late last year, so it wouldn't apply in

12  this case, now makes bank fraud of any home mortgage loan,

13  that definition has been added in part because of the

14  mortgage fraud problem.  I would agree with the Court's

15  analysis.

16         The one thing I would note, because I do think the

17  Court does need to find the defendant himself derived more

18  than million dollars from those financial institution.  I

19  would just point to Exhibits 125-A1 through 125-F2 which

20  were admitted at trial, our exhibits, checks to the

21  defendant himself total $1.3 million.

22         THE COURT:  Can you digitally flash those before

23  the Court?  You're saying you don't have one chart adding up

24  those checks.

25         MR. MEYERS:  No, Your Honor.  I think it's clear

1  from the record, those checks are in evidence, 125-A1,

2  through 125-F2.  1.5 million.  It's in the Presentence

3  Report.

4         I would also note the application note for this is

5  found in the 2009 Guidelines, the yellow book, at page 94,

6  Application Note 11, it says it includes all property, real

7  or personal, tangible or intangible, which is obtained

8  directly or indirectly, as a result of such offense,

9  certainly the defendant derived lots of real estate as well.

10 I don't think it's even a close call that he got more than a

11 million dollars worth of not just checks, but real property

12 and other items from financial institutions in this case.

13        The defendant himself, part of his argument today

14 is that, "I obtained lots of property from foreclosing

15 banks."  That's in furtherance of the fraud, supports the

16 finding in this case, though it's not necessary since we

17 have more than million dollars in checks alone.

18        THE COURT:  I missed that number in the

19 Presentence Report.  What paragraph is it in the Presentence

20 Report?

21        MR. MEYERS:  I'm sorry.  I don't now that the 1.35

22 is in the Presentence Report.  It may be.

23        THE COURT:  I don't think it is.  Because I

24 wouldn't be sitting here asking for all this presentation of

25 evidence if it was in the PSR.

CECALA - CROSS

1          MR. MEYERS:  I would be happy -- I have the

2     exhibits.  I would be happy to put them on the screen for

3     the Court.  I think the government filed this memo

4     October 8th, 2009, more than two months ago.  I don't see

5     the defendant challenging that those checks add up to more

6     than 1.35 million.

7          THE COURT:  I understand that, but still do me the

8     favor of flashing them before my eyes so I can see every

9     one.  I can read fairly quickly.

10          MR. MEYERS:  All right.  125A-1.

11          THE COURT:  Are you going to type in each one

12     every time?

13          MR. MEYERS:  Yes, sir.

14          THE COURT:  All right.  There's got to be a

15     quicker way to do this.

16          MR. MEYERS:  I think they are in evidence, Your

17     Honor.

18          THE COURT:  Let me ask Mr. Tate:  Mr. Tate, do you

19     dispute the authenticity of those exhibits?  I know you can

20     dispute the intent behind them, but do you dispute the

21     authenticity?

22          MR. TATE:  Your Honor, to be honest with you,

23     without seeing them, I don't have any direct memory of them

24     from the trial.  I don't really know what they are.  But I

25     don't think the Court needs me to stipulate to it, the Court

1  can make its findings.  Our position is set forth in our

2  sentencing memorandum as to why we don't believe it's more

3  than one million.

4          THE COURT:  I understand your legal position.  I'm

5  not disputing that.

6          MR. MEYERS:  Just would be clear, these were

7  admitted at trial.  They are evidence.

8          THE COURT:  I understand that.

9          MR. MEYERS:  The authenticity I don't think was in

10  question.

11          THE COURT:  Put Agent McNeely on the stand and let

12  me him testify to it really quickly, and Mr. Tate can cross.

13          MR. MEYERS:  As to the number?

14          THE COURT:  Yeah.

15          MR. MEYERS:  I don't know that he's added it up,

16  Your Honor.  Literally he hasn't.  I added it up.  I put it

17  in the Sentencing Memorandum.  It's just arithmetic.  I

18  think, you know --

19          THE COURT:  I understand it's all in the exhibits

20  but you said what has been added I guess --

21          MR. MEYERS:  This, Your Honor, would be easier.  I

22  have a solution:  Which is I have the exhibit list which

23  lists the amounts.

24          THE COURT:  You do?

25          MR. MEYERS:  I can put the exhibit list -- it has

CECALA - CROSS

1    never been questioned as whether the amounts to Cloud are

2    correct.  Would that sufficient?

3              THE COURT:  Did Special Agent McNeely put together

4    that exhibit list?

5              MR. MEYERS:  No, sir.  It's what -- the attorneys

6    put together the exhibit list.

7              THE COURT:  Sometime.  Sometimes the agent will do

8    it for you.

9              MR. MEYERS:  Not in my cases, Your Honor.  I would

10   be happy to put this in front of the screen.

11             THE COURT:  Put the exhibit list forward because

12   the documents backup the exhibit list.

13             MR. MEYERS:  Yes, they do, Your Honor.

14             THE COURT:  And the documents are in the regard.

15             MR. MEYERS:  125A-1 is a check for $10,392,22.

16             125A-2 is a check for $13,483.68.

17             125A-3 is a check for $23,584.

18             125A-4 is a check for $27,190.

19             125A-5 is a check for $2,309.10.

20             125A-6 is a check for $300s.

21             125A-7 is a check for $30,240.

22             125A-8 is a check for $18,000.

23             125A-9 is a check for $10,960.

24             125A-10 is a check for $19,608.63.

25             125A-11 is a check for $33,630.

CECALA - CROSS

1      125A-12 is a check for $19,719.82.

2      I should note that all of the checks I'm reading

3  were to Defendant Cloud from the attorneys' trust accounts.

4      125A-13 is a check for $28,445.03.

5      125A-14 is a check for $94,996.80.

6      125B-1 is a check for $7,058.50.

7      125B-2 is a check for $46,130.49.

8      125B-3 is a check for $16,928.41.

9      125B-4 is a check for $15,606.01.

10     125B-5 is a check for $8,651.

11     125B-6 is a check for $11,446.13.

12     125B-7 is a check for $4,782.50.

13     125B-8 is a check for $26,850.

14     125B-9 is a check for $4,353.

15     125B-10 is a check for $69,851.26.

16     125B-11 is a check for $17,399.11.

17     125B-12 is a check for $2,959.08.

18     125B-13 is a check for $23,550.57.

19     125C-1 is a check for $28,136.36.

20     125C-2 is a check for $27,709.59.

21     125C-3 is a check for $45,766.

22     125C-4 is a check for $65,009.

23     125C-5 is a check for $63,080.05.

24     125C-6 is a check for $4,309.33.

25     125D-1 is a check for $38,211.99.

CECALA - CROSS

1          125D-2 is a check for $33,318.25.

2          125D-3 is a check for $17,504.62.

3          125D-4 is a check for $46,349.77.

4          125D-5 is a check for $42,346.98.

5          125D-6 is a check for $13,496.06.

6          125E-1 is a check for $23,090.92.

7          125E-2 is a check for $44,025.

8          125E-3 is a check for $26,858.

9          125E-4 is a check for $1,000.

10         125E-5 is a check for $51.647.55.

11         125E-6 is a check for $46,825.

12         125E-7 is a check for $53,368.23.

13         125E-8 is a check for $2,970.32.

14         125E-9 is a check for $48,127.78.

15         125E-10 is a check for $500.

16         125E-11 is a check for $500.

17         125E-12 is a check for $1,000.

18         125E-13 is a check for $19,049.76.

19         125E-14 is a check for $500.

20         125E-15 is a check for $22,660.09.

21         125F-1 is a check for $2,440.03.

22         125F-2 is a check for $84,504.26.

23         The government submits that those checks add up to

24    more than a million dollars.

25         THE COURT:  Thank you.

1        Anything else?

2        MR. TATE:  Specifically with respect exhibits

3   125D-1 through E1, D1 through D6, the checks from the

4   Whitley's trust account, I believe it was the testimony of

5   the Attorney Whitely that there was nothing untoward about

6   the closings in those cases which he cut those checks to

7   Mr. Cloud.

8        And one of the elements is not just that he

9   received a receipt, but that the receipts were derived from

10  unlawful activity.  And we would just point that out as a

11  basis to our objection, at least to those.

12       THE COURT:  D 1 through D6.

13       MR. TATE:  Yes.

14       THE COURT:  D1 through D6.

15       MR. MEYERS:  Not true, Your Honor.  She did say

16  that originally when called to the stand.  The Court will

17  recall in cross-examination the government showed her the

18  kickback checks and she states she was unaware, and stated

19  definitely that made those transactions fraudulent.  In

20  fact, the jury convicted the defendant Cloud of 134 Redwood

21  Lane, 3101 Fair Oaks Drive, 7423 Monaco Drive, Counts Two,

22  Three and Four, I believe all of which were Whitely

23  transactions.  So the jury disagreed with the defendant's

24  direct examination of that attorney.

25       THE COURT:  All right.  Thank you.

1    Certainly when the jury found beyond a reasonable

2  doubt as to those substantive counts, the Court's not going

3  to second-guess the jury.

4    Furthermore, the Court does recollect the

5  testimony as Mr. Meyers did summarize, and it does appear to

6  the Court that those were fraudulent proceeds from financial

7  institutions.

8    Anything else, Mr. Tate?

9    MR. TATE:  No.

10    THE COURT:  The Court finds by the preponderance

11  of the evidence that the defendant did harm financial

12  institutions under the definition as found in the Sentencing

13  Guidelines of Financial Institutions in excess of

14  $1 million.  And that was directly -- directly caused by the

15  defendant, and then the defendant directly benefited from

16  that.  It wasn't any of his co-conspirators.

17    All right.  So the Court overrules the objection

18  as to the harm to the -- million-dollar harm to the

19  financial institutions from which Mr. Cloud benefited.  Just

20  the use the right term of art, it's $1 million in gross

21  receipts from one or more financial institutions, and the

22  defendant did derive approximately $1.3 million gross

23  receipts from one or more financial institutions.

24    That covers all of the paragraph 24, Section 2B1.1

25  calculations?   Is that correct?  Is there any other

1   objections with regard to the paragraph 24, Section 2B1.1

2   calculations?

3               MR. MEYERS:  I don't believe so, Your Honor.

4               THE COURT:  All right.  So now we go to the other

5   enhancements, and I think the only one left is role in the

6   offense.  Correct?

7               MR. MEYERS:  Yes, Your Honor.

8               THE COURT:  All right.  There's no -- I don't

9   believe either party -- well, Mr. Tate, you had some

10  presentation of evidence.  Does it apply to this?

11              MR. TATE:  Yes.  We also filed a written

12  objection.

13              THE COURT:  Yes, I have that right here.  It's

14  page 14 of your Sentencing Memorandum.

15              MR. TATE:  We'd rest on your case.

16              THE COURT:  Oh, all right.

17              And the government's argument begins page 35 of

18  its Sentencing Memo.

19              Does either party want to add anything to the

20  factual record?

21              MR. MEYERS:  Not unless the Court has any

22  questions.

23              THE COURT:  No.  Any other argument?  Just your

24  pleadings.  All right.

25              The Court's said earlier today that the promotor

1    is the individual who puts together all of the key

2    individuals necessary to commit mortgage fraud transaction.

3    The promotor recruits a recruiter who recruits investors, so

4    that's -- so the promotor both finds recruiters and

5    indirectly the investors.  The promotor finds the closing

6    attorney, promotor finds a mortgage broker, the promotor

7    finds a real estate appraiser, the promotor finds frequently

8    a mortgage underwriter such as co-defendant Juderita

9    Russell.  The promotor is not a licensed individual but is

10   the person that brings all these licensed individuals

11   together, and most importantly the promotor finds the

12   property.

13          So the promotor is clearly the person organizing

14   the transaction, and the two transactions that constitute

15   the flip.  And as the promotor organizes the transaction,

16   the promotor also is, in effect, managing all of these

17   individuals because these individuals are acting on behest

18   of the promotor, who is bringing the property, the

19   transaction, and either directly or indirectly bringing the

20   investors to a transaction.

21          So the Court finds as a matter of fact that the

22   defendant was an organizer and manager in this conspiracy,

23   and overrules the objection.

24          MR. TATE:  Your Honor, now that the Court has made

25   the factual finding, we would object to the factual finding

CECALA - CROSS

1   with respect Mr. Cloud.  That Mr. Cloud organized the

2   licensed professionals at the table, and specifically number

3   two, that he found the appraisers, underwriters.  We think

4   that conflicts with the evidence at trial and we would

5   object.

6          THE COURT:  So noted.  I thought there was ample

7   evidence at trial he actually paid kickbacks to

8   Mrs. Juderita Russell.  She was an underwriter.

9          MR. TATE:  No.  It was Dan Greene's testimony that

10  he paid --

11        THE COURT:  Oh, you're right.  Mr. Greene wrote

12  the checks to Juderita Russell.  I concur.

13        MR. TATE:  Then I think Mr. Greene's testimony

14  also said Mr. Cloud didn't know anything about it, didn't

15  even know which underwriters he was using.

16        THE COURT:  I don't recall that.  It might be

17  true.  It still isn't important if a co-conspiracy knows

18  exactly who the underwriter is so long as the co-conspirator

19  is relying on that underwriter as a fellow conspirator.

20  It's the promotor who is still putting together the deal.

21  The promotor that receives the largest windfall of anybody

22  in the deal, so the promotor is the organizer and manager.

23        MR. MEYERS:  I think the Court implied this but

24  just since we're here so late anyway, I'd just ask the Court

25  to find specifically that there were more five

CECALA - CROSS

1   participants --

2           THE COURT:  In the whole conspiracy there are well

3   more than five participants.  In each single flip, in many

4   of those there were five participants in each individual

5   flip.  But, yes, there were, over the course of the

6   conspiracy, far more than five.  There were 25 financial

7   institutions.  So that's, I believe -- weren't there at

8   least 25 financial institutions impacted?

9           MR. MEYERS:  Yes, Your Honor.  I would refer to

10  the number of participants, namely Kim Dauria, Michael Ryan.

11          THE COURT:  No, I understand.  But I'm saying with

12  each financial institution -- well, I guess that's

13  irrelevant, the number of financial institutions.

14          Does the government have a calculation of the

15  number of investors to the whole course of the conspiracy

16  with regard to Mr. Cloud's primary transactions?

17          MR. MEYERS:  We didn't calculate that, Your Honor.

18  I would note that by adding up simply those that the Court

19  has convicted, the Court gets to 15.

20          THE COURT:  No, I'm talking about investors.

21  Straw buyers investors.

22          MR. MEYERS:  I did not add that up.  I would say

23  it's well over 20.

24          THE COURT:  There were 93 properties, right?

25          MR. MEYERS:  Yes, sir.

CECALA - CROSS

1          THE COURT:  And did each investor, are you

2     saying -- I thought there were a few investors that were

3     involved two or three times but most investors were only

4     involved one time.

5          MR. MEYERS:  I think that it would -- that was

6     true, there was some runoffs.  I think actually most

7     Defendant Cloud would get them to do --

8          THE COURT:  Two or three.

9          MR. MEYERS:  Several.  I think there was one or

10    two would did more than that even, as -- I think Robert

11    Moore and Steve Mirman were some of the earlier ones who did

12    over five.

13         THE COURT:  So out of 93 transactions, you're

14    estimating 20 investors?

15         MR. MEYERS:  I think that's fair, Your Honor,

16    which would take the Court to 35 participants.  Again, these

17    are folks who did wrong by accepting money to sign documents

18    they didn't read.  I wouldn't put them at the level of folks

19    who were charged in this case.  But I think for purposes of

20    this analysis, the Court could conclude that.  It certainly

21    doesn't need to, unless it wishes to upwardly vary or to do

22    an upward departure because the number of participants is

23    actually understated by only a two-level increase, when five

24    is what the Guidelines is intended to address.

25         THE COURT:  We've discussed this earlier.  They

1    are both co-conspirators and victims.

2              MR. MEYERS:  Yes, sir.

3              THE COURT:  And the government chose not to charge

4    them, when the government could have charged them, because

5    the government was sympathetic towards them because they

6    were ultimately victimized.

7              But there was well over five, well over five

8    individuals not investors -- well over five what were

9    involved in the conspiracy directly under the organization

10   of Mr. Cloud, the Court finds as a matter of fact, and we

11   don't have to include the investors, even though there

12   probably were something in the neighborhood of 20.  All

13   right.

14             All right.  Does that cover all the outstanding

15   objections?

16             MR. TATE:  Yes.

17             MR. MEYERS:  Yes, Your Honor.

18             THE COURT:  All right.  Based on the Presentence

19   Report and all the Court's findings today, in the instant

20   case the advisory Guidelines provide for offense level of

21   39, Criminal History Category I, and a Guideline sentencing

22   range of 262 to 327 months.

23             Do the parties agree those are the appropriate

24   Guidelines based on the Court's rulings?

25             MR. MEYERS:  Yes, Your Honor, before departure,

1  which we think would be included in the Guidelines,

2  technically speaking.

3       THE COURT:  So you want to argue -- I guess you

4  did mention it for an upward departure based on the

5  Guidelines not properly showing the extent of victimization.

6       MR. MEYERS:  Yes, Your Honor.  Under Guideline

7  5K2.5, which -- the government addresses that upward

8  departure motion on page 66 of its memorandum, the Fourth

9  Circuit has held that that is an encouraged basis for

10  departure, and the government cites a number of cases in the

11  Fourth Circuit and elsewhere in which sentences were doubled

12  as a result of that Guideline.  And we think that it's

13  especially appropriate here.

14       What the Court found was that Defendant Cloud

15  could have foreseen some losses out to 200 meters from his

16  conduct.  But really the damage caused by the defendant,

17  Cloud, was much, much more extensive than that.  The Court

18  found 9 million was reasonably foreseeable, and therefore

19  found it should be 2B1.2.  The reality it's a 89 million

20  that resulted from the defendant's conduct.

21       When this Court is fashioning an appropriate

22  sentence to meet not only the Guidelines, but all the

23  requirements of sentencing, including deterrence, I think

24  it's important for the Court to address in its sentence all

25  that damage that's caused by the defendant's conduct,

CECALA - CROSS

1  especially given the fact we're about $600,000 short of the

2  next cutoff.

3          THE COURT:  Well, I understand your argument.  I'm

4  going to deny your motion for an upward departure under

5  5K2.5 because the Court did find that there was $9 million

6  of property damage or loss that was collateral, and did

7  factor that in the Guidelines, and the scriveners of the

8  Guidelines chose to make them break off 20 million, not the

9  Court; and the Court did consider that 9 million.  So the

10 Court believes an upward departure is not justified because

11 the Court has factored that in.

12         MR. MEYERS:  I just wanted to make sure the Court

13 understands my argument, I think it does, but based on what

14 the Court said, what the government is asking for is an

15 upward departure on the basis 80 million.

16         THE COURT:  The other 80 million.

17         MR. MEYERS:  Yes, sir.  It's 80 million not

18 accounted for.

19         THE COURT:  I'm sorry, I didn't understand.  I

20 didn't understand specifically you were talking about the

21 other 80 million.  You did say 89 million.

22         MR. MEYERS:  I think that what these courts have

23 found here --

24         THE COURT:  But, see, the Court's earlier finding

25 that it's harder -- the Court's uncomfortable with seeing

1    the defendant aware, reasonably foreseeing damages as much

2    as a half mail away from the foreclosed property.

3              MR. MEYERS:  I accept that ruling from the Court.

4    Now the question for the Court -- so that means only that

5    9 million which fits in 2B1.1 which requires reasonable

6    foreseeability.  5K2.5 is specifically designed for it as

7    losses not reasonably foreseeable to defendant, therefore

8    not taken into account in 2B1.1.  Here we have $80 million

9    in worth of damage not taking into account in the

10   Guidelines.

11             I want to point to the Court in particular *United*

12   *States v. Erpenbeck*, which is cited and described by the

13   government on page 67 of the Sentencing Memorandum.

14             That was a bank fraud case.  Advisory Guideline

15   range was 188 to 235 months, and the district court departed

16   upward to 300 months, adding a significant amount of time.

17   And the reason the Sixth Circuit said it was warranted was

18   because of, quote, "The devastating effect of the unraveling

19   of the fraudulent scheme had on the communities he built and

20   sold unsuspecting homeowners.  The subdivision was left in

21   disrepair.  Streets and parking lots remain unpaid.  Some

22   homeowners were left with acrid water rates."

23             That damage to the communities not foreseen by the

24   defendant in this case, but real damage was relevant to

25   making sure the sentence fully takes into account the amount

1  of damage caused by this fraud.

2          And what I'm asking for the Court is to make sure

3  when word of this sentencing gets that out folks understand,

4  listen, you may not think that if you didn't foresee it,

5  it's not going to effect you.  You should understand when

6  you commit mortgage fraud, there's all kinds of unforeseen

7  damages and results for it.  And the courts in Western

8  District of North Carolina are going to take that into

9  account, at least to some extent, in fashioning their

10  sentence.  Because when you cause that much damage,

11  $80 million, you don't just get a free ride for it.  Because

12  Guidelines for it -- 2B1.1, excuse me, requires it to be

13  reasonably foreseeable; even if it's not foreseen by you,

14  the Court will take it account under 2K2.5.

15          THE COURT:  I understand everything you're saying,

16  but if you're talking about deterrence, right now we're in a

17  range of 26 to 28 years.  That's a lot of deterrence in that

18  range already.

19          MR. MEYERS:  It understates, Your Honor -- it

20  understates the level of damage in this case by $80 million

21  in that sentence.

22          MR. TATE:  Let me just say that they never proved

23  the $89 million in damages.  It's all theoretical.  They

24  never proved it.  We don't believe that there's $89 million

25  worth of damage.  Mr. Cecala was right; there was relatively

1  little damage in terms of home prices at all.  We don't

2  believe an upward departure is warranted.  We just assert

3  our earlier objection to the collateral damages.

4       THE COURT:  I understand that, and your expert

5  said -- did not -- did not future the methodology.  So I

6  mean your expert didn't necessarily find that as a logical

7  calculation for collateral damage.  The Court was looking at

8  reasonably foreseeable and not all collateral damage.  All

9  right.

10       I understand everything you are saying, Mr.

11 Meyers.  I understand you're saying $80 million of

12 Dr. Cowan's analysis that the Court is not considering.  But

13 the Court is considering the fact that there's substantial

14 collateral damage; but collateral damage, is in the Court's

15 eyes, on the block or the next block, up to 200 meters, and

16 the Court is uncomfortable saying there's collateral damage

17 a half mile away.  I'm sure there's incidents of it, and the

18 experts say there is, but the Court is uncomfortable in

19 looking at that broadly.  So the Court's going to deny the

20 upward departure based on the 80 million.

21       All right.  So back to the Court's -- any other

22 Guideline calculations departures upwardly or downwardly?

23       MR. MEYERS:  We talked about abuse of trust

24 earlier.  I don't think that that would -- I think that

25 would be more of a variance argument since the Court

1    rejected it under the Guidelines, just a preview for the

2    Court.

3            And I'll take a third bite at the apple, if I can,

4    on upward variance, or I'll ask the Court to condense all of

5    it in one.

6            THE COURT:  Oh, variance, we haven't gotten there.

7    Mr. Tate, anything else on the Guidelines?

8            MR. TATE:  Nothing other than our motion for a

9    downward departure.  We rest on our pleadings.

10           THE COURT:  Summarize again -- I've got it right

11   here -- no, that's our PSR objections.  There are so many

12   pleadings in this case.

13           Here we go.  Document 235.  The Court denies the

14   defendant's motion for a downward departure.  The Court

15   wants to quickly summarize.

16           The defendant argues the lending community was

17   partly culpable for mortgage fraud.  The Court doesn't

18   dispute that there was reckless lending during this period

19   and the oversight which should have been there wasn't, and

20   the lending institutions really did allow those who didn't

21   truly qualify for credit to receive credit.

22           However, that's analogous to me leaving my front

23   door open and someone coming in and stealing my TV.  The

24   theft of a TV is just as criminal.  I might have been

25   negligent, but it doesn't reduce the responsibility of the

1    defendant.  So even if the lending industry was negligent

2    and reckless, the defendant still committed the crime.  He

3    took advantage of an industry that was being careless at the

4    time.

5            The argument that the defendant deserves a

6    departure to avoid sentencing disparity is really predicated

7    on the fact that he did not cooperate and the others did

8    cooperate, and cooperation is the first step in paying off

9    your debt to society.  The defendant did not chose to

10   cooperate.  The jury found him guilty.  He doesn't get the

11   benefit of cooperation.  He doesn't get the benefit of

12   pleading guilty, so he is -- he doesn't receive a downward

13   departure based on that.

14           The defendant referred to this as a downward

15   departure but he also cites the sentencing factors on that.

16   So that means it's an alternative variance motion.  We'll

17   deal with variances in a moment.

18           All right.  Have I covered all your arguments for

19   departure, Mr. Tate?  Did you have any other argument for

20   departure?

21           MR. TATE:  No.

22           THE COURT:  All right.  So based on the Court's

23   rulings, in the instant case the advisory Guideline provide

24   for an offense level of 39, Criminal History Category I, and

25   a Guideline sentencing 262 to 327 months.  Do the parties

CECALA - CROSS

1    agree that those are the appropriate Guidelines after

2    considering all issues with regard to the Sentencing

3    Guidelines?

4            MR. MEYERS:  Yes, Your Honor.

5            MR. TATE:  We restate our earlier objection.

6            THE COURT:  Right.  But subject to objections, are

7    those the correct calculations?

8            MR. TATE:  Yes.

9            THE COURT:  Thank you.

10           All right, Mr. Tate, I'll allow you to make

11   argument on behalf of your client or to present any

12   witnesses you might have with regard to any form of variance

13   or any anything dealing with the appropriate sentence for

14   your client.

15           MR. TATE:  Let them say a few things on behalf of

16   Mr. Cloud, notwithstanding the objections here.

17           It seems to me that Mr. Cloud is being treated

18   more harshly because he elected to exercise his

19   constitutional right to a jury trial.  He had zero criminal

20   history.  None whatsoever.

21           THE COURT:  He has a criminal record, he doesn't

22   have any criminal history points.  He committed fraudulent

23   travel, submitted travel expense forms to the U. S. Air

24   Force.

25           MR. TATE:  And they did not chose to charge him on

1  that offense.

2          THE COURT:  No, they did.  They found him guilty

3  of a misdemeanor and he did not receive a BCD, bad conduct

4  discharge at the time.  He was punished, but he was not

5  discharged; didn't get a dishonorable or bad conduct

6  discharge.  Confined at hard labor for one year and

7  six months.  Reduced to a grade of Airman Basic.  That's

8  true punishment under the Uniform Code of Military Justice.

9          MR. TATE:  We would suggest to the court that

10  that's so remote in time, dating back to 1978, it appears

11  more than 30 years ago.  That really should not be an

12  indication of Mr. Cloud's propensity to commit crimes.  His

13  ability to be rehabilitated remains.

14          In addition to this, Your Honor, in addition to

15  his zero criminal history, Mr. Cloud was simply a person who

16  I believe his role has been extremely exaggerated here.

17          Mr. Cloud was not the person that brought these

18  various players to the table.  These folks were very

19  organized criminals, including mortgage brokers.  They are

20  the ones who obtained yield spreads.  They're the ones that

21  received commissions.  If they did not get a loan approved,

22  it did not happen.

23          As we indicated, Mr. Cloud was interested in

24  investing in real estate.  What he did was he took some

25  pointers.  He went to a broker.  The broker said you need

1    more income.  He helped him come up with that.  But he's not

2    the most culpable person here.  He had no fiduciary

3    relationship with the lender.  He had no ability to get the

4    loan approve.  He had no ability to order an appraiser.  He

5    had no ability to hire underwriters or to do any of those

6    things.  And for the people who were the most culpable to

7    receive a tenth of a sentence, based on basically pleading

8    guilty, I think is a miscarriage of justice.

9                I'm not the sentencing court.  I can only say what

10   my observations are.  I've represented many defendants,

11   Mr. Cloud is far from an criminal.  In my opinion, if it

12   matters --

13               THE COURT:  I understand your respect for you

14   client.  You've worked with him closely over the last, I

15   guess, two-and-a-half years.  But the argument you're making

16   really is closing argument at trial.  You're saying he's not

17   criminal; that's a jury determination.

18               MR. TATE:  I understand that.  I mean he has

19   sustained the conviction, but one of the tenants of 3553(a)

20   is for the Court not only to punish based on one's

21   culpability, which I say is much less than the Court has

22   already sentenced, but also to look at whether there's a

23   need for rehabilitation; whether there's a need for

24   deterrence.

25               Mr. Cloud is not the one that needs to be

1   deterred.  It was the brokers and the lenders that allowed

2   this to happen all in the name of greed.  And Mr. Cloud's,

3   he received are peanuts compared to the big scheme of

4   things.

5          As I mentioned in our Sentencing Memorandum,

6   people who made 50 million, millions and millions of dollars

7   have not been prosecuted.  They want to talk about

8   collateral damage to the community, The Observer's story on

9   Beazer Homes talked about all of the collateral damage; that

10  Beazer Homes received a deferred prosecution.

11          And I think it's relevant to the 3553(a) analysis,

12  part of the scheme.  If it's truly about culpability, how is

13  it that a real estate developer that sold homes,

14  Mr. Henderson, with inflated appraisals, none of that was

15  considered.

16          These are people who were licensed professionals,

17  who had a fiduciary duty to, not only the lenders, but also

18  to the people they serviced.  Mr. Cloud didn't have any of

19  that.

20          You know, his guilt aside, clearly the jury found

21  him guilty, but the issue is what is the just and fair

22  punishment?  And if you're considering his culpability, I

23  don't think you become more culpable because you exercise

24  your right to trial.  All of sudden you become more guilty.

25  All of a sudden your losses are more than anybody else.  All

1    of a sudden your means are more sophisticated than anybody

2    else's.  They should be consistent with everybody else that

3    was sentenced in this case.  And he has been singled out, in

4    my opinion, what appears to be because he went to trial.

5    And that's his choice.

6             THE COURT:  He singled himself out.  I'm a little

7    confused when you say "he was single out."  The government

8    has --

9             MR. TATE:  He's been singled out for a more severe

10   punishment for that purpose.

11            THE COURT:  Well, and I understand what you're

12   saying, but your argument is inconsistent with the

13   philosophy of the Sentencing Guidelines provide for a 5K1.1

14   motion, and is inconsistent with the Federal Rule of

15   Criminal Procedure 35 that say cooperation in the form of

16   substantial assistance results in a reduced sentence.  In

17   the Sentencing Guidelines they say if you plead guilty,

18   you'd get -- in his case it would be a three-level

19   reduction.

20            MR. TATE:  But if you're getting a 5K off of a

21   loss amount, that's stipulated to, and the guy goes to

22   trial, it's supposedly part of the same scheme and even less

23   culpable, the Court finds that a loss amount ten times that,

24   how is the loss any greater for him versus any other

25   defendant just by the fact they pled guilty and got a 5K?

1    5K didn't -- off of 90 million --

2            THE COURT:  The government argued, Mr. Meyers

3    argued earlier today that he benefited from the stipulated

4    amount of his co-conspirators because it was probably a

5    lesser amount than the government ultimately could have

6    proved against each of them, as well Mr. Cloud's loss amount

7    because of the timeliness of the plea.

8            MR. TATE:  We objected to the loss amount.  I have

9    expended all the energy on that I can.  We don't agree with

10   it.

11           THE COURT:  I understand.

12           MR. TATE:  But the bottom line is we think that

13   Mr. Cloud is a person who was a small-time real estate

14   investor that sought to get in on the real estate business.

15   During this time he had lawyers closing his shop for

16   mortgage brokers, it was so lucrative to do that.  He got it

17   on in his mind, and I know this because I went to Rule 11

18   hearings with him to plead guilty, he didn't believe he was

19   guilty in his mind.  The jury found otherwise.  But he

20   didn't believe he was guilty because he figured if he was

21   going to attorneys, he's going to mortgage brokers and they

22   are telling him what to do, it must be okay.  And that's

23   decisions he made.  Because he made that decision, doesn't

24   mean that he should be sentenced on an exaggerated loss

25   amount or any other things.

1      I believe his sentence should be as equal to any

2  other people, particularly people that had fiduciary

3  relationships with the lenders, who dealt with tens and

4  thousands of loans outside of Mr. Cloud.

5      Mr. Cloud didn't bring these people to the table.

6  They were already at the table before he got there.  There

7  was never evidence he directed Amy Phillips to do anything.

8  Never met her at all.  Never substantiated that.  He did one

9  transaction with Don Henderson, yet he's tacked with

10  $3 million of things that he did that Don Henderson

11  testified himself had nothing to do with Mr. Cloud.  The

12  same with Kenneth Strong.  The $29,000 at closing, all of a

13  sudden he's responsible for everything Mr. Strong ever did.

14  But, you know, those are all factors that the Court should

15  consider.

16      There's no need to afford adequate deterrence of

17  Mr. Cloud.  He's 62 years old.  A man with zero criminal

18  history points.  He's very unlikely to be recidivist.  It's

19  a nonviolent offense.  There's people that stick a gun at

20  someone's that get less time.  That man has never committed

21  an act of violence.

22      The fact that he served his country honorably in

23  the military.  His face is disfigured today from his service

24  in the military.  And those are things that you should

25  consider.

CECALA - CROSS

1        His need for educational/vocational training.
2   He's done a lot of that in prison since he's been here.  I
3   mean if you look at all the factors under 3553(a), (b), (c)
4   and (d) and it calls for a sentence of time served, and I
5   asked for it on behalf of Mr. Cloud, measuring his
6   culpability in this case.

7        I just -- it's just -- it's really appalling that,
8   you know -- you've got home builders who hire licensed
9   brokers, real estate people and everything else, not a
10  single one of them has been charged.  Not a single one.  But
11  then to come into court and say this man is responsible for
12  $89-, $90 million to this community is really absurd to me.
13  Considering the fact that the people who got their loans
14  approved weren't taxed with that kind of loss.  The only
15  thing I heard to distinguished him from them is he went to
16  trial.  And the last thing I heard, exercising your
17  constitutional right not one of the sentencing mandates.
18  Now, you certainly don't get the three-level acceptance of
19  responsibility because he didn't do that.  He doesn't get 5K
20  because he didn't cooperate.  We understand that.

21       But the problem that we have is with the -- really
22  disparity in application of the Sentencing Guideline
23  enhancement between him and the other people involved.
24  That's our issue.

25       With that, I'm going to rest and rest on my

1    Sentencing Memorandum.  Mr. Cloud is happy to make response

2    if the Court would like to hear it.

3            THE COURT:  Thank you, Mr. Tate.  Mr. Cloud, you

4    have the right to address the Court if the you so chose.

5            DEFENDANT CLOUD:  I do, Your Honor.

6            First of all, like Mr. Tate said, I apologize for

7    being here under these circumstances.  And I did make a

8    mistake and I apologize to the Court for that.  I made a

9    mistake in trusting the attorneys and the brokers, and I did

10   not mean to cause any harm to the community.  I left civil

11   service to come here to start in the real estate business

12   and I intended to stay in it until I retired, but I met the

13   wrong people and became involved doing some of the wrong

14   things, so I apologize for that.

15           But I have a gun to my head also.  Michael Bryant.

16   That was why I turned him in.  Okay.  Mr. Bryant doesn't

17   know about that.  I was the one who turned people in

18   initially that was doing bad real estate deals.

19           Michael Bryant and Ken Bill.  I did it through the

20   Internal Revenue Service because I was knew in the area and

21   I didn't know anyone.  But I knew that Michael Bryant was a

22   former police officer, so I didn't know who to talk to.  So

23   I wrote the Internal Revenue Service a letter and eventually

24   a year later they sent someone out to talk to me.  And I

25   told them what I knew was going on in the real estate

CECALA - CROSS

1    industry.

2           That is, I was still learning.  But to make a long

3    story short, I learned how to do the flip and I was doing

4    flips, but I was doing them correctly.  Then I, because Dan

5    Greene asked me to, falsified some leases and kept asking me

6    to, and I falsified some more leases.  And I admit to that.

7    But as far as hurting anyone, I even told the customers what

8    had to be done and they agreed with it.

9           So everyone was aware of everything because I told

10   them everything.  I'm not going to hide information.

11          THE COURT:  When you say "customers," I guess --

12          DEFENDANT CLOUD:  Buyers.

13          THE COURT:  What we've referred to in court as

14   investors.

15          DEFENDANT CLOUD:  Right.  The buyer.  The buyers.

16   Everyone knew what was going on.  Everyone.  And they

17   testified to that that they wanted to buy properties.  So

18   there was nothing at all wrong with what I did.  As far as I

19   knew, we were following them all on the level, as far as I

20   knew.

21          THE COURT:  So when you knew there were -- a

22   fraudulent loan application was submitted you thought that

23   was all right?

24          DEFENDANT CLOUD:  No.  When I realized they were

25   fraudulent, it was three years later.  In 2003 was when I

CECALA - CROSS

1    knew, I had gone to some training and that's when I found

2    out that what I had done was wrong.

3            THE COURT:  2003 you discovered what you were

4    doing was wrong.  Why did you continue then after 2003?

5            DEFENDANT CLOUD:  I don't remember doing any more

6    leases after I found out that was done, and then the

7    industry changed the way you didn't have to do leases any

8    more.

9            THE COURT:  Well, but I'm talking about in a loan

10   application where the customer is checking to be a resident

11   and you know they are not going to be a resident, did you

12   not know that was wrong?

13           DEFENDANT CLOUD:  I didn't do that.  I didn't know

14   that.  We had take contracts, sir, contracts and residential

15   loan application.  I marked or the customer marked the

16   correct data on that form, we turned it in to the mortgage

17   broker.

18           THE COURT:  No, I understand that.  But if a

19   customer marked "residential purchase" for -- to become the

20   owner occupant, and you knew you had -- either you or

21   Mr. Goines or someone who recruited them to be the investor,

22   you didn't think that was a problem?

23           DEFENDANT CLOUD:  Recruit them to get rental

24   property.

25           THE COURT:  Yeah.  But they didn't check on the

1  loan application that it was rental property, they checked

2  they were going to be a resident.

3          DEFENDANT CLOUD:  We checked it to be rental

4  properties.  That's why none of those forms were found.

5  They were all destroyed.

6          THE COURT:  By whom?

7          MR. TATE:  I think what Mr. Cloud is saying, and I

8  don't want to cut off his allocution --

9          THE COURT:  I -- well, I understand why you are

10  cutting him off because he's beginning to kind of perpetrate

11  a fraud in the court, that all these documents that were

12  properly filled out were destroyed, and that's very

13  interesting.  I think Mr. Meyers is probably as surprised as

14  I am to discover --

15          MR. TATE:  No.  Your Honor, I can direct you to

16  the direct testimony from my direct examination of Dan

17  Greene, I asked him about the handwritten application.  He

18  said he did not have them.  He didn't use the "destroy."  He

19  said he didn't have them anymore --

20          THE COURT:  So that's what he's referring to.

21  Okay.  I'll take him at face value on that.  Because I

22  understand that Mr. Greene then did say that he didn't have

23  a lot of the handwritten applications left.

24          MR. TATE:  That they turned in.  Mr. Greene was

25  also clear that he would -- see, Mr. Cloud would not know

1  whether to check primary resident, investment property or

2  the like.  That's the broker who knows about the interest

3  rates and things like that.  The broker says, "It's not

4  going to be approved, Bill, unless they can show how they

5  are paying for this house that they are living in and your

6  leasing it."

7       What he saying is he goes to them and says, "Hey,

8  this is what you need to get it approved."  They bring it

9  back to Mr. Greene.

10      He doesn't have the wherewith all to know what's

11  needed and what's not needed because he doesn't use the

12  underwriting -- the underwriter.  That's the broker who does

13  that.

14      So that's why we took offense to when the court

15  said that Mr. Cloud brought these people to the table.  He

16  wouldn't have the expertise or the wherewithal to bring

17  everybody to the table.  He's hustling.  He's trying to get

18  a property --

19      THE COURT:  But you used the word that I meant.

20  You had he's hustling.  That's it.  He's hustling, bringing

21  the people to the table.

22      MR. TATE:  But none of this could happen without

23  the broker.

24      THE COURT:  Oh, I don't think anyone disputes

25  that.  Neither could it happen without the real estate

CECALA - CROSS

1   attorney.  None of it could happen without someone creating

2   some fraudulent document, whether lease or income

3   verification or fraudulent account verification.  I mean it

4   took everyone.

5          MR. TATE:  Just to give the Court a snapshot of

6   his culpability, if you recall even the government's own

7   arguments at trial was that the closing documents, the lease

8   agreements, all that stuff was window dressing in case

9   anybody looked.  It really was not -- not relied on in any

10  way.  It was there as a backup in case anybody questioned

11  it.  But it's what you input into the matrix that causes

12  whether a loan gets approved or not.

13         I think Mr. Cecala was quite clear today.  He made

14  a lot about the Settlement Statements.  But the Settlement

15  Statements really refer -- were there not to protect the

16  lender but to protect Mr. Cloud and the buyer.  That they

17  know what they are supposed to be getting at closing.  It

18  had nothing to do with the lender.  The lender doesn't rely

19  on it at all.  Mr. Cecala said --

20         THE COURT:  Correct.  The lender doesn't rely on

21  it but the second mortgage market does rely on it and your

22  expert said, because I asked him, and so -- and that's the

23  ultimate lender is secondary mortgage market in virtually

24  every one of -- on account of FHA type of loans.

25         MR. TATE:  We agree with that.

1        But I say in the big scheme of things, Mr. Cloud
2   was not the most culpable, he was least culpable.  And
3   basically he could not achieve anything he was doing without
4   Dan Greene, Kim Dauria, all these people who essentially
5   received a slap on the wrist.  And that's the travesty that
6   I'm discussing in disparity, even considering they plead
7   guilty in the 5K, that they were not taxed with these
8   collateral damages when they were the ones who were the most
9   responsible for collateral damage.

10        Dan Greene created many more loans than the ones
11  he did for Cloud.  And he testified about them being
12  fraudulent as well.  That's why they knew to go to him.  And
13  that being said, I think that there's nothing -- none of the
14  tenants of 3553 are met by a sentence of 26 to 28 years for
15  Mr. Cloud, essentially a life sentence for this 62-year-old
16  man with no criminal history.

17        I'm not the sentencing court.  I can only argue on
18  his behalf.  And I do it earnestly from the heart.  And I do
19  believe every word that I've said about Mr. Cloud.

20        I don't think he would return to the criminal
21  justice system.  I don't think he's a bad person.  And I
22  haven't always gotten along with Mr. Cloud, you know from
23  his letters to the Court, but I have to look beyond those
24  differences and argue from an sense of humanity and
25  fairness.  And what I think is just common fairness, and I

1 think it's very unfair for him to be -- receive that type of

2 sentence when others received a much lesser sentence whether

3 they plead guilty or not.

4          He did what he did.  He made some money.  But at

5 the end of the day, his houses went into foreclosure.

6 Nobody talks about that.  His houses went into foreclosure.

7 He was an uneducated consumer who got those high interest

8 rates and things he couldn't maintain as well.

9          So I mean, you know, he did what he did.  He went

10 to trial.  But I don't think that he should be sentenced to

11 ten times longer than anybody else.

12          THE COURT:  And I do want to correct something.  I

13 had roughly estimated 26 to 28 years; it's more like 22 to

14 28 years.  I think that's right.  262 months is just shy of

15 22 years.

16          MR. TATE:  With that being said, I'll rest.

17          THE COURT:  Mr. Cloud, you may finish.

18          DEFENDANT CLOUD:  And I did learn, as Mr. Tate

19 said, that the brokers were the ones that were in control of

20 everything.  And when I said earlier --

21          THE COURT:  Help me, when you say "broker," you

22 mean the mortgage broker.

23          DEFENDANT CLOUD:  Yes.

24          THE COURT:  There's also a real estate broker.

25          DEFENDANT CLOUD:  Right.  The mortgage broker.

1  They were in control of everything.  I just learned that,

2  and that I could not do anything without them.

3          So I did what they asked me to do.  I didn't

4  question them about anything.  Then I also did what the

5  attorneys told me to do.  When Mr. Lee asked me to bring a

6  check in for closing, he told me that the bank had told him

7  to do the check the way he had told me to redo it.  Because

8  the first check I took him, if the prosecution had taken

9  that first check, first cashier's check that I got from

10  Mr. Lee, it was seeing that, I had the clients name, my

11  first client, I had his name on the check from my account.

12  Mr. Lee told me to take that check back, and put my name on

13  it and the client's down in the "remark" section.  That

14  that's the way this company wanted it.  So I went back and I

15  did that.  And I did all the checks like that from that

16  point on because that's the way he said do it.  I trusted

17  him to give me the right information.  He's an attorney.

18  The expert.  So I went and did what they told me to do.

19          When the prosecutor came to me again and asked me

20  to how I wanted to plead.  With what he was offering me,

21  nine to ten years, I said no, I'm not pleading to that

22  because I felt that I was not guilty.  And what did he do?

23  Threatened me with life imprisonment.  Did you not?

24          That's what he did.  He threatened me with life

25  imprisonment.  And that's what he's making sure that he's

CECALA - CROSS

1  doing today.  He made sure he's tried to do that.  But he

2  also made a mistake.  Did I file charges against him?  No, I

3  did not.

4          THE COURT:  How did the government make a mistake

5  in this case?

6          DEFENDANT CLOUD:  Your Honor, we had a meeting

7  here on November 17th and we discussed that.  Did we not?

8          THE COURT:  We did.  We had a status conference

9  yes.

10          DEFENDANT CLOUD:  Did I file charges?  No, I did

11  not.

12          MR. TATE:  Mr. Cloud, I have to step in, and I

13  have some concerns about Mr. Cloud.  You know, I'm not

14  trying to cut off his allocution.  I think the Court has

15  given him a chance to allocute, but part of the difficulties

16  in this case is -- and more recently is that Mr. Cloud's --

17  how can I put it, his memory or take of what things happened

18  don't always jive with the way I recall things, and some of

19  that appears to be coming out now.

20          THE COURT:  Well, the essence of that pleading was

21  to make sure you could continued your representation.

22          MR. TATE:  It had nothing to do with charges

23  against Mr. Meyers.  I don't understand.  He made that

24  reference --

25          THE COURT:  Well, I think there's a reference in

CECALA - CROSS

1    that letter to both ineffective assistance of counsel and

2    prosecutorial misconduct.  And -- but the one I was

3    concerned about of course was ineffective assistance of

4    counsel because I didn't want to proceed to sentencing with

5    him making a allegation.  I can't specifically remember the

6    letter, but if there is a reference to prosecutorial

7    misconduct in there, I would have let that pass at that time

8    because there's an appropriate time for that to be raised

9    and it wasn't for purposes of sentencing, particularly since

10   he was represented by you, Mr. Tate, and I knew you had the

11   responsibility to file such a motion if you thought there

12   was one justifying it.

13        So the November 17th meeting was a status

14   conference called by this Court with regard to whether you

15   can continue to represent him, you and Mr. Tate continue to

16   represent Mr. Cloud.  We all agree that would be

17   appropriate.  And you've done a vigorous job on behalf of

18   your client.

19        Mr. Cloud, go on and finish -- unless Mr. Tate,

20   your advising your client that he should stop.

21        MR. TATE:  I advised him, but, of course, he has

22   an absolute right to allocute, and so I don't want that to

23   be an issue.

24        THE COURT:  It is.  It's up to you.  Mr. Cloud,

25   you may continue or you may not.

1          DEFENDANT CLOUD:  I just have some things on my

2   mind because I feel that I have been unjustly treated.

3   Okay.  And I really do.

4          With the whole real estate thing, I really feel

5   that I have been singled out.  I really do.  And with that

6   Mr. Tate, has done an excellent job in defending me and I

7   thank him for that.

8          But I think the prosecution has gone overboard,

9   really overboard in fulfilling of it's mission that they say

10  what to do.  And that's to put me in the jail for the rest

11  of my life.  That's what they had in front of five officers

12  in a meeting.  Mr. Tate was there.  Five prosecutors, two

13  postal people.

14          THE COURT:  All right.  Anything else, Mr. Cloud?

15          DEFENDANT CLOUD:  Yes, sir.

16          Some of those deals were not fraudulent.  A lot of

17  them were not fraudulent.  There was no fraudulent data in

18  them.  A lot of those homes, my sister's home is -- was not

19  foreclosed.  1605 Bellguard Avenue not for foreclosed.  You

20  saw Bhula White on the screen here.  That was not foreclosed

21  on.  8601 First Front Court, that's where my sister lived.

22  That's never been foreclosed.  A lot of these properties are

23  not foreclosed.

24          So my point is that information is inaccurate.

25  Okay.  And I did statistics in school also, and I listened

CECALA - CROSS

1 to those reports and lot of them are inaccurate based on

2 what the government gave.  So with that I'll sit down.

3 Thank you.

4          THE COURT:  Thank you, Mr. Cloud.

5          All right, Mr. Meyers, Mr. Randall.

6          MR. MEYERS:  Thank you, Your Honor.

7          I'd like to address first disparity arguments

8 since that was the argument that was spent the most time on

9 by defense counsel.

10          As the government notes in its memo, there's

11 really two reasons here why there's a disparity:  One, which

12 is 5K.  The second one, depends on the information available

13 at the time of the guilty plea.

14          The government and Ken Bill, Ken Strong and

15 William Phillips came to plead guilty it was 2003.  We

16 simply didn't know that much.  Same is true for Don

17 Henderson; the same was true wore Michael Bryant.  It gets

18 worse for a defendant the more information that is known.

19 Those defendants were sentenced on less than the full amount

20 of information.  That was the strategic choice they made in

21 the judgment of their lawyers.

22          That's recognized as being perfectly proper, in

23 fact, occurring in nearly ever case.  The Fourth Circuit,

24 *United States v. Pierce*, which is cited at page 74 of the

25 Government's Sentencing Memorandum.  There the Fourth

1  Circuit said, "The defendant and his co-conspirators are not

2  similarity situated.  The defendant was sentenced based on

3  all the evidence adduced at trial, while the co-conspirators

4  plead guilty and were sentenced based on the government's

5  stipulation and the information available prior to trial.

6  The district court was required to make a reasonable

7  estimate of loss given the available information, and the

8  quality of that information changed over time."

9        That's simply what happened here.  The Defendant

10 Cloud was based upon all the information, because when you

11 get ready for trial, you find out about more bad conduct for

12 the defendant.  That's what happened in this case, in

13 addition to the 5K motions made by the Court.

14        THE COURT:  Well, 5K motions and Rule 35 motions

15 made by the government, the Court's denied them.

16        MR. MEYERS:  If I do that again, please --

17        THE COURT:  I don't think you need to recite that

18 portion of your memorandum that reminds the Court of the

19 case law supporting how, over time, during the course of

20 investigation, loss amounts get more severe, drug amounts

21 get more severe, whatever the amount is because during the

22 investigation the government learns more.

23        I'd like to you focus on Mr. Cloud's assertion

24 that he turned in Mr. Bryant and Mr. Bell, or Bill, Mr. Ken

25 Bill; that he wrote a letter to the Internal Revenue

1    Service.

2           MR. MEYERS:  There's simply no evidence of that,

3    Your Honor.  I think I would have seen it before now.  I

4    think it's simply a flat misrepresentation to the Court at

5    this point.

6           THE COURT:  Okay.  What if he did do it?

7           MR. MEYERS:  I think, Your Honor, to the extent

8    that that allegation was made, I believe with counsel early

9    on -- not that allegation but a similar allegation, namely,

10   when he was -- he said, "Listen.  I'm the victim here.  Look

11   at my own house, which Michael Bryant flipped to me," which

12   is No. 2 on the list of transactions of the Presentence

13   Report. And all that was is the defendant himself serving

14   for one transaction as the straw buyer.  Had all the same

15   elements of fraud as all of these, and it was one of the

16   ways in which the defendant learned the scheme.  It marked

17   the beginning of his partnership with Michael Bryant in this

18   case.

19          So I think the Court should simply give no

20   credibility to that.  With the defendant, I think we would

21   have heard evidence of that.  If it's true, it's quite a

22   serious allegation.  It's simply not true.  What the

23   defendant did was serve as straw buyer for the second house

24   in time that is involved in the conspiracy here.

25          THE COURT:  He said that a year later he was

CECALA - CROSS

1    interviewed by the Internal Revenue Service.

2            MR. MEYERS:  There's no evidence of that, Your

3    Honor.  I don't believe that to be true.

4            THE COURT:  But the service agent that's here is a

5    special agent or a revenue agent?

6            MR. MEYERS:  Special agent.  He's not here

7    anymore, Your Honor.  He was a special agent.

8            THE COURT:  All right.

9            MR. MEYERS:  He is a special agent.  He was here.

10            THE COURT:  He was here and is a special agent.

11    All right.  So at least, based on your knowledge of his

12    knowledge of the services involved in this investigation,

13    you were unaware of any representative of the Internal

14    Revenue Service interviewing the defendant, I guess, 2003

15    time frame?

16            MR. MEYERS:  That is correct.  In fact, the IRS is

17    not involved in this case.  IRS special agent is here

18    because he works a lot of mortgage fraud cases.

19            THE COURT:  So he came here for training.

20            MR. MEYERS:  Yes, sir.  It's continuing education

21    for them.  The IRS was simply not involved in this case,

22    Your Honor.  So I think the court should give that statement

23    of the defendant no credence, like many of the other false

24    statements, which I'm prepared to prove just a couple of

25    them now, Your Honor.

CECALA - CROSS

1          I mean, the suggestion that there's nothing wrong

2     with what he did, and I thought he was about to say that he

3     made mistakes, and he said his mistake, if the Court

4     recalled, was that he trusted his co-conspirators.  The

5     evidence directed to the contrary.

6          The evidence was that this was the defendant

7     directing and leading this organization.  He went to them.

8     They were all consistent.

9          What he says is simply not true.  I'd like to play

10    for the Court now the additional victim impact statements

11    which we didn't play earlier.  It's about 14 minutes, Your

12    Honor.  And I'll play that.  I think it's directly relevant.

13    And one of the reasons I want to do that, Your Honor, this

14    is the impact to the buyers on their lives.

15         There's one buyer in here, Gabriel Brown, who is

16    in 2005.  2005 borrower.  I'll point out to the Court in her

17    memorandum of interview in her documents it's the one the

18    Court found the conspiracy continued in 2005.  The defendant

19    suggested earlier he found out that was fraudulent in 2003,

20    and what his wife's MOI, which is in the Presentence Report,

21    what the other MOI's after that time period cite, is he

22    mostly shifted his operation to Atlanta.  That's what he did

23    when he supposedly found out it was fraudulent.

24         And the idea that you can find out a scheme is

25    fraudulent after years of forging signatures, creating tax

1  returns, falsifying -- even lease agreements is the one

2  thing he will admit, I guess because they have his fax

3  header he the top -- filling out false statements, making

4  false promises over and over again is simply absurd, and is

5  a flat misrepresentation to this court, which is

6  particularly egregious after two weeks of testimony to the

7  contrary.

8         MR. TATE:  Your Honor, we object to playing impact

9  statements.  These people testified at trial.  It's

10  cumulative.  The hour's late.

11         THE COURT:  I understand your concern for the

12  time, but I believe I have a legal obligation under the

13  Justice for All Act to consider all victim impact

14  statements.  And I apologize to all the Court staff and all

15  everyone in the courtroom, but I believe I necessarily

16  should hear these videotape impact statements.  And even if

17  law didn't mandate that I do hear them, I think in my

18  discretion I want to hear them also.

19         MR. TATE:  Just so my point is clear, we don't

20  consider any of the straw buyers to be victimized if they

21  are identified co-conspirators.  Our position remains the

22  same; they can't be both.

23         THE COURT:  No.  No, some of these are investors,

24  like the last couple of these are investors like the 2006

25  transaction, right?  Mr. Meyer?

CECALA - CROSS

1        MR. MEIER:  Yes, Your Honor.

2        THE COURT:  But not --

3        MR. MEYERS:  2005.

4        THE COURT:  Are all of them investors?

5        MR. MEYERS:  Yes, Your Honor.

6        THE COURT:  I want to hear them because they are

7   both co-conspirators and victims at the same time.  And the

8   victimization ultimately to them is in many cases extremely

9   severe.  So I definitely want to here this.  And I believe

10  the Justice for All Act requires that when the government's

11  deeming the victims, I believe I have to hear it.  Even if I

12  didn't hear it, I want to hear it.  Go ahead.

13        (Videotape played.)

14        MR. MEYERS:  Judge, this is just some of the

15  victim impact evidence that the Court heard during trial

16  from Rodney Thompson.  The Court will recall he was

17  attempting to support his parents buying a house nearby.

18  Mr. Thompson was forced into bankruptcy, the houses went

19  into foreclosure, and stories like this go on and on and on.

20        The losses are not just to these individuals,

21  they are not just to the banks, they are not just to the

22  financial markets, they are not just to the neighborhoods,

23  they are also to these individuals.

24        Your Honor, the defendant, William Cloud, got up

25  and said to this Court that he learned in 2003 what he was

1   doing as fraudulent.  And you see him doing it over and over

2   and over again, all the way through 2005, even one attempt

3   we found in the January 2006.

4        His co-defendants had plead guilty.  They were

5   awaiting sentencing.  The defendant, Cloud, simply moved to

6   another jurisdiction and found new victims, new ways to

7   defraud, and kept on with the scheme.

8        I'd like to show the Court what is in the

9   Presentence Report as Document 215-5, page 54 of 186.  It's

10  one of the attachments to the Presentence Report.  It is a

11  Memorandum of Interview of Ms. Brown.  It is SA4B for

12  purposes of the government's sentencing exhibits.

13       I point out to the Court Mr. Brown's interview

14  found under 2007, we were preparing for trial.  She said,

15  "Like the other straw buyer's print-off, Cloud did all the

16  paperwork for her financing.  He hold her if she didn't have

17  a 1099, he would provide one."  Cloud told her to and she

18  completed income verification form in which she -- which

19  Cloud indicated she made $70,000 a year.  That's not, in

20  fact, true.  In the Greene Financial, Cloud told her to just

21  go along with it and agree with everything the loan officer

22  said when the loan officer called to verify.

23       Ms. Brown said she asked Cloud why she didn't say

24  she lived in the home.  He said, "Just do it," and she would

25  get at cheaper interest rate.  Cloud told her they were a

1  good investment.  He promised her that they would put the

2  renters in the homes.  She could sell the homes for a profit

3  where he would buy them and she wouldn't have to spend any

4  money on her own.  This was again 6332 Thelo Drive; 2317

5  Jordi Way.  He didn't even give her the keys.  The first

6  closing was at Dan Greene's office.

7        Your Honor this is some of the conduct in 2005.

8  Cloud paid everything, and he gave her the kickback check

9  for $16,000.  Met her in the parking lot.  She said that

10 Cloud was shading it, and Cloud said, "Don't worry,

11 everybody is doing it."  After telling this Court that he

12 found out this was fraudulent in 2003, he's doing this in

13 2005.  She never intended to live in the home nor did she

14 ever talked about she wanted to live in them; she falsely

15 said they were going to be her primary residence.

16       The Defendant Cloud also told this Court that a

17 bunch of these houses he said weren't fraud.  For example,

18 my sister's house.  Since that's the example he used, we

19 will show that example to the Court.

20       The documents are in the Presentence Report.

21 Ms. Horton was interviewed by the Postal Inspection Service,

22 attachment to the Presentence Report, it's Document 215-3,

23 page 50 of 152 where that interview report starts in the

24 Presentence Report.  I'll show the Court, I believe it's at

25 17B.

1    She said she was William Cloud's sister.  She had

2  talked to him about getting houses.  He convinced her to do

3  it.  She said throughout the transaction she thought he was

4  just the middle man.  She didn't even realize he was the

5  seller.  He flipped a house to her.  She didn't even realize

6  it.

7    Taking to you page 2 of this exhibit, he gave her

8  a kickback for the house, and she cried when she reviewed

9  HUD-1 Settlement Statement for the first half of the flip,

10  realizing that her brother had sold her a house that he

11  bought the same day for $51,000 and sold to her for $70,000.

12    This is the example he chooses to present to this

13  Court of how a lot of these weren't fraudulent, example

14  which, for lack of a better word, he screwed his own sister

15  with this fraud.

16    It wasn't just the people from the churches it

17  wasn't just the Filipino America community, he did it to his

18  own family, which is exactly why there's nobody behind him

19  today at this sentencing hearing.  He preyed on everyone in

20  pursuit of his own greed, Your Honor.

21    The loan application for his sister indicated that

22  she had rented the home on 8601 First Front Court for eight

23  years.  It's not true.  They owned the house and had been

24  living there only for a few months.

25    Page 3.  They didn't provide the cash deposit that

1    was listed there.  They didn't own a car that was listed on

2    the loan occupation.  They never had any intention of

3    occupying as a primary residency and it said they did.

4          The cashier's check with her in the remitter line,

5    they didn't purchase the check nor did she provide funds for

6    the transaction.

7          Your Honor, this is yet another example of the

8    defendant, when he's asked to allocute, and to say what he

9    says about his crimes, he blames it on the mortgage brokers,

10    he is blames it on the banks, he blames it on the attorneys,

11    he blames it on the brokers, he blames it on the prosecutor.

12    No one is responsible for this crime -- Mr. Cloud says he's

13    not responsible for this crime, yet everyone else is

14    responsible for it.  Yet he preys on all those communities

15    that trusted him.

16          These straw buyers said over and over again that

17    the worst thing about this wasn't just how much money I

18    lost, getting sued, going into bankruptcy, losing house

19    after house, it changed their entire outlook on the world.

20    They don't trust people anymore.

21          To have someone like that, a friend, a family

22    member prey on you, victimize you like that, and to lose

23    your trust for everyone, that's something the defendant

24    Cloud stole in addition to money.  He stole their trust,

25    Your Honor.

1    He said, "There's nothing at all wrong with what I

2   did." It shows to the Court that the defendant, Cloud, will

3   do this again.

4    There are other examples in the 2005 memorandums

5   of interview. I point the Court to Allen Thompson. He's

6   some of the few last transactions. His MOI is in the

7   Presentence Report. I think the Court has likely reviewed

8   it. Again the same story in 2005. I will present it to the

9   Court very briefly.

10   At S87B, this is in the Presentence Report at

11  Document 215-5, page 91 of 186. Allen Thompson purchased

12  two houses. These houses are listed in the attachment of

13  Presentence Report as No. 86 and No. 87 and No. 90. They

14  are in 2005, Your Honor.

15   Allen Thompson, in 2005, after Mr. Cloud had told

16  the Court he learned that the scheme was fraudulent, said

17  Cloud was the middleman. He purchased those three

18  properties. He was getting a $20,000 kickback up front for

19  each property purchased.

20   Page 2. Cloud told him his partners would pay the

21  difference between the mortgage and the rent. He was in

22  partnership with these individuals. They paid the down

23  payment. They came in with a cashier's check. Prior to all

24  them, Cloud told them to say he was going to live in the

25  house. Cloud told them.

1    Dan Greene was on the application.  He didn't have

2  a Wachovia account.  He received payment again for these

3  closings.

4    I'm not going to belabor this, but the statement

5  to the Court by the defendant is unbelievable; that he

6  learned this was fraudulent 2003, and then it stopped.  All

7  he did was cover his tracks by removing to a different

8  jurisdiction.  That's what makes him the worst person in

9  this entire case.  That's what makes him the person who is

10  the most incorrigible, the most reprehensible, the most

11  guilty because he kept this on.

12    He was in it from the very beginning and he was in

13  it way after everyone except for Dan Greene and him had

14  stopped, all the way through 2005.  The defendant Cloud kept

15  on and kept on.

16    Your Honor, I am asking the Court to impose a

17  sentence of 360 months imprisonment.  It is the equivalent

18  of going one level above the Guideline range here.  I

19  believe it's appropriate, because if the Court does not

20  impose that sentence that's above the Guideline range, it

21  takes into account not at all the victimization of all the

22  borrowers, because there's nowhere accounted for it in the

23  Presentence Report or in the Guidelines.  The Guidelines

24  don't address that.  They don't address robbing someone of

25  trust, except for the abuse of trust issue which this Court

1    has declined to apply under the Guidelines.  The Court may

2    address it, however, in its sentencing with an upward

3    variance.

4         It doesn't address $80 million of loss in the

5    neighborhoods, and really it doesn't address any loss to the

6    neighborhoods because those losses to the neighborhoods

7    change the Guidelines not at all.  He was already at $10

8    million above the next level.

9         The losses to the neighborhoods, victimization of

10   straw buyers, the reprehensible conduct all the way through

11   2005, those dictate a sentence that is that high.

12        The Defendant Cloud played on churches.  He played

13   on Filipino Americans.  He created the documents.  He was

14   the leader.

15        I ask the Court most of all to impose that

16   sentence, 360 months, for that deterrence purposes, not just

17   to address this defendant, who is the worst of the worst,

18   but also to address the terms of this.

19        The mortgage fraud is at an all time high.

20   There's case after case cited in the Government's

21   Memorandum, which says that white-color criminals like

22   Cloud, and the ones that follow him, look to see the

23   cost/benefit analysis of infusion in the fraud.  They look

24   to see the probability that they'll get caught.  And the

25   Court can see we can only handle so many of these cases.  We

1  just can't get to them.  We don't have the resources.  It

2  takes forever to prosecute them.  The Beazer Homes

3  investigation is ongoing.  It's simply not true that no one

4  will be prosecuted for that case.  All we've done is settle

5  with the company itself.  Investigation is ongoing.

6          It takes a lot of resources.  It takes a

7  foreclosure and a lot of complaints to even find out one of

8  these mortgage fraud cases is going on.

9          The probability of detection and the prosecution

10 is quite low for those engaging in mortgage fraud.  And

11 example of a bank robber is a good one, because those are

12 folks who routinely go to jail for 30 years for one

13 transaction in which they steal a few thousand dollars.

14         The defendant, Cloud, with greed as his only

15 motive, robbed dozens and dozens of banks with lies and with

16 a scheme that was much more intricate and much more thought

17 out, and he had every the opportunity to make a living the

18 right way.  With a master's degree, with all of his

19 abilities, the defendant, Cloud, had the opportunity to live

20 his life the right way.  Instead, for a six-year period, six

21 years of ongoing activity, the defendant, Cloud, engaged in

22 fraud.

23         Judge Posner writes that raising the price of

24 crime will reduce its incidence, and I would ask this court

25 to raise the price of mortgage fraud.  That this sentence

CECALA - CROSS

1  for this defendant was more deserving than any other

2  defendant.

3           THE COURT:  Thank you, Mr. Meyers.

4           Mr. Cloud, there's three-step process the Court

5  must work through in determining the appropriate -- you

6  don't need to stand up yet, but I'm just explaining the

7  legal process that the Court is going to go through.

8           Through this three-step process this Court must go

9  through in determining the appropriate and reasonable

10  sentence in your case.  This three-step process was set

11  forth by the U. S. Supreme Court in a series of decisions

12  starting with the decision of *United States v. Booker*.  The

13  first step in that process is determining the advisory

14  Guideline range that applies in your specific case.

15           As you are aware, a few moments ago, after almost

16  a full day of testimony and hearing, the Court concluded

17  that the appropriate Guideline range in your case was 262 to

18  327 months.  Now, that is the starting point of analysis.

19  It is not necessarily the ending point.

20           The second step is to determine if a statutory

21  minimum sentence applies in your case.

22           You have been convicted of multiple counts, but

23  none of those counts have a statutory minimum sentence.

24  Several of the counts have a 30-year maximum sentence.  The

25  Court can sentence you literally to several hundred years of

1    imprisonment, but the Court does not intend to do that

2    today.  But there's no minimum sentence that Congress has

3    mandated that the Court must sentence you too.

4           The third, and by far the most important step the

5    Court must follow in determining the appropriate and

6    reasonable sentence in your case is to apply a series of

7    sentencing factors that are set forth in Title 18,

8    United States Code, Section 3553(a).  And you've heard both

9    those attorneys today discuss those factors at different

10   times, and I'm sure Mr. Tate has discussed the sentencing

11   factors with you.

12          The Court is going to go through the sentencing

13   factors in your case and discuss how they apply in both

14   determining aggravated factors in the analysis of your

15   criminal conduct.

16          These sentencing factors were set forth by

17   Congress to guide courts in fashioning an appropriate and

18   reasonable sentence that's sufficient but not greater than

19   necessary to accomplish all the goals of sentencing.  The

20   first sentencing factor the Court wants to consider is the

21   nature and circumstances of the offense and the history and

22   characteristics of you, the defendant.

23          This is, as the Court has already found as a

24   matter of fact earlier today, a sophisticated criminal

25   offense.  It's one that required an extraordinary amount of

1 organization.  It requires someone with a charismatic

2 personality.  It requires someone who can convince those who

3 have licenses to practice law or to prepare real estate

4 appraisals or to work in mortgage brokerage operations,

5 requires many people with fiduciary duties to breach their

6 fiduciary duties and their ethical obligation under their

7 license to practice, much less criminal law.

8           I know it's your assertion that you were taking

9 the guidance of those who were licensed and trained in these

10 areas, but the record evidence shows that you were the one

11 with the talent and the ability and the charismatic

12 personality to bring all the players together.  You built

13 your transactions on a series of falsehood and lies.

14           Fraudulent statements, the false statements varied

15 from transaction to transaction, but there was fraud in

16 every single transaction that you put together.  And whether

17 this was a fraudulent lease agreement or whether it was a

18 fraudulent statement on a loan application as to whether

19 someone was a resident, owner/occupant versus being an

20 investor, whether it was a fraudulent statement on a HUD-1

21 about who was providing the down payment, you were directly

22 or indirectly involved in all those false statements.

23           It was a sophisticated and cunning operation, and

24 you were really at the center of all the fraud on each and

25 everyone of these transactions.

1    And you also prayed upon friends, and the Court

2    has just seen the videotapes of some of your friends, many

3    in the Filipino America community.  You also targeted

4    members of certain churches, and you hired recruiters to

5    target those individuals, and once some of these properties

6    started to go into foreclosure and you received complaints

7    from the investors or what you call customers, you

8    disregarded them in many cases and allowed the properties to

9    go into foreclosure.  And, therefore, your

10   customer/investors lost their credit worthiness, financial

11   institutions lost money from their loans, and the ultimate

12   impact was broad-based.

13   The victimization was more than just the immediate

14   victims, but as we spent most of the day discussing, it

15   involved the neighborhood.  It involved loss of property

16   taxes.  It involved cost to the community of additional

17   services, such as law enforcement support, social services

18   when abandon houses become the cesspools for criminal

19   activity.  And good neighborhoods lost some of their peace

20   and tranquility when abandoned homes became the center of

21   problems for those communities.  The nature and circumstance

22   of this offense are absolutely grave and broad-reaching.

23   And your history and characteristics also are

24   troubling to the Court.

25   One, that you acknowledged earlier in your

1   allocution, Mr. Meyers pointed out, you said you had found

2   out in 2003 what you were doing was fraudulent.  Well, why

3   didn't you stop?  You said you changed preparing lease

4   agreements and things like that that were fraudulent, but if

5   you really knew in 2003 that what you were doing was wrong,

6   you should have stopped cold and not just slightly changed

7   what you were doing.

8           But it also goes back to something that the Court

9   finds troubling.  You have had problems with the law before

10  in a lesser agree; you had problems with the law while you

11  were in the Air Force, at that time once again it was

12  fraudulent statements.  It wasn't reckless behavior, getting

13  drunken and in a brawl, which is not acceptable conduct but

14  it is a conduct more related to someone in their teens or

15  early 20s; it was false statements.  It was fraudulent

16  statements on travel vouchers.  And fast-forward to 1999,

17  and you're doing it again.  And there was a gap there in

18  time, but it's still crimes of veracity, crimes of

19  truthfulness.

20          So your history and characteristics don't defend

21  you.  They show that you've lied on forms before and you

22  were willing to do it starting in 1999, and you did it for

23  many years.  And although you have no criminal history

24  points, it's very hard to view you as a first-time offender

25  because every time you committed a fraudulent transaction,

1 you were committing an individual substantive crime; you

2 just didn't get prosecuted for it.  So you did this for

3 many, many years, and finally it all caught up with you in

4 this indictment, in this multiple indictment.  The ultimate

5 indictment of prosecution I think was the second superseding

6 indictment.  So the first sentencing factor weighs heavily

7 against you.

8    The next sentencing factor is the need for the

9 Court to impose a sentence that reflects the seriousness of

10 the defense, to promote respect for the law, and to provide

11 just punishment for the offense.

12    The Court's not going to restate all the things it

13 just went through in discussing nature and circumstances of

14 the offense.  But just to say that all of those things also

15 apply to the seriousness of this offense.  The pervasive

16 victimization of your crime just shows how serious this

17 crime is.  The immediate victims, the neighborhood victims,

18 the victims in the broader community, the local government

19 that has loss of tax revenues and an increase in

20 governmental support of the victimized neighborhood, and

21 ultimately, to an immeasurable degree, you contributed to

22 the mortgage collapse that happened in 2008.  Although

23 that's not at all measurable, and it's -- the problem with

24 our credit markets in 2008 is we lent money to people who

25 couldn't afford it.  And you facilitated the lending of

1  money to those who couldn't afford to borrow the money and

2  sustain debt servicing on their actual residence and the

3  residence they were investing in.

4         The need to promote respect for the law.

5         Real estate transactions, real estate closings

6  have so many licensed individuals around them because I

7  think public policy dictates those be honest transactions

8  because there's so much put at risk in those transactions.

9  Not only the money from the financial institutions, but it's

10 also the people who are buying the property.  And they are

11 heavily regulated.  And they have lawyers, they have real

12 estate appraisers, they have mortgage brokers, all these

13 individuals so they can be honest transactions.  And you

14 used your talent and ability to undermined the lawful

15 structure of those closings.  So there's an absolute need

16 for this Court to impose a sentence that promotes respect

17 for the law.

18        And the Court wants to point out that your motive

19 was greed.  You weren't trying to help others.  The fact

20 that in your allocution you talked about your sister's

21 property, and then Mr. Meyers points out that your sister

22 was in tears when she learned that you flipped a property on

23 her.  You didn't have respect for the law and you didn't

24 have respect for the individuals you brought to these

25 transactions.

1          And to provide just punishment for the offense.

2          It's always hard to exactly determine what's just

3    punishment for any offense because it is a sentence -- the

4    government says you deserve a 30-year sentence, and the

5    Sentencing Guidelines aren't quite to 30 years.

6          Is there a real difference for you between a

7    30-year sentence and a sentencing in the

8    Sentencing Guidelines because of your age?  I'm not sure.

9    Because either one is such a lengthy sentence based on your

10   age, they might be de facto life sentences.  So it's hard

11   for the Court to measure specifically in your case a just

12   punishment because as a gentleman in your early 60s, any

13   sentence over a decade or so is a sentence that might be

14   life imprisonment for you.

15         Nonetheless, the Court believes that you deserve a

16   very serious and lengthy punishment, and that if the

17   sentence the Court imposes is a de facto life sentence, even

18   if it's not an actual life sentence, that's still a just

19   punishment.

20         And I want to add to that the criticism you gave

21   of Mr. Meyers a few minutes ago when you alleged that

22   somewhere during the negotiation process when you chose not

23   to enter a plea, you felt that he threatened you with a life

24   sentence.

25         The reality is when you entered this courtroom

1   today, these Sentencing Guidelines calculations were a 360

2   -- well, the Presentence Report recommended 360 months to

3   life.  The government's proposal in one of its memorandum

4   suggested an offense level of 45, which would have been

5   mandatory life, and you aren't far from there in the

6   calculations.

7           So when Mr. Meyers, if, in fact, he said to you

8   "you are facing life imprisonment," there was no

9   misrepresentation whatsoever if he, in fact, said that.  I

10  don't know if he actually said that.  But if he did, the

11  fact that if he said that, that certainly is a very

12  possible -- could have been, and might still be, a

13  possibility for you, and if the Court sentences you to an

14  actual time versus life imprisonment, it may be a de facto

15  term of imprisonment anyway.

16          I found it disingenuous when you attacked Mr.

17  Meyers earlier, and I think whether he said that or not, it

18  is not improper for a prosecutor to estimate that the

19  Sentencing Guidelines could result in life imprisonment when

20  it seems to be a plausible calculation based on the record

21  before this Court.

22          The next sentencing factor the Court needs to

23  consider is the need for the sentence imposed to afford

24  adequate deterrence to criminal conduct.

25          That is what we refer to as general deterrence.

1    The Court needs to impose a sentence that tells others who

2    have not committed mortgage fraud of how horrendous mortgage

3    fraud is as a crime.  The Court needs to deter others from

4    getting involved in such criminal conduct for a variety of

5    reasons.  Not only does it impact our financial institutions

6    and impact our neighborhood, but it also, as Mr. Meyers

7    pointed out, is a crime that's hard to detect.

8            The crime is detected frequently months, and in a

9    couple instances in your case years after the crime

10   occurred, only after the property goes into foreclosure and

11   there's some collapse of the property, the debt services

12   stops and a foreclosure start occurs, and then maybe the

13   financial institution sells it or someone sells it in a form

14   of foreclosure.  The point is it's a crime that's hard to

15   detect.  So that's another reason, in addition to the

16   extraordinary victimization, where the Court needs to deter

17   others from getting involved in this type of criminal

18   conduct.

19           The Court also needs to impose a sentence to

20   protect the public from further crimes of you.  We call that

21   specific deterrence; specifically deterring you.

22           The Court was trying to be sympathetic to you

23   earlier in your allocution, but the Court did not hear any

24   remorse in your voice.  The Court heard you pointing fingers

25   as everybody else, pointing one at Mr. Meyers, pointing at

1  Mr. Bryant and Mr. Bell -- or Bill, rather; attacking

2  Mr. Greene.  You just didn't seem to either care or

3  understand that you were facilitating large amounts of

4  fraud.  You were substantially benefiting, making more money

5  off of each transaction than anyone else, and then sending

6  these properties into foreclosure and disrepair, and having

7  a pervasive deterioration of the property, and then, of

8  course, deterioration of the neighborhood.

9         So the Court really does believe you need to be --

10  you, personally, need to be deterred from further criminal

11  conduct and a lengthy sentence is necessary to do that.

12         The Court also needs to impose a sentence that it

13  considers needed rehabilitation in the most effective

14  manner.

15         The Court believes you are an educated gentlemen,

16  very articulate gentleman.  You're obviously a very smart

17  gentleman.  The Court believes you will receive educational

18  and vocational opportunity within the Federal Bureau of

19  Prisons.  Also, the Court doesn't believe the sentence is

20  going to have much impact on your rehabilitation, because

21  you already are a gentleman of some years, and although

22  you're not elderly at all, you are over 60, and when you are

23  released from the Bureau of Prisons, you will probably be --

24  you will probably be too old to work a traditional job.

25         But nonetheless, the Court believes the Bureau of

1    Prisons will provide you rehabilitation opportunities, and

2    hopefully you can survive your sentence and take advantage

3    of those rehabilitation opportunities.

4         The Court wants to also discuss in detail the

5    sentencing factor of avoiding unwarranted sentencing

6    disparity amount similarity situated defendants.

7         You argue, and Mr. Tate argued, that you are

8    unjustly punished, or are facing a lengthy punishment far

9    more severe than you co-conspirators, and Mr. Tate's core

10   argument is because you executed your constitutional right

11   to a trial.

12        The Court does not dispute that you exercised your

13   constitutional right to trial.  The Court does not dispute

14   that the fact you have not admitted your guilt, and you've

15   delayed acknowledging your guilt, and even to this day you

16   believe generally you are not guilty, then that has had an

17   impact on your Sentencing Guideline calculation and had a

18   impact on this Court's view of your sentence.

19        The question, though, is not how long your

20   sentence is; whether it's an unwarranted sentencing

21   disparity among similarity situated, and I underline

22   "unwarranted sentencing disparity."

23        The Court believes the sentence you will receive

24   is far more severe than virtually all your codefendants but

25   that's a warranted sentencing disparity.  Because you

1  haven't shown remorse, because you facilitated these

2  transactions, because you preyed on friends and family

3  members, because the damage from your criminal conduct was

4  far more pervasive than just the foreclosure of one home,

5  because you have not assisted the government in preventing

6  this criminal conduct, all of these support a far more

7  serious sentence than your co-conspirators.

8          There's also, as Mr. Meyers pointed out, the

9  chronology of this investigation.

10          The earliest defendants admitted their guilt in

11  2003.  Even after some of your co-conspirators were

12  acknowledging they were involved in criminal conduct, you

13  were still in criminal conduct.

14          The government had a limited database or a certain

15  body of evidence in 2003.  It used that evidence to

16  prosecute the individuals that it was targeting at that time

17  then.  And after they cooperated, the body of evidence of

18  the government grew, and over time the government learned

19  more about the damage and more about the individual rolls of

20  each of the players, and through that term of the

21  investigation, the evidence suggested you were a far more

22  serious co-conspirator.  And you still continued, knowing

23  there was an investigation around you, you still continued

24  to participant.

25          The government's information and evidence just got

1    stronger, and the amount of criminal conduct you were

2    involved in became more clearer.  And because you, even to

3    this day, haven't acknowledged any wrongfulness, the

4    government has taken all the evidence it's collected over a

5    five to six years of investigation and used it in presenting

6    it's evidence to the probation officer, and then presenting

7    it's evidence to this Court.  And that's why you're facing a

8    far more severe sentence than your co-conspirators.  That's

9    why it's a legitimate sentencing disparity, and why this

10   Court intends to hand down a sentence today that you will

11   hear in a few moments that is lengthy and severe, and is

12   justified by virtually every sentencing factor under

13   3553(a).

14        The Court also notes that it's going to impose a

15   sentence -- a restitution judgment, which is also a

16   sentencing factor.  That will be part of, of course, the

17   judgment, and it is mandated under the Mandatory Victim

18   Restitution Act.

19        All right.  The Court has considered all of the

20   sentencing factors in Title 18, United States Code, Section

21   3553(a).  The Court has gone through some detail on

22   virtually all those sentencing factors, explaining how it

23   impacts the Court's reasoning today.

24        The Court is about to state a sentence that it

25   believes is sufficient but not greater than necessary to

1  accomplish the goals of all those sentencing factors.  The

2  Court would invite the attorneys to listen to the proposed

3  sentence before it's actually imposed, so if there's a legal

4  reason why it should not be imposed, you can so advise.

5          The Court proposes the following sentence:

6          Pursuant to the Sentencing Reform Act of 1984 and

7  *United States v. Booker*, it is the judgment of the Court,

8  having considered the factors noted in 18 U.S.C. Section

9  3553(a), that the defendant, William Roosevelt Cloud, is

10  hereby committed to the custody of the Bureau of Prisons to

11  be imprisoned for a term 60 months open Count One; 324,

12  three-two-four, months on each of Counts Two through Twelve,

13  Fifteen through Eighteen and Twenty-Five; and 240 months on

14  each of Counts Twenty-Seven through Three-Three, all counts

15  to be served concurrently, for a total of 324 months.

16          It is further ordered that the defendant be

17  required to support all dependents from prison earnings

18  while incarcerated as outlined in the Presentence Report.

19          Upon release from imprisonment, the defendant

20  shall be placed on supervised release for a term of three

21  years.  This term consists of terms of three years on each

22  count, all such terms to run concurrently.

23          Within 72 hours of release from the custody of the

24  Bureau of Prisons, the defendant shall report in person to

25  the Probation Office to the district to which the defendant

1  is released.  While on supervised release, the defendant

2  shall not commit another federal, state or local crime, and

3  shall comply with the standard conditions that have been

4  adopted by the Court in Western District of North Carolina.

5  And shall comply with the following additional conditions:

6  Periodic drug testing mandated by the Violent Crime Control

7  and Law Enforcement Act of 1994 is hereby suspended.  The

8  Court finds this offense is not drug related, and the

9  defendant has no current or past history of substance abuse.

10       It is further ordered the defendant shall pay the

11  United States a special assessment of $2,400.

12       The Court finds the defendant does not have the

13  ability to pay a fine or interest.  The Court having

14  considered the factors noted in 18 U.S.C. 3572(a) will waive

15  payment of a fine and interest in this case.

16       It is further ordered having considered the

17  factors noted in 18 U.S.C., Section 3572(a), that the

18  defendant shall reimburse United States for court-appointed

19  attorney's fees.

20       It is further ordered having considered -- having

21  determined the amount of restitution owed to each victim,

22  that the defendant shall make restitution as directed to the

23  following victims in the following amounts:

24       To Chase Home Finance, $542,676.17.

25       First Tennessee Bank, $29,509.92.

1    To Wilshire Credit Corporation, $16,169.80.

2    First Horizon Home Loans, $42,021.82.

3    To Alterna Mortgage, $21,000.  And the defendant

4   is jointly and severally liable with Michael Dwayne Bryant,

5   case 3:05CR330, for that 21,000.

6    First Guaranty, $39,768.91.  And once again, the

7   defendant is jointly and severally with Michael Dwayne

8   Bryant for that 39,000.

9    Alterna Mortgage Company, a second time, for

10  $51,450.  And the Court notes that the defendant is jointly

11  and severally liable with Donald Henderson, case 3:04CR236,

12  for that sum of $51,450.

13    Finally, to Southstar Funding, LLC, or whatever

14  entity it now controls Southstar Funding, or the bankruptcy

15  trustee that controls Southstar Funding, because it has been

16  in bankruptcy, for the sum of $137,444.83.  The defendant is

17  jointly and severally liable with Kenneth Strong, case

18  3:03CR216, for that 137,000 sum.

19    Now, any payment made that is not payment in full

20  shall be divided proportionately among the victims named.

21  The defendant is jointly and severally liable with the

22  co-defendant for the total amount of restitution.  Although

23  that might be a moot point in this particular case -- no, I

24  take that back, only Ms. Russell has passed away.

25    PROBATION OFFICER:  That's correct.

1          THE COURT:  Now, payment of the criminal monetary

2   penalties shall be due and payment immediately.  The Court

3   has considered the financial and other information contained

4   in the Presentence Report, and finds the following is

5   feasible:  If the defendant is unable to pay any monetary

6   penalty immediately, during the period of imprisonment

7   payments shall be made through the Bureau of Prisons Inmate

8   Financial Responsibility Program.

9          Upon release from imprisonment, any remaining

10  balance shall be paid in monthly installments of no less

11  than $150 to commence within 60 days after release from

12  imprisonment until paid in full.

13         Throughout the period of supervision the Probation

14  Officer shall monitor the defendant's economic circumstances

15  and report to the Court, with recommendations as warranted,

16  any material changes that affect the defendant's ability to

17  pay any court-ordered penalties.

18         Now, I ask counsel if there's any legal reason why

19  the sentence should not be imposed as stated?

20         MR. MEYERS:  I think there's a technical

21  correction the Court needs to make.  The Court ordered

22  324 months as to Counts Two through Twelve.  I think the

23  Court did that because Counts Two through Four are mail

24  fraud charges, and, in fact, they do effect a financial

25  institution.  However, the indictment I believe did not

1   allege they affected a financial institution.

2           THE COURT:  I see what you're saying.  So those

3   are five years --

4           MR. MEYERS:  20 years, Your Honor.  I believe the

5   Court should correct its sentence so Counts Two through Four

6   are a sentence of 240 months, and beginning with Count Five,

7   that would be 324 months.

8           THE COURT:  You are correct.  Okay.

9           The Court amends its sentence to say that Counts

10  Two through Four result in 240 months on each those counts,

11  in addition to Counts Twenty-Seven through Thirty-Three.

12          MR. MEYERS:  Yes, Your Honor.

13          THE COURT:  Thank you.  Thank you very much for

14  clarifying that.

15          Mr. Tate, is there anything illegal about that

16  sentence?  I know you've reserved your right to appeal your

17  objections, but is there anything illegal about the

18  sentence?

19          MR. TATE:  Other than what we've already objected

20  to, no.

21          THE COURT:  All right.  Thank you.

22          Now, before the Court goes forward, the Court also

23  wants to make an alternative ruling.

24          Both parties have asked the Court to vary from the

25  Sentencing Guidelines.  The Court obviously has denied the

1    variance upward made by the government and the variance

2    downward made by the defendant.  The Court believes

3    324 months is, under the sentencing factors, the correct

4    sentence.  That is the Court's belief that this is the

5    appropriate and reasonable sentence.  This is the sentence

6    that considered all the sentencing factors thoroughly, and

7    it's a sentence that is sufficient but not greater than

8    necessary to accomplish the goals of sentencing.

9         Therefore, the Court hands down this alternative

10   sentence:  If the U. S. Court of Appeals of the Fourth

11   Circuit were to determine that this Court either improperly

12   as a matter of law applied the Sentencing Guidelines or was

13   clearly erroneous in any of it's findings of fact, and,

14   therefore, the Sentencing Guideline calculation were either

15   to go up because the Court did not find the amount the

16   government requested, or to go down because the defense has

17   shown that the Court applied a calculation improperly,

18   increased the offense level improperly, the Court

19   alternatively varies upwardly or downwardly as from the

20   Sentencing Guideline range determined by the Fourth Circuit,

21   and reaches a sentence of 324 months as the total sentence,

22   with the sentence as previously set as to each count, and

23   all the other terms of the alternative sentence are the same

24   as the primary sentence.

25        So the Court has sentenced both within the

1  Guidelines and outside the Guidelines by variance if the

2  Fourth Circuit were to determine the Court miscalculated the

3  Guidelines.

4         Mr. Cloud, please stand again.

5         Sir, you may appeal your conviction if you believe

6  that the verdict was somehow unlawful, if you believe there

7  was some defect in your trial.

8         You also have a right to appeal your sentence,

9  particularly if you think the sentence is contrary to law.

10 Now, any notice of appeal must be filed within ten days from

11 the date of written judgment in this case.  This court

12 usually hands down written judgment one to two weeks after

13 this sentencing hearing.  I do want to say, because we're

14 coming up on the holiday season, the written judgment in

15 your case might not be handed down within two to two weeks,

16 it might be hand down in January.  Nonetheless, whenever the

17 written judgment is handed down, you have ten days.

18        Now if you were unable to pay the cost of an

19 appeal, you may apply for leave to appeal at no cost to you.

20 If you so request, the clerk of court will prepare and file

21 a notice of appeal on your behalf.  The Court recommends

22 that you talk in detail with Mr. Tate about these appeal

23 rights and procedures.

24        And do you understand these appeal rights and

25 procedures as the Court has stated them to you today?

CECALA - CROSS

1          DEFENDANT CLOUD:  Yes, sir, I understand them, and

2    we do appeal.

3          THE COURT:  All right.  Thank you.

4          All right.  Is there anything else from counsel?

5          Mr. Tate, there any reason to maintain your

6    witnesses here in the Mecklenburg County?

7          MR. TATE:  No, Your Honor.

8          THE COURT:  They can be -- the writs can be

9    released?

10         MR. TATE:  Yes.

11         THE COURT:  The Court orders that those writs be

12   released, and the U. S. Marshal Service return the defendant

13   to the custody -- not the defendants, the witnesses.

14         Mr. Tate, I should have asked:  Would your client

15   like a recommendation designation?

16         MR. TATE:  Yes.  We'd asked for the Butner Medical

17   Facility if he qualifies with the sentence he got.  But if

18   he qualifies, for that facility.

19         THE COURT:  Certainly.  The Court will recommend

20   to the U. S. Bureau of Prisons that the defendant be

21   designated to the medical facility Butner if he qualifies,

22   and if he doesn't qualify, to Butner anyway or to another

23   medical facility.  To Butner.

24         MR. TATE:  Yes.  Thank you.

25         THE COURT:  Anything else from the United States?

CECALA - CROSS

1          MR. MEYERS:  No, Your Honor.

2          THE COURT:  All right.  Then the sentence as

3    stated, as well as the alternative sentence, is hereby

4    imposed and this case is concluded.

5          I thank all counsel and all court personnel for

6    staying so late, but I do believe that the appropriate thing

7    to do today was to finish this case so that all the parties

8    are here and the experts are here and their witnesses that

9    were brought here from the BOP.  So thank you very much, and

10   we're now in recess.

11         (Court adjourned 9:20 p.m.)

12                    - - - - -

13

14   **UNITED STATES DISTRICT COURT**
     **WESTERN DISTRICT OF NORTH CAROLINA**

15

16

17                    **CERTIFICATE OF REPORTER**

18         I, JOY KELLY, RPR, CRR, certify that the foregoing
     is a correct transcript from the record of proceedings in
19   the above-entitled matter.

20

21

22   S/JOY KELLY

23   **JOY KELLY, RPR, CRR**                    **Date** _____
     **U.S. Official Court Reporter**
24   **Charlotte, North Carolina**

25